**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **No. 11-cv-9202 (PAC)** |
| | : | |
| **-v.-** | : | **ECF Case** |
| | : | |
| **DANIEL H. MUDD, ENRICO DALLAVECCHIA, and THOMAS A. LUND,** | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| **Defendants.** | : | |

---

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANTS DANIEL H. MUDD, ENRICO DALLAVECCHIA, AND THOMAS A. LUND TO DISMISS PLAINTIFF'S COMPLAINT

James D. Wareham
james.wareham@dlapiper.com
James E. Anklam
james.anklam@dlapiper.com
DLA PIPER LLP
500 Eighth Street, NW
Washington, DC  20004-2131
Telephone:  (202) 799-4000

John M. Hillebrecht
john.hillebrecht@dlapiper.com
DLA PIPER LLP
1251 Avenue of the Americas
New York, NY  10020-1104
Telephone:  (212) 335-4590

*Counsel for Daniel Mudd*

Michael N. Levy
michael.levy@bingham.com
Amy K. Carpenter-Holmes
amy.carpenter-holmes@bingham.com
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC  20006-1806
Telephone:  (202) 373-6000

*Counsel for Thomas Lund*

Andrew J. Levander
andrew.levander@dechert.com
Hector Gonzalez
hector.gonzalez@dechert.com
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone:  (212) 698-3500

Kelly B. Kramer
kkramer@mayerbrown.com
MAYER BROWN LLP
1999 K Street, NW
Washington, DC  20006-1101
Telephone:  (202) 263-3000

*Counsel for Enrico Dallavecchia*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND ................................................................................ 3

ARGUMENT ..................................................................................................... 11

I.    THE COURT MUST DISMISS THE FIRST, THIRD, FOURTH, AND FIFTH CLAIMS FOR RELIEF BECAUSE SECTION 3(c) OF THE EXCHANGE ACT EXEMPTS OFFICERS AND EMPLOYEES OF FNMA FROM THE PROVISIONS OF THE EXCHANGE ACT ................................................. 11

    A.    The Ordinary Meaning Of Section 3(c) Exempts Officers And Employees Of FNMA From The Provisions Of The Exchange Act Alleged In The Complaint ................................................................................................ 11

        1.    FNMA Is An "Independent Establishment Of The United States" Within The Ordinary Meaning Of The Statutory Text ............................ 11

        2.    Sections 10, 13, And 20 Of The Exchange Act Do Not Specifically Refer To FNMA And Therefore Do Not Apply To The Defendants ...... 13

    B.    The History, Structure, And Purposes Of The Exchange Act Confirm That Congress Intended That Entities Such As FNMA And Its Officers And Employees Not Be Subject To The Provisions Of The Exchange Act ................ 14

        1.    The Legislative History Of The Exchange Act Establishes That Congress Intended The Section 3(c) Exemption To Cover Instrumentalities Of The United States .................................................... 15

        2.    FNMA Is An Instrumentality Of The United States ............................... 16

    C.    Sound Policy Reasons Support Adherence To The Exemption's Text And Purpose ....................................................................................................... 18

II.    ALL CLAIMS FOR RELIEF MUST BE DISMISSED FOR FAILURE TO ALLEGE AN ACTIONABLE MISREPRESENTATION ............................................. 20

    A.    The SEC Has Failed To Allege An Actionable Omission By Defendants ......... 21

    B.    The SEC Has Failed To Allege An Actionable Misstatement By Defendants ............................................................................................... 22

        1.    FNMA Expressly Disclosed How It Classified Subprime Loans And Accurately Used Its Classification Criteria To Calculate Its Subprime Holdings For Its Periodic Public Filings ................................. 22

        2.    FNMA Expressly Disclosed How It Classified Alt-A Loans And Accurately Used Its Classification Criteria To Calculate Its Alt-A Holdings For Its Periodic Public Filings ............................................... 25

**TABLE OF CONTENTS**
(continued)

Page

3.     Even After It Was Placed Into Conservatorship, And Even To This Day, FNMA Has Not Altered The Types Of Loans It Classifies As Subprime Or Alt-A ................................................................... 27

C.     FNMA Disclosed All Required Material Information Concerning The Credit Risk Of Its Single-Family Business ......................................... 28

1.     FNMA's Comprehensive And Detailed Disclosures Contained All Material Information About The Objective Credit Risks In Its Single-Family Portfolio ............................................................ 29

2.     FNMA's Disclosures Were Not Materially Misleading As A Matter Of Law In Light Of FNMA's Evolving And Comprehensive Disclosures About Its Credit Risks............................... 30

3.     The Market's Indifferent Reactions To FNMA's Disclosures Of Its Classification Criteria For Subprime And Alt-A Confirm That The Alleged Misstatements Were Immaterial................................... 32

D.     Mr. Mudd's Public Statements Were Not Misleading Misstatements................ 34

III.     THE FIRST AND THIRD CLAIMS FOR RELIEF MUST BE DISMISSED FOR FAILURE ADEQUATELY TO ALLEGE SCIENTER................................................... 36

A.     The Defendants' Stock Transactions During The Relevant Period Refute Any Suggestion Of Scienter............................................................ 38

B.     Allegations Dependent Upon The Defendants' Corporate Positions Are Insufficient To Establish Scienter ...................................................... 39

C.     FNMA's Elaborate Disclosure Process Negates Scienter ................................... 39

D.     FNMA's Public Discussions About Its Loan Programs In Its Filings And Elsewhere Negate Any Inference Of Scienter ...................................... 40

E.     FNMA's Post-Conservatorship Subprime And Alt-A Disclosures, Which FNMA's Regulator Repeatedly Approved, Negate Scienter............................... 41

IV.     THE SECOND CLAIM FOR RELIEF MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UNDER SECTION 17(a)(2) OF THE SECURITIES ACT ................................................................................ 42

V.     THE THIRD AND FIFTH CLAIMS FOR RELIEF MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR AIDING AND ABETTING LIABILITY UNDER SECTION 20(e) OF THE EXCHANGE ACT ................................................ 43

A.     The Complaint Fails To Allege Mr. Dallavecchia's Or Mr. Lund's Actual Knowledge Of Any Securities Law Violation ................................... 44

B.     The Complaint Fails To Allege That Mr. Dallavecchia Or Mr. Lund Substantially Assisted Any Primary Violation ...................................... 46

## TABLE OF CONTENTS
### (continued)

Page

1. The Complaint's Allegations Regarding Mr. Dallavecchia's And Mr. Lund's "Awareness" And "Approval" Fail As A Matter of Law ............................................................................................. 47

2. The Complaint's Allegations Regarding Mr. Dallavecchia's And Mr. Lund's Sub-Certifications Fail As A Matter of Law ........................ 48

3. The Complaint Fails To Allege That Mr. Dallavecchia's Public Statements Substantially Assisted Any Primary Violation..................... 48

CONCLUSION................................................................................................. 49

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ................................................................................20, 36

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983)...................................................................................47

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)........................................................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................20

*Caiola v. Citibank, N.A., New York*,
   295 F.3d 312 (2d Cir. 2002)................................................................................21

*Capri Optics Profit Sharing v. Digital Equip. Corp.*,
   760 F. Supp. 227 (D. Mass. 1991) ......................................................................21

*Chahine v. First Magnus Fin. Corp.*,
   No. 10-13456, 2010 U.S. Dist. LEXIS 120098 (E.D. Mich. Nov. 12, 2010)..........18

*Colonial Bank & Trust Co. v. Am. Bankshares Corp.*,
   439 F. Supp. 797 (E.D. Wis. 1977)....................................................................13

*Dep't of Employment v. United States*,
   385 U.S. 355 (1966)............................................................................................16

*Diamond v. Chakrabarty*,
   447 U.S. 303 (1980)............................................................................................14

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
   822 F.2d 1242 (2d Cir. 1987)..............................................................................20

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
   314 U.S. 95 (1941)..............................................................................................16

*Federal National Mortgage Association v. Lefkowitz*,
   390 F. Supp. 1364 (S.D.N.Y. 1975)....................................................................18

*Ferber v. Travelers Corp.*,
   785 F. Supp. 1101 (D. Conn. 1991) ....................................................................43

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ................................................................................................16

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) .....................................................................................28

*Garcia v. U.S.*,
    469 U.S. 70 (1984) ...................................................................................................15

*Glazer v. Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992) .....................................................................................21

*Halperin v. eBanker-USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) ...............................................................................32, 35

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*,
    530 U.S. 1 (2000) .....................................................................................................14

*Hinton v. Fed. Nat'l Mortgage Ass'n*,
    945 F. Supp. 1052 (S.D. Tex. 1996) .........................................................................18

*Howe v. Bank for Int'l Settlements*,
    194 F. Supp. 2d 6 (D. Mass. 2002) ...........................................................................13

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) .......................................................................38

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3rd Cir. 1997) ..................................................................................33

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) .......................................................................38

*In re Fannie Mae 2008 Sec. Litig.*,
    No. 08 Civ. 7831, 2009 U.S. Dist. LEXIS 109886 (S.D.N.Y. Nov. 24, 2009) ................16, 18

*In re Hardinge, Inc. Sec. Litig.*,
    696 F. Supp. 2d 309 (W.D.N.Y. 2010) ......................................................................30

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    No. 09 MD 2030, 2012 WL 523553 (S.D.N.Y. Feb. 15, 2012) ...............................41

*In re Sec. Capital Assurance, Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010) .......................................................................39

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ........................................................................21

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)..............................................23, 46

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..........................................36, 37, 38

*Key Tronic Corp. v. United States*,
    511 U.S. 809 (1994)........................................................................13

*Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.*,
    903 F. Supp. 479 (S.D.N.Y. 1995)..................................................17, 18

*Kuriakose v. Fed. Home Loan Mortgage Corp.*,
    2011 U.S. Dist. LEXIS 34285 (S.D.N.Y. Mar. 30, 2011) ...........................23, 26, 34

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995)........................................................................15

*Nolte v. Capital One Fin. Corp.*,
    390 F.3d 311 (4th Cir. 2004) ......................................................23

*OKC Corp. v. Williams*,
    461 F. Supp. 540 (N.D. Tex. 1978) ..............................................13

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)........................................................................24

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)........................................................................33

*Phillips v. LCI Int'l., Inc.*,
    190 F.3d 609 (4th Cir. 1999) ......................................................30

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)..............................................38, 39

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002)........................................................................22

*Ressler v. Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1999) ..............................................38

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................................................20

*Ruotolo v. City of New York*,
514 F.3d 184 (2d Cir. 2008)....................................................20

*Rust v. Johnson*,
597 F.2d 174 (9th Cir. 1979) ...................................................18

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
--- U.S. ---, 131 S. Ct. 1885 (2011)...........................................11

*SEC v. Aragon Capital Advisors, LLC*,
No. 07 Civ. 919, 2011 WL 3278907 (S.D.N.Y. July 26, 2011) ....................46

*SEC v. Black*,
No. 04-c-7377, 2008 WL 4394891 (N.D. Ill. Sept. 24, 2008)...................36

*SEC v. Brown*,
740 F. Supp. 2d 148 (D.D.C. 2010) .........................................43

*SEC v. Daifotis*,
No. C 11-00137, 2011 WL 2183314 (N.D. Cal. June 6, 2011) ...............42, 44

*SEC v. DiBella*,
587 F.3d 553 (2d Cir. 2009)................................................43-44

*SEC v. Dorozhko*,
574 F.3d 42 (2d Cir. 2009).................................................12

*SEC v. Espuelas*,
579 F. Supp. 2d 461 (S.D.N.Y. 2008)................................ 36, 44, 46-47

*SEC v. Forman*,
No. 07-11151, 2010 WL 2367372 (D. Mass., June 9, 2010)....................43

*SEC v. Fraser*,
No. CV-09-00443, 2009 WL 2450508 (D. Ariz. Aug. 11, 2009)................48

*SEC v. Glantz*,
No. 94 Civ. 5737, 1995 WL 562180 (S.D.N.Y. Sept. 20, 1995) .............42

*SEC v. Kelly*,
765 F. Supp. 2d 301 (S.D.N.Y. 2011).......................................42

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*SEC v. Monarch Funding Corp.*,
192 F.3d 295 (2d Cir. 1999)................................................................20, 42

*SEC v. Mozilo*,
No. 09-cv-3994, 2010 WL 3656068 (C.D. Calif. Sept. 16, 2010).........................36

*SEC v. Norton*,
21 F. Supp. 2d 361 (S.D.N.Y. 1998).......................................................42

*SEC v. Power*,
525 F. Supp. 2d 415 (S.D.N.Y. 2007).....................................................21

*SEC v. Stanard*,
No. 06 Civ. 7736, 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009).........................20

*SEC v. Treadway*,
430 F. Supp. 2d 293 (S.D.N.Y. 2006)..................................................37, 47

*SEC v. U.S. Environmental, Inc.*,
82 F. Supp. 2d 237 (S.D.N.Y. 2000).....................................................20

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)..............................................................37

*Staehr v. Mack*,
No. 07 Civ. 10368, 2011 WL 1330856 (S.D.N.Y. Mar. 31, 2011) ...................22

*T I Fed. Credit Union v. DelBonis*,
72 F.3d 921 (1st Cir. 1995)..............................................................16

*Xiao Ji Chen v. U.S. Dep't of Justice*,
471 F.3d 315 (2d Cir. 2006)..............................................................15

### STATUTES

12 U.S.C. § 1716................................................................12, 17

12 U.S.C. § 1716(3)..............................................................3

12 U.S.C. § 1716(4)..............................................................3

12 U.S.C. § 1717(a)(2)(B) ....................................................11, 13

12 U.S.C. § 1719................................................................13

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

12 U.S.C. § 1719(b) ...................................................................................................17

12 U.S.C. § 1719(c) .............................................................................................. 17-18

12 U.S.C. § 1719(d) ...................................................................................................17

12 U.S.C. § 1719(e) ...................................................................................................17

12 U.S.C. § 1723a ......................................................................................................17

12 U.S.C. § 1723a(d)(2) .............................................................................................37

12 U.S.C. § 1723a(g) ............................................................................................ 17-18

12 U.S.C. § 1723(c)(2) ...............................................................................................17

15 U.S.C. § 77c(a)(2) .................................................................................................14

15 U.S.C. § 77q(a)(2) ............................................................................................42, 43

15 U.S.C. § 77q(c) .....................................................................................................14

15 U.S.C. § 77t(d) ......................................................................................................44

15 U.S.C. § 77t(e) ......................................................................................................44

15 U.S.C. § 78c(c) ............................................................................................. 11, 13-14

15 U.S.C. § 78j(b) ......................................................................................................14

15 U.S.C. § 78m(a) ....................................................................................................14

15 U.S.C. § 78oo(a) ...................................................................................................14

15 U.S.C. § 78t(e) .................................................................................................14, 44

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124
    Stat. 1376 ...........................................................................................................44

Housing and Community Development Act of 1992, Pub. L. No. 102-550, Title XIII,
    106 Stat. 3672 ................................................................................................18, 19

Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, § 1162, 122 Stat.
    2654.....................................................................................................................13

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title IX, § 902, 82
Stat. 476 ................................................................................................................13

## PRELIMINARY STATEMENT

The SEC alleges that the Federal National Mortgage Association ("FNMA")
misrepresented its exposure to subprime and Alt-A loans. But FNMA explicitly defined those
ambiguous terms and then accurately disclosed the amounts of subprime and Alt-A loans
meeting those definitions in its portfolio. Thus, on their face, FNMA's disclosures were
complete and accurate. And lest there be any confusion, FNMA also provided investors with
reams of objective data about its entire portfolio, including borrowers' FICO credit scores, loan-
to-value ("LTV") ratios, loan ages, and geographic concentrations. In short, there is no
misrepresentation or deception in this case. Indeed, notwithstanding changes in management,
enhanced government oversight, and the filing of this Complaint, FNMA's public filings
continue to define and classify subprime and Alt-A loans in the same way that the SEC somehow
contends was improper. Moreover, the Complaint is entirely devoid of any claims of suspicious
stock sales or any other allegation coming anywhere close to motive, opportunity, or intent on
the part of any of these three Defendants selected for blame by the SEC.

Specifically, the SEC alleges that FNMA misrepresented its exposure to subprime loans
because it failed to include loans containing an Expanded Approval ("EA") pricing feature in its
calculation of subprime volumes. FNMA explicitly stated in its disclosures that it classified
loans as subprime if they were originated by subprime specialty lenders "using processes unique
to subprime loans." No matter what the SEC may allege about the risks, expected performance,
or credit characteristics of EA loans, the Complaint fails to state a claim for the simple reason
that the SEC does not allege and cannot allege that EA loans were originated "using processes
unique to subprime loans." Because EA loans did not meet FNMA's definition of subprime
loans, the failure to include EA loans in FNMA's calculation of subprime volumes cannot
constitute an actionable misrepresentation as a matter of law.

The SEC's claim that FNMA should have included lender-selected process efficiency loans in its calculation of Alt-A loans fares no better.  FNMA's public filings clearly stated that it classified loans as Alt-A if "the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features."  On its face, this is a disclosure of the loans that originators deliver to FNMA as "Alt-A," not a disclosure of all "reduced documentation" loans.  The Complaint fails to state a claim because the SEC does not and cannot allege that originators designated lender-selected process efficiency loans as Alt-A loans when delivering these loans to FNMA.  Because these loans did not meet FNMA's definition of Alt-A loans, the failure to include them in FNMA's calculation of Alt-A volumes cannot constitute an actionable misrepresentation.

For these reasons alone, the motion to dismiss should be granted.  There are, however, a number of other fatal flaws in the Complaint:

- In addition to failing to allege any affirmative misstatement by FNMA or the Defendants, the Complaint fails to allege an actionable omission.  FNMA was under no duty to use any particular definition of subprime or Alt-A, or to include EA or lender-selected process efficiency loans in the definitions it used.

- Even if the SEC somehow could plausibly allege that there was a misrepresentation or omission, the Complaint fails to allege the required materiality.  FNMA's use of the terms subprime and Alt-A did not in any way detract from the wealth of objective, immutable, replicable, and comparable data it disclosed to investors about every single loan in its single-family book of business.  FNMA clearly informed investors that these metrics are the best method of assessing the risks presented by its credit book of business.

- With respect to the section 10(b) claims, the Complaint fails to adequately plead scienter.  The fact that FNMA's classifications of subprime and Alt-A remain the same to this day is a compelling indicator that the Defendants acted reasonably, and the Complaint fails to plead any other facts sufficient to support the required strong inference of fraudulent intent.

- Moreover, the Exchange Act claims fail because section 3(c) of that Act expressly exempts from its provisions the officers and employees of an "independent establishment of the United States."  FNMA and the Defendants clearly fall within the scope of this exemption.

The Complaint fails to present even remotely plausible allegations that the Defendants intended, had motivation, or committed any actions to mischaracterize FNMA's portfolio. Rather, the SEC now creates its own unique *post hoc* definitions and asserts that FNMA failed to match these definitions back in 2007; and it does so despite the fact that, under full government control and new management, FNMA continues to report loans exactly as it did during the period of the Complaint.  For these and the other reasons detailed below, the Complaint fails to state any plausible claim for relief against the Defendants.

## FACTUAL BACKGROUND

*FNMA and its Mission.*  FNMA is a Government-Sponsored Enterprise, chartered by Congress to facilitate a stable secondary market for residential mortgages and to provide greater access to mortgage financing.  One way FNMA achieves these congressionally-mandated goals is by acquiring mortgages from loan originators as part of FNMA's single-family credit guaranty business.[1]  Throughout the Relevant Period, Compl. ¶ 2, investors were well aware of FNMA's status as a monoline Government-Sponsored Enterprise whose operations were limited to a single market -- the secondary residential mortgage market in the United States.[2]

Congress required FNMA to support lending to low- and moderate-income families and in underserved geographic areas.  FNMA Charter Act §§ 301(3)-(4); 12 U.S.C. § 1716(3)-(4). Between 2005 and 2008, the United States Department of Housing and Urban Development ("HUD") mandated that more than half of all loans that FNMA purchased be secured by homes owned by low- and moderate-income families.[3]  FNMA annually released public reports of its

---

[1] *See, e.g.,* FNMA, 2005 Annual Report (Form 10-K), at 5 (May 2, 2007) ("2005 10-K").
[2] *See, e.g.,* FNMA, 2006 Annual Report (Form 10-K), at 1-2 (Aug. 16, 2007) ("2006 10-K").
[3] In 2005, HUD required that 52% of all loans or mortgage-backed securities purchased by FNMA be secured by homes owned by low- and moderate-income families.  *See* 2005 10-K, at 24-25.  This percentage grew each year until reaching 56% in 2008.  *See* FNMA, 2008 Annual Report (Form 10-K), at 36 (Feb. 26, 2009) ("2008 10-K").

performance with respect to these and other housing goals.[4]  To meet these housing goal requirements, FNMA was forced to relax some of its underwriting criteria.  FNMA plainly disclosed this practice -- and its risks -- in each of its 10-K filings:

> We have also relaxed some of our underwriting criteria to obtain goals-qualifying mortgage loans and increased our investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals, which could increase our credit losses.

FNMA, 2004 Annual Report (Form 10-K), at 28 (Dec. 6, 2006) ("2004 10-K"); *see also* 2005 10-K at 25, 45, 123; 2006 10-K, at 27, 65, 75; FNMA, 2007 Annual Report (Form 10-K), at 30 (Feb. 27, 2008) ("2007 10-K").

*FNMA's Disclosure Process.*  As part of a $6.3 billion restatement that invested $1.6 billion to establish "new strategies, roles, responsibilities, governance, and culture," FNMA enhanced its disclosure procedures.[5]  FNMA adopted a robust and transparent approval process that included a Disclosure Committee responsible for vetting all of FNMA's public filings. FNMA hired an esteemed member of the bar, who also served as its General Counsel, to head the Disclosure Committee.  As her deputy, she chose a securities lawyer with particularized expertise in SEC disclosures.  FNMA's public disclosures were reviewed by a large number of FNMA executives before they were presented to the CEO, the CFO, and the Board.  Throughout the Relevant Period, FNMA's regulator also reviewed its disclosures.[6]

Notably, the SEC does not and cannot allege that FNMA or any of the Defendants deviated from Disclosure Committee procedures.  The SEC also does not and cannot allege that any of the Defendants attempted to hinder the review of any proposed disclosures.

---

[4] *See, e.g.,* FNMA, 2005 Annual Housing Activities Report, at 3, *available at* http://www.fhfa.gov/webfiles/375/HMG_MAE_-_2005_AHAR.pdf.
[5] *See,e.g.,* 2004 10-K, at 198-99 (describing enhancements); 2006 10-K, at 159-60.
[6] Prior to July 30, 2008, FNMA's regulator was the Office of Federal Housing Enterprise Oversight ("OFHEO"); after that date, FNMA was regulated by the Federal Housing Finance Agency ("FHFA").

*FNMA's Credit Risk Disclosures.*  As early as 2003, FNMA published extensive tables in every annual Form 10-K reflecting nine separate credit risk characteristics for *every single loan* in the single-family business:  original LTV ratio, current LTV ratio, product type, property type, occupancy type, FICO credit score, loan purpose, geographic concentration, and origination year.  These tables clearly and objectively disclosed the percentage of loan balances that fell into each different credit risk category.  *See, e.g.,* 2004 10-K, at 140-42 (set forth in Appendix A to the Declaration of Michael N. Levy) ("Decl. Appendix A").  As the housing market and economy as a whole deteriorated, FNMA provided even more information, including additional weighted-average data for FICO scores.

FNMA also disclosed, immediately following these tables, the "key elements" of these credit characteristics, giving investors a comprehensive view of how the credit characteristics disclosed in the tables reflected risk.  *See, e.g., id.* at 144-45 (also included in Decl. Appendix A).  Beginning in August 2007, FNMA publicly filed quarterly credit supplements containing even more detailed information about the credit characteristics of its business.[7]

The credit characteristics reported by FNMA were objective, immutable, replicable, and comparable, which allowed investors to weigh for themselves the factors that they considered most important when assessing risk in an increasingly turbulent market.[8]  FNMA did not -- and still does not -- report separately on each of the myriad of loan programs (including affordable housing programs) or brand names represented on its books.  Even though it entered

---

[7] FNMA, Discussion of Credit Book of Business (Aug. 16, 2007) ("August 2007 Credit Supplement"); FNMA, 2007 Q1-Q3 10-Q Investor Summary, Credit Supplement (Nov. 9, 2007); FNMA, 2007 10-K Investor Summary (Feb. 27, 2008); FNMA, 2008 Q1 10-Q Investor Summary (May 6, 2008); FNMA, 2008 Q2 10-Q Investor Summary (Aug. 8, 2008); FNMA, 2008 Q3 10-Q Credit Supplement (Nov. 10, 2008).  These documents were included as part of 8-K filings.

[8] Unlike the qualifications for EA pricing, which changed frequently, an LTV ratio or FICO score does not change meaning over time and allows investors to compare FNMA's holdings objectively with those of other financial institutions.

conservatorship more than three years ago, FNMA continues to disclose the credit risks of the single-family business in the same way it did during the Relevant Period.  *Compare* 2007 10-K, at 125-28 *with* FNMA, Annual Report (Form 10-K), at 153-57 (Feb. 29, 2012) ("2011 10-K").

*FNMA's EA Feature.*  More than a decade ago, well before the Relevant Period began, FNMA incorporated the EA loan feature into Desktop Underwriter ("DU"), the automated underwriting system for FNMA's prime conventional book, as a means to help deserving borrowers with imperfect credit obtain conventional, prime mortgage loans at a comparatively lower cost.[9]  The EA feature granted certain credit-challenged borrowers mortgage rates that were below the rates offered by specialty subprime originators but somewhat higher than the rates typically offered to borrowers with excellent credit.  FNMA Lender Letter, at 2.  Loans with the EA pricing feature had all of the standard structural benefits of conventional, prime loans, *e.g.*, no prepayment penalties.  EA was simply a pricing mechanism applied to loans that were originated in exactly the same manner as other conventional, prime mortgage loans.  The characteristics that determined the risk of EA loans, such as FICO scores and LTV ratios, were exactly the characteristics that determined the risk of all other conventional, prime mortgage loans in FNMA's single family book.  Loans with the EA pricing feature tended to have lower FICO scores and higher LTV ratios (as necessary to fulfill the affordable housing goals objectives of the EA feature), and FNMA disclosed these credit characteristics for all of its loans -- including every EA loan -- in detailed tables in each of its periodic filings.

*FNMA's Lender-Selected Process Efficiency Loans.*  FNMA purchased two main types of reduced documentation loans during the Relevant Period.  The first were borrower-selected

---

[9] *See* FNMA Lender Letter, LL03-00: Eligibility of Mortgages to Borrowers with Blemished Credit Records (April 11, 2000), at 2-3, ("FNMA Lender Letter), *available at* http://www.scribd.com/doc/16562208/FNMALender-Letter-LL0300041100.

reduced documentation loans, issued to borrowers who affirmatively elected to pay a higher rate to avoid documenting their income or assets.  The second type of reduced documentation loans were lender-selected process efficiency loans, issued to borrowers who were ready, willing, and able to provide income and asset documentation, but from whom the originating lender (for reasons of processing efficiency) sought less documentation.  Borrowers who obtained lender-selected process efficiency loans often were not aware of this feature, and they paid no higher rate than for a fully documented loan.  FNMA management reasonably believed, and FNMA data confirmed, that borrowers who simply accepted an unsolicited documentation efficiency feature from their lender presented no additional material risk of credit losses.

*FNMA's Subprime and Alt-A Disclosures*.  In addition to disclosing in its periodic filings myriad credit characteristics of every loan it purchased, FNMA management made additional disclosures regarding subprime and Alt-A loans.  FNMA management believed that the unique processes by which subprime loans were originated resulted in additional material risk beyond that which could be measured by the credit characteristics disclosed in the detailed tables.  Similarly, FNMA management believed that Alt-A loans bore additional material risk of credit losses because these borrowers affirmatively sought, and paid a premium for, the right to provide less documentation.  For these reasons, in addition to the tables depicting the credit characteristics of all of its loans, FNMA began in 2007 to disclose separately the percentages in its portfolio of those loans it classified as subprime and Alt-A.

Specifically, FNMA disclosed that "[s]ubprime mortgage loans are often originated by lenders specializing in this type of business, *using processes unique to subprime loans*.  In reporting our subprime exposure, we classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders."  2005 10-K, at 36 (emphasis added).  Beginning

in November 2007, FNMA amended this definition to include loans originated by "subprime divisions of large lenders" using the same processes unique to subprime loans. FNMA, Quarterly Report (Form 10-Q), at 51 (Nov. 9, 2007) ("2007 Q3 10-Q"). FNMA's subprime disclosures accurately reflected management's reasonable belief that the unique origination path of these loans independently increased their risk.

In support of the premise that EA loans should have been disclosed as "subprime" notwithstanding the fact that they were originated using a conventional, prime origination process rather than "processes unique to subprime loans," the Complaint repeatedly refers to the kinds of *borrowers* who received loans with the EA pricing feature and the relative performance of those loans. FNMA's disclosed subprime definition, however, had nothing to do with the credit history of borrowers or with the performance of loans. FNMA was clear: loans were considered to be subprime if they were originated by subprime-specialty lenders using processes unique to subprime loans. It was common knowledge in the mortgage industry that there was no uniform definition for subprime loans. FNMA's approach, however, was reasonable and consistent with one of the common usages of the term in the market.[10]

FNMA did not include EA loans in its calculation of subprime holdings because those loans were not originated "using processes unique to subprime loans."[11] The Complaint does not and cannot allege otherwise. Nor does or can the SEC allege that any of the Defendants believed

---

[10] *See, e.g.*, S. Chomsisengphet & A. Pennington-Cross, *The Evolution of the Subprime Mortgage Market*, Federal Reserve Bank of St. Louis Review 31-56 (Jan/Feb 2006) (describing multiple differences between loans made by subprime lenders and loans made by other lenders); Center for Responsible Lending, *Steered Wrong: Brokers, Borrowers, and Subprime Loans* 3, 6, 32-33 (Apr. 8, 2008) (describing how subprime lender practices differ from practices in the prime sector).

[11] Similarly, the My Community Mortgage ("MCM") loans cited in the Complaint were not originated using processes unique to subprime lending and therefore were not disclosed as subprime. The Complaint conflates EA and MCM where convenient in an effort to inflate the numerical impact of the allegation that loans with the EA pricing feature should have been disclosed as subprime, but the Complaint does not articulate even a token argument as to why FNMA's subprime exposure would be materially misstated without including MCM.

that FNMA's subprime definition was incorrect or that any of the Defendants considered loans with the EA pricing feature in fact to be subprime.[12]   Notably, FNMA still does not consider EA loans to be subprime, and it still does not include these loans in the computation of its subprime holdings.  The most recent 10-K filed by FNMA on February 29, 2012, after the SEC filed its Complaint in this action, states:

> Subprime mortgage loans were typically originated by lenders specializing in this type of business or by subprime divisions of large lenders, using processes unique to subprime loans.  In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans were originated by one of these specialty lenders or a subprime division of a large lender.  We exclude loans originated by these lenders if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. We have loans with some features that are similar to subprime mortgage loans that we have not classified as subprime because they do not meet our classification criteria.

2011 10-K, at 196.  This disclosure was drafted by FNMA's new management team and issued with FHFA's approval following FNMA's resolution of a three-year-long SEC investigation. Yet it remains entirely consistent with the way FNMA classified subprime loans throughout the Relevant Period.  FNMA *still* counts loans as subprime only if they were originated by specialty subprime lenders employing processes unique to subprime lending.  Some loans, like loans with the EA pricing feature, have "some features that are similar to subprime mortgage loans," but FNMA still does not classify them as subprime because they "do not meet [FNMA's] classification criteria."  *Id.*  This was true during the Relevant Period, and it is true today.

Likewise, during the Relevant Period, FNMA disclosed that it "classified mortgage loans as Alt-A if the lenders that deliver[ed] the mortgage loans to [FNMA] have classified the loans as Alt-A based on documentation or other product features."  FNMA, Notification of Late Filing

---

[12] The Complaint also fails to allege that the Defendants believed MCM loans met FNMA's disclosed definition of subprime.

(Form 12b-25), at 8 (May 9, 2007).  FNMA did not include all reduced documentation loans in its calculation of Alt-A holdings because not all reduced documentation loans were marked as Alt-A by the lenders when they sold these loans to FNMA.  Indeed, only those loans issued to borrowers who affirmatively sought the reduced documentation feature and who paid a premium for it were marked as Alt-A at delivery.  It was these Alt-A loans that, in FNMA's view, had additional material risk above and beyond the multiple credit risk characteristics that FNMA already disclosed for every loan.

Again, the Complaint does not and cannot allege that any of the Defendants believed that FNMA's Alt-A definition was incorrect.  Nor does the Complaint allege that any of the Defendants considered lender-selected process efficiency loans to be Alt-A, or that lenders in the market considered lender-selected process efficiency loans to be Alt-A or marked them as such when delivering these loans to FNMA.  Moreover, just as with the disclosed classification of subprime loans, to this day FNMA *still* does not consider lender-selected process efficiency loans to be Alt-A and *still* does not include lender-selected process efficiency loans in the computation of its Alt-A holdings.  The 2011 10-K filed by FNMA on February 29, 2012, states:

> In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that delivered the mortgage loans to us classified the loans as Alt-A based on documentation or other product features.  We have loans with some features that are similar to Alt-A mortgage loans that we have not classified as Alt-A because they do not meet our classification criteria.

2011 10-K, at 194.  This approach is completely consistent with how FNMA classified Alt-A loans throughout the Relevant Period:  based not on documentation level alone but rather on how the lender coded the loan when it delivered the loan to FNMA.  Because originators do not designate lender-selected process efficiency loans as Alt-A at delivery, FNMA has never considered them to be Alt-A.  This was true during the Relevant Period, and it is true today.

**ARGUMENT**

**I.      THE COURT MUST DISMISS THE FIRST, THIRD, FOURTH, AND FIFTH CLAIMS FOR RELIEF BECAUSE SECTION 3(c) OF THE EXCHANGE ACT EXEMPTS OFFICERS AND EMPLOYEES OF FNMA FROM THE PROVISIONS OF THE EXCHANGE ACT**

The first, third, fourth, and fifth claims for relief (the "Exchange Act claims") accuse the Defendants of violating sections 10, 13, and 20 of the Exchange Act and certain SEC Exchange Act rules.  *See* Compl. pp. 53-56.[13]  Section 3(c) of the Exchange Act, however, expressly exempts from the Act's provisions any "independent establishment of the United States."  15 U.S.C. § 78c(c).[14]  As a Government-Sponsored Enterprise chartered by the federal government to help implement federal policies, but granted significant independence in its day-to-day operations, FNMA falls squarely within the text and purpose of the exemption set forth in section 3(c).  Because the exemption expressly applies equally to "any officer, agent, or employee of any such . . . establishment," *id.*, the Exchange Act claims against the Defendants must be dismissed.

**A.      The Ordinary Meaning Of Section 3(c) Exempts Officers And Employees Of FNMA From The Provisions Of The Exchange Act Alleged In The Complaint**

**1.      FNMA Is An "Independent Establishment Of The United States" Within The Ordinary Meaning Of The Statutory Text**

The term "independent establishment of the United States" in section 3(c) is neither defined nor referenced elsewhere in the Exchange Act.  *See* 15 U.S.C. §§ 78a-78pp.  When a statutory term is undefined, it must be given its "ordinary meaning" at the time it was enacted.  *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, --- U.S. ---, 131 S. Ct. 1885, 1891 (2011).

---

[13] The Complaint restarts paragraph numbering after ¶ 198 on page 53.  To avoid confusion, this Memorandum will cite to page numbers when discussing allegations after ¶ 198.

[14] Section 3(c) of the Exchange Act provides in full: "No provision of this chapter shall apply to, or be deemed to include, any executive department or independent establishment of the United States, or any lending agency which is wholly owned, directly or indirectly, by the United States, or any officer, agent, or employee of any such department, establishment, or agency, acting in the course of his official duty as such, unless such provision makes specific reference to such department, establishment, or agency."  15 U.S.C. § 78c(c).

The ordinary meaning of "establishment" is "[t]hat which is established," meaning that which is "[m]ade stable or firm; fixed or secured in some way." *Webster's New International Dictionary* 874 (2d ed. 1934).[15]  An "establishment" is "independent" if it is:  "[n]ot dependent, as . . . [n]ot subject to control by others; not subordinate; self-governing;" or "[n]ot dependent for support or supplies;" "self-directing." *Id.* at 1262; *see also Webster's Twentieth-Century Dictionary* 584, 858 (1934) (defining "establishment" as including "an institution, whether public or private," and defining "independent" as "self-directing"); *The Concise Oxford Dictionary of Current English* 387 (2d ed. 1931) (defining "establishment" as an "organized body of men maintained for a purpose . . . ; public institution").  Under its ordinary meaning, then, the section 3(c) exemption applies to the officers and employees of an entity that was established by the United States but is self-governing, self-directing, or self-financing.

As a Government-Sponsored Enterprise, the Federal National Mortgage Association falls squarely within the ordinary meaning of section 3(c).  First, FNMA is an establishment of the United States.  Congress established FNMA to pursue governmental purposes, including facilitating a stable secondary market for residential mortgages and providing greater access to mortgage financing for low- and moderate-income families, even if these activities involve an "economic return that may be less than the return earned on other activities." *See* 12 U.S.C. § 1716.  Moreover, Congress acted to ensure that FNMA, as an establishment of the United States, would continue to pursue these governmental objectives.  FNMA exists in perpetuity unless Congress, exercising a right it reserved for itself, affirmatively dissolves FNMA. *See* 12 U.S.C. § 1717(a)(2)(B).[16]

---

[15] Courts often consult the second edition of *Webster's International Dictionary*, published in 1934, to determine the meaning of undefined terms in the Exchange Act. *See SEC v. Dorozhko*, 574 F.3d 42, 50 (2d Cir. 2009).

[16] Congress also has dictated that, as an establishment of the United States, FNMA must maintain its principal office

(Footnote Continued on Next Page.)

Second, during the Relevant Period, FNMA was "independent."  It was self-governing, self-directing, and self-funding.  A majority of FNMA's Board of Directors was elected by FNMA's shareholders, *see, e.g.*, Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, § 1162, 122 Stat. 2654, 2781, and FNMA, as a Government-Sponsored Enterprise, did not rely upon appropriations from the government, *see, e.g.*, H.R. Rep. No. 90-1585 (1968), as *reprinted in* 1968 U.S.C.C.A.N. 2973, 2943-45; 12 U.S.C. § 1719.

"Perhaps because of the clarity of the statutory text, the case law interpreting [section 3(c)] is quite thin."  *Howe v. Bank for Int'l Settlements*, 194 F. Supp. 2d 6, 24 (D. Mass. 2002). The three courts that have applied the exemption in section 3(c), however, have had little trouble applying the plain meaning of the text.  *See Colonial Bank & Trust Co. v. Am. Bankshares Corp.*, 439 F. Supp. 797, 802 (E.D. Wis. 1977) (applying section 3(c) to the FDIC); *Howe*, 194 F. Supp. 2d at 24 (applying section 3(c) to Federal Reserve officials); *OKC Corp. v. Williams*, 461 F. Supp. 540, 549 (N.D. Tex. 1978) (applying section 3(c) to SEC officials).  Likewise, FNMA falls directly within the ordinary meaning of the express exemption in section 3(c).

2.   **Sections 10, 13, And 20 Of The Exchange Act Do Not Specifically Refer To FNMA And Therefore Do Not Apply To The Defendants**

Pursuant to section 3(c), provisions of the Exchange Act do not apply to independent establishments of the United States -- including FNMA -- or to their officers or employees

---

(Footnote Continued from Previous Page.)

in Washington, DC, or its metropolitan area.  12 U.S.C. § 1717(a)(2)(B).  Moreover, Congress affirmed FNMA's status as an establishment of the United States in the 1968 legislation that reorganized FNMA.  In that legislation, Congress created the National Corporation for Housing Partnerships ("NCHP") as a "private corporation for profit." Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title IX, § 902, 1968 U.S.C.C.A.N. (82 Stat. 476) 547, 637-38.  In contrast to FNMA, Congress expressly declared that NCHP "will *not* be an agency or establishment of the United States."  *Id.* (emphasis added).  The absence of similar language in the provisions related to FNMA's new structure confirms Congress's understanding that, unlike NCHP, FNMA *is* an "establishment of the United States."  *See Key Tronic Corp. v. United States*, 511 U.S. 809, 818-19 (1994) (holding that where Congress included language in one statutory provision, but not another, courts must give effect to Congress's "deliberate decision" to treat the subjects differently).

"unless such provision makes *specific reference* to such . . . establishment." 15 U.S.C. § 78c(c) (emphasis added).  None of the Exchange Act provisions relied upon by the SEC in its Complaint -- sections 10, 13, and 20 -- refer specifically to FNMA.  *See id.* at §§ 78j(b), 78m(a), 78t(e).  The fact that Congress has directly invoked FNMA by name elsewhere in the Exchange Act, *see id.* at § 78oo(a) (referring, in section 38 of the Exchange Act, to certain "securities of the Federal National Mortgage Association"), confirms that Congress knew how to "make specific reference" to FNMA when it wanted to do so.  The lack of any such reference in sections 10, 13, and 20 is decisive and requires the dismissal of the Exchange Act claims.

The broad scope of Congress's exemption of independent establishments such as FNMA in the Exchange Act is confirmed when contrasted with the comparatively limited scope of the statutory exemptions in the Securities Act.  Section 17(c) of the Securities Act states that the exemptions provided in section 3 of that Act, 15 U.S.C. § 77c(a)(2), which apply to instrumentalities of the United States, "shall not apply" to the section 17 anti-fraud provisions. *See id.* at § 77q(c) ("The exemptions provided in section 77c [of the Securities Act] shall not apply to the provisions of this section [17 of the Securities Act].").  No similar abrogation of the statutory exemption in Exchange Act section 3(c) appears in sections 10, 13, or 20 of the Exchange Act.

    **B.**    <u>The History, Structure, And Purposes Of The Exchange Act Confirm That Congress Intended That Entities Such As FNMA And Its Officers And Employees Not Be Subject To The Provisions Of The Exchange Act</u>

When a statute's ordinary meaning can be readily discerned, courts generally need not go any further.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000).  Even "[b]road general language is not necessarily ambiguous when congressional objectives require broad terms."  *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980). Nonetheless, other tools of statutory construction in addition to the text of section 3(c) confirm

that FNMA and its officers and employees are exempt from the provisions of the Exchange Act.

> **1.**    **The Legislative History Of The Exchange Act Establishes That Congress Intended The Section 3(c) Exemption To Cover Instrumentalities Of The United States**

The House and Senate Committee Reports accompanying the Exchange Act establish that Congress specifically intended to exempt instrumentalities of the United States and their officers and employees from the Act's provisions.  *See* H.R. Rep. 73-1383, at 17 (1934) (the Exchange Act "is not to apply to instrumentalities . . . of the United States, except where they are specifically included"); S. Rep. No. 73-792, at 14 (1934) ("the act shall not apply to instrumentalities . . . of the United States").  The Supreme Court has "repeatedly stated" that "the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represent the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation.'"  *Garcia v. U.S.*, 469 U.S. 70, 76 (1984) (quoting *Zuber v. Allen*, 396 U.S. 168, 186 (1969)); *see also Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 325 (2d Cir. 2006).

These explicit statements regarding the exemption's scope are reinforced by the broader purpose and history behind Congress's passage of the Exchange Act.  The statute was part of the federal government's New Deal response to the Great Depression.  Government instrumentalities were an integral part of this response.  *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 388 (1995) (describing "major group" of government corporations "directed to stabilizing the economy and to making distress loans" as part of response to Great Depression).  The House and Senate Reports' statements that section 3(c) precludes Exchange Act liability for instrumentalities of the United States, which operate at the behest of Congress to further public purposes, advanced the express design of Congress's response to the Great Depression.

### 2.   FNMA Is An Instrumentality Of The United States

Just as FNMA is an "independent establishment of the United States," so too is it an

instrumentality of the United States.  Although there is no bright-line test for what constitutes a

government instrumentality, *In re Fannie Mae 2008 Sec. Litig.*, No. 08 Civ. 7831, 2009 U.S.

Dist. LEXIS 109886, at *12 (S.D.N.Y. Nov. 24, 2009), the Supreme Court has emphasized

certain factors.  Most fundamentally, the Court has considered whether an entity is established by

the government to facilitate and pursue governmental objectives.  *See, e.g.*, *Dep't of Employment

v. United States*, 385 U.S. 355, 358-59 (1966) (emphasizing that Red Cross was federally

established and served government functions); *Fed. Land Bank of St. Paul v. Bismarck Lumber

Co.*, 314 U.S. 95, 102 (1941) (recognizing land banks' "important governmental function").[17]

Direct government control of an entity's operations and management is *not* necessary for

an entity to be an instrumentality of the United States.  In *Department of Employment*, for

example, the Supreme Court held that ongoing governmental supervision, including a regular

financial audit, of the American Red Cross's operations indicated its instrumentality status, even

though "government officials [did] not direct [the Red Cross's] everyday affairs."  385 U.S. at

359-60.  As the Supreme Court has explained, an instrumentality is "typically established as a

separate juridical entity . . . run as a distinct economic enterprise."  *First Nat'l City Bank v.

Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 624 (1983).

Many of the factors described above align with the ordinary meaning of "independent

establishment of the United States" and likewise compel the conclusion that FNMA readily

qualifies as an instrumentality of the United States.  Indeed, Congress said as much in FNMA's

---

[17] Indeed, an instrumentality is a means "to achieve an end or purpose."  *Black's Law Dictionary* 870 (9th ed. 2009);
*see also T I Fed. Credit Union v. DelBonis*, 72 F.3d 921, 931 (1st Cir. 1995) (stating that an entity's governmental
function may be "the most 'significant factor in determining whether a particular entity is a federal instrumentality'"
(quoting *United States v. Michigan*, 851 F.2d 803, 806 (6th Cir. 1988))).

charter.  *See* 12 U.S.C. § 1719(b), (d)-(e) (stating that the obligations and securities issued by

FNMA "are not guaranteed by the United States and do not constitute a debt or obligation of the

United States or any agency *or instrumentality thereof other than the corporation*") (emphasis

added); *Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479, 496 (S.D.N.Y.

1995) (holding that this language stems from the "obvious premise" that FNMA "is an

instrumentality of the United States").

The history of FNMA and its governing statutes also confirms its status as an

instrumentality of the United States.  Since its creation in 1938, FNMA has served to advance

governmentally defined objectives, including "provid[ing] stability" and "ongoing assistance to

the secondary market for residential mortgages (including . . . activities involving a reasonable

economic return that may be less than the return earned on other activities)" and "promot[ing]

access to mortgage credit throughout the Nation (including central cities, rural areas, and

underserved areas)."  12 U.S.C. § 1716.  Congress has subjected FNMA's operations to the

ongoing approval and oversight of government officials.  *See, e.g.*, *id.* at § 1719(d), (e) (requiring

"the approval of the Secretary of the Treasury" before FNMA can issue mortgage-backed

securities, corporate debt, and other obligations); *id.* at § 1723a (requiring FNMA to make

annual reports to Congress regarding its progress in meeting specific policy objectives and

authorizing audits of FNMA by the Comptroller General of the United States).  The federal

government bestowed upon FNMA certain benefits and other features that emphasize its

essential federal character.  FNMA, for example, is exempt from most state and local taxes and

all state-level business qualification laws.  *See id.* at § 1723(a), (c)(2).  The Federal Reserve

Banks "are authorized and directed" to act as FNMA's fiscal agents, and the Secretary of the

Treasury is authorized to purchase up to $2.25 billion of obligations issued by FNMA.  *Id.* at §§

1719(c), 1723a(g).

For these reasons and others, courts repeatedly have held, in a variety of contexts, that FNMA is an instrumentality of the United States. Indeed, as this Court held in *Federal National Mortgage Association v. Lefkowitz*, 390 F. Supp. 1364, 1368 (S.D.N.Y. 1975), there is "little doubt that Congress intended FNMA to be recognized as a federal instrumentality."[18] Accordingly, this Court also has held consistently that FNMA is a federal instrumentality and thus exempt from the Securities Act. *See In re Fannie Mae 2008 Sec. Litig.*, 2009 U.S. Dist. LEXIS 109886, at *12-14; *Kidder Peabody*, 903 F. Supp. at 496.

## C.   Sound Policy Reasons Support Adherence To The Exemption's Text And Purpose

The policy reasons for Congress's section 3(c) exemption likewise support dismissal of the Complaint's Exchange Act claims. Quite rationally, in the midst of creating new and varied bodies to pursue governmental ends through innovative, sometimes private, means, Congress chose to protect its own establishments and instrumentalities from the impact Congress intended the Exchange Act to have on private corporations pursuing private ends. In enacting section 3(c), Congress reserved to itself -- not the SEC or anyone else -- the right to create a regulatory regime to supervise the conduct of those in the Defendants' positions. Although Congress exempted the Defendants from the enforcement regime of the Exchange Act, it subjected them, as "executive officers" of a Government-Sponsored Enterprise,[19] to a variety of regulatory mechanisms that are not applicable to the executive officers of private entities.

---

[18] Other cases are in accord with *Lefkowitz*. *See Rust v. Johnson*, 597 F.2d 174, 177-78 (9th Cir. 1979); *Chahine v. First Magnus Fin. Corp.*, No. 10-13456, 2010 U.S. Dist. LEXIS 120098, at *5 (E.D. Mich. Nov. 12, 2010); *Hinton v. Fed. Nat'l Mortgage Ass'n*, 945 F. Supp. 1052, 1060 (S.D. Tex. 1996).

[19] "Executive officer" includes the CEO, CFO, and any executive vice president of FNMA. *See* Housing and Community Development Act of 1992, Pub. L. No. 102-550, Title XIII, § 1303, 106 Stat. 3672, 3942 (codified at 12 U.S.C. § 4502). Each Defendant is an executive officer of FNMA. *See* Compl. ¶¶ 19, 20, 21.

For example, during the Relevant Period, the Director of OFHEO was authorized to impose civil money penalties on any executive officer of FNMA who engaged "in any conduct that cause[d] or [was] likely to cause a loss" to FNMA or that violated FNMA's charter, any order, rule, or regulation promulgated pursuant to FNMA's charter, or any agreement between FNMA and OFHEO.[20]  The Director of OFHEO also could order any executive officer of FNMA "to take affirmative action to correct or remedy any condition resulting from [such] conduct or violation," including by issuing a cease-and-desist order or by requiring the executive officer to make restitution or otherwise reimburse or indemnify FNMA for any losses caused by the executive officer.[21]

Furthermore, although Congress exempted FNMA and other instrumentalities from the Exchange Act, Congress consciously and expressly empowered the SEC itself to regulate the activities of FNMA's officers and employees through the anti-fraud provisions of the Securities Act.  The continuing applicability of section 17(a) of the Securities Act, along with the authority that Congress provided to OFHEO and FHFA to regulate and sanction the conduct of executive officers of Government-Sponsored Enterprises, makes clear that giving effect to Congress's exemption of the Defendants from the Exchange Act does not render federal authorities powerless to police the conduct of FNMA's officers and employees.

Indeed, it would be incongruous to permit the federal government to use FNMA to achieve its policies and purposes yet treat it like an ordinary private-sector enterprise, unconnected to the federal government or its policy objectives, for purposes of Exchange Act liability.  Such an approach would be rooted in political expedience and counter to the explicit

---

[20] *See* Pub. L. No. 102-550, Title XIII, § 1376, 106 Stat. at 3991 (codified at 12 U.S.C. § 4636).  These civil money penalties could reach $100,000 for each day that such conduct persisted.  *Id.*
[21] *Id.* at § 1371, 106 Stat. at 3986-88.

text and purpose of section 3(c).  Accordingly, the first, third, fourth, and fifth claims for relief must be dismissed.

## II.  ALL CLAIMS FOR RELIEF MUST BE DISMISSED FOR FAILURE TO ALLEGE AN ACTIONABLE MISREPRESENTATION

To survive a motion to dismiss, a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Moreover, "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).[22]  Specifically, Rule 9(b) requires that the Complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995).  Where multiple defendants are asked to respond to allegations of fraud, the complaint must inform each defendant of the nature of his alleged participation in the fraud.  *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  As set forth below, the Complaint falls far short of satisfying these heightened requirements.

---

[22] The Complaint alleges violations of sections 10(b) and 13(a) of the Exchange Act and section 17(a) of the Securities Act.  Rule 9(b) applies to each violation alleged in the Complaint.  *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004); *SEC v. U.S. Environmental, Inc.*, 82 F.Supp. 2d 237, 241 n. 2 (S.D.N.Y. 2000).  To state a claim under each of these provisions, the SEC must allege a material misrepresentation.  *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. Stanard*, No. 06 Civ. 7736, 2009 WL 196023, at *28 (S.D.N.Y. Jan. 27, 2009).

A.     **The SEC Has Failed To Allege An Actionable Omission By Defendants**

Despite presenting its claims as alleged misstatements, the SEC's theory of liability actually is premised on alleged omissions of information that the SEC now claims, in hindsight, should have been included in FNMA's disclosures.  The Complaint alleges that FNMA's disclosures were false and misleading because FNMA did not include EA loans in its calculation of subprime exposure and did not include lender-selected process efficiency loans in its calculation of Alt-A exposure.

To allege an actionable omission, however, a plaintiff must first establish a duty to disclose the omitted information.  *See, e.g., In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."); *SEC v. Power*, 525 F. Supp. 2d 415, 419 (S.D.N.Y. 2007); *Capri Optics Profit Sharing v. Digital Equip. Corp.*, 760 F. Supp. 227, 232 (D. Mass. 1991) (holding that "a claim of nondisclosure cannot be camouflaged as a case of misrepresentation to avoid an applicable rule of law").  A duty to disclose exists in three circumstances:  (i) where there is insider trading, (ii) where a statute or regulation requires disclosure, or (iii) where inaccurate, incomplete, or misleading prior disclosures have been made. *See Glazer v. Formica Corp.*, 964 F.2d 149, 156-57 (2d Cir. 1992).  The SEC has failed to allege the existence of any of these circumstances and, therefore, cannot allege the existence of a duty to disclose.

Although, "upon choosing to speak, one must speak truthfully about material issues," *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002), the SEC has not alleged that there were prior inaccurate, incomplete, or misleading disclosures that required correction. FNMA disclosed its definitions of "subprime" and "Alt-A" and reported the volume of all loans that fell within those definitions.  The fact that the SEC now believes investors would have been

interested in how other definitions might have affected this disclosure is irrelevant.  "Disclosure

of an item of information is not required . . . simply because it may be relevant or of interest to a

reasonable investor."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *see also Staehr v.*

*Mack*, No. 07 Civ. 10368, 2011 WL 1330856 at \*6 (S.D.N.Y. Mar. 31, 2011) (rejecting claims

under sections 10(b) and 20(b) that Morgan Stanley did not adequately disclose subprime

exposure "because the Company disclosed its general exposure to securitized mortgage products,

and had no obligation to divulge further information").  Because FNMA included all loans that

met its definitions of subprime and Alt-A and was under no duty to include other loans or adopt

different definitions, the SEC has failed to allege an actionable omission.

**B.**    **The SEC Has Failed To Allege An Actionable Misstatement By Defendants**

Even analyzing the Complaint's allegations as putative misstatements, the Complaint

fails to plead a cognizable claim for relief.  The SEC has failed to allege "any untrue statement of

a material fact" made by FNMA.  17 C.F.R. § 240.10b-5(b).  FNMA expressly defined how it

classified subprime and Alt-A loans, and it consistently and accurately calculated and disclosed

its subprime and Alt-A holdings pursuant to those classification criteria.  Because loans receiving

the EA pricing feature never fell within FNMA's definition of subprime and lender-selected

process efficiency loans never fell within FNMA's definition of Alt-A, failing to include loans

with the EA feature as "subprime" or lender-selected process efficiency loans as "Alt-A" cannot,

as a matter of law, constitute an actionable misstatement under the securities laws.

**1.**    **FNMA Expressly Disclosed How It Classified Subprime Loans And**
        **Accurately Used Its Classification Criteria To Calculate Its Subprime**
        **Holdings For Its Periodic Public Filings**

FNMA expressly stated that it classified loans as subprime only if they were:  (i)

originated by subprime specialty lenders (ii) using processes unique to subprime loans.  2005 10-

K, at 36.  FNMA accurately disclosed the volume of loans it held that met this definition.  The

SEC does not allege otherwise and, thus, fails to allege an actionable misstatement by FNMA.

The SEC nonetheless asserts that EA loans "were exactly the type of loan that investors would reasonably believe FNMA included when calculating its [subprime] exposure."  Compl. ¶ 5.  Allegations that FNMA's classification system was non-standard, or that FNMA should have classified its loans differently, however, are insufficient as a matter of law to establish an actionable misrepresentation.  *See, e.g., Kuriakose v. Fed. Home Loan Mortgage Corp.*, No. 08-civ-7281, 2011 U.S. Dist. LEXIS 34285, at *32 (S.D.N.Y. Mar. 30, 2011) (Freddie Mac's use of a disclosed but non-standard subprime definition did not render its subprime disclosures "misleading").  During the Relevant Period, the term "subprime" had no commonly accepted definition.  *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 359 (S.D.N.Y. 2011) (surveying subprime definitions and concluding that none was commonly accepted between 2006 and 2008).[23]  Therefore, "subprime" necessarily was an institution-specific term, the definition of which required some level of judgment and discretion.  *See Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004) (because there was no standard industry-wide approach to defining the term subprime, "the meanings of these terms are institution-specific" and the information "will not be entirely comparable from one institution to the next").

The implausibility of the Complaint's allegations is underscored by the fact that the SEC alternatively suggests, also without support, that investors believed that FNMA classified as subprime every loan that it acquired from a lender that also happened to appear on HUD's

---

[23] Indeed, the SEC's own Chief Accountant stated in January 2008 that there was no fixed definition of subprime mortgage loans.  Letter from Conrad Hewitt, Chief Accountant, SEC, to Arnold Hanish, Chairman of the Comm. on Corporate Reporting, Fin. Executives Int'l, and Sam Ranzilla, Chairman of the Prof'l Practice Executive Comm., Am. Inst. of Certified Pub. Accountants (Jan. 8, 2008), *available at* http://www.sec.gov/info/accountants/staffletters/hanish010808.pdf.

subprime lending list.[24]  Compl. ¶¶ 104-05.  FNMA, however, never suggested that it was using the HUD subprime lender list, and the Complaint does not allege otherwise.  Indeed, HUD itself explained that "*not all of the loans reported by subprime lender specialists are subprime loans. In fact, a number of subprime lenders also originate prime loans.*"[25]  Moreover, even if the Court were to assume *arguendo* that investors believed that FNMA used the HUD list to identify subprime specialty lenders, investors knew -- because FNMA told them -- that FNMA only classified loans as subprime if they were originated using "processes unique to subprime lending."  Because EA loans were not originated using "processes unique to subprime lending," EA loans, whether originated by a lender on the HUD list or not, were not included in FNMA's subprime classification.

The Complaint also alleges that FNMA "defined" subprime loans as those made to "borrowers with weaker credit histories" and that "nothing" in FNMA's disclosures alerted investors to its exposure to such borrowers.  Compl. ¶¶ 85-86, 88-89.  These allegations are not true on the face of the disclosures.  *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (disclosures must be "read as a whole").  First, FNMA never defined subprime to mean loans to "borrowers with weaker credit histories."  Rather, after warning readers that the term subprime had no uniform definition, FNMA simply noted a *characteristic* of many subprime loans, namely, that they "typically are made to borrowers with weaker credit histories." FNMA, Notification of Late Filing (Form 12b-25), at 8 (Feb. 27, 2007).  This told investors that subprime loans were frequently, but not always, made to borrowers with weaker credit histories; FNMA's disclosures did not say that *all* loans to such borrowers were subprime.  Moreover, FNMA made clear in its disclosures that its subprime definition was not based upon the credit

---

[24] Tellingly, the Complaint fails to allege that any of the Defendants were aware of this list.
[25] HUD Subprime Lender List (*available at* http://www.huduser.org/portal/datasets/manu.html) (emphasis added).

histories of the borrowers but instead depended upon the type of originator and the process used to originate the loan.  *See* 2005 10-K, at 36.

Second, throughout the Relevant Period, FNMA unambiguously disclosed its exposure to "borrowers with weaker credit histories" through its FICO score disclosures.  These disclosures made clear that approximately 5% of FNMA's single-family portfolio involved loans to borrowers with FICO scores below 620, in contrast to the 0.2% of loans FNMA disclosed as subprime.[26]  Therefore, the Complaint's assertions that FNMA disclosed "nothing" about FNMA's exposure to borrowers with weaker credit histories is patently false and cannot support any plausible allegation that FNMA somehow misrepresented either its subprime loan exposure or its exposure to borrowers with weaker credit histories.

> ### 2. FNMA Expressly Disclosed How It Classified Alt-A Loans And Accurately Used Its Classification Criteria To Calculate Its Alt-A Holdings For Its Periodic Public Filings

As with its subprime definition, FNMA expressly disclosed how it classified Alt-A loans. Again, the SEC does not allege that FNMA failed to follow its Alt-A classification criteria. Rather, the Complaint alleges that FNMA's *Alt-A* disclosures were misleading because they did not include all of FNMA's *reduced documentation* loans.  Compl. ¶ 168 ("[FNMA's *Alt-A*] reporting materially understated the extent of FNMA's total exposure to *reduced documentation* loans." (emphasis added)); *see also* Compl. ¶¶ 166, 177-78, 181, 185, 190, 195.[27]

FNMA, however, never equated all reduced documentation loans with Alt-A loans, and the Complaint does not allege otherwise.  Indeed, the SEC admits that FNMA tracked internally

---

[26] FNMA, in its disclosures, used a FICO score under 620 to define a "Low FICO score" and an LTV ratio above 90% to define a "High LTV Ratio."  *See, e.g.*, August 2007 Credit Supplement, at 3-4.

[27] The Complaint also alleges that FNMA's Alt-A disclosures were misleading because they did not include some reduced documentation loans that allegedly performed worse than full documentation loans.  Compl. ¶ 165. FNMA's Alt-A definition, however, was not based on loan performance, and the Complaint does not allege otherwise.

two different types of reduced documentation loans:  lender-selected process efficiency loans, in which lenders chose to grant process efficiencies to high credit quality borrowers (in exchange for no additional fees), and borrower-selected Alt-A loans, in which borrowers actively sought to provide reduced mortgage documentation (and paid more for doing so).  Compl.  ¶¶ 163-64.

Throughout the Relevant Period, FNMA explicitly told investors that it classified loans as Alt-A if they were designated as such when they were delivered to FNMA by the originator. FNMA does not originate loans.  It is a secondary market purchaser that relies on the originator to make primary market determinations.  The Complaint does not allege that these originators did not properly distinguish between borrower-selected Alt-A and lender-selected process efficiency loans, much less that FNMA believed that there was anything amiss about such distinctions.  Accordingly, FNMA's accurate disclosures based on its publicly stated definition of Alt-A loans cannot serve as a basis for liability.  *See, e.g., Kuriakose*, 2011 U.S. Dist. LEXIS 34285, at *32.

The SEC also seems to imply that FNMA's Alt-A disclosures were misleading because FNMA did not disclose that it, not the originators, specified the conditions under which they could deliver Alt-A loans to FNMA.  Compl. ¶¶ 168-71.[28]  The Complaint does not allege how it was misleading for FNMA to instruct originators to classify borrower-selected reduced documentation loans, but not lender-selected process efficiency loans, as "Alt-A" at delivery.  It also does not allege that FNMA had any incentive to create a classification system that would understate its Alt-A holdings.  In fact, such a classification system would *reduce* the fees that FNMA otherwise would earn from loans classified as Alt-A.  FNMA charges a higher guaranty

---

[28] The import, if any, of this omission is never addressed in the Complaint, likely because FNMA still does not state anywhere in its Alt-A disclosures that it, not the originators, specifies the delivery conditions.  *See* 2011 10-K, at 194.

fee to lenders when it buys Alt-A loans because of the additional material credit risk of these loans.  FNMA does not charge this higher guaranty fee when it buys lender-selected process efficiency loans.  The Complaint utterly fails to address the fact that FNMA had a financial incentive to direct lenders to classify more, not fewer, reduced documentation loans as "Alt-A" loans and thereby collect greater guaranty fee income.

### 3.    Even After It Was Placed Into Conservatorship, And Even To This Day, FNMA Has Not Altered The Types Of Loans It Classifies As Subprime Or Alt-A

In November 2008, after FNMA was placed into conservatorship, FNMA added a clause to its subprime disclosure:  "[W]e have other loans with some features that are similar to . . . subprime loans that we have *not* classified as . . . subprime because they *do not meet* our classification criteria."  Compl. ¶ 148 (emphasis added).  FNMA added a similar clause to its Alt-A disclosure:  "[W]e have other loans with some features that are similar to Alt-A . . . that we have *not* classified as Alt-A . . . because they *do not meet* our classification criteria."  *Id.* ¶ 196 (emphasis added).  The SEC asserts that these basic tautologies are admissions that FNMA held loans that fell within its subprime and Alt-A classification criteria that it had not previously disclosed as subprime or Alt-A.  Compl. ¶¶ 149, 197.  But the additional clause only reiterates what was clear in FNMA's earlier disclosures:  that FNMA did not count as "subprime" loans that did not meet its subprime classification criteria and did not count as "Alt-A" loans that did not meet its Alt-A classification criteria.

Tellingly, the Complaint does not and cannot allege that FNMA began to classify loans as subprime or Alt-A after conservatorship that it had not included within those classifications previously.  To this day, in its most recent Form 10-K filing, FNMA continues to exclude EA loans from its subprime classification and continues to exclude lender-selected process efficiency loans from its Alt-A classification.  After a three-year SEC investigation ending with a non-

prosecution agreement and with the full knowledge of the federal regulator and conservator that now controls it, FNMA is still using the same classification criteria the SEC claims was fraudulent during the Relevant Period.  *See* 2011 10-K, at 194, 196.

**C.**     **FNMA Disclosed All Required Material Information Concerning The Credit Risk Of Its Single-Family Business**

For a misstatement or omission to be material (and, therefore, actionable), a plaintiff must allege a misstatement or omission "that a reasonable investor would have considered significant in making investment decisions."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  Further, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Id.* at 162 (citations and internal quotation marks omitted).

The Complaint lacks any plausible allegation that the exclusion of EA loans from FNMA's classification of subprime loans, or the exclusion of lender-selected process efficiency loans from its classification of Alt-A, was material to investors.  Indeed, in light of FNMA's extensive disclosures regarding its entire portfolio, the SEC can make no such allegation.  It is implausible for the SEC to claim that the supposed flaws in FNMA's expressly disclosed classifications for subprime and Alt-A somehow "significantly altered the 'total mix' of information made available" to investors when FNMA provided these disclosures *in addition to* objective, detailed information about *every one* of its single-family loans, including those also identified as subprime or Alt-A.  FNMA's extensive disclosures gave investors the data they needed to assess the credit risks posed by FNMA's holdings.  Because investors had more than sufficient information to judge FNMA's risk profile, the SEC cannot plausibly allege any material misstatement or omission.

28

1.      **FNMA's Comprehensive And Detailed Disclosures Contained All Material Information About The Objective Credit Risks In Its Single-Family Portfolio**

Taken as a whole, FNMA's disclosures set forth all material information about the objective credit risks in its book of single-family home loans.  For example, in its 2004 10-K, at 139-42, FNMA explained that its single-family book was "diversified based on several factors that influence credit quality and performance and help manage our credit risk," including FICO scores; LTV ratios; geographic concentration; origination year; loan purpose; and product, property, and occupancy type.  To further illustrate the distribution of these credit risks within its single-family book, FNMA provided a very detailed set of tables.  *See* Decl. Appendix A at 140-43.  Notably, the SEC does not allege that any of this underlying objective data was inaccurate.

An investor reviewing these tables would see that 8% of the loans in FNMA's single-family mortgage credit book in 2004 had an original LTV ratio of 90% or higher and that 5% had FICO scores under 620.  Moreover, FNMA explicitly informed investors that objective risk factors such as high LTV ratios and low FICO scores were especially important in considering the overall credit risk of the single-family book.  FNMA explained, for example, that "LTV ratio is a strong predictor of credit performance," and, "[a]ssuming all other factors are equal, the likelihood of default and the gross severity of a loss in the event of default are typically lower as the LTV ratio decreases."  *Id.* at 144.  Additionally, FNMA informed investors that "a higher FICO score typically indicates a lesser degree of credit risk."  *Id.* at 145.  The same or similar statements were included in all subsequent annual filings.[29]

If investors could see the objective details regarding the risk profiles of every loan on FNMA's books, FNMA's voluntary *additional* disclosures of small subsets of loans it classified

---

[29] *See* 2005 10-K, at 121; 2006 10-K, at 124; 2007 10-K, at 125; 2008 10-K, at 174; 2009 10-K, at 150; 2010 10-K, at 154; 2011 10-K, at 154.

as "subprime" and "Alt-A" simply cannot be material.  Because FNMA disclosed to investors a bounty of detailed and accurate objective information about all of its single-family loans in disclosures spanning hundreds of pages, the SEC cannot plausibly contend that FNMA's statements about its subprime and Alt-A exposure, which consisted of mere sentences, significantly altered the total mix of information available to the market.[30]

### 2. FNMA's Disclosures Were Not Materially Misleading As A Matter Of Law In Light Of FNMA's Evolving And Comprehensive Disclosures About Its Credit Risks

In addition to these comprehensive disclosures regarding the risks of its single-family book of business, FNMA provided even more information as the housing market deteriorated during the severe and unprecedented economic crisis in 2007 and 2008.

At the outset, it was no secret that FNMA was purchasing loans made to borrowers who represented potential credit risks.  By 2007, HUD mandated that FNMA target 55% of the loans it guaranteed to "low- and moderate-income" borrowers.  *See* 24 C.F.R. § 81.12(c)(3).  As FNMA increased its holdings of these loans, it publicly warned investors of the attendant risks. For example, in its 2004 10-K, FNMA informed investors that it had "*relaxed* some of our underwriting criteria to obtain [HUD] goals-qualifying mortgage loans and *increased* our investments in *higher-risk* mortgage loans that are more likely to serve the borrowers targeted by HUD's goals and subgoals, *which could increase our credit losses*."  2004 10-K, at 43 (emphasis added).  FNMA issued similar warnings in each of its subsequent annual filings.[31]

As the housing market began to deteriorate, FNMA provided investors with additional

---

[30] *See, e.g.*, *Phillips v. LCI Int'l., Inc.*, 190 F.3d 609, 615 (4th Cir. 1999) (dismissing complaint for lack of materiality where allegations rested, in part, on "exaggeration of a single statement[] and isolation of that statement from its context and from the wealth of other information publicly available when it was made"); *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 326-27 (W.D.N.Y. 2010).

[31] *See* 2005 10-K, at 25; 2006 10-K, at 16; 2007 10-K, at 30; 2008 10-K, at 46; 2009 10-K, at 38; 2010 10-K, at 58; 2011 10-K, at 64.

information about such housing goals loans, including:

- FNMA's expectation of increased credit losses (*e.g.*, 2006 10-K, at 23);

- The change in market conditions and economic factors affecting FNMA's business (*e.g., id.* at 47-48); and

- FNMA's expected increase in credit losses for 2007, due in part to FNMA's investment in loans supporting its HUD goals (*id.* at 65, 75).

Apart from these explicit disclosures, FNMA began issuing quarterly Credit Supplements that provided investors with even more detailed information about the risks it faced. For example, starting in August 2007, FNMA disclosed the additional risks associated with loans that featured both a low FICO and a high LTV ratio, enabling investors to assess FNMA's holding of "layered risk" loans. August 2007 Credit Supplement, at 3-4. This disclosure explained that 1% of FNMA's single-family book consisted of loans with both a FICO score of less than 620 and an LTV ratio of greater than 90%. *Id.* FNMA warned investors that a substantial percentage of these layered risk loans were intended to meet the HUD goals requirements and "could be viewed as particularly sensitive to further declines in home prices and/or further regional weakness in employment." *Id.* While highlighting these risky loans, FNMA made clear that they were "aside from" its "subprime" loans.[32]

In contrast to the Complaint's specious attempt to conflate "subprime-quality" loans with "subprime" loans, *see* Compl. ¶ 86, FNMA made disclosures warning investors about the different kinds of high risk loans in its portfolio and expressly distinguished "subprime" loans from "loans to borrowers with lower credit scores":

---

[32] FNMA provided this information in response to the question, "*Aside from* your traditional core business, *subprime* and Alt-A, are there *other* segments/product features in your book of business that could be viewed as particularly sensitive to further declines in home prices and/or further regional weakness in employment?" August 2007 Credit Supplement, at 3-4 (emphasis added).

> We have experienced increases in serious delinquency rates across our
> conventional single-family mortgage credit book, including in higher risk loan
> categories, such as *subprime loans*, Alt-A loans, adjustable-rate loans, interest-
> only loans, loans made for the purchase of investment properties, negative-
> amortizing loans, *loans to borrowers with lower credit scores* and loans with high
> loan-to-value ratios.

2007 Q3 10-Q, at 89 (emphasis added).  In the face of these unequivocal disclosures about the

increased risk of default in FNMA's single-family book, including disclosures about the risks

posed by the HUD-goal loans, the SEC cannot plausibly contend that the alleged

misrepresentations about the extent of FNMA's "subprime" and "Alt-A" exposure were material.

Rather, as the Second Circuit held in the context of stock offerings, "[c]ertain alleged

misrepresentations are immaterial as a matter of law because it cannot be said that any

reasonable investor could consider them important *in light of adequate cautionary language set

out in the same offering . . . .*" *Halperin v. eBanker-USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.

2002) (emphasis added).  Just as the cautionary language in *Halperin* warned investors about the

precise risks of investing that plaintiffs later claimed were omitted, FNMA's public disclosures

expressly warned investors of the increased risks of default in light of the deteriorating economy

and FNMA's holdings of HUD-goal and other loans.  *See id.* at 360 ("The cautionary language

addresses the relevant risk directly, and therefore neither offering memorandum was

misleading.").  Accordingly, any alleged misrepresentations in FNMA's disclosures were

"immaterial as a matter of law."  *Id.* at 357.

>    **3.    The Market's Indifferent Reactions To FNMA's Disclosures Of Its
>           Classification Criteria For Subprime And Alt-A Confirm That The
>           Alleged Misstatements Were Immaterial**

That investors viewed FNMA's subprime and Alt-A classifications as immaterial in light

of its extensive objective credit risk disclosures and cautionary language is confirmed by the

market's indifference when FNMA disclosed its classification criteria and when it reminded

32

investors that it held low-FICO loans "aside from" its subprime holdings.  Specifically, on May 2, 2007, FNMA disclosed its subprime classification criteria for the first time.  2005 10-K, at 36. The classification criteria made clear that FNMA did not consider every loan to a borrower with a weak credit history to be a subprime loan.  The stock price promptly *rose* from $59.28 (its May 1 closing price) to $59.82 (its May 2 closing price). Likewise, when FNMA disclosed on August 16, 2007, that it held low-FICO loans "aside from" its subprime holdings, its stock price *rose* from $61.45 to $65.15.[33]

These market reactions refute the SEC's claim, Compl. ¶ 89, that investors would have read FNMA's February 2007 subprime disclosure to include all of its loans to borrowers with weaker credit characteristics.  Indeed, the lack of a negative market reaction either in May 2007 or in August 2007 confirms that FNMA's February 2007 disclosure of its subprime exposure was more than sufficient.  *See, e.g., Oran v. Stafford,* 226 F.3d 275, 283 (3d Cir. 2000) (dismissing claims where public disclosure of information "had no appreciable negative effect on the company's stock price"); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425 (3d Cir. 1997) (Alito, J.).

The same holds true with respect to FNMA's Alt-A disclosures.  On April 30, 2008, the Wall Street Journal reported on FNMA's holdings of "Fast & Easy" brand loans.  *See Countrywide Loss Focuses Attention on Underwriting*, Wall St. J., Apr. 30, 2008.  The article reported that neither Countrywide nor FNMA viewed these lender-selected process efficiency loans to be Alt-A loans.  If, as the SEC claims, investors were concerned that FNMA did not classify Fast & Easy loans (and other lender-selected process efficiency loans) as Alt-A, the market would have reacted negatively -- especially given the article's critical tone.  But the news

---

[33] Market Watch, FNMA Historical Quotes, http://www.marketwatch.com/investing/stock/fnma/historical.

had no impact on FNMA's stock price; it declined from $28.35 to $28.30, or by less than 0.2%. In contrast, the mortgage finance sector as a whole declined by more than 2% that day.[34]  The logical and permissible conclusion from the market's reaction is that investors either understood that FNMA's Alt-A classifications did not include lender-selected reduced documentation loans or did not view this information as material.  Either way, the Complaint fails.

### D.      Mr. Mudd's Public Statements Were Not Misleading Misstatements

The Complaint presents isolated excerpts from Mr. Mudd's March and April 2007 congressional testimony and certain statements Mr. Mudd made to the press in the winter of 2007 in order to allege that Mr. Mudd materially misstated FNMA's exposure to subprime loans. The SEC's misstatement theory with respect to Mr. Mudd is based on two types of statements, which the SEC isolates and provides out of context in its Complaint:  (i) statements in which Mr. Mudd noted that subprime loans were made to borrowers with weak credit histories and (ii) statements in which Mr. Mudd said that less than 2% of FNMA's book of business was comprised of subprime loans.  Compl. ¶¶ 44, 96, 97, 132, 133, 146.  The Complaint does not allege that either statement was inaccurate.  Instead, the Complaint presents out of context statements in an effort to assert that Mr. Mudd's statements were materially misleading because EA loans also were made to borrowers with weak credit histories but were not included in the subprime numbers Mr. Mudd cited publicly.  In other words, the SEC claims that Mr. Mudd should have used the term "subprime" differently, not that he used FNMA's definition of subprime inaccurately.  But FNMA's classification criteria, as a matter of law, is not misleading. *See Kuriakose*, 2011 U.S. Dist. LEXIS 34285, at *32.

---

[34] *Interactive Stock Chart for Dow Jones KBW Mortgage Finance Index (MFX)*, Bloomberg, http://inj-web12.bloomberg.com/quote/MFX:IND/chart (last visited Mar. 7, 2012) (click "5Y;" then click "Indicators" and select "Rate of Change;" then hover mouse over Apr. 30, 2008; the rate of change below will read "-2.02747," meaning about -2% for the KBW Mortgage Finance Index).

Even assuming *arguendo* Mr. Mudd's statements were somehow misleading, they were not material.  First, Mr. Mudd's statements were clarified by "plain and prominently displayed language" in FNMA's filings and, thus, were immaterial in light of those disclosures.  *Olkey*, 98 F.3d at 9 (oral presentations not misleading because contradicted by language in prospectuses).  Furthermore, the Complaint does not address Mr. Mudd's statements "together and in context" and does not allege how, considered within "the total mix of information" offered in his public statements, any of Mr. Mudd's isolated statements qualifies as a material misstatement.  *Cf. Halperin*, 295 F.3d at 357.

For example, the context of Mr. Mudd's congressional testimony in the spring of 2007 was his explanation to Congress of FNMA's efforts to support loans to credit-blemished borrowers who were creditworthy enough to be eligible for prime loans, such as EA, rather than loans offered by specialty subprime originators.  Such loans often contained predatory terms like teaser adjustable rates and prepayment penalties designed to dissuade borrowers from refinancing.[35]  Mr. Mudd repeatedly emphasized FNMA's efforts to move these borrowers out of loans originated by subprime lenders using processes unique to subprime lending -- that is, out of loans that fit FNMA's subprime classification -- and into prime, conventional loans like EA. *See, e.g.,* Daniel H. Mudd, Remarks before the National Association of Federal Credit Unions (Sept. 12, 2007) ("Fannie Mae offers a range of affordable lending products.  We have Expanded

---

[35] *Legislative Proposals on Government-Sponsored Enterprise (GSE) Reform: Hearing Before the H. Comm. on Fin. Servs.*, 110th Cong. 55-56 (2007) (statement of Mr. Mudd).  Indeed, one main point of Mr. Mudd's testimony was that some individuals with imperfect credit histories should be allowed access to prime, conventional loans that were originated without the often punitive features associated with processes unique to subprime lending. *Possible Responses to Rising Mortgage Foreclosures: Hearing Before the H. Comm. On Fin. Servs.,* 110th Cong. 23-24 (2007) ("We want subprime borrowers to have a fair shot at homeownership.  We think simple, straightforward, fixed-payment mortgages are generally the best products for these borrowers . . . ."); *see also* Daniel H. Mudd, Remarks at the Goldman Sachs Financial Services CEO Conference 2007 (Dec. 11, 2007) ("We have a HomeStay™ initiative that helps subprime borrowers refinance into safer, prime loans, and so far, that initiative has enabled us to help about 52,000 homeowners, $10 billion worth of financing, financed out of subprime into prime financial performing.  They were just in the wrong category.").

Approval, *a prime mortgage financing option . . . .*") (emphasis added).  Given this context and

the total mix of information, no reasonable investor could have believed that Mr. Mudd's

statements meant that (i) only subprime loans were made to borrowers with weak credit histories

or (ii) FNMA's only risky loans were subprime loans.  Consequently, the Complaint's

allegations regarding these statements fail to state a claim.[36]

## III.   THE FIRST AND THIRD CLAIMS FOR RELIEF MUST BE DISMISSED FOR FAILURE ADEQUATELY TO ALLEGE SCIENTER

Rule 9(b) requires the SEC to allege facts giving rise to "a strong inference of fraudulent

intent."  *Acito*, 47 F.3d at 52.  The requisite "strong inference" of fraud "'may be established

either (a) by alleging facts to show that defendants had both motive and opportunity to commit

fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness.'"  *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124,

1128 (2d Cir. 1994)).  "To support a strong inference of scienter, plaintiff may not put forth a

motive possessed by nearly all corporate insiders, but must 'allege that defendants benefited in

some concrete and personal way from the purported fraud.'"  *SEC v. Espuelas*, 579 F. Supp. 2d

461, 470 (S.D.N.Y. 2008) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).[37]

"Where motive is not apparent, it is still possible to plead scienter by identifying

circumstances indicating conscious behavior by the defendant, though the strength of the

circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (citation

---

[36] The claim that Mr. Mudd falsely certified under Sarbanes-Oxley, Compl. pp. 55-56, rests on the same mistaken premise as all the other claims and should be dismissed for that reason.  In addition, SEC Rule 13a-14(a) does not support a separate cause of action.  *SEC v. Mozilo*, No. 09-cv-3994, 2010 WL 3656068, at *21 (C.D. Calif. Sept. 16, 2010); *SEC v. Black*, No. 04-c-7377, 2008 WL 4394891, at *16 (N.D. Ill. Sept. 24, 2008).

[37] *See also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (noting that "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold" because "allegations that the defendants concealed and misrepresented the corporation's financial condition in order to protect their executive positions and compensation" are "common to all corporate executives and, thus, too generalized to demonstrate scienter") (internal citations and quotation marks omitted); *Acito*, 47 F.3d at 54 ("executive compensation dependent upon stock value does not give rise to a strong inference of scienter").

omitted).  In the Second Circuit, "[c]onscious misbehavior or recklessness is demonstrated by conduct that is 'highly unreasonable' and 'represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *SEC v. Treadway*, 430 F. Supp. 2d 293, 331 (S.D.N.Y. 2006) (quoting *Kalnit*, 264 F.3d at 142).  Allegations of "fraud by hindsight" do not suffice, and "conclusory allegations -- that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things -- do not satisfy the requirements of Rule 9(b) . . . such allegations are so 'broad and conclusory as to be meaningless.'"  *Shields*, 25 F.3d at 1129 (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir. 1982)).  In all cases, the alleged misconduct must "rise to the level of 'highly unreasonable or extreme misconduct, rather than simply to mere deviations from standards of ordinary care.'"  *Treadway*, 430 F. Supp. 2d at 332 (quoting *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 422 (S.D.N.Y. 2001)).

The Complaint lacks any plausible allegation that the Defendants had any "motive and opportunity" to commit fraud.  In fact, the SEC does not allege that any of the Defendants obtained any "concrete and personal benefits" whatsoever.[38]  Absent a motive to defraud, the SEC must "produce a stronger inference of recklessness" to maintain its securities fraud claims.  *Kalnit*, 264 F.3d at 143.  The Complaint's allegations fall well short of this threshold.

---

[38] The Complaint alleges that the Defendants received Annual Incentive Plan ("AIP") bonuses "tied to attaining corporate and personal goals" and also received increased compensation during the period in question.  *See* Compl. ¶¶ 40-42, 52, 59-60.  This implies, but does not specifically allege, that financial incentives motivated the Defendants.  The Complaint acknowledges, however, that "all Fannie Mae executives" received an AIP bonus.  *Id.* ¶ 41.  Because the bonus program was "common to all corporate executives," it destroys any suggestion that defendants benefitted in a "concrete and personal way" from the alleged fraud.  *See Kalnit*, 264 F.3d at 139.  Moreover, such incentive compensation is required by FNMA's charter.  *See* 12 U.S.C. § 1723a(d)(2) (providing "a significant portion of potential compensation of all executive officers" shall be based on FNMA's performance).  Likewise, the Complaint utterly fails to allege, because it cannot, a concrete connection between the Defendants' compensation and the alleged fraud.

A.    **The Defendants' Stock Transactions During The Relevant Period Refute Any Suggestion Of Scienter**

The Second Circuit has recognized that whether a defendant sold any personal shares of corporate stock during the period of alleged inadequate disclosure is an important factor in evaluating scienter.  *See Kalnit*, 264 F.3d at 139.  All three of the Defendants held FNMA stock during the period of alleged inadequate disclosure.  Apart from sales to satisfy tax obligations,[39] none of them sold any of their FNMA shares during this period.  In fact, two of the three Defendants *purchased* shares of FNMA stock during this period.[40]

The Defendants' retention of their extensive FNMA holdings and purchases of additional FNMA stock are facts "wholly inconsistent with fraudulent intent."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 561; *see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 403 (S.D.N.Y. 2010) (rejecting plaintiffs' scienter allegations because defendants had not sold their stock during the class period, which "either suggests that [defendants] were unaware" of any alleged fraud, or that they "legitimately believed in Fannie's financial health in spite of the reports"); *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (noting lack of stock sales by defendants prior to drop in stock price and stating that it "is nonsensical to impute dishonest motives to [defendants who] suffered significant losses in their stock holdings and executive compensation").  The Defendants' stock transactions demonstrate that the Complaint fails to allege plausible facts sufficient to establish the required strong inference of scienter.

---

[39] Sales made at the time of a stock grant to satisfy tax obligations do not establish scienter.  *See, e.g., In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 59-60 (E.D.N.Y. 1999).  The tax sales are not truly voluntary actions by the executive, and the sale proceeds are used to pay taxes; they do not increase the personal wealth of the stock grant recipient.

[40] Mr. Mudd purchased 5,000 FNMA shares in November 2007.  FNMA, Form 4 (Statement of Changes in Beneficial Ownership), Nov. 21, 2007.  As of March 2008, Mr. Mudd owned more than 1.2 million shares of FNMA common stock.  FNMA, Current Reports (Form 8-K), Apr. 4, 2008.  Mr. Dallavecchia purchased almost $90,000 of FNMA stock in November 2007.  FNMA, Form 4 (Statement of Changes in Beneficial Ownership), Nov. 27, 2007.

**B.**    **Allegations Dependent Upon The Defendants' Corporate Positions Are Insufficient To Establish Scienter**

The SEC repeatedly alleges nothing more than that Mr. Mudd, Mr. Dallavecchia, and Mr. Lund had "access" to or "received" information by virtue of their positions at FNMA.  *See* Compl. ¶¶ 9, 47, 67, 74, 75, 112, 159.  As other decisions from this Court have recognized, status-based allegations are insufficient to allege scienter.  *See In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595 (S.D.N.Y. 2010) ("Plaintiffs' broad allegations that Defendants received and were aware of information contradicting their public statements because they held management roles is not enough to allege scienter."); *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 300 ("[A]ccusations founded on nothing more than a defendant's corporate position are entitled to no weight.").  The Complaint fails to allege any facts that would plausibly distinguish the Defendants' knowledge and intent from the state of mind of dozens of other FNMA officers and employees who played related, and at least equally responsible, roles in FNMA's disclosures -- both at the time and post-conservatorship.

**C.**    **FNMA's Elaborate Disclosure Process Negates Scienter**

Throughout the Relevant Period, all disclosure decisions at FNMA were reviewed by a number of senior FNMA executives (including the General Counsel, who chaired the Disclosure Committee) before they were presented to the CEO, CFO, and Board.  In addition, junior FNMA officials sub-certified disclosures to more senior officials, who provided sub-certification to the CEO and CFO before those officials signed the filings.

The SEC does not and cannot allege that any FNMA employee at any level ever refused to sub-certify based on a disagreement with the disclosures or the disclosure methodology.  Nor does the Complaint allege that FNMA or any of the Defendants deviated from Disclosure Committee procedures or that any Defendant attempted to hinder the review of any proposed

disclosures.  In fact, the SEC concedes that the entire Disclosure Committee was fully aware that

FNMA's subprime definition did not include EA loans and that FNMA purchased reduced

documentation loans that were not considered to be or disclosed as Alt-A.  *See* Compl. ¶¶ 112,

158.  FNMA's elaborate disclosure process, with internal checks and reviews, is entirely

inconsistent with any contention that the Defendants acted with the required recklessness or

conscious misbehavior and further confirms the inadequacy of the Complaint's allegations of

scienter.

### D.   FNMA's Public Discussions About Its Loan Programs In Its Filings And Elsewhere Negate Any Inference Of Scienter

FNMA and its executives discussed its affordable housing loan programs in a variety of

public fora, including its regulatory filings.  FNMA provided extensive information about these

programs to potential lenders, mortgage brokers, and borrowers.[41]  FNMA also warned investors

not to rely upon "vague, prosaic titles that pass for market data -- 'subprime,' 'Alt-A . . . .'"

Daniel H. Mudd, Speech Before the National Federation of Credit Unions (Sept. 12, 2007), at 3.

FNMA likewise disclosed the growth of its affordable housing activities.  For example, in this

same speech, Mr. Mudd disclosed that FNMA had acquired "almost $53 billion" in its affordable

housing loan programs since the beginning of 2007.[42]  *Id.*  FNMA's repeated public discussions

of the very programs that the SEC contends the Defendants were attempting to conceal negates

---

[41] *See, e.g.*, FNMA, 2007 Single-Family Selling Guide, https://www.efanniemae.com/sf/guides/ssg/index.jsp (follow "Access the Selling and Servicing Guides via AllRegs" hyperlink).

[42] $53 billion would constitute approximately 10 times the volume of FNMA's subprime exposure.  The Defendants were not seeking to conceal from the public the fact that FNMA's subprime exposure did not include the loans falling within these affordable lending programs.  *See, e.g.,* FNMA, 2006 Annual Report, CEO Letter to Shareholders at 5 (November 2, 2007), http://www.fanniemae.com/resources/file/ir/pdf/proxy-statements/2006_ceo_shareholder_letter.pdf ("FNMA purchased or guaranteed $53 billion in '[a]ffordability products'").  FNMA also disclosed the volume of its substantial affordable housing loan programs in its public Annual Housing Activities Reports.  *See, e.g.,* FNMA Annual Housing Activities Report, Mar. 16, 2007, http://www.fhfa.gov/webfiles/373/HMG_MAE_-_2006_AHAR.pdf; FNMA Annual Housing Activities Report, Mar. 17, 2008, http://www.fhfa.gov/webfiles/371/HMG_MAE_-_2007_AHAR.pdf.

any inference of scienter.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030,

2012 WL 523553, at *11 (S.D.N.Y. Feb. 15, 2012).

      **E.**      **FNMA's Post-Conservatorship Subprime And Alt-A Disclosures, Which FNMA's Regulator Repeatedly Approved, Negate Scienter**

      The continuity of FNMA's classification of subprime and Alt-A in its public filings since

the Defendants left FNMA further counsels against a finding of scienter.[43]  FNMA has had two

CEOs since Mr. Mudd's departure and has hired a new Chief Legal Officer (who also chairs the

Disclosure Committee).  FHFA, as FNMA's conservator, reviewed and approved all of FNMA

disclosures during this period:

> FHFA personnel, including senior officials, have reviewed our SEC filings prior
> to filing, including this annual report on Form 10-K for the year ended December
> 31, 2011 ("2011 Form 10-K"), and engaged in discussions regarding issues
> associated with the information contained in those filings.  Prior to filing our 2011
> Form 10-K, FHFA provided Fannie Mae management with a written
> acknowledgement that it had reviewed the 2011 Form 10-K, and *it was not aware
> of any material misstatements or omissions* in the 2011 Form 10-K and had no
> objection to our filing the 2011 Form 10-K.

2011 10-K, at 199 (emphasis added).

      Even after the turnover in senior management and review by FHFA, FNMA continues to

classify subprime and Alt-A loans in the same manner as during the Relevant Period.  The SEC's

Complaint notwithstanding, FNMA still does not include EA loans in its calculation of subprime

loans and still does not include lender-selected process efficiency loans in its calculation of Alt-

A loans.  The fact that these classifications remain unaltered despite new oversight and personnel

-- and even after the SEC filed this Complaint -- underscores the implausibility of the SEC's

claims that the Defendants acted with scienter.

---

[43] Messrs. Mudd and Dallavecchia left FNMA in 2008; Mr. Lund left in June 2009.

IV.  **THE SECOND CLAIM FOR RELIEF MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CLAIM UNDER SECTION 17(a)(2) OF THE SECURITIES ACT**

As demonstrated above, the second claim for relief, which alleges that Messrs. Mudd and Dallavecchia violated section 17(a)(2) of the Securities Act, must be dismissed for failure to plead a material misstatement or omission.[44]  Separately, the SEC has failed to allege that Messrs. Mudd or Dallavecchia (i) obtained *money or property* by means of a misstatement or omission (ii) in connection with the *offer or sale of securities*.  *See Monarch*, 192 F.3d at 308; *SEC v. Kelly*, 765 F. Supp. 2d 301, 319 (S.D.N.Y. 2011).

Section 17(a)(2) imposes liability only on defendants who obtain money or property "by means of" a misrepresentation or omission.  15 U.S.C. § 77q(a)(2); *see also SEC v. Norton*, 21 F. Supp. 2d 361, 365 (S.D.N.Y. 1998).  The SEC, therefore, must allege that the Defendants, not FNMA, "actually obtained money or property *by means of the untrue statements*."  *SEC v. Glantz,* No. 94 Civ. 5737, 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20, 1995) (emphasis added); *see also SEC v. Daifotis*, No. C 11-00137, 2011 WL 2183314, at *10 (N.D. Cal. June 6, 2011) (dismissing section 17(a)(2) claim for failure to allege *defendant's* receipt of money or property from the alleged fraud).

The SEC does not and cannot allege that Messrs. Mudd or Dallavecchia *personally* acquired any proceeds from the sale of FNMA stock.  Rather, the Complaint alleges only that they received compensation as FNMA executives.  Compl. ¶¶ 40-42, 58-61.  Where the SEC relies on a defendant's salary or bonus to meet this element of section 17(a)(2), however, it must

---

[44] The Complaint does not allege that Mr. Dallavecchia made any statements concerning FNMA's Alt-A holdings, and it alleges that Mr. Dallavecchia made only one statement about FNMA's subprime exposure.  But in that statement Mr. Dallavecchia merely repeated what FNMA publicly disclosed -- that "[a]pproximately 0.2% of our single-family credit book of business consisted of subprime loans or FNMA MBS backed by subprime loans."  Compl. ¶ 93.

plead facts tying the alleged misleading statement or omission to the calculation of the

defendant's compensation.[45]  Here, the Complaint generally alleges that Defendants'

compensation was tied to meeting personal and corporate goals.  Compl. ¶¶ 41, 59.  Beyond

making the less-than-extraordinary statement that a goal for a public company is to file its

mandatory financial disclosures, *id.* ¶ 59, however, the Complaint fails to allege any nexus

between compensation and the specific disclosures at issue here.  *See Forman*, 2010 WL

2367372, at *8.[46]

## V.    THE THIRD AND FIFTH CLAIMS FOR RELIEF MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR AIDING AND ABETTING LIABILITY UNDER SECTION 20(e) OF THE EXCHANGE ACT

In the third claim for relief, the Complaint alleges that Messrs. Mudd, Dallavecchia, and

Lund each violated section 20(e) of the Exchange Act by aiding and abetting alleged violations

by FNMA and/or Mr. Mudd of section 10(b) and Rule 10b-5(b).  Similarly, in the fifth claim for

relief, the Complaint alleges that Messrs. Mudd, Dallavecchia, and Lund each violated section

20(e) by aiding and abetting FNMA and/or Mr. Mudd in their alleged violations of section 13(a)

and Rules 12b-20, 13a-1, and 13a-13.  To state a claim under section 20(e), the SEC must allege

(i) a primary securities law violation by another, (ii) the defendant's knowledge of that violation,

and (iii) the defendant's substantial assistance in the primary violation.  *See SEC v. DiBella*, 587

---

[45] *See SEC v. Forman*, No. 07-11151, 2010 WL 2367372, at *8 (D. Mass., June 9, 2010) (granting summary judgment where defendant's bonus not tied specifically to corporate performance); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991) (dismissing section 10(b) claims because "incentive compensation can hardly be the basis on which an allegation of fraud is predicated . . . . [W]ere the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations.").

[46] The second claim for relief must be dismissed for the additional reason that the SEC has failed to allege that any offer or sale of securities ever took place.  *See* 15 U.S.C. § 77q(a)(2); *SEC v. Brown*, 740 F. Supp. 2d 148, 164 (D.D.C. 2010).  For example, as against Mr. Dallavecchia, the Complaint has failed to allege any facts plausibly establishing that the sole statement attributed to him, Compl. ¶ 93, has a nexus to any offer or sale of FNMA securities.

F.3d 553, 566 (2d Cir. 2009).[47]

The third and fifth claims for relief must be dismissed against all Defendants because, as demonstrated above, the Complaint fails to allege a primary securities law violation.  This discussion, *supra* Parts II & III, demonstrates that Mr. Mudd lacked actual knowledge of a violation or any conduct by him to substantially assist a violation.  The third and fifth claims for relief also must be dismissed against Messrs. Dallavecchia and Lund because the Complaint fails to allege that Mr. Dallavecchia or Mr. Lund (i) had actual knowledge of a primary violation or (ii) engaged in conduct that substantially assisted such a violation.  *See Espuelas*, 579 F. Supp. 2d at 471; *DiBella*, 587 F.3d at 566.

### A.    The Complaint Fails To Allege Mr. Dallavecchia's Or Mr. Lund's Actual Knowledge Of Any Securities Law Violation

The Complaint fails to allege that either Mr. Dallavecchia or Mr. Lund had actual knowledge of a primary securities law violation.[48]  The SEC nowhere alleges that Mr. Dallavecchia or Mr. Lund knew or believed (i) that EA loans met FNMA's definition of subprime but nevertheless were not included in its subprime calculations or (ii) that lender-selected process efficiency loans met FNMA's definition of Alt-A but nevertheless were not included in its Alt-A calculations.

Rather, in support of its claims that EA loans should have been disclosed as subprime, the

---

[47] The Complaint charges Mr. Lund only with violations of the Exchange Act.  Compl. at pp. 54, 56.  Accordingly, the SEC's prayers for penalties and a permanent bar against Mr. Lund under the Securities Act, *id.* at 57-58, must be dismissed as inapposite.  *See* 15 U.S.C. § 77t(d), (e).

[48] Apparently relying on a provision of the recent Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 ( "Dodd-Frank Act"), that permits the SEC to allege aiding and abetting violations based on recklessness, *see* 15 U.S.C. § 78t(e), the SEC attempts to lower its pleading burden with respect to the aiding and abetting counts.  This provision, however, is inapplicable here because it did not go into effect until July 22, 2010 -- almost two years after the Relevant Period alleged in the Complaint ended.  *See* Dodd-Frank Act § 4; *Daifotis*, 2011 WL 2183314, at *14 (declining to apply the Dodd-Frank Act retroactively).  In any event, the Complaint also fails to allege any conduct on the part of any Defendant that even approaches reckless behavior, let alone acting with knowledge.

SEC alleges that (i) Mr. Dallavecchia and Mr. Lund knew that FNMA's EA loans were experiencing delinquencies and causing disproportionate credit losses, (ii) EA loans were the highest credit risk loans in FNMA's book of business, and (iii) "it was well-known within FNMA that EA was generally considered subprime in the marketplace."  Compl. ¶¶ 46, 53, 66-67, 106.  In support of its claims that Messrs. Dallavecchia and Lund knew that all lender-selected process efficiency loans should have been disclosed as Alt-A, the SEC alleges that (i) FNMA's lender-selected process efficiency loans performed, on average, 1.4 times worse than fully documented loans with similar credit characteristics and (ii) "certain types" of lender-selected process efficiency loans performed as much as two times worse than similar fully-documented loans and as poorly as "some" Alt-A loans, and this was discussed at a staff meeting held by Mr. Lund on July 29, 2008, shortly before conservatorship.[49]  Compl. ¶¶ 165, 192.

The Complaint's reliance on the relative performance of and credit losses caused by different types of loan products is a red herring and is legally insufficient to show that Mr. Dallavecchia or Mr. Lund had knowledge of a securities law violation.  As explained in more detail above, FNMA's subprime and Alt-A definitions were explicit and consistent.  Neither definition had anything to do with loan performance or credit losses.  An allegation that Mr. Dallavecchia or Mr. Lund had access to reports showing that, for some period of time, EA loans performed worse than FNMA's subprime loan holdings, or that some lender-selected process efficiency loans, for some period of time, performed worse than some fully documented loans or as poorly as some Alt-A loans, has no bearing whatsoever on whether Mr. Dallavecchia or Mr. Lund knew or believed that EA loans satisfied FNMA's subprime definition or that lender-selected process efficiency loans satisfied FNMA's Alt-A definition.  Indeed, *some* grouping of

---

[49] The Complaint does not allege that Mr. Dallavecchia or Mr. Mudd was present at this meeting.

loans always can be found that performed better or worse than *some* other group of loans.[50]  This

is irrelevant to a determination of whether Mr. Dallavecchia or Mr. Lund knew that FNMA's

subprime and Alt-A disclosures, which did not define subprime or Alt-A based on performance

metrics, were inaccurate or constituted primary violations of the securities laws.

　　　　Further, the allegation that unnamed people "in the marketplace" believed EA loans to be

subprime, *see* Compl. ¶ 106, is wholly conclusory and says nothing about what Mr. Dallavecchia

or Mr. Lund actually knew or believed.  That other market participants may have perceived EA

loans to be risky does not demonstrate knowledge by Mr. Dallavecchia or Mr. Lund that these

loans satisfied FNMA's definition of "subprime" and does not, as a matter of law, plausibly

allege "actual knowledge" of a primary violation of the securities laws.

### B.　　The Complaint Fails To Allege That Mr. Dallavecchia Or Mr. Lund Substantially Assisted Any Primary Violation

　　　　The Complaint similarly fails to allege that Mr. Dallavecchia or Mr. Lund substantially

assisted any alleged primary violation.  "'A defendant provides substantial assistance only if [he]

affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables

the fraud to proceed.'"  *SEC v. Aragon Capital Advisors, LLC*, No. 07 Civ. 919, 2011 WL

3278907, at *17 (S.D.N.Y. July 26, 2011) (quoting *JP Morgan Chase Bank v. Winnick*, 406 F.

Supp. 2d 247, 256 (S.D.N.Y. 2005)).  To allege substantial assistance, the SEC must "allege that

the aider and abettor's conduct was a substantial causal factor in the perpetuation of the

underlying violation."  *Espuelas*, 579 F. Supp. 2d at 471  (citation omitted).  Further, the SEC

must allege that "the acts of the aider and abettor proximately caused the primary violation," *id.*

(citing *Treadway*, 430 F. Supp. 2d at 339), and "a 'but-for' concept of proximate cause will not

---

[50] *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 358-60 (declining to infer recklessness based on the poor performance of loans plaintiffs alleged should have been, but were not, disclosed as subprime).

satisfy this requirement," *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983) (citation

omitted).  Therefore, "mere awareness and approval of the primary violation is insufficient to

make out a claim for substantial assistance."  *Treadway* 430 F. Supp. 2d at 339.

> **1.**     **The Complaint's Allegations Regarding Mr. Dallavecchia's And Mr. Lund's "Awareness" And "Approval" Fail As A Matter of Law**

The Complaint is replete with allegations that amount to nothing more than "awareness"

or "approval" on the part of Mr. Dallavecchia and Mr. Lund.  These allegations fail as a matter

of law.  *Id.*  In support of its allegations that Mr. Dallavecchia and Mr. Lund aided and abetted

primary violations of the securities laws, the Complaint alleges that they:  were *members* of

FNMA's Disclosure Committee; *received* reports containing acquisition volume and

performance data with respect to EA loans; were *aware* that EA loans had high delinquency

rates; were *provided* with reports showing the credit losses attributable to EA loans; *received* a

document with information regarding EA loans that was "not ultimately made public;" were

*aware* of FNMA's increasing Alt-A exposure based on reports they *received*; and *recognized*

that *some* reduced documentation loans purchased by the company performed as poorly as *some*

Alt-A loans.  Compl. ¶¶ 49, 54, 67, 74, 76, 110, 112, 157, 159, 180, 192.  Without more, such

knowledge, awareness, and receipt of information does not constitute substantial assistance.

*Treadway*, 430 F. Supp. 2d at 339.  The Complaint completely fails to allege how such passive

conduct by Mr. Dallavecchia or Mr. Lund proximately caused the alleged securities law

violations.  Indeed, the Complaint fails to allege even a (legally insufficient) "but-for" causal link

between the passive conduct alleged in its Complaint and the alleged primary violations.  Even if

Mr. Dallavecchia and Mr. Lund "received," "recognized," or were "aware" of all of the

information alleged in the Complaint, this passive activity is insufficient to render either Mr.

Dallavecchia or Mr. Lund liable for substantially assisting a primary securities law violation.

### 2. The Complaint's Allegations Regarding Mr. Dallavecchia's And Mr. Lund's Sub-Certifications Fail As A Matter of Law

The Complaint alleges in conclusory fashion that Mr. Dallavecchia and Mr. Lund "approved" certain of FNMA's public filings and sub-certified its Forms 10-K and Forms 10-Q and, therefore, are liable for aiding and abetting the company's alleged primary securities law violations.[51]  Compl. ¶¶ 14, 20, 21, 50, 55, 92, 109, 117, 192.  The fact that both Mr. Lund and Mr. Dallavecchia "approved" FNMA's disclosures is insufficient as a matter of law to allege aiding and abetting liability.  At least one court that has considered similar allegations by the SEC -- that a defendant sub-certified the company's public disclosures -- rejected them as insufficient, as a matter of law, to allege substantial assistance.  *See, e.g., SEC v. Fraser*, No. CV-09-00443, 2009 WL 2450508, at *7-8 (D. Ariz. Aug. 11, 2009) (dismissing aiding and abetting claims after concluding that allegations that defendant "had some involvement in the creation of the Forms 10-K and thereafter certified in various documents that the forms were accurate" were "not sufficient to state a claim for substantial participation").  The Complaint notably fails to include any allegations about the nature of Mr. Dallavecchia's or Mr. Lund's review of these massive public filings, never mind the specific disclosures regarding "subprime" and "Alt-A" contained in only a few lines within them.  *See id.* at *8.  Absent specific, plausible allegations of affirmative conduct by Mr. Dallavecchia or Mr. Lund to assist substantially the making of the particular misrepresentations alleged in the Complaint, the Complaint's aiding and abetting claims fail as a matter of law.  *Id.*

### 3. The Complaint Fails To Allege That Mr. Dallavecchia's Public Statements Substantially Assisted Any Primary Violation

Similarly, the Complaint's aiding and abetting allegations against Mr. Dallavecchia based

---

[51] Significantly, the Complaint does not allege that Mr. Lund played any role in drafting any of FNMA's disclosures or any statements on behalf of FNMA, Mr. Mudd, or Mr. Dallavecchia.

on his comments during FNMA's February 2007 investor call, Compl. ¶ 93, fail as a matter of law.  During that call, Mr. Dallavecchia warned investors that around 5% of FNMA's book was loans to borrowers with FICO scores below 620 and that 8% of its book was loans with LTV ratios above 90%.  FNMA, Analyst's Conference Call (Feb. 27, 2007), at 6.  He further warned investors that the housing market was "moving through a challenging period," that a "notably less benign credit environment had taken shape," and that the potential existed for the first ever nationwide decline in housing prices.  *Id.* at 5.  He told investors that "credit performance in the market could deteriorate further."  *Id.*  If anything, these pessimistic statements demonstrate that Mr. Dallavecchia, rather than offering "substantial assistance" to the hypothetical fraud alleged in the Complaint, was actively warning investors about the risks FNMA faced.

## CONCLUSION

FNMA's subprime and Alt-A disclosures were accurate.  In addition, FNMA provided extensive disclosures of the credit characteristics for every single loan in its single-family book of business.  The three Defendants selected for blame by the SEC had no motive to mislead the investing public, and the SEC fails to allege that they did.  We respectfully request that the Court dismiss this misguided Complaint with prejudice.

Dated: March 30, 2012                                    Respectfully submitted,

                                                         /s/ *Michael N. Levy*_____
                                                         Michael N. Levy

                                                         BINGHAM MCCUTCHEN LLP

                                                         Michael N. Levy
                                                         michael.levy@bingham.com
                                                         Amy Carpenter-Holmes
                                                         amy.carpenter-holmes@bingham.com

2020 K Street, NW
Washington, DC 20006-1806
Telephone: (202) 373-6000

*Counsel for Defendant Thomas A. Lund*


DLA PIPER LLP

James D. Wareham
james.wareham@dlapiper.com
James E. Anklam
james.anklam@dlapiper.com
500 8th Street, NW
Washington, DC  20004-2131
Telephone: (202) 799-4000

John M. Hillebrecht
john.hillebrecht@dlapiper.com
1251 Avenue of the Americas
New York, NY  10020-1104
Telephone: (212) 335-4590

*Counsel for Defendant Daniel H. Mudd*


DECHERT LLP

Andrew J. Levander
andrew.levander@dechert.com
Hector Gonzalez
hector.gonzalez@dechert.com
David P. Staubitz
david.staubitz@dechert.com
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone: (212) 698-3500


MAYER BROWN LLP

Kelly B. Kramer
kkramer@mayerbrown.com
1999 K Street, NW
Washington, DC  20006-1101
Telephone: (202) 263-3000

*Counsel for Defendant Enrico Dallavecchia*

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2012, a true and correct copy of the Memorandum Of Law In Support Of The Motion Of Defendants Daniel H. Mudd, Enrico Dallavecchia, And Thomas A. Lund To Dismiss Plaintiff's Complaint was served electronically via the Court's Electronic Case Filing system on the following:

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

Preethi Krishnamurthy
krishnamurthyp@sec.gov
Alexander M. Vasilescu
vasilescua@sec.gov
Three World Financial Center, Suite 400
New York, NY 10281-1022
Telephone: (212) 336-1100

Natasha S. Guinan
GuinanN@sec.gov
Sarah L. Levine
levinesa@sec.gov
Stephen L. Cohen
cohens@sec.gov
100 F Street, NE
Washington, DC 20549-0001
Telephone: (202) 942-8088

*Counsel for Plaintiff SEC*

/s/  *Michael N. Levy*_____
Michael N. Levy