UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Case No. 11-CV-9202 (PAC) |
| | : | |
| | : | ECF Case |
| v. | : | |
| | : | |
| DANIEL H. MUDD, ENRICO DALLAVECCHIA, and THOMAS A. LUND, | : | |
| | : | |
| Defendants. | : | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF DEFENDANTS DANIEL H. MUDD, ENRICO DALLAVECCHIA, AND THOMAS A. LUND TO DISMISS PLAINTIFF'S COMPLAINT

Preethi Krishnamurthy
Sarah L. Levine (admitted *pro hac vice*)
Natasha S. Guinan
Alexander M. Vasilescu
Stephen L. Cohen (admitted *pro hac vice*)
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
(202) 551-4511 (Levine)

May 21, 2012

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

PRELIMINARY STATEMENT .......................................................................................1

THE COMPLAINT'S FACTUAL ALLEGATIONS ...................................................2
    I.    BACKGROUND .........................................................................................................2
    II.   THE SUBPRIME DISCLOSURE FRAUD ......................................................................3
        A.  Fannie's Subprime Loan Acquistions ............................................................3
        B.  The Misrepresentations About Fannie's Subprime Exposure....................4
    III.  THE ALT-A DISCLOSURE FRAUD ..........................................................................6
        A.  Fannie's Low-Documentation Loan Acquisitions ......................................6
        B.  The Misrepresentations About Fannie's Alt-A Exposure...........................7
    IV.  FANNIE'S POST-CONSERVATORSHIP ADMISSIONS .................................................8

STANDARD ON A MOTION TO DISMISS ..............................................................8

ARGUMENT ......................................................................................................................9
    I.  FANNIE IS SUBJECT TO THE EXCHANGE ACT...........................................................9
        A.  This Court Has Already Found That Fannie Is Subject
            to the Exchange Act..........................................................................................9
        B.  The Plain Language of Section 3(c) Excludes Fannie..................................9
        C.  Legislative History Shows Fannie Is Not an Independent Establishment...........11
        D.  Fannie's Charter Shows That the Exchange Act Applies to Fannie....................12
            1.  Congress reconstituted Fannie as a government-sponsored
               private corporation ..................................................................................12
            2.  Congress "exempt[ed]" Fannie's securities because Fannie
               was subject to the Exchange Act .............................................................13
        E.  Fannie Has Acknowledged That the Exchange Act Applies ..............................13
    II.  THE COMPLAINT ALLEGES MISREPRESENTATIONS AND/OR OMISSIONS...........................14
        A.  The Subprime Descriptions and Exposure Figures Were
            False and Misleading. .......................................................................................15
            1.  The Subprime Statements From February through April 2007 ..............15
            2.  The Subprime Statements From May through August 2007 ...................16
            3.  The Remaining Subprime Statements During the
               Relevant Period ........................................................................................19
            4.  Credit Risk Data Disclosed By Fannie Did Not Cure the Fraud..............20
        B.  The Alt-A Statements Were Misleading ..........................................................20

III.   THE ALLEGED MISREPRESENTATIONS AND OMISSIONS ARE MATERIAL........................22

    A.   The Other Disclosures Do Not Render the False Figures Immaterial................23

    B.   The Market Reaction Is Irrelevant to Materiality Under
        the Circumstances....................................................................................25

IV.   The Complaint Adequately Alleges Scienter.................................................27

    A.   The Complaint Adequately Alleges Mudd's Scienter ............................28

    B.   The Complaint Adequately Alleges Lund's Scienter...........................30

    C.   The Complaint Adequately Alleges Dallavecchia's Scienter ..............31

    D.   Fannie's Disclosure Process Does Not Negate Scienter.....................32

    E.   Fannie's Other Public Disclosures Do Not Negate Scienter.............32

    F.   Corrective Disclosures After the Relevant Period Do
       Not Negate Scienter................................................................................33

V.   THE COMPLAINT STATES A CLAIM UNDER SECTION 17(A)(2) .........................34

VI.   THE COMPLAINT STATES CLAIMS FOR AIDING AND ABETTING LIABILITY.................35

    A.   The Complaint Adequately Alleges Defendants' Scienter.....................35

        1.   The Complaint Alleges Defendants' Actual Knowledge .................35

        2.   Recklessness Also Satisfies the Scienter Element for These Claims .............36

    B.   Defendants Substantially Assisted Primary Violations ...........................38

CONCLUSION... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...40

# TABLE OF AUTHORITIES

## CASES

*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ................................................................15

*Armstrong v. McAlpin,*
    699 F.2d 79 (2d Cir. 1983) ................................................................39

*CSX Transportation, Inc. v. Alabama Department of Revenue,*
    131 S. Ct. 1101 (2011) ................................................................12

*Central Bank of Denver v. First Interstate Bank of Denver,*
    511 U.S. 164 (1994) ................................................................37

*Charles Hughes & Co. v. SEC,*
    139 F.2d 434 (2d Cir. 1943) ................................................................18

*Chiarella v. United States,*
    445 U.S. 222 (1980) ................................................................38

*In re Citigroup Inc. Securities Litigation,*
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) ................................................................21

*Colonial Bank & Trust Co. v. America Bankshares Corp.,*
    39 F. Supp. 797 (E.D. Wis. 1977) ................................................................10

*Cortec Industries, Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991) ................................................................15, 40

*In re Fannie Mae 2008 Securities Litigation,*
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) ................................................................9

*Ferber v. Travelers Corp.,*
    785 F. Supp. 1101 (D. Conn. 1991) ................................................................35

*Ganino v. Citizens Utilities Co.,*
    228 F.3d 154 (2d Cir. 2000) ................................................................22, 24

*In re General Electric Co. Securities Litigation,*
    __ F. Supp. 2d __, 2012 WL 90191 (S.D.N.Y. Jan. 11, 2012) ................................................................24

*German v. SEC,*
    334 F.3d 1183 (10th Cir. 2003) ................................................................37

*Graham v. SEC,*
  222 F.3d 994 (D.C. Cir. 2000) ................................................................................37

*Halperin v. eBankerUSA.com, Inc.,*
  295 F.3d 352 (2d Cir. 2002) ..................................................................................25

*Howe v. Bank for International Settlements,*
  194 F. Supp. 2d 6 (D. Mass. 2002) ......................................................................10

*IIT v. Cornfeld,*
  619 F.2d 909 (2d Cir. 1980) ..................................................................................36

*International Brotherhood of Teamsters, Chauffeurs, Warehousemen and*
  *Helpers of America v. Daniel,* 439 U.S. 551 (1979) ............................................13

*Iowa Public Employees' Retirement System v. MF Global, Ltd.,*
  620 F.3d 137 (2d Cir. 2010) ..................................................................................25

*Judicial Watch, Inc. v. Federal Housing Finance Agency,*
  646 F.3d 924 (D.C. Cir. 2011) ..............................................................................10

*Landgraf v. USI Film Products,*
  511 U.S. 244 (1994) ...............................................................................................37

*In re MBIA, Inc. Securities Litigation,*
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) ..................................................................22

*Martinez v. I.N.S.,*
  523 F.3d 365 (2d Cir. 2008) ..................................................................................37

*Mendrala v. Crown Mortgage Co.,*
  955 F.2d 1132 (7th Cir. 1992) ..............................................................................10

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000) ..................................................................................27

*O'Connor & Associates v. Dean Witter Reynolds, Inc.,*
  529 F. Supp. 1179 (S.D.N.Y. 1981) ......................................................................38

*O'Rourke v. Smithsonian Institution Press,*
  399 F.3d 113 (2d Cir. 2005) ..................................................................................11

*OKC Corp. v. Williams,*
  461 F. Supp. 540 (N.D. Tex. 1978) ......................................................................10

*Olkey v. Hyperion 1999 Term Trust, Inc.,*
  98 F.3d 2 (2d Cir. 1996) ........................................................................................25

*Ouaknine v MacFarlane,*
  897 F.2d 75 (2d Cir. 1990) ...................................................................................27

*P. Stolz Family Partnership L.P. v Daum,*
  355 F.3d 92 (2d Cir. 2004) ...................................................................................25

*Paisola v GAP Adventures, Inc.,*
  2012 WL 1019585 (S.D.N.Y. Mar. 26, 2012) ......................................................... 8

*Rombach v Chang,*
  355 F.3d 164 (2d Cir. 2004) .................................................................................33

*SEC v Brown,*
  740 F. Supp. 2d 148 (D.D.C. 2010) ......................................................................34

*SEC v Daifotis,*
  2011 WL 2183314 (N.D. Cal. June 6, 2011) .........................................................38

*SEC v Delphi Corp.,*
  2008 WL 4539519 (E.D. Mich. Oct. 8, 2008) .......................................................34

*SEC v DiBella,*
  587 F.3d 553 (2d Cir. 2009) ...........................................................................38, 39

*SEC v Escala Group Inc.,*
  2009 WL 2365548 (S.D.N.Y. July 31, 2009) .........................................................32

*SEC v Fehn,*
  97 F.3d 1276 (9th Cir. 1996) ...............................................................................37

*SEC v Forman,*
  2010 WL 2367372 (D. Mass. June 9, 2010) ..........................................................35

*SEC v Fraser,*
  2009 WL 2450508 (D. Ariz. Aug. 11, 2009) ..........................................................40

*SEC v Gabelli,*
  653 F.3d 49 (2d Cir. 2011) .........................................................................9, 20, 21

*SEC v Glantz,*
  1995 WL 562180 (S.D.N.Y. 1995) ........................................................................34

*SEC v Global Express Capital Real Estate Investment Fund I, LLC,*
  289 Fed. Appx. 183 (9th Cir. Aug 7, 2008) ..........................................................40

*SEC v Gold,*
  2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) ........................................................27

*SEC v. Hopper,*
    2006 WL 778640 (S.D. Tex. Mar. 24, 2006)........................................................34

*SEC v. KPMG LLP,*
    412 F. Supp. 2d 349 (S.D.N.Y. 2006)...............................................................37

*SEC v. Lybrand,*
    200 F. Supp. 2d 384 (S.D.N.Y. 2002)...............................................................37

*SEC v. PIMCO Advisors Fund Management LLC,*
    341 F. Supp. 2d 454 (S.D.N.Y. 2004)...............................................................37

*SEC v. Penthouse International, Inc.,*
    390 F. Supp. 2d 344 (S.D.N.Y. 2005).........................................................26, 37

*SEC v. Stanard,*
    2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ..............................................26, 34, 37

*SEC v. Tambone,*
    550 F.3d 106 (1st Cir. 2008).........................................................................34

*In re Scholastic Corp. Securities Litigation,*
    252 F.3d 63 (2d Cir. 2001)...........................................................................27

*Staub v. Proctor Hospital,*
    131 S. Ct. 1186 (2011)................................................................................39

*In re Take-Two Interactive Securities Litigation,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...............................................................27

*United States v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991).........................................................................26

*United States v. Sanders,*
    67 F.3d 855 (9th Cir. 1995)...........................................................................38

*In re Veeco Instruments, Inc. Securities Litigation,*
    235 F.R.D. 220 (S.D.N.Y. 2006)....................................................................33

## STATUTES AND RULES

12 U.S.C. § 1716b ......................................................................................12, 13

12 U.S.C. § 1723(a)-(d) ....................................................................................13

15 U.S.C. § 77c(a) ...........................................................................................12

15 U.S.C. § 77q(a)(2) .................................................................................... 34

15 U.S.C. § 78c(c) ................................................................................. 10, 12

15 U.S.C. § 78oo(a) .................................................................................... 13

15 U.S.C. § 78t(e) ....................................................................................... 37

24 U.S.C. § 411 .......................................................................................... 11

28 U.S.C. § 2671 .................................................................................. 11, 12

49 U.S.C. § 1111 ........................................................................................ 11

39 U.S.C. § 201 ................................................................................... 10, 11

Dodd-Frank, Pub. L. No. 111-203 § 929O, 124 Stat. 1376 ........................ 37

17 C.F.R. § 240.10b-5 ............................................................................... 19

Fed. R. Civ. P. 9(b) .................................................................................... 27

Fed. R. Civ. P. 15(a) .................................................................................. 40

## LEGISLATIVE MATERIALS

156 Cong. Rec. H5237 (daily ed. June 30, 2010) ..................................... 37

H.R. Conf. Rep. 73-1838 (1934) ............................................................... 12

H.R. Rep. 73-1383 (1934) ......................................................................... 12

H.R. Conf. Rep. 111-517 (2010) ............................................................... 37

S. Rep. No. 73-792 (1934) ......................................................................... 12

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this memorandum of law in opposition to the Defendants' Memorandum of Law in Support of the Motion of Defendants Daniel H. Mudd, Enrico Dallavecchia, and Thomas A. Lund to Dismiss Plaintiff's Complaint ("Defs.' Mem."). For the reasons set forth below, Defendants' motion should be denied in its entirety.

## PRELIMINARY STATEMENT

The Federal National Mortgage Association ("Fannie" or the "Company") and Defendants understated the Company's exposure to subprime and reduced documentation Alt-A loans by more than $440 billion during a time of heightened investor concern about such loans. The Complaint alleges that, in reporting and quantifying Fannie's exposure, Defendants— three of Fannie's senior executives— knowingly or recklessly excluded material volumes of loans matching Fannie's disclosed definitions of subprime and Alt-A. This provided investors with false comfort that Fannie's exposure to such loans was minimal when it was not. In moving to dismiss, Defendants mischaracterize the SEC's claims and quote selectively from Fannie's disclosures.

Defendants' arguments should be rejected for at least five reasons.

*First*, Section 3(c) of the Securities Exchange Act of 1934 (the "Exchange Act") plainly does not exclude Defendants from Exchange Act liability because Fannie is not an "independent establishment" of the United States. In the 74 years since Fannie was created no court has found otherwise, and Fannie has explicitly acknowledged that the Exchange Act applies to it. *Second*, Fannie's subprime and Alt-A disclosures clearly encompassed material quantities of loans that the Company excluded from its disclosed amounts of subprime and Alt-A loans. Defendants cannot— and do not— dispute the Complaint's allegations concerning the quantity and relative credit performance of the excluded subprime and Alt-A loans. Defendants also concede that Fannie never defined subprime or Alt-A loans by any other credit data the Company supplied. That data could

not therefore have contradicted, clarified or rendered immaterial Fannie's misleading disclosures. *Third,* the Complaint adequately alleges scienter for both the primary liability and aiding and abetting claims. The Complaint alleges that each Defendant received specific data concerning the excluded loans based on which each Defendant knew or recklessly disregarded that it was false and misleading to exclude those loans. The Complaint also alleges Defendants' individual roles in making, crafting and approving the misleading disclosures. *Fourth,* Fannie's first periodic filing after being placed into government conservatorship told investors— for the first time— it had "other loans with some features that are similar to" subprime and Alt-A loans. This admission demonstrates that Fannie's prior subprime and Alt-A disclosures were misleading. *Fifth,* the Complaint alleges that, at a minimum, Mudd and Dallavecchia received bonuses as a result of their fraud and therefore states a claim under Section 17(a)(2) of the Securities Act of 1933 (the "Securities Act"). For these and other reasons, Defendants' motion to dismiss should be denied in its entirety.

**THE COMPLAINT'S FACTUAL ALLEGATIONS**

**I.   BACKGROUND**

From at least December 6, 2006 through August 8, 2008 (the "Relevant Period"), Fannie was a shareholder-owned, government-sponsored enterprise established by Congress to support liquidity, stability and affordability in the mortgage market. (¶ 22.)[1] Fannie's common stock traded publicly on the New York Stock Exchange. (¶¶ 2, 24.) Fannie provided market liquidity by purchasing mortgage loans originated by lenders and securitizing them into mortgage-backed securities ("MBS"). (*Id.*) During the Relevant Period, Fannie's primary business segment was its Single Family Credit Guaranty business ("Single Family"). (¶¶ 29-30.) Single Family accounted for more than half of Fannie's net revenues. (¶ 30.) Among other things, it securitized single family mortgage loans into Fannie MBS. (*Id.*) The business earned revenue mainly from fees it received for guaranteeing the

---

[1] "¶" refers to paragraphs of the SEC's Complaint.

payment of principal and interest on loans underlying Fannie's Single Family MBS. (*Id*)

Mudd was Fannie's CEO from June 2005 until September 2008, its interim CEO from December 2004 until June 2005, and its chief operating officer from February 2000 until November 2004. (¶ 19.) Dallavecchia was Fannie's chief risk officer from June 2006 until August 2008, when he was removed by Fannie's Board of Directors. (¶ 20.) Lund, a Fannie employee since 1995, was executive vice president of Single Family from July 2005 until June 2009. (¶ 21.)

Mudd certified and Lund and Dallavecchia sub-certified each of Fannie's annual Forms 10-K and quarterly Forms 10-Q during the Relevant Period. (¶¶ 19-21.) Defendants each reviewed and approved the Forms 12b-25 filed on February 27 and May 9, 2007. (*Id*)

## II.   THE SUBPRIME DISCLOSURE FRAUD

### A.  Fannie's Subprime Loan Acquisitions

From at least the late 1990s, Fannie acquired and guaranteed subprime mortgage loans made to borrowers with weaker credit histories. (¶ 66.) The Company's two primary programs for such borrowers were Expanded Approval ("EA") and MyCommunityMortgage ("MCM"). (*Id*)

Prior to the Relevant Period, Fannie, both internally and in communications with government agencies, treated EA loans as subprime loans. (¶¶ 69-71, 75.) During the Relevant Period, Defendants knew EA and MCM loans had a higher likelihood of default than prime loans. (¶¶ 66-67, 90-92.) Defendants each knew EA loans were, on average, the highest credit risk loans on Fannie's entire book of business and contributed disproportionately to Fannie's credit losses. (¶¶ 67-68, 74-76, 90-91, 110-12, 118, 119.) Prior to the Relevant Period, investors and analysts understood EA and MCM-type loans were Fannie's main subprime exposure. (¶ 86.) In fact, on April 5, 2007, a senior Fannie executive emailed Lund and Dallavecchia, saying that "mcm and ea are much deeper risks that we take and many (if not all) in the market call EA subprime." (¶ 106.)

During the Relevant Period, Fannie's EA loans increased in volume from $43.3 billion in

3

2006 to $58.3 billion in 2008. (¶ 77.) By the end of the Relevant Period, EA and MCM loans totaled approximately 3.5% of Fannie's $2.8 trillion Single Family book of business. (¶¶ 28, 77.)

### B. The Misrepresentations About Fannie's Subprime Exposure

By early 2007, investors became increasingly focused on subprime loans and their default risks. (¶¶ 43, 81.) On February 6, 2007, Mudd sent a memo to the Board noting that investors and analysts were "focused on" Fannie's "subprime risk." (¶ 82.) In early 2007, Fannie's Disclosure Committee, which included Lund and Dallavecchia, decided to include for the first time a quantitative disclosure about the Company's subprime exposure in its public filings. (*Id*)

On February 23, 2007, in a call with investors, Mudd defined subprime mortgages as "those offered to borrowers with damaged credit." (¶ 84.) Four days later, Fannie's 12b-25 filing with the SEC similarly defined subprime broadly: "Although there is no uniform definition for sub-prime... sub-prime loans typically are made to borrowers with weaker credit histories." (¶ 85.) The 12b-25 then quantified the Company's subprime exposure: 0.2% of its Single Family book of business consisted of subprime mortgage loans or Fannie MBS backed by subprime mortgage loans and an additional 2% of the book consisted of other subprime securities. (¶¶ 85, 87.) That day, in a call with investors, Dallavecchia repeated the 0.2% figure and called it "immaterial," "prudent" and "modest." (¶¶ 93-95.) The next month, on March 15, Mudd similarly testified before a Congressional committee that "[s]ubprime simply means... that you have a credit blemish.... It's less than 2 percent of our book." (¶ 96.) One month later, on April 17, Mudd testified before the same committee that "'[s]ubprime' is, after all, simply the description of a borrower who doesn't have perfect credit" and that Fannie's subprime exposure was less than 2.5% of its book. (¶¶ 97-98.)

Defendants' false quantifications led investors to believe that Fannie's subprime exposure was negligible. (¶¶ 43, 81-82, 86-89.) In fact, at the time Fannie's Single Family subprime exposure was approximately ten times greater than disclosed— $43.3 billion rather than $4.8 billion. (¶ 87.)

4

Defendants' false quantifications of Fannie's subprime exposure continued throughout the Relevant Period. (¶¶ 100-46.) On May 2, 2007, Fannie filed its 10-K for the year 2005. (¶ 100.) It defined Fannie's subprime exposure as follows:

> 'Subprime mortgage' generally refers to a mortgage loan made to *a borrower with a weaker credit profile than that of a prime borrower*. As a result of the weaker credit profile, *subprime borrowers have a higher likelihood of default than prime borrowers*. Subprime mortgage loans are *often* originated by lenders specializing *in this type of business*, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of *these* specialty lenders. . . .

(¶ 101 (emphasis added).) On August 16, 2007, Fannie filed its 2006 10-K. (¶ 114.) It defined subprime loans even more broadly:

> In recent years, we have increased our acquisitions of loans *to borrowers with riskier credit profiles*, referred to as subprime loans by the industry. Subprime mortgage loans that we acquire are *generally* originated by lenders specializing in this type of business, using processes unique to subprime loans.

(¶ 114 (emphasis added).) These 10-Ks, along with the 12b-25 that Fannie filed on May 9, 2007, falsely minimized Fannie's exposure to subprime loans by using the same 0.2% and 2% subprime exposure figures as in prior filings. (¶¶ 101, 107-08, 114.) These figures excluded more than $57 billion of EA and MCM loans that fell within these subprime definitions. (¶¶ 102-08, 113-16.)

On November 9, 2007, Fannie filed similarly false 10-Qs for each of the first three quarters of 2007. (¶¶ 118-31.) The 10-Q for the first quarter of 2007 defined its subprime exposure as:

> A subprime mortgage loan generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans are typically originated by lenders specializing in this type of business *or by subprime divisions of large lenders*, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or a subprime division of a large lender.

(¶ 119 (emphasis added).) Using this or a comparable definition of subprime, these 2007 10-Qs falsely represented the same 0.2% and 2% subprime exposure figures, as of March 31, 2007, as

5

previous filings. (¶¶ 119-20.) On December 2, 2007, in a published newspaper interview, Mudd said, "We have about 2 percent of our broker's business in total that meets our definition of what would be a subprime loan, not a predatory loan, but typically a loan to an individual that has had a credit blemish in the past." (¶ 132.) These three 10-Qs and Mudd's public comments excluded more than $60 billion of EA and MCM loans from the Single Family subprime exposure that met the definition of subprime Mudd and the Company used— approximately twelve times greater than the amount disclosed. (¶¶ 121-33.)

Using similarly broad descriptions of subprime, Fannie's 10-K for the year 2007, filed on February 27, 2008, falsely excluded more than $94 billion of EA and MCM loans. (¶¶ 134-37.) Its 10-Qs for the first and second quarters of 2008, filed on May 6 and August 8, 2008, respectively, falsely excluded approximately $101 billion of EA and MCM loans— approximately 3% of the Single Family book. (¶¶ 138-45.) On August 20, 2008, Mudd, echoing these misleading figures, represented that "[s]ubprime to Fannie Mae means a loan to a borrower that has had a credit problem in the past" and falsely stated that Fannie has "about zero percent" exposure to subprime loans. (¶ 146.)

Throughout the Relevant Period, Defendants intended their own public statements and Fannie's public filings to falsely minimize the Company's subprime exposure by excluding EA and MCM loans that were issued to borrowers with weaker credit profiles, met the Company's descriptions of subprime, were considered subprime both inside and outside Fannie, performed worse than loans Fannie disclosed as subprime, and were responsible for a disproportionate amount of its credit losses. (¶¶ 14, 66-71, 72-76, 92, 97, 99, 104, 106, 110-12, 117-19, 133, 141-42, 146.)

## III.   THE ALT-A DISCLOSURE FRAUD

### A.   Fannie's Low-Documentation Loan Acquisitions

In 1999, Fannie increased its participation in low-documentation loans, often called Alt-A

loans. (¶¶ 1, 62-65, 151-54.) For example, in July 1999, Fannie and Countrywide Home Loans ("Countrywide") created a low-documentation "internet loan" marketed as the *Fast and Easy* loan. (¶ 63.) The loan allowed borrowers to obtain pre-approval for mortgages without providing documents to verify income or assets. (*Id.*) By the mid-2000s, Fannie increased its purchases of those and similar loans from other lenders to boost its market share. (¶ 64.) By 2006, 27.8% of Fannie's Single Family loan acquisitions were low-document loans, more than a 50% increase from 2004. (¶ 154.)

Internally, Fannie called low-documentation loans such as *Fast and Easy*, for which the lender ostensibly initiated the reduced documentation option for processing the loan, either "lender-selected" or "special lender program" loans. (¶¶ 163, 165.) Fannie internally called loans "borrower-selected" when the borrowers requested loans with low-documentation requirements. (*Id.*) As Defendants were aware, both lender-selected and borrower-selected loans performed worse than comparable loans with full documentation. (¶¶ 155-60, 165, 179, 192.) Internally, Fannie monitored all reduced documentation loans for credit risk purposes because reduced documentation loans had a higher risk of serious delinquency or default than comparable fully documented loans. (¶¶ 155-60.) Internally, Fannie tracked both lender-selected and borrower-selected loans as reduced documentation loans. (*Id.*) None of this was ever made known to the public.

### B. The Misrepresentations About Fannie's Alt-A Exposure

During the Relevant Period, Fannie's SEC filings defined Alt-A loans as follows (or substantially similarly):

> 'Alt-A mortgage' generally refers to *a loan that can be underwritten with lower or alternative documentation than a full documentation mortgage loan* but may also include other alternative features. As a result, *Alt-A mortgage loans generally have a higher risk of default than non-Alt-A mortgage loans*. In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features.

(¶¶ 176, 180 (emphasis added), 187.) The filings then quantified Fannie's exposure to such Alt-A

loans as a percentage of the Company's Single Family book. (¶¶ 161-67.)

Defendants knew the filings failed to disclose that the Company's Alt-A exposure figures did not include the loans internally tracked as lender-selected low documentation loans. (¶¶ 156-62, 177, 181, 185-86, 190-92, 195, 197.) For example, in Fannie's 10-Q filing on the last day of the Relevant Period, Defendants omitted approximately $341 billion of low-documentation loans from the Company's disclosed Alt-A business. (¶ 195.) The 10-Q falsely disclosed that the Company's Alt-A exposure was 11% of its Single Family business, rather than the actual figure of 23%. (*Id.*)

The filings also misrepresented that Fannie used the lender's impartial, third-party classification to determine when to classify and disclose loans as Alt-A. The filings did not disclose that Fannie— not the lenders— determined whether certain loans would be classified as Alt-A and that Fannie could therefore minimize the quantity of loans so disclosed. (¶¶ 168-71.)

IV.   **FANNIE'S POST-CONSERVATORSHIP ADMISSIONS**

On August 8, 2008, Fannie announced a net loss of $2.3 billion. (¶ 26.) It disclosed that the main cause of its credit losses was the deterioration of a small number of higher-risk loan products. (*Id.*) On September 6, 2008, Fannie's new regulator placed the Company into conservatorship. (¶ 27.) At around the same time, Mudd and Dallavecchia were removed from the Company, and Lund left the Disclosure Committee. (¶¶ 19-20, 147, 196.) In Fannie's very next filing, on November 16, 2008, it disclosed for the first time that it had "other loans with some features that are similar to" subprime and Alt-A loans that were not classified as subprime or Alt-A. (¶¶ 148, 149, 196, 197.)

## STANDARD ON A MOTION TO DISMISS

On a motion to dismiss for failure to state a claim, "a court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor." *Paisola v GAP Adventures, Inc.*, 2012 WL 1019585, at *2 (S.D.N.Y. Mar. 26, 2012) (citation omitted). To survive a

motion to dismiss, a complaint need only "'allege a plausible set of facts sufficient to raise a right to relief above the speculative level.'" *SEC v Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011).

ARGUMENT

## I.   FANNIE IS SUBJECT TO THE EXCHANGE ACT.

This Court and Fannie have each stated that the Company is subject to the Exchange Act. Defendants nevertheless argue that the entire Act is inapplicable to Fannie and its employees because Fannie is an "independent establishment of the United States" under Exchange Act Section 3(c). (Defs.' Mem. 11–19.) Defendants conflate the term "instrumentality" in the Securities Act with the term "independent establishment" in the Exchange Act. They also fail to recognize that only federal agencies or departments— unlike Fannie— have ever been deemed "independent establishment[s]" under Section 3(c).

### A.   This Court Has Already Found That Fannie Is Subject to the Exchange Act.

In the class action litigation against Fannie, Mudd, Dallavecchia and others, this Court specifically stated: "While Fannie is congressionally chartered, it is also a publicly owned corporation and subject to the Securities Exchange Act of 1934." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 392 (S.D.N.Y. 2010). None of the defendants in that action argued that the Exchange Act did not apply to Fannie— not Fannie, not Mudd, and not Dallavecchia. In fact, in the 74 years since Fannie was created, not a single court has held that the Act does not apply to Fannie.

### B.   The Plain Language of Section 3(c) Excludes Fannie.

Section 3(c) explains that the Exchange Act does not apply to "governmental departments or agencies." Fannie is not such an entity. Section 3(c) states:

> (c) *Application to Governmental Departments or Agencies.* No provision of this chapter shall apply to, or be deemed to include, any executive department or independent establishment of the United States, or any lending agency which is wholly owned, directly or indirectly, by the United States, or any officer, agent, or employee of any such department, establishment, or agency, acting in the course of his official duty as

9

such, unless such provision makes specific reference to such department, establishment, or agency.

15 U.S.C. § 78c(c). The plain meaning of Section 3(c)— especially when read with the heading— does not include Fannie. At least two Circuit Courts have held or assumed that Fannie or its sibling, Freddie Mac, are not agencies. *See Judicial Watch, Inc. v. Fed. Hous. Fin. Agency*, 646 F.3d 924, 926 (D.C. Cir. 2011) (Fannie and Freddie Mac "are structured as private corporations," and plaintiffs "acknowledge[d]" that they were not agencies for Freedom of Information Act purposes); *Mendrala v. Crown Mortgage Co.*, 955 F.2d 1132, 1134-39 (7th Cir. 1992) (Freddie Mac is not an agency for purposes of the Federal Tort Claims Act, which defines agency to include "independent establishment" of the government). Even Defendants do not argue that Fannie is a governmental department or agency. (Defs.' Mem. 11-19). Indeed, Defendants omit the entire heading from their quotation of Section 3(c). (*Id.* at 11 n.14.)

As far as the SEC is aware, courts have recognized only three governmental entities under Section 3(c) of the Exchange Act: the Federal Reserve Board, the Federal Deposit Insurance Corporation ("FDIC"), and the SEC itself. *See Howe v. Bank for Int'l Settlements*, 194 F. Supp. 2d 6, 24 (D. Mass. 2002) (Federal Reserve Board); *Colonial Bank & Trust Co. v. Am. Bankshares Corp.*, 439 F. Supp. 797, 802 (E.D. Wis. 1977) (FDIC); *OKC Corp. v. Williams*, 461 F. Supp. 540, 549 (N.D. Tex. 1978) (SEC). None of these entities sold shares to the public on a stock exchange, as Fannie did. None of them registered or filed disclosures with the SEC, as Fannie did. Each of them is a government agency or department with government employees, unlike Fannie.

Ignoring the defining "governmental departments or agencies" language, Defendants argue that "independent establishment of the United States" must include Fannie because Fannie is "independent" and an "establishment." This novel argument should be rejected. Although no court has defined the term "independent establishment" in Section 3(c), Congress has specifically designated certain entities as independent establishments. *See, e.g.*, 39 U.S.C. § 201 (Postal Service is

10

"an independent establishment of the executive branch of the Government of the United States");
24 U.S.C. § 411 ("Armed Forces Retirement Home is an independent establishment in the executive
branch."); 49 U.S.C. § 1111 ("The National Transportation Safety Board is an independent
establishment of the United States Government."). Congress has never designated Fannie an
independent establishment.

The Second Circuit's analysis of the term "independent establishment of the United States"
in the context of the Federal Tort Claims Act ("FTCA") confirms that the identical language in
Exchange Act Section 3(c) does not include Fannie. In *O'Rourke v Smithsonian Institution Press*, the
Second Circuit held that the Smithsonian is an "independent establishment[ ] of the United States"
under the FTCA. 399 F.3d 113, 122 (2d Cir. 2005) (quoting 28 U.S.C. § 2671). The Second Circuit
pointed to a series of factors in analyzing the Smithsonian's status, including: (1) "[w]henever the
Smithsonian is sued, representation is provided by government attorneys from the Department of
Justice"; (2) "[i]f a money judgment is entered against the Smithsonian, the judgment is paid from
the United States Judgment Fund"; and (3) "most of the Smithsonian's operational expenses, and
the judgments against it, are funded from the United States Treasury." *Id* at 119. Unlike the
Smithsonian, Fannie is not represented by the Department of Justice; money judgments against
Fannie are not paid from the U.S. Treasury; and Fannie's operational expenses are not funded by the
United States. Fannie funded its expenses by raising money in the capital markets.

**C. Legislative History Shows Fannie Is Not an Independent Establishment.**

Defendants argue that because this Court has held Fannie to be an "instrumentality of the
United States" under the Securities Act, Fannie must be an "independent establishment of the
United States" under the Exchange Act. Defendants improperly rely on House and Senate reports
from April 1934. (Defs.' Mem. 15.) Defendants claim this legislative history shows that Congress
intended Section 3(c) to exempt "instrumentalities … of the United States" from the Exchange Act,

11

even though the term "instrumentality" does not appear in Section 3(c). (*Id.* (citing H.R. Rep. 73-1383 at *18 (1934) & S. Rep. No. 73-792 at *14 (1934)).) Yet Defendants fail to cite the later conference report dated May 1934. *See* H.R. Conf. Rep. 73-1838 at *4 (1934). That conference report addresses the purpose of the bill and makes no reference to "government instrumentality" in discussing Section 3(c). *Id.; see CSX Transp., Inc. v. Alabama Dep't of Revenue*, 131 S. Ct. 1101, 1108 (2011) (rejecting house report's description, explaining that a later "Conference Report on the final bill abandoned the House Report's narrowing language and described the subsection as it was written").

Congress knew how to use the term "government instrumentality" when it wanted. The same Congress that used the term in the Securities Act did not include the phrase in Exchange Act Section 3(c) the following year. 15 U.S.C. § 77c(a); 15 U.S.C. § 78c(c). Congress has even used the terms "independent establishments of the United States" and "government instrumentality" in the same statutory section, demonstrating that Congress understands each term to be distinct. For example, the FTCA addresses "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States." 28 U.S.C. § 2671. Congress clearly treated "independent establishments of the United States" and "instrumentalities. . .of the United States" as two separate categories with distinct meanings. *Id.*

### D. Fannie's Charter Shows That the Exchange Act Applies to Fannie.

#### 1. *Congress reconstituted Fannie as a government-sponsored private corporation.*

Congress created Fannie in 1938 and restructured it in 1968 by dividing its responsibilities between Fannie and a new entity, Ginnie Mae. *See* 12 U.S.C. § 1716b. Fannie's 1968 statutory charter drew a clear distinction between Ginnie Mae, a government entity, and Fannie, a private corporation with government sponsorship. Congress declared that Ginnie Mae "will remain in the

Government," while Fannie "will be a Government-sponsored private corporation." 12 U.S.C. § 1716b. Ginnie Mae was designated as a government entity "administered under the direction of the Secretary [of Housing and Urban Development]." 12 U.S.C. § 1723(a). Fannie was structured as a "private corporation" to be stockholder-owned, managed by a board of directors elected by stockholders, and publicly traded. 12 U.S.C. §§ 1716b, 1723(a), 1723(b), 1718(a). Ginnie Mae employees are subject "to the civil service and classification laws," 12 U.S.C. § 1723a(d)(1), while Fannie employees are not, 12 U.S.C. § 1723a(d)(2). Ginnie Mae is exempt from federal taxes, 12 U.S.C. § 1723a(c)(1), while Fannie is not, 12 U.S.C. § 1723a(c)(2).

> 2. *Congress "exempt[ed]" Fannie's securities because Fannie was subject to the Exchange Act.*

Fannie's 1968 statutory charter designated Fannie's securities as exempt under both the Securities Act and the Exchange Act (although, as described below, not their anti-fraud provisions):

> All stock, obligations, securities, participations, or other instruments issued pursuant to this title shall, to the same extent as securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States, be deemed to be *exempt* securities within the meaning of laws administered by the Securities and Exchange Commission.

12 U.S.C. § 1723c (emphasis added).[2] If Congress had understood Section 3(c) to exclude Fannie from the entire Exchange Act, Congress would have had no reason to designate Fannie's securities as exempt from certain provisions of the same Act in 1968. Based on the more limited exemption for Fannie's securities, Fannie was not required to fulfill the Exchange Act's reporting obligations, including through periodic filings. Yet Fannie was (and is) subject to the anti-fraud provisions of the Securities and Exchange Acts, just like other issuers of exempted securities. *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Daniel*, 439 U.S. 551, 565 n.18 (1979) ("the antifraud provisions of the respective [Securities] Acts continue to apply" to exempted securities).

## E. Fannie Has Acknowledged That the Exchange Act Applies.

---

[2] In 2008, Congress declared that Fannie's securities are no longer exempt. *See* 15 U.S.C. § 78oo (a).

Fannie has explicitly acknowledged that it is subject to the Exchange Act and the SEC's enforcement authority under the Act. From 1968 through 2003, Fannie did not register with the SEC or file SEC disclosures. In 2003, Fannie voluntarily registered with the SEC. In anticipation of its registration, Fannie submitted a letter to the SEC acknowledging that if it chose to register, it would be subject to the SEC's full enforcement authority under the Exchange Act:

> Voluntary Exchange Act registration will also subject Fannie Mae to the provisions of the Exchange Act, and to the SEC's enforcement jurisdiction thereunder, applicable to issuers with securities registered under Section 12(g), except where the Exchange Act or the rules thereunder explicitly exclude "exempted securities."

(Decl. of Natasha S. Guinan ("Guinan Decl."), Ex. A.)

Fannie's acknowledgement is not surprising. Permitting an entity to register and make filings with the SEC but then immunizing that entity from liability for fraud in the filings, as Defendants propose, would undermine the very purpose of disclosure— to protect investors from fraud. During the Relevant Period, Fannie was registered with the SEC, made periodic SEC filings, and was subject to the antifraud provisions of the securities laws. Indeed, the SEC sued Fannie in 2006 for accounting fraud under the Exchange Act. *See SEC* v. *Fed. Nat'l Mortgage Ass'n*, No. 06-00959 (RJL) (D.D.C. 2006), Complaint. Fannie consented to jurisdiction in a court filing executed by Mudd, settled and paid $400 million dollars. (Guinan Decl., Ex. B.)

## II.    THE COMPLAINT ALLEGES MISREPRESENTATIONS AND/OR OMISSIONS.

The Complaint alleges that Defendants understated the percentage of Single Family subprime and Alt-A loans guaranteed by Fannie in order to mask the Company's true exposure to loans investors were increasingly concerned about. Through selective quotations and recharacterizations of the Complaint, Defendants nevertheless contend the subprime and Alt-A statements were literally true and therefore not actionable. (Defs.' Mem. 21-28.) To do so,

Defendants devote pages of their brief to providing their disputed view of certain loans.[3] Yet none of the documents Defendants reference— including extraneous documents that should not be considered on this motion and credit risk data contained in Fannie's filings— contradicts the Complaint's allegations that the subprime and Alt-A statements were false and misleading.[4]

## A. The Subprime Descriptions and Exposure Figures Were False and Misleading.

### 1. *The Subprime Statements From February through April 2007*

Fannie's quantitative subprime disclosures between February and April 2007 were false because they failed to include all loans that fell within Fannie's subprime description. In a 12b-25 filing with the SEC and in public statements Mudd and Dallavecchia made, Defendants broadly described subprime as loans made to borrowers with "a credit blemish," "damaged credit," "weaker credit histories," or "a borrower who doesn't have perfect credit," with no other qualifying language. (¶¶ 84-85, 96-97.) As Defendants each knew, Fannie targeted loans such as EA and MCM precisely to such borrowers. (¶¶ 66-68.) Yet Defendants reported Fannie's Single Family exposure to subprime loans as 0.2% when, including EA and MCM loans, it was ten times greater. (¶¶ 84-98.) Defendants cannot seriously contend that these statements were true. Even a Fannie memorandum Defendants

---

[3] For example, Defendants provide, without a single citation, their one-sided description of lender-selected low-documentation loans in an attempt to contradict the Complaint's allegations. (Defs.' Mem. 6-7.) Similarly, Defendants describe pricing and risk features of EA loans (*id* at 6), some of which are simply wrong. For instance, EA loans, like subprime loans, sometimes had prepayment penalties, contrary to Defendants' bald assertion to the contrary. In any event, these factual disputes should be resolved at trial, not on a motion to dismiss.

[4] Defendants cite several documents other than SEC filings, including apparent reports submitted by Fannie to HUD (Defs.' Mem. 4 n.4 & 40 n.42), a letter provided by Fannie to lenders in 2000 (*id* at 6 n.9), several articles about subprime loans (*id* at 8 n.10), and a 2007 selling guide Fannie provided to potential lenders, mortgage brokers, and borrowers (*id* at 40 n.41). None of these documents is referenced in, was relied on for, or is otherwise integral to the Complaint, and none should therefore be considered on this motion. *See A TSI Commc'ns, Inc. v Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff *and* upon which it relied in bringing the suit.") (emphasis added); *Cortec Indus., Inc. v Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991) (documents other than those filed with the Commission or attached or referenced in the complaint can be considered on a motion to dismiss if "there was undisputed notice to plaintiffs of their contents *and* they were integral to plaintiffs' claim.") (emphasis added).

cite in describing the EA program supports the Complaint's allegations. (Defs.' Mem. 6 & n.9.) The memorandum's subject line is "Eligibility of Mortgages to Borrowers *with Blemished Credit Records*" (emphasis added)— almost exactly the words Mudd used to publicly describe subprime loans.

Defendants nevertheless argue that the subprime statements were not misleading because the descriptions of subprime loans were not definitions but rather "a characteristic of many subprime loans." (Defs.' Mem. 24.)[5] This is an insupportable distinction without a difference. In a 12b-25 filed February 2, 2007, Fannie's only definition of its subprime exposure was loans "made to borrowers with weaker credit histories." (¶ 72.) As Defendants concede, at least until May 2, 2007, neither they nor Fannie disclosed any other classification criteria for subprime loans. (Defs.' Mem. 33.) Nor did they otherwise inform investors that, although weak credit was a subprime characteristic, Fannie did not define subprime loans that way. Defendants' statements plainly meant that 0.2% of Single Family's book consisted of loans made to borrowers with weaker credit histories, a figure that was false and misleading because it excluded loans made to precisely such borrowers.

2. *The Subprime Statements From May Through August 2007*

On May 2, 2007, Fannie filed its 2005 10-K, which quantified Fannie's Single Family subprime exposure as 0.2% of its book. (*Id.*) Fannie's 12b-25, filed on May 9, 2007, and its 2006 10-K, filed on August 16, 2007, contained substantially similar subprime descriptions and the same 0.2% figure. (¶¶ 107, 114.) This figure and language was false and misleading for three reasons.

*First*, the subprime description implied that the 0.2% figure included all loans made to borrowers with weaker credit profiles (or by lenders who specialized in making such loans), when in

---

[5] In each 10-K Fannie filed during the Relevant Period, the Company provided a *Glossary of Terms used in this Report*, noting that "[t]erms used in this report have the following meanings, unless the context indicates otherwise." Each glossary provided definitions for subprime and Alt-A loans. When Fannie reported the subprime and Alt-A exposure figures at issue, its glossary terms were identical to the definitions of Alt-A and subprime used in the Company's credit risk disclosures at issue here. (Guinan Decl. Ex. C.)

fact it did not include any EA and MCM loans that met that description, as Defendants knew. (¶¶ 103, 106.) Fannie's description of subprime loans begins with a broad defining statement:

> 'Subprime mortgage' generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers.

It then states that "[s]ubprime mortgage loans are often originated by lenders specializing *in this type of business*" and concludes with a sentence purporting to describe Fannie's classification of "loans as subprime if the mortgage loans are originated by one of *these* specialty lenders." (¶¶ 103, 106 (emphasis added).) Read together, the passage informs investors that Fannie's broad reporting of subprime exposure included all loans "by lenders specializing in *this type of business*"— that is, "*loan[s] made to... borrower[s] with... weaker credit profile[s].*" In fact, Fannie excluded billions of dollars of precisely such loans. Nothing in Fannie's description alerted investors that the Company *only* categorized loans as subprime if they were originated by certain unspecified lenders specializing in "loan[s] made to... borrower[s] with... weaker credit profile[s]."

> *Second,* Defendants incorrectly contend that these subprime statements were literally true because they stated that Fannie classified loans as subprime only if they were originated using "processes unique to subprime lending." (Defs.' Mem. 8, 24.) Defendants distort the plain meaning of the statements. The two applicable sentences read:

> Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans. In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders.

(¶ 101.) The first sentence provides a general description of subprime loans. The word "often" precedes the characteristics that follow, including "processes unique to subprime loans," meaning that they are typical, but not defining, features of such lenders. The next sentence represents that Fannie classified loans as subprime if they were originated by one of "these" lenders. Taken

together, the plain meaning of these two sentences is that Fannie broadly classified mortgage loans as subprime if (**but *not* only if**) they were originated by subprime specialty lenders, which often— but not always— used "processes unique to subprime loans." Nothing in this description suggested that Fannie categorized a loan as subprime only if it was originated by a subprime specialty lender *and* through unique subprime processes.[6] Nor did Fannie explain or define such processes.

*Third*, the descriptions falsely implied that in reporting its subprime exposure, Fannie included loans originated by all subprime specialty lenders, particularly those on HUD's subprime lender list. As Lund and other Fannie employees knew, HUD publicly posted a list of subprime lenders widely used by the mortgage industry. (¶ 104.) During the Relevant Period, the HUD list included 210 subprime lenders. (*Id.*) The May 2007 subprime language clearly implied that no more than 0.2% of the Single Family book consisted of loans originated by these lenders. (¶¶ 104-05.) In fact, Fannie arbitrarily included loans from only fifteen subprime lenders in its subprime figure, which no reasonable investor could have inferred. (¶ 105.) Fannie's subprime figure excluded many loans originated by other subprime lenders on the HUD list, including EA loans, and was therefore misleading. (*Id.*) Defendants contend that the subprime statements did not explicitly reference the HUD list. (Defs.' Mem. 24.)[7] Yet the reference to subprime "specialty lenders" implied that Fannie used the widely-accepted HUD list in categorizing loans as subprime. *See, e.g., Charles Hughes & Co. v SEC*, 139 F.2d 434, 437 (2d Cir. 1943) ("The law of fraud knows no difference between express representation on the one hand and implied misrepresentation or concealment on the other.").[8]

---

[6] The 2006 10-K contained slightly differently language with the same meaning: "Subprime mortgage loans that we acquire are *generally* originated by subprime lenders specializing in this type of business, using processes unique to subprime loans." (¶ 114 (emphasis added).)

[7] Defendants quote HUD, which states that not all loans made by subprime lender specialists are subprime loans. (Defs.' Mem. 24 & n.25.) This is irrelevant because Defendants purportedly classified loans as subprime if those loans were originated by a subprime specialty lender.

[8] To the extent the filings failed to inform investors that Fannie did not use the HUD (or any other) subprime lender list and arbitrarily included loans only from fifteen subprime specialty lenders, it was also an actionable

Defendants offer no *other* source listing fifteen lenders that investors might have referenced.

### 3.   *The Remaining Subprime Statements During the Relevant Period*

On November 9, 2007, Fannie filed 10-Qs for the first three quarters of 2007. (¶ 119.) The 10-Qs continued to represent that Fannie classified loans originated by subprime specialty lenders as subprime. (*Id.*) The 10-Qs added, for the first time, loans "typically originated… by subprime divisions of large lenders" to the Company's subprime classification. (¶¶ 119-20.) Fannie's 2007 10-K, filed on February 27, 2008, contained similar language. (¶ 134.) Fannie then represented that its Single Family subprime exposure remained at 0.2% and later 0.3% of its book. (¶¶ 119-20, 134.)

On December 2, 2007, Mudd represented in a published newspaper interview that 2% of Fannie's entire business "meets our definition of what would be a subprime loan, not a predatory loan, but typically a loan to an individual that has had a credit blemish in the past." (¶ 132.)[9] Mudd then added an explanation of "affordability product"— EA and MCM were types of such products— implying that those loans were included in the 2% subprime figure. (*Id.*) In fact, he knew that they were not and that Fannie's subprime exposure was much higher. (¶ 133.) On August 20, 2008, Mudd said in a radio interview that Fannie's exposure to subprime loans was "about zero percent." (¶ 146.)

These statements were false, both for the reasons described above concerning subprime specialty lenders and because Fannie neither tracked loans from "subprime divisions of large lenders" nor included them in the subprime figures. (¶¶ 123-31.) Indeed, Fannie acquired more than $28.5 billion of loans from Countrywide's subprime division alone during the Relevant Period— many times more than the 0.2% or 0.3% Single Family subprime figure disclosed. (¶¶ 126-28.)

---

omission, necessary "to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

[9] The 2% figure included securities, backed by subprime loans, held for investment.

### 4. *Credit Risk Data Disclosed By Fannie Did Not Cure the Fraud.*

Defendants further argue that the subprime quantifications could not have been misleading

because Fannie disclosed that approximately 5% and 8% of its Single Family book consisted,

respectively, of loans made to borrowers with FICO scores below 620 and loans with original LTV

ratios greater than 90%. (Defs. Mem.' 5, 25 & Levy Decl. App. A.) As Defendants point out,

however, Fannie did not define subprime loans by any of these credit metrics. (Defs.' Mem. 7, 8.)

Rather, Fannie described subprime as set forth in the preceding sections. Defendants cannot have it

both ways. If, as the Complaint alleges and Defendants concede, Fannie's definition of its subprime

exposure was not based on the disclosed credit risk metrics (including FICO scores and LTV ratios),

then that data could not have clarified or contradicted the false and misleading representations that

0.2% or 0.3% of the Single Family book consisted of subprime loans.[10] Indeed, the 8-Ks that Fannie

filed beginning in August 2007 did not disclose that at least an additional 2% of the Single Family

book consisted of subprime loans. They reiterated the false subprime figures and continued to give

investors false comfort that the Company's exposure to subprime loans was microscopic. (¶¶ 78-

80.)[11]

### B. The Alt-A Statements Were Misleading.

Throughout the Relevant Period, Fannie's filings described Alt-A loans as follows:

> 'Alt-A mortgage' generally refers to a loan that can be underwritten with lower or
> alternative documentation than a full documentation mortgage loan but may also
> include other alternative product features. As a result, Alt-A mortgage loans
> generally have a higher risk of default than non-Alt-A mortgage loans. In
> reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the
> lenders that deliver the mortgage loans to us have classified the loans as Alt-A
> based on documentation or other product features.

---

[10] Prior to August 2007, Fannie also did not disclose the percentage of Single Family loans that were riskier
because they had multiple credit risk factors, such as loans with both a FICO score below 620 and an LTV
ratio above 90%. *See, e.g.,* Levy Decl. App. A.

[11] Even if the Court were to accept Defendants' arguments that the subprime statements at issue were literally
true, "literally true statements that create a materially misleading impression" are actionable. *SEC v Gabelli,*
653 F.3d 49, 57 (2d Cir. 2011).

(¶¶ 180, 187.) Reasonable investors would have understood that language to mean that all "lower or alternative documentation" loans were included in the Alt-A exposure figures, as long as the lender informed Fannie that the loans had a reduced documentation feature. (¶¶ 168-71.) In fact, this description was intentionally misleading. Fannie instructed lenders not to code certain low-documentation loans— lender-selected loans such as *Fast and Easy*— as Alt-A and then excluded such loans from its Alt-A exposure figures. (*Id.*) On occasion, lenders coded lender-selected low-documentation loans as Alt-A, and Fannie then instructed the lenders to re-classify the loans prior to taking delivery. (¶ 170.) During the Relevant Period, Defendants and Fannie never disclosed that lender-selected low-documentation loans were excluded from the reported Alt-A figures. (¶¶ 161-71.) This practice falsely minimized the Company's reported exposure to risky low-documentation loans in a way that no reasonable investor could have understood.

Defendants nevertheless contend that their Alt-A statements were not misleading for three reasons that make no sense. *First*, Defendants contend that the Alt-A statements were not misleading because they were true: Fannie classified loans as Alt-A only when lenders did so. (Defs.' Mem. 26.) If so, the disclosures were "literally true statements that create a materially misleading impression" and therefore actionable. *Gabelli*, 653 F.3d at 57; *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 221, 235 (S.D.N.Y. 2010) (declining to dismiss allegations that Citigroup misled investors by quantifying two separate categories of transactions, "CDO-type" and "[m]ortgage-related," falsely implying that the former were not mortgage-backed). *Second*, Defendants contend that instructing lenders not to code lender-selected low-documentation loans as Alt-A was not itself misleading. (Defs.' Mem. 26-27.) This argument distorts the Complaint's allegations. Fannie implied that lenders independently classified low-documentation loans as Alt-A. Yet Fannie failed to explain that it had privately instructed lenders not to classify as Alt-A a large category of low-documentation loans that Defendants knew were riskier than fully documented loans. The Alt-A figures therefore

misled investors into believing that Single Family's exposure to risky, low-documentation loans was about half as much as it really was. *Finally*, Defendants contend that Fannie had no financial incentive to instruct lenders to understate Alt-A loans because Fannie would have received higher fees for lender-selected low-documentation loans if they had been coded as Alt-A. (*Id.* at 26-27.) In fact, Fannie had a financial incentive to lower its fees: increasing its market share. (¶¶ 39, 151-54.) Fannie and Defendants had another important reason to understate the Company's Alt-A exposure: to make its business look less risky to investors, Congress, and its regulator.

### III.   THE ALLEGED MISREPRESENTATIONS AND OMISSIONS ARE MATERIAL.

"Materiality is a mixed question of law and fact." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). At the pleading stage, the SEC "satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Id.* at 161. The Second Circuit has repeatedly held that "a complaint may not properly be dismissed... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at 162 (citation omitted).

The Complaint adequately alleges materiality. During a period of heightened investor concern about subprime and Alt-A loans, Defendants understated Fannie's subprime exposure by more than $100 billion and its Alt-A exposure by more than $340 billion. (¶¶ 43, 81-82, 144, 195.) The amount of Fannie's subprime and Alt-A loans was particularly "important to investors because of the volatility in the housing and secured-transaction markets." *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 569, 570, 574-86 (S.D.N.Y. 2010) (complaint pled materiality where it alleged a failure to disclose that $8.1 billion, or 1% of an insurer's portfolio, was exposed to assets backed in part by residential-mortgage-backed securities). Defendants contend that the subprime and Alt-A misrepresentations are not material as a matter of law because (1) Fannie provided other allegedly

22

corrective and cautionary information, and (2) the stock price did not drop when Fannie allegedly made corrective disclosures. These arguments have no merit and are not ripe for resolution.

### A. The Other Disclosures Do Not Render the False Figures Immaterial.

Defendants contend that certain disclosed credit risk metrics and cautionary language rendered immaterial the significant understatement of Fannie's subprime and Alt-A loans. (Defs.' Mem. 28-32.) In fact, none of the disclosed information contradicted the false figures.

Defendants first point to particular credit risk data, including the percentage of Fannie's book with FICO scores below 620 and with LTV ratios above 90%. (*Id* at 29-30, 35.) Yet, as Defendants acknowledge, Fannie never used FICO scores, LTV ratios, or the other disclosed credit data to define its subprime or Alt-A exposure. (*Id* at 1, 7.) Fannie's filings quantified its subprime and Alt-A exposure without reference to those credit metrics. (*Id* at 7.) Defendants admit they believed the manner of subprime loans' origination "resulted in additional material risk beyond that which could be measured by the credit characteristics disclosed in the detailed tables," and similarly that Alt-A loans "bore additional material risk of credit losses." (*Id*) While Defendants disagree that their description of such loans was misleading, they concede that the disclosed credit data did not capture the additional material risks of subprime or Alt-A loans. (*Id*) Indeed, the credit data did not provide any additional information about low-documentation or Alt-A loans. Defendants' argument boils down to this sleight of hand: Fannie defined and quantified its subprime and Alt-A exposure precisely because Defendants understood these definitions and quantifications captured a material risk not disclosed in the credit data. Yet, despite Defendants' understanding that the quantifications were material, they assert that the reasonable investor must have found the false quantifications immaterial in light of the disclosed credit data. (*Id* at 7, 28-32.) This tortured argument should be rejected. Investors were focused on Fannie's subprime and Alt-A exposure.

Defendants next point to more general cautionary language Fannie used in filings, including

the relaxation of some underwriting criteria, change in market conditions, rising delinquency rates, and other non-subprime or non-Alt-A loans "sensitive to further declines in home prices." (*Id.* at 30-32, 35.) Like the credit data, none of these disclosures alerted investors that Fannie had significantly understated its subprime and Alt-A exposure. (¶¶ 78-80, 131, 186.) For example, the August 2007 8-K touted by Defendants noted that, in addition to the reported subprime and Alt-A loans, 1% of the Single Family book consisted of loans with FICO scores below 620 and LTV ratios above 90%. (Defs.' Mem. 31.) It did not disclose that Fannie's reported subprime figure did not include EA and MCM loans that clearly fit its subprime description and totaled more than 2% of the same book. Nor did the 8-Ks ever address low-documentation or Alt-A loans.

In any event, these fact-intensive arguments should not be resolved on a motion to dismiss. In *Ganino*, the Second Circuit considered defendants' argument that their SEC filings "contained sufficient accurate information to neutralize any misleading impressions" created by the alleged fraudulent statements, as Defendants contend here. *Ganino*, 228 F.3d at 168. In reversing the district court's dismissal of the complaint, the Second Circuit explained: "[T]he corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements... .The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.* at 167 (internal citations and quotation marks omitted). Similarly, even if the disclosures Defendants rely on here were in any sense corrective, which they were not, their "intensity and credibility" should be assessed at trial, not on a motion to dismiss. *See, e.g., In re Gen. Elec. Co. Sec. Litig.*, __ F. Supp. 2d __, 2012 WL 90191, at *18, n.1 (S.D.N.Y. Jan. 11, 2012) (finding defendants' argument "that their qualitative statements were not material when read in the context of the specific warnings made" in the disclosures "unpersuasive at the motion to dismiss stage").

Defendants' reliance on *Halperin v eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002), and *Olkey v Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996), is misplaced. (Defs.' Mem. 32, 35.) In *Olkey*, the Second Circuit affirmed the dismissal of claims based on forward-looking oral representations "contradicted by plain and prominently displayed language in the prospectuses." 98 F.3d at 4, 9. Similarly, in *Halperin*, the Second Circuit affirmed the dismissal of a claim based on forward-looking statements contradicted by cautionary language in the same offering materials. 295 F.3d at 356-61. Both cases applied the "bespeaks caution" doctrine. *See Iowa Pub. Employees' Ret. Sys. v MF Global, Ltd.*, 620 F.3d 137, 142 n.12 (2d Cir. 2010) (analyzing the doctrine's line of cases, including *Olkey* and *Halperin*). That doctrine "applies only to statements that are forward-looking"— not misstatements or omissions of present or historical fact. *Id* at 142; *P. Stolz Family P'ship L.P. v Daum*, 355 F.3d 92, 96-98 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."). Defendants misrepresented Fannie's historical and then-current exposure to subprime and Alt-A loans. Neither the credit data nor the purported cautionary language contradicted the misleading statements or rendered them immaterial as a matter of law.

## B. The Market Reaction Is Irrelevant to Materiality Under the Circumstances.

Defendants next contend that the Complaint fails to allege materiality because Fannie's stock price did not drop following purportedly corrective announcements. This argument suffers from two flaws. *First*, there were no corrective disclosures during the Relevant Period, as the Complaint alleges.[12] Neither Fannie nor anyone else ever disclosed that the Company's subprime and Alt-A exposures were significantly greater during the Relevant Period. Defendants contend that Fannie "disclosed its classification criteria" for subprime loans in its May 2007 10-K and then disclosed in

---

[12] Fannie first made a corrective disclosure after it was under conservatorship. (¶¶ 147-49, 196-98.) By that time, Fannie had announced a net loss of $2.3 billion and its uncertainty as to whether it had enough capital to carry it through its losses— factors that had a much greater impact on its stock price. (¶ 26.)

August 2007 that it held low-FICO loans "aside from" its subprime loans. (Defs.' Mem. 32-33.) Defendants completely ignore the Complaint's allegations that the May 2007 10-K's definition and quantification of subprime was itself misleading, not corrective, and that the August 2007 8-K neither clarified nor corrected the reported quantity of subprime and Alt-A loans. (¶¶ 80, 100-06.) Furthermore, Defendants do not— and cannot— point to any corrective disclosures by the Company concerning its Alt-A loans during the Relevant Period. (Defs.' Mem. 33-34.) In fact, the 8-Ks fail to address them at all (other than to reiterate the falsely understated Alt-A loans).[13]

*Second*, Defendants' argument is particularly flawed because no stock price drop is required in this Circuit to plead or prove materiality. *See, e.g., United States v Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("[W]hether a public company's stock price moves up or down or stays the same... does not establish the materiality of the statements made, though stock movement is a factor the jury may consider relevant."); *SEC v Penthouse Int'l, Inc.*, 390 F. Supp. 2d 344, 353 (S.D.N.Y. 2005) ("[T]here is no requirement to allege or demonstrate any particular movement in a company's stock price in order to sustain the element of materiality on a Rule 12(b)(6) motion."); *SEC v Stanard*, 2009 WL 196023, at *22-25, 26 (S.D.N.Y. Jan. 27, 2009) (SEC proved at trial that misstatements were material, even though the stock price did not drop after a restatement). Unable to cite a single case from this Circuit to support their argument, Defendants instead cite two Third Circuit cases that contradict the Second Circuit's decision in *Bilzerian*. (Defs.' Mem. 33.) Defendants fail to mention that the Third Circuit's "special" materiality test, which requires a stock price drop following a corrective disclosure, runs counter to "the Second Circuit's rejection of a rigid formula for evaluating

---

[13] Defendants claim that an April 2008 *Wall Street Journal* article about Countrywide informed investors that Fannie did not classify lender-selected low-documentation loans as Alt-A. (Defs.' Mem 33-34.) Defendants do not bother to attach the article, perhaps because it says no such thing. The article merely reports that Fannie classified *Fast and Easy* loans as "prime," without providing the actual volume of such loans acquired by Fannie. (Guinan Decl. Ex. D at 1.) It says nothing about whether Fannie classified *Fast and Easy* loans as Alt-A or not. Because neither this article nor any of the other disclosures Defendants cite were corrective, the movement of Fannie's stock price thereafter is irrelevant.

materiality." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 291-92 (S.D.N.Y. 2008). The

Complaint alleges materiality regardless of Fannie's stock price.

## IV.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER.

To plead scienter, the SEC must "'allege facts giving rise to a strong inference of fraudulent

intent.'" *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). A "strong inference" of fraudulent intent

"'may be established *either* (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, *or* (b) by alleging facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness.'" *Novak*, 216 F.3d at 307 (emphasis added). Defendants

misconstrue more than a decade of Second Circuit law by arguing that the SEC must allege motive,

specifically stock sales by Defendants, to establish scienter.[14] (Defs.' Mem. 36-39.)

The Complaint alleges that Defendants knew or recklessly disregarded that Fannie's

subprime and Alt-A statements were false and misleading.[15] In its SEC filings, Fannie claimed to

inform investors about its credit risk, which Fannie discussed in terms of the relative performance of

its loans, measured by default rates, serious delinquency rates ("SDQs"), and ultimately credit losses.

(¶¶ 93, 101, 119 (citing 2007 10-Q (1Q) at 90 ("loans with a higher credit risk may cause a further

increase in the delinquencies and credit losses we experience"), 172, 180.) Fannie repeatedly defined

its subprime loan disclosure in part by noting that subprime loans generally have a higher rate of

---

[14] Federal Rule of Civil Procedure 9(b) provides that "the circumstances constituting fraud" "must [be] state[d] with particularity," but that "intent, knowledge, and other conditions of a person's mind may be alleged generally." Scienter allegations are therefore not subject to Rule 9(b)'s particularity requirement. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir. 1990) ("Allegations of scienter are not subjected to the more exacting consideration applied to the other components of fraud."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation.").

[15] "[T]ypically [complaints] have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.... We have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308; *see also SEC v. Gold*, 2006 WL 3462103, at *4 (E.D.N.Y. Aug. 18, 2006) (scienter can be shown when a defendant "consciously disregards 'red flags'").

default than prime loans, and it defined its Alt-A loan disclosure in part by noting that Alt-A loans generally have a higher risk of default than non-Alt-A loans. (¶¶ 101, 114, 119, 172, 180.) In its SEC filings, Fannie tied its acquisition of subprime and Alt-A loans to higher SDQ rates and credit losses, precisely the reason these loans were important to investors. (*Id*)

Defendants knew or recklessly disregarded that Fannie's filings were false and misleading. Defendants failed to include all the loans that a reasonable investor would understand to fall within Fannie's description of subprime and Alt-A and omitted the loans they knew investors cared about: loans that posed a comparatively higher credit risk by the very standards Fannie invoked in its filings— default, delinquency and credit loss.

## A.  The Complaint Adequately Alleges Mudd's Scienter.

The Complaint alleges in detail that Mudd knew his and Fannie's statements about the Company's subprime and Alt-A exposure were false and misleading. For example, Mudd knew he and Fannie misled investors by saying that the subprime exposure figures included loans made by specialty lenders "to borrowers with weaker credit histories" or "weaker credit profiles[s]," while excluding billions of dollars of precisely such EA and MCM loans. (¶¶ 85, 101, 119-20.) Mudd requested and received data, including a draft 8-K he received on August 3, 2007, alerting him that Fannie's EA loans were made to borrowers with "weaker credit profiles" than the loans Fannie disclosed as subprime and telling him the volume of Fannie's EA and MCM loans. (¶¶ 110-11.)

Mudd also knew, when he certified that "we have classified mortgage loans as subprime if the mortgage loans are originated by... a subprime division of a large lender," that Fannie's reported exposure to subprime loans did not include loans originated by "subprime divisions of large lenders." (¶¶ 124-28.) For example, in one particular meeting in February 2007 between Mudd and Countrywide's president, Mudd learned that Countrywide's subprime lending division alone

originated and sold more than $14.2 billion worth of loans to Fannie from 2004 through 2006—twice the amount of loans Fannie disclosed as subprime. (¶ 126.)

Mudd further knew that Fannie omitted loans that investors cared the most about and reasonably believed were included in the subprime exposure figures. For example, the draft 8-K Mudd received on August 3, 2007, showed that EA loans had higher SDQ rates than the disclosed subprime loans.[16] (¶ 110.) On October 26, 2007, Mudd received a report documenting that Fannie's credit losses from EA and MCM far outweighed losses from loans it disclosed as subprime. (¶ 118.) Mudd also knew from this and other reports he received that EA loans suffered credit losses "disproportionate to the amount of the book they constitute[d]." (¶ 137.)

The Complaint also alleges Mudd's scienter as to the misleading Alt-A statements. It points to specific information Mudd received showing that lender-selected low-documentation loans fell within Fannie's description of Alt-A and were riskier than full documentation loans, but were not included in Fannie's reported Alt-A figures. Mudd regularly received internal reports on and monitored the low-documentation loan acquisition trends at the Company and the attendant credit risk those loans presented. (¶ 155.) For example, Mudd received a quarterly CEO briefing dated April 2006, stating that credit risks, including reduced documentation, were a strong predictor of serious delinquency within the first year of a loan's acquisition and therefore presented significant credit risk. (¶ 156.) Indeed, internal reports to which Mudd had access tracked both lender-selected and borrower-selected low-documentation loans precisely because both had delinquency rates higher than otherwise comparable, full documentation loans. (¶¶ 155, 163, 165.) Mudd also knew that lender-selected low-documentation loans were categorically excluded from the reported Alt-A exposure figures. For example, the April 2006 CEO briefing stated that 20.2% and 23.5% of Single Family loans were reduced documentation loans by the end of 2005 and February 2006, respectively.

---

[16] Lund and Dallavecchia also received this August 3, 2007 data in the form of a draft 8-K. (¶¶ 110-12.)

(¶ 156.) Because these figures were about twice as large as Fannie's reported Alt-A exposures, Mudd knew that about half of Single Family's low-documentation loans, all of which investors believed Fannie included in its Alt-A exposure, were not included in the reported Alt-A figures. (¶ 162.)

### B. The Complaint Adequately Alleges Lund's Scienter.

Lund, the most senior executive in charge of Single Family, knew and had access to information contradicting the misleading subprime and Alt-A exposure figures. For example, Lund knew EA loans were the highest credit risk loans on Fannie's book. (¶ 67.) On April 5, 2007, towards the beginning of the Relevant Period, a Fannie senior officer e-mailed Lund, along with Dallavecchia, that "mcm and ea are much deeper risks that we take and many (if not all) in the market call EA subprime." (¶ 106.) From reports he received at the time, Lund also knew EA loans were the type of loans that investors were concerned about: EA loans were on average the highest credit risk loans on Fannie's book and performed worse than the loans disclosed as subprime. (¶¶ 67, 112.) Lund also received documents showing, among other things, that EA and MCM loans suffered greater losses than the loans Fannie reported as subprime and that credit losses from EA loans were disproportionate to Fannie's total book. (¶¶ 118, 137.) Lund further knew the HUD subprime lender list was an authoritative source for subprime-lender identification in the mortgage industry and was at least reckless in not knowing that loans from lenders on the HUD list were excluded from Fannie's reported subprime exposure. (¶ 104.)

Lund also knew that Fannie's statements about its Alt-A exposure were misleading. During the Relevant Period, Lund's staff routinely prepared presentations and reports about Fannie's increasing acquisitions of low-documentation loans and the credit risks associated with those loans, including their SDQ rates. (¶¶ 156, 160, 165.) As the head of Single Family, Lund had access to data and information prepared by his employees, as well as Early Warning reports— all of which conveyed, according to his staff, that "[l]ow doc is more likely to default than full doc." (¶ 160.) At

least by July 29, 2008, Lund had also learned that *Fast and Easy* loans performed as poorly as some

loans included by Fannie in its reported Alt-A exposure. (¶ 192.) Based on other reports and data

Lund received, including a regular loan acquisition report known as the "Tom Lund Report," Lund

further knew that Fannie's reported Alt-A figures excluded about half of the low-documentation

loans that investors believed Fannie counted as Alt-A. (¶¶ 159, 162, 179, 192.)

      C. **The Complaint Adequately Alleges Dallavecchia's Scienter.**

      Dallavecchia was head of a team "tasked with developing a definition of 'sub-prime,' as well

as providing the numbers." (¶ 83.) Dallavecchia received reports and had access to information

showing that EA and MCM met Fannie's description of subprime as loans to borrowers with

"weaker credit histories" or "riskier credit profiles." (¶¶ 67, 85, 110-113, 114.) Dallavecchia also

knew that the omitted EA and MCM loans were riskier than the loans Fannie included in its

subprime exposure and that investors considered these types of loans subprime. (¶ 106.) He

regularly received reports and had access to information indicating that EA loans were on average

the highest credit risk loans on Fannie's books and contributed disproportionately to credit losses.

(¶¶ 106, 110-113, 118, 137.) For example, by July 2008, Dallavecchia had emailed Mudd directly to

highlight that EA and MCM were generating approximately 20% of the Company's credit losses.

(¶ 141.) By the beginning of August 2008, Fannie internally classified EA and MCM as two of its

three highest-risk loan products and made plans to eliminate the EA loan program to improve the

overall credit quality of its Single Family book. (¶ 142.)

      As for Alt-A, Dallavecchia regularly monitored the total low-documentation loan acquisition

trends at the Company and the related credit risk those loans presented via internal reports. (¶ 155.)

For example, at the beginning of his tenure in June 2006, Dallavecchia was briefed on Fannie's

increasing stake in low-documentation loans. (¶ 157.) Throughout the fall of 2006, Dallavecchia

received drafts of Fannie's 2004 10-K, which contained detailed acquisition data about low-

documentation mortgages, including quantitative data that showed such mortgages "represented approximately 18%, 20% and 24% of our single-family acquisitions in 2004, 2005, and the first half of 2006." (¶ 158.) Dallavecchia therefore knew that Fannie omitted approximately half of the low-documentation loans from its reported Alt-A exposure. (¶ 162.)

### D. Fannie's Disclosure Process Does Not Negate Scienter.

Defendants argue that Fannie's general disclosure process somehow negates scienter. The mere existence of a disclosure committee and the involvement of lawyers in the process— facts not alleged in the Complaint— are insufficient to dismiss allegations of disclosure fraud. Defendants' argument amounts to an affirmative, advice-of-counsel defense, which Defendants have not formally asserted. That argument is premature; Defendants' scienter-based defense should be assessed by the factfinder at trial, not on a motion to dismiss. *See, e.g., SEC v Escala Group Inc.*, 2009 WL 2365548, at *1, 14 (S.D.N.Y. July 31, 2009) (denying a motion to dismiss Section 10b-5 claims against a CFO on the company's disclosure committee, who argued that he "deferred" to the "judgment of in-house counsel" concerning related party disclosures, and holding that defendant could attempt to defeat the scienter-based allegation at trial by demonstrating good faith).

### E. Fannie's Other Public Disclosures Do Not Negate Scienter.

Defendants argue that public discussions about the Company's affordable housing loan programs in filings and public statements negate any inference of scienter. (Defs.' Mem. 40.) Defendants misconstrue the SEC's claims. The Complaint does not allege that the Company failed to provide information about the affordable housing loan programs; rather, it alleges that the subprime disclosures caused investors to reasonably believe that EA and MCM loans were included in the reported subprime exposure figures, when they were not. (¶ 5.) Leaving out large amounts of EA and MCM loans led investors to underestimate Fannie's subprime exposure. (¶¶ 8, 13.)

Defendants attempt to exonerate Mudd by pointing to a September 2007 speech in which Mudd urged investors not to rely upon "vague, prosaic titles that pass for market data—[such as] 'subprime,' [and] 'Alt-A." At the time, the Company had been quantifying its subprime and Alt-A exposure to investors for approximately seven months, precisely because Mudd knew how important subprime and Alt-A loans were to investors. Mudd's statement— at best, a futile attempt to redirect investors' concern from subprime and Alt-A exposure figures to other data— underscores the importance of these figures to investors, even given the other credit data provided by Fannie. Far from constituting a mitigating "warning" to investors, this statement is an admission by Mudd that he knew the company's disclosures and his statements about subprime and Alt-A disclosures were important and misleading to investors. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (a warning does not provide "'protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away'")*; see also In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) (Warnings must be "reasonably specific as opposed to generic or boilerplate so as to constitute a real warning to investors.").

### F. Corrective Disclosures After the Relevant Period Do Not Negate Scienter.

Defendants claim there is no basis for an inference of scienter because Fannie "continues to classify subprime and Alt-A loans in the same manner." (Defs.' Mem. 41.) Defendants fail to mention that within weeks of being placed into conservatorship, when Mudd and Dallavecchia no longer worked at Fannie and Lund no longer belonged to its disclosure committee, Fannie disclosed for the first time that it had "other loans with some features that are similar to" subprime and Alt-A loans that were not classified as subprime or Alt-A. (¶¶ 147-50, 196-98.) These corrective

disclosures, which continue even in Fannie's most recent 10-K, strongly suggest that the subprime and Alt-A disclosures alleged in the Complaint were intentionally misleading.[17]

## V.   THE COMPLAINT STATES A CLAIM UNDER SECTION 17(A)(2).

The Complaint alleges that Mudd and Dallavecchia "directly or indirectly... obtain[ed] money or property by means of" their false statements. 15 U.S.C. § 77q(a)(2) (emphasis added). The plain language of Section 17(a)(2) "specifically imposes liability on all those who 'obtain money or property' through fraud, not only on those who 'profit' from such activity." *SEC v. Glantz*, 1995 WL 562180, at *5 (S.D.N.Y. Sept. 20 1995). The SEC states a claim where "[i]t is reasonable to infer" that the fraud "factored into the calculation of" compensation, such as a salary or bonus. *SEC v. Hopper*, 2006 WL 778640, at *12 (S.D. Tex. Mar. 24, 2006). Section 17(a)(2) "does not require that the person alleged to have made the false or misleading statement... obtain money or property for [him]self. Rather, it is sufficient... [to] allege[ ] that [the defendant] made false statements to investors in connection with [the company's] efforts to raise money through its public offerings." *SEC v. Delphi Corp.*, 2008 WL 4539519, at *20 (E.D. Mich. Oct. 8, 2008); *SEC v. Tambone*, 550 F.3d 106, 128 & n.29 (1st Cir. 2008) (Section 17(a)(2) prohibits "*indirectly* obtaining money by means of an untrue statement"), *reh'g en banc granted and op. withdrawn*, 573 F.3d 54 (2009), *and op. reinstated in relevant part*, 597 F.3d 436, 450 (2010) (*en banc*).

The Complaint alleges that fraud factored into Mudd and Dallavecchia's compensation because each received a bonus tied to the Company's performance. (¶¶ 40-42, 53, 56, 58-60.) By understating the Company's exposure to subprime and Alt-A loans, the fraud kept Fannie's stock price— an important measure of corporate performance— from falling at a time of heightened

---

[17] For the reasons set forth in the sections above, the Complaint also states a claim against Mudd under Rule 13a-14. Citing two cases outside the Second Circuit, Mudd contends that no cause of action exists under that rule. (Defs.' Mem. 36 n.36.) He fails to point out that that is a minority view and "SEC claims brought under Rule 13a-14 are routinely permitted." *SEC v. Brown*, 740 F. Supp. 2d 148, 164-65 (D.D.C. 2010) (citing cases); *Stanard*, 2009 WL 196023, at *28.

investor concern about such loans.[18] This affected both the Company's efforts to raise money from investors through offerings and Defendants' own compensation.[19] (¶¶ 42, 44, 59, 60, 84-89, 93-95.) Dallavecchia's bonus was further tied to responsibility for "author[ing] the Risk Section of the 2004 10-K," one of the misleading disclosures at issue. (¶ 59.)[20]

## VI.   THE COMPLAINT STATES CLAIMS FOR AIDING AND ABETTING LIABILITY.

Defendants argue that the SEC's aiding and abetting claims under Section 20(e) of the Exchange Act should be dismissed because the Complaint fails to allege that Defendants had "actual knowledge" of and "substantially assisted" a primary violation.[21] (Defs.' Mem. 43-49.) Defendants ignore the Complaint's factual allegations and misstate the scienter standard.

### A.   The Complaint Adequately Alleges Defendants' Scienter.

#### 1.   *The Complaint Alleges Defendants' Actual Knowledge.*

The Complaint satisfies the scienter element of the SEC's aiding and abetting claims by alleging Defendants' actual knowledge. As set forth above in Parts II and IV, the Complaint alleges that Defendants and Fannie led investors to believe that the Company disclosed its entire exposure to subprime and Alt-A loans when Defendants knew that a material volume of loans meeting Fannie's reported subprime and Alt-A definitions were excluded. Defendants do not and cannot dispute their receipt of information and data concerning the excluded loans. The Complaint alleges

---

[18] The stock price was inflated because the fraud was material, as explained in Part III.B, even though there were no corrective disclosures resulting in precipitous stock price drops immediately afterwards.

[19] As reflected in the filings referenced in the Complaint, Fannie raised money through public offerings throughout the Relevant Period. (Guinan Decl. Ex. E.)

[20] Defendants argue otherwise, but neither of the cases they cite supports their arguments. First, they cite *SEC v. Forman*, which they claim requires allegations directly tying the misrepresentation to their compensation. (Defs.' Mem. 42-43 & n.45.) In fact, *Forman* imposes no such requirement and dismissed a Section 17(a)(2) claim because there was "no evidence that the employee bonus was tied to company performance or that Forman was an executive within the meaning of the bonus plan." *Forman*, 2010 WL 2367372, at *8 (D. Mass. June 9, 2010); (*compare* ¶¶ 40-42, 53, 56, 58-60). Second, they quote *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991), in which the court discussed allegations of compensation in the context of scienter, not Section 17(a)(2)'s "money or property" requirement. (Defs.' Mem. 43 n.45.)

[21] Defendants also contend that the SEC has failed to allege a primary violation for the reasons set forth in the rest of their brief. (Defs.' Mem. 44.) As shown above in Parts I through IV, their argument has no merit.

that when Defendants made, certified, or sub-certified the misstatements about subprime and Alt-A loans, they each knew that a much larger volume of loans with comparatively high delinquencies and credit losses fell within Fannie's reported definitions of subprime and Alt-A loans but were nevertheless excluded, as set forth above in Part IV.[22]

For instance, all three Defendants received data and information prior to the publication of Fannie's 2006 10-K alerting them that the Company's EA loans were larger in volume and had higher SDQ rates and credit losses than those loans Fannie reported as subprime. (¶¶ 67, 110-12.) Further, a senior officer specifically informed Lund and Dallavecchia that "mcm and ea are much deeper risks that we take and many (if not all) in the market call EA subprime." (¶ 106.) Lund and Dallavecchia attempt to sidestep this email by calling it "wholly conclusory." (Defs.' Mem. 46.) The email *is* conclusory. The sender concluded, as the SEC alleges, that EA loans were risky and subprime and told Lund and Dallavecchia exactly that. What Lund and Dallavecchia may have personally believed, despite the email, is a matter for trial— not a motion to dismiss.

### 2. *Recklessness Also Satisfies the Scienter Element for These Claims.*

Even if the Complaint's scienter allegations did not satisfy an actual knowledge standard, which they do, the SEC's allegations are nonetheless sufficient to plead aiding and abetting. Defendants' assertion that the aiding and abetting claims require actual knowledge is wrong. (Defs.' Mem. 44 n.48.) Recklessness satisfies the scienter standard for aiding and abetting claims.

In 1980, the Second Circuit held that recklessness was sufficient for aiding and abetting violations when the defendant owed a fiduciary duty to the victims. *See IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir. 1980). Fourteen years later, the Supreme Court held that there was no private right of

---

[22] Fannie put the relative credit performance of its subprime and Alt-A loans at issue in its periodic and other filings by repeatedly highlighting the delinquencies, defaults and credit losses associated with those loans. (¶¶ 101, 114, 119, 172, 180.) Thus, Defendants' knowledge about the relative credit performance of the excluded subprime and Alt-A loans is not a "red herring" argument (Defs.' Mem. 45-46), but a relevant and significant fact, as shown above in Part IV.

action for aiding and abetting Section 10(b) violations. *See Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 177-78, 191 (1994). In response, Congress enacted Section 20(e) of the Exchange Act, clarifying the SEC's authority to bring aiding and abetting claims against anyone who "knowingly provide[d] substantial assistance" to an Exchange Act violation. 15 U.S.C. § 78t(e) (1995) (amended 2010). Afterwards, courts in this District and other Circuits differed as to whether recklessness was sufficient for the SEC's Exchange Act aiding and abetting claims.[23]

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). It amended Section 20(e) "by inserting 'or recklessly' after 'knowingly.'" Dodd-Frank, Pub. L. No. 111-203 § 929O, 124 Stat. 1376. Under the Supreme Court's two-step test to determine whether this is a clarifying amendment that can be applied retroactively, the Court must first decide "whether Congress has expressly prescribed the statute's proper reach," and, if not, "'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 269-70, 280 (1994); *Martinez v. I.N.S.*, 523 F.3d 365, 370-77 (2d Cir. 2008). The Dodd-Frank amendment satisfies both steps. First, the Conference Report accompanying the bill shows that Congress intended it to be a clarifying amendment: It "*makes clear* that the intent standard in SEC enforcement actions for aiding and abetting *is* recklessness."[24] H.R. Conf. Rep. 111–517 (2010) (emphasis added). This is dispositive. Yet the amendment also satisfies the second step because by codifying the interpretation of various

---

[23] *See, e.g., Penthouse Int'l*, 390 F. Supp. 2d at 355 (recklessness sufficient where fiduciary duty existed); *SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 468 (S.D.N.Y. 2004) (same); *SEC v. Lybrand*, 200 F. Supp. 2d 384, 400 (S.D.N.Y. 2002) (finding recklessness argument "compelling" without resolving the issue); *Graham v. SEC*, 334 F.3d 1183, 1196 (10th Cir. 2003) (recklessness sufficient); *Graham v. SEC*, 222 F.3d 994, 1004 (D.C. Cir. 2000) (extreme recklessness sufficient); *but see, e.g., Stanard*, 2009 WL 196023, at *31-32 (actual knowledge required); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 382-84 (S.D.N.Y. 2006) (same); *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996) (same).

[24] Congressman Paul Kanjorski, Chairman of the House Financial Services Committee's Capital Markets Subcommittee, told the House of Representatives that the amendment "facilitates the ability of the SEC to bring actions against those individuals who aid and abet securities fraud" in that it "*clarifies* that the knowledge requirement to bring a civil aiding and abetting claim can be satisfied by recklessness." 156 Cong. Rec. H5237 (daily ed. June 30, 2010) (emphasis added).

federal courts— including the D.C. Circuit and some courts in this District— it imposes no new legal consequences on Defendants' conduct. *Cf. United States v. Sanders*, 67 F.3d 855, 857 (9th Cir. 1995) ("An amendment that resolves a circuit split generally clarifies and does not modify existing law."). Indeed, Defendants' conduct took place in Washington, D.C., where venue also exists. (¶ 24.) Under the law during the Relevant Period in both the D.C. Circuit and this District, Defendants could have been held liable for Exchange Act aiding and abetting violations based on recklessness, as set forth above in note 23.[25]

In the alternative, the Court should apply the pre-Dodd-Frank recklessness standard that several courts in this District applied to aiding and abetting claims when a fiduciary duty was owed to victims, as set forth above in note 23.[26] Here, Defendants were corporate officers who owed a fiduciary duty to the victims, Fannie's shareholders and prospective investors. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 227-28 & n.8 (1980); *O'Connor & Assocs. v. Dean Witter Reynolds, Inc.*, 529 F. Supp. 1179, 1184 (S.D.N.Y. 1981) ("Corporate officers and directors owe fiduciary duties to the corporation and its shareholders"). Therefore, the SEC's allegations of recklessness, as described above in Part IV, are sufficient to plead scienter for these claims.

### B. Defendants Substantially Assisted Primary Violations.

Dallavecchia and Lund argue that the Complaint fails to plead that they substantially assisted a primary violation because (1) mere awareness and approval, (2) mere sub-certification, and (3)

---

[25] Defendants incorrectly cite *SEC v. Daifotis*, 2011 WL 2183314, at *12-14 (N.D. Cal. June 6, 2011), for the proposition that Dodd-Frank cannot be applied retroactively. (Defs.' Mem. 44 n.48.) The *Daifotis* court addressed aiding and abetting claims under the Investment Company Act of 1940, which the SEC had no authority to bring in federal court before Dodd-Frank. Here, the SEC has long had authority to bring Exchange Act aiding and abetting claims under a recklessness standard, as described above.

[26] Defendants' reliance on *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009), is misplaced. (Defs.' Mem. 43-44.) There, the Second Circuit listed "knowledge" as an element of an aiding and abetting claim where the defendant at issue, DiBella, was not a fiduciary. 587 F.3d at 565 n.6 (quoting a Connecticut decision finding that a co-defendant was the sole fiduciary of the victim fund). The Second Circuit explicitly reasoned that it was relying on its pre-*Central Bank* cases, including *ITT*, which, as described above, found recklessness sufficient when a fiduciary duty exists. *Id.* at 566 & n.9.

Dallavecchia's representations on the February 2007 investor call do not constitute substantial

assistance. (Defs.' Mem. 46-49.) Their arguments fail for three reasons.

*First*, they ignore numerous specific allegations of their active roles and participation in the

fraud. As certifying and sub-certifying executive officers with fiduciary duties and disclosure-related

obligations, Dallavecchia and Lund were Disclosure Committee members who reviewed and edited

the subprime and Alt-A misstatements— Dallavecchia even wrote and took credit for some of

them.[27] (¶¶ 20-21, 45, 49, 50, 54-56, 59, 76, 83, 92, 93-95, 109-10, 117-18, 155, 158.) Dallavecchia

also made misleading oral statements on the February 2007 conference call. (¶¶ 93-95.) In any event,

even inaction can establish substantial assistance when, as here, it is "in conscious and reckless

violation of a duty to act." *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983). At a minimum,

Dallavecchia and Lund, as corporate officers and fiduciaries, failed to alert investors that the

reported subprime and Alt-A exposure figures excluded substantial amounts of qualifying loans.

*Second*, Dallavecchia and Lund argue that their sub-certifications and approvals of the public

filings at issue are insufficient as a matter of law because their conduct did not proximately cause the

false disclosures. (Defs.' Mem. 46.) Their argument misconstrues both the law and the allegations.

"Liability for aiding and abetting can be established by showing that the defendant joined the

specific venture and shared in it, and that his efforts contributed to its success, or, in other words, by

showing that the defendant consciously assisted the commission of the specific [violation] in some

active way." *DiBella*, 587 F.3d at 566 (citations omitted). The Second Circuit has required that a

defendant's conduct proximately cause the fraud, *Armstrong*, 699 F.2d at 92, and the Complaint's

allegations satisfy that requirement. "Proximate cause requires only 'some direct relation between the

injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too

remote, purely contingent, or indirect.'" *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011). Here,

[27] Lund and Dallavecchia were the only Single Family and Chief Risk Office representatives, respectively, who served as members of the Disclosure Committee. (¶¶ 49, 54.)

Dallavecchia and Lund were active members of Fannie's Disclosure Committee and did not simply sub-certify Fannie's SEC filings, as described above.[28]

   *Third,* Defendants perfunctorily argue that Dallavecchia's remarks on a February 2007 investor call do not constitute substantial assistance because in addition to understating Fannie's exposure to subprime loans, Dallavecchia "actively warn[ed] investors about the risks Fannie faced." (Defs.' Mem. 48-49.) For the reasons set forth above in Part III.A, Dallavecchia's other statements on the call neither contradicted his misrepresentations nor merits dismissal of the aiding and abetting claims.

CONCLUSION

   For the reasons set forth above, the SEC respectfully requests that the Court deny Defendants' motion to dismiss the Complaint in its entirety.[29]

Dated: Washington, D.C.
       May 21, 2012

                                        By:    /s/  Natasha S. Guinan
                                               Preethi Krishnamurthy
                                               Sarah L. Levine (admitted *pro hac vice*)
                                               Natasha S. Guinan
                                               Alexander M. Vasilescu
                                               Stephen L. Cohen (admitted *pro hac vice*)
                                               Attorneys for Plaintiff
                                               Securities and Exchange Commission
                                               100 F Street, N.E.
                                               Washington, D.C. 20549-4030
                                               (202) 551-4511 (Levine)

---

[28] Defendants cite *SEC v. Fraser*, 2009 WL 2450508, at *7-8 (D. Ariz. Aug. 11, 2009), to argue that certifying financial statements is alone insufficient to establish substantial assistance. In *Fraser*, decided under Ninth Circuit law, the complaint "contain[ed] no allegation that Fraser had any role in the actual drafting or editing of the Forms 10-K," unlike this Complaint. *Id.* at *8. In fact, the Ninth Circuit has found that "reviewing, approving and certifying the [corporation's] misleading public filings" constitutes substantial assistance. *SEC v. Global Express Cap. Real Estate Inv. Fund I, LLC*, 289 Fed. Appx. 183, at *3 (9th Cir. Aug. 7, 2008).

[29] If the Court nevertheless dismisses the allegations about one or more particular misstatements or any claims, the SEC respectfully requests that the Court grant leave to replead. "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires.").