UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES SECURITIES AND  :
EXCHANGE COMMISSION,

          :   11 Civ. 09202 (PAC)

      Plaintiff,     OPINION & ORDER

  -against-      :

DANIEL H. MUDD, ET AL.,    :

      Defendants.   :
--------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 10, 2012
```

HONORABLE PAUL A. CROTTY, United States District Judge:

On December 16, 2011, the SEC instituted this action against Daniel Mudd, Enrico Dallavecchia, and Thomas Lund (collectively, the "Defendants"), for misleading investors concerning Federal National Mortgage Association's ("FNMA") level of exposure to risky subprime and reduced documentation "Alt-A" loans.  The SEC charged: (1) Mudd with violating Section 10(b) of the Exchange Act and Rule 10b-5 (Count One); (2) Mudd and Dallavecchia with violating Section 17(a)(2) of the Securities Act (Count Two); (3) all Defendants with aiding and abetting violations of Section 10(b) and Rule 10b-5 (Count Three); (4) Mudd with violating Rule 13A-14(A) of the Exchange Act (Count Four); and (5) all Defendants with aiding and abetting violations of Section 13(A) of the Exchange Act and Rules 12B-20, 13A-1 and 13A-13 (Count Five).[1]

On March 30, 2012, the Defendants moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the complaint, arguing: (1) Counts One, Three, Four, and Five, must be dismissed because Section 3(c) of the Exchange Act exempts Defendants from liability; (2) all Counts should be dismissed for failure to allege an actionable misrepresentation or omission; (3) Counts One and Three should be dismissed for failure to adequately allege scienter; (4) Count Two

---

[1]  The SEC entered into a non-prosecution agreement with FNMA.

should be dismissed for failure to state a claim under Section 17(a)(2); and (5) Counts Three and Five should be dismissed for failure to state a claim under Section 20(e).

For the reasons that follow, Defendants' motion to dismiss is DENIED.

## <u>BACKGROUND</u>

FNMA was established by Congress in 1938 to support liquidity, stability, and affordability in the secondary mortgage market.  (Compl. ¶ 22.)  In 1968, Congress reorganized FNMA "into two separate and distinct corporations":  (1) FNMA, which was to be "a Government-sponsored private corporation"; and (2) Ginnie Mae, which was to "remain in the Government."  12 U.S.C.A. § 1716b.

Defendant Mudd was FNMA's Chief Executive Officer from June 2005 through September 2008.  During that time, he certified FNMA's 10-Ks and 10-Qs, and reviewed and approved FNMA's Forms 12b-25.  (Compl. ¶ 19.)  Defendant Dallavecchia was FNMA's Chief Risk Officer from June 2006 through August 2008.  During that time, he sub-certified FNMA's 10-Ks and 10-Qs, and reviewed and approved FNMA's Forms 12b-25.  (<u>Id.</u> ¶ 20.)  Defendant Lund was FNMA's Executive Vice President of Single Family from July 2005 through June 2009.  During that time, he sub-certified FNMA's 10-Ks and 10-Qs, and reviewed and approved FNMA's Forms 12b-25.  (<u>Id.</u> ¶ 21.)

From December 6, 2006 through August 8, 2008 (the "Relevant Period"), FNMA was a shareholder-owned, government-sponsored enterprise, which was listed on the stock exchange, and issued stocks (common/preferred) and mortgage backed securities ("MBS").  FNMA's primary business during this time was its Single Family Credit Guaranty business ("Single Family").  (<u>Id.</u> ¶¶ 29-30.)

1. *FNMA's Subprime Exposure*

From at least the 1990s, FNMA acquired and guaranteed subprime mortgage loans made to borrowers with weaker credit histories, primarily through two programs: Expanded Approval/Timely Payment Rewards ("EA") and MyCommunityMortgate ("MCM").[2]  (Id. ¶ 66.)  Prior to the Relevant Period, FNMA, both internally and in communications with government agencies, treated EA loans as subprime.  (Id. ¶¶ 69-71, 75.)

By early 2007, investors had become increasingly focused on subprime loans and the risks associated with such loans.  (Id. ¶ 81.)  On a February 23, 2007 call with investors, Mudd defined subprime mortgages as loans "offered to borrowers with damaged credit."  (Id. ¶ 84.)  Four days later, on February 27, 2007, FNMA defined subprime mortgages in its Form 12b-25 as loans made to "borrowers with weaker credit histories."  (Id. ¶ 72.)  FNMA's Form 12b-25 stated that 0.2% of FNMA's Single Family book of business consisted of subprime loans or mortgage backed securities ("MBS") backed by subprime loans; and an additional 2% of the book consisted of other subprime securities.  (Id. ¶¶ 85, 87.)  On a conference call that same day, Dallavacchia stated that FNMA's 0.2% subprime exposure was "immaterial," "prudent," and "modest."  (Id. ¶¶ 93-95.)

Beginning on May 2, 2007, FNMA expanded its subprime disclosures, to state:

*"Subprime mortgage" generally refers to a mortgage loan made to a borrower with weaker credit profile*, than that of a prime borrower.  As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers.  *Subprime mortgage loans are often originated by lenders specializing in this type of business*, using process unique to subprime loans.  In reporting our subprime exposure, *we have classified mortgages loans as subprime if the mortgage loans are originated by one of these specialty lenders* or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as subprime when sold. . . . We also

---

[2]  MCM loans were often made to borrowers who lacked funds to make a sufficient down-payment and, thus, had high loan-to-value ("LTV") ratios.  FNMA defined a LTV ratio above 90% to be a "high LTV Ratio."  (Aug. 2007 Credit Supp. 3-4.)

> estimate that subprime loans represented approximately 2.2% of our single-family mortgage credit book of business as of December 31, 2006, of which approximately 0.2% consisted of subprime mortgage loans or structured FNMA Mae MBS backed by subprime mortgage loans and, to a lesser extent, resecuritizations of private-label mortgage-related securities backed by subprime mortgage loans.

(Id. ¶ 101 (emphasis added).)  In November 2007, FNMA expanded its subprime definition to include loans from "subprime divisions of larger lenders."  (Id. ¶ 119.)

FNMA's publicly disclosed subprime exposure failed to include its exposure to EA and MCM loans, despite the fact that these loans were made to borrowers with weaker credit histories.  In February 2007, FNMA had approximately $43.3 billion worth of EA loans, and $13.8 billion worth of MCM loans.  (Id. ¶ 102.)  FNMA's exposure to EA loans alone was approximately ten times as large as FNMA's disclosed subprime exposure.  (Id. ¶¶ 86-89.)  By February 27, 2008, FNMA had approximately $55.6 billion worth of EA loans, and $38.8 billion of MCM loans.  (Id. ¶ 135.)  FNMA's publicly disclosed subprime exposure also failed to include in full FNMA's acquisition of $28.5 billion worth of loans from Countrywide Home Loans' ("Countrywide") subprime division.  (Id. ¶¶ 126-28.)  Had FNMA's acquisition of such loans been included in full, FNMA's disclosed subprime exposure would have more than doubled.  (Id. ¶¶ 126-28.)

Mudd, however, continued to tell the public that FNMA had "about zero percent" exposure to subprime loans, which he defined as "a loan to a borrower that has had a credit problem in the past."  (Id.¶ 146 (August 20, 2008 radio interview).)

2.  *FNMA's Alt-A Exposure*

In July 1999, FNMA increased its participation in low-documentation loans, often called "Alt-A" loans.  (Id. ¶ 146.)  Specifically, FNMA and Countrywide entered into an alliance agreement, which included, inter alia, the creation of a reduced documentation

4

internet loan, eventually called the "Fast and Easy" loan.  The Fast and Easy loan allowed

applicants with qualifying FICO[3] credit scores to be preapproved for mortgage loans

without providing documentation to verify income or assets.  (Id. ¶ 63.)  Internally,

FNMA called low-documentation loans such as Fast and Easy, for which the lender

initiated the reduced documentation process, either "lender-selected" or "special lender

program" loans.  (Id. ¶¶ 163, 165.)  FNMA referred to other low/no documentation loans,

for which the borrower specifically requested the minimal documentation option, as

"borrower-selected" low-documentation loans.  (Id. ¶ 163.)  Both borrower-selected and

lender-selected low-documentation loans performed worse than comparable full-

documentation loans, and FNMA internally monitored all reduced documentation loans

for credit risk.  (Id. ¶¶ 155-160, 165, 192.)

> FNMA defined Alt-A loans as follows:
>
> *'Alt-A mortgage' generally refers to a loan that can be underwritten with lower or alternative documentation* than a full documentation mortgage loan but may also include other alternative product features.  As a result, Alt-A mortgage loans generally have a higher risk of default than non-Alt-A mortgage loans.  In reporting our Alt-A exposure, *we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation* or other product features.

(Id. ¶ 180 (emphasis added).)  FNMA did not include lender-selected low-documentation

loans in its Alt-A exposure calculations, because FNMA instructed lenders not to classify

such loans as Alt-A.  (Id.  ¶¶ 169-71.)  Thus, for example, FNMA's August 16, 2007 10-

K stated that Alt-A constituted 12% of FNMA's Single Family mortgage credit book,

when all low-documentation loans totaled 22% of the book.  (Id. ¶¶ 181-185.)

---

[3] "FICO refers to the Fair Isaac Corporation, which is the industry standard credit scoring system." Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 467 n. 6 (3rd Cir.2005). "FICO scores are based on a consumer's credit history." Id.

###### 3.  *Post-Conservatorship*

In its first post-conservatorship filing, in November 2008, FNMA added an additional disclaimer:  "we have other loans with some features that are similar to" both subprime and Alt-A loans "that we have not classified as [Subprime or Alt-A] . . . because they do not meet our classification criteria."  (Id. ¶¶ 148, 196.)

## **GENERAL LEGAL STANDARDS**

I.   General Motion to Dismiss Standard

When considering a Fed. R. Civ. P. 12(b)(6)  motion, the court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007); see Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009).   The court only "assess[es] the legal feasibility of the complaint"; it does not "assay the weight of the evidence which might be offered in support thereof."  Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003).

To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.   "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (citation omitted).

II.   Heightened Pleading Standards of Rule 9(b)

Fed. R. Civ. P. 9(b) requires a heightened pleading standard for complaints alleging fraud: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  See In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632–33

(S.D.N.Y. 2008).  This standard requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).

III.     Elements of Claims under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act prohibits any person from using or employing "any manipulative or deceptive device or contrivance in contravention" of SEC rules. 15 U.S.C. § 78j(b).  Rule 10b-5 prohibits "any device, scheme, or artifice to defraud" and "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . ."  17 C.F.R. § 240.10b-5.  To state a claim under Rule 10b-5, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005).

IV.     Materiality

A complaint alleging a Rule 10b-5 claim fails if it relies on statements or omissions "that a reasonable investor would [not] have considered significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).  "An omitted fact may be immaterial if the information is trivial, or is so basic that any investor could be expected to know it."  Id. at 162 (internal citations omitted).  "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Thus, "whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." Novak v. Kasaks, 216 F.3d 300, 315 (2d Cir. 2000).

V.      Scienter Pleading Standards in Fraud Claims

A plaintiff claiming fraud can plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006).  Recklessness sufficient to establish scienter involves conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care."  Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996). A "strong inference" of scienter may arise where the complaint sufficiently alleges that the defendants: "knew facts or had access to information suggesting that their public statements were not accurate . . . ."  Novak, 216 F.3d at 311 (internal citations omitted).

**ANALYSIS OF DEFENDANTS' MOTION TO DISMISS**

I.      Section 3(c) of the Exchange Act: As Applied to Counts One and Three-Five

Defendants argue that Section 3(c) of the Exchange Act exempts them from liability under the Act, and thus bars Counts One, Three, Four, and Five.  Section 3(c) provides:

*Application to governmental departments or agencies:*

No provision of this chapter shall apply to, or be deemed to include, any executive department or *independent establishment of the United States*, or any lending agency which is wholly owned, directly or indirectly, by the United States, or any officer, agent, or employee of any such department, establishment, or agency, acting in the course of his official duty as such, unless such provision makes specific reference to such department, establishment, or agency.

15 U.S.C.A. § 78c(c) (emphasis added).  Defendants argue that FNMA is an "independent establishment" of the United States because it was established by Congress and, as a private corporation, is largely independent.

The term "independent establishment" is neither defined, nor referred to elsewhere in the Exchange Act.[4]  Our analysis begins with Section 3(c)'s text.  "When interpreting a statute, the 'first step . . . is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  [The Court's] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Virgilio v. City of New York, 407 F.3d 105, 112 (2d Cir. 2005) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Robinson, 519 U.S. at 341.  Where the plain meaning is ambiguous, a court may consult extrinsic materials "to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005).

The ordinary meaning of the words "independent"—meaning "not dependent," "not subject to the control of others," "not subordinate," and "self-governing"—and "establishment"—meaning "that which is established"—do not clarify whether FNMA, a governmental sponsored private corporation, falls within Section 3(c)'s exception.  See

---

[4]  There are only three cases where a court has applied Section 3(c) of the Exchange Act.  See Colonial Bank & Trust Co. v. American Bankshares Corp., 439 F.Supp. 797, 803 (D.C.Wis. 1977) (holding that Section 3(c) barred a suit against the FDIC in its corporate capacity for tortious misrepresentation, because the suit was, "by virtue of § 2679(a), a suit against the United States."); Howe v. Bank for Intern. Settlements, 194 F.Supp.2d 6, 23-24 (D.Mass. 2002) (holding that Federal Reserve officials, as "Government officers acting in their official capacities," were exempt under Section 3(c) from liability); OKC Corp. v. Williams, 461 F.Supp. 540, 549 (D.C.Tex. 1978) (holding that SEC employees acting in the course of their official duties were exempt from liability under Section 3(c)). These cases are not binding, do not provide any analytical help, and do not involve similar entities.

Webster's International Dictionary 679 (2d ed.1934).  The context in which the term is used

sheds some light on it meaning.  The term "independent establishment" is placed between

"executive *departments*" and a "lending *agency*"; and the statute's title refers to the application

of the Exchange Act to "governmental *departments or agencies*."  Defendants are correct that the

header was added only upon codification, not by Congress (Def. Reply 2 & n.2), but "[i]t is well

established that the title of a statute or section is an indication of its meaning."  Bell v. Reno, 218

F.3d 86, 91 (2d Cir. 2000) (citing INS v. National Ctr. for Immigrants' Rights, Inc., 502 U.S.

183, 189 (1991)).

 If Section 3(c)'s exemption is limited to federal departments and agencies, then it is clear

that FNMA is not exempt.  Other Circuits considering this issue have concluded that FNMA and

Freddie Mac—FNMA's sibling which was established by the Government in 1970 as a private

corporation[5]—are not federal agencies.  See Judicial Watch, Inc. v. Federal Housing Finance

Agency, 646 F.3d 924, 926 (D.C. Cir. 2011) (holding that FNMA and Freddie Mac are not

federal agencies for purposes of FOIA requests); Mendrala v. Crown Mortgage Co., 955 F.2d

1132 (7th Cir. 1992)).  Mendrala held that Freddie Mac is not a federal agency under the Federal

Torts Claims Act ("FTCA").  The FTCA, which was established by Congress in 1948, defines a

"federal agency" to include "the executive departments, the judicial and legislative branches, the

military departments, *independent establishments of the United States*, and corporations

primarily acting as instrumentalities or agencies of the United States, but does not include any

contractor with the United States."  28 U.S.C.A. § 2671.  The Seventh Circuit considered:  "(1)

the federal government's ownership interest in the entity; (2) federal government control over the

entity's activities; (3) the entity's structure; (4) government involvement in the entity's finances;

---

[5]  Freddie Mac has essentially the same charter as FNMA, and was intended to provide competition to
FNMA.

and (5) the entity's function or mission." Id. at 1136.  The federal government does not have an ownership interest in Freddie Mac, and Freddie Mac does not receive appropriations from Congress.  Id. at 1138.  The Seventh Circuit thus concluded that the first and fourth elements were not satisfied.  Further, the federal government had only limited control over Freddie Mac, as the Board of Directors determined the general policies and supervised the exercise of Freddie Mac's powers.  The Board, in turn, was controlled by private shareholders—thirteen Board members are elected by voting shareholders and only five are appointed by the President.  Id.  While Freddie Mac is subject to regulation by the Housing and Urban Development ("HUD"), such regulation does not extend to Freddie Mac's daily operations.  Id.  In any event, the Circuit held that "extensive federal regulation does not convert an entity into a 'federal agency' under the FTCA."  Id.  Thus, the Circuit concluded that the second and third elements were not satisfied.  Finally, the Circuit found that while Freddie Mac furthers an important federal mission, "and does act as a federal agency or instrumentality in this sense," that this factor "is not dispositive when weighted against the other four factors."  Id. at 1138-39.  Indeed, "[a]ll federally chartered corporations further some congressional mission, but the fact that an entity is federally chartered does not make it a federal agency under the [FTCA]."  Id.  It thus concluded that Freddie Mac is not a federal agency, and thereby implicitly held that it is not an "independent establishment."

Applying the same test here, there is but one conclusion: FNMA is not an independent establishment within the meaning of Section 3(c).  FNMA is a private corporation, whose stock is listed on the exchange and is publicly traded.  FNMA is managed and controlled by a Board of Directors, who are elected by the shareholders.  See 12 U.S.C. §§ 1716(b), 1723(a), 1723(b), 1718(a).  FNMA pays its own way; it raises its operational expenses by generating revenue; and

it does not receive federal appropriations.  Of course, FNMA, like Freddie Mac, furthers an important federal mission, and is subject to regulation by HUD, but these facts are not dispositive when weighed against the other factors.  Under the Seventh Circuit's test, FNMA is not an "independent establishment."  Additional external indicia support this conclusion:  the Defendants in this action are not represented by the federal government;[6] money judgments against FNMA are not paid from the United States Treasury;[7] and FNMA is not exempt from federal taxes, see 12 U.S.C. § 1723a(c)(2).  In light of these considerations, it is not a surprise that no Court has ever held that FNMA is an independent establishment within the meaning of Section 3(c).

Section 3(c)'s legislative history and Congress's purpose in enacting the Exchange Act further reinforces the Court's view that FNMA is not an independent establishment.  The House and Senate Committee Reports issued in April 1934, reflect that the Exchange Act was initially drafted to exempt governmental "instrumentalities."  See H.R. Rept. 73-1383, at 18; S. Rep. No. 73-792, at 14.  This mirrored the language Congress used one year earlier in drafting the Securities Act of 1933.  See In re FNMA Mae 2008 Sec. Litig., 08 Civ. 7831 (PAC), 2009 U.S. Dist. LEXIS 109886, at *9-10 (S.D.N.Y. Nov. 24, 2009) (discussing how FNMA is exempt from liability under the '33 Act, because it is a governmental instrumentality).  By May 31, 1934, however, the exemption had been narrowed to apply to "independent establishments" with no

---

[6]  Notably in two of the three cases that have applied Section 3(c), the government defendants were represented in court by government attorneys, see Howe and OKC; in, Colonia Bank, FDIC's counsel was not specified.

[7]  Cf. O'Rourke v. Smithsonian Institution Press, 399 F.3d 113, 119, 122 (2d Cir. 2005) (holding that the Smithsonian, which was explicitly designated by Congress as an "independent establishment," qualifies as "the United States" for purposes of copyright jurisdiction, because "Congress authorizes appropriations for most" of its works, the persons responsible for its operations are either "United States officials of the highest rank" or person appointed by Congress, it was "represented by government attorneys," and judgments against it "are paid by the United States Judgment Fund, with funds appropriated by Congress.")

mention of "instrumentalities," <u>see</u> H.R. Conf. Rep. 73-1838 (House Conference Report), which is how the Act read when enacted in June 1934.  <u>Cf.</u> <u>Mendrala</u>, 955 F.2d at 1135 (suggesting that a federal agency, and thus independent establishment, is on par with corporations that "*primarily act*[ ] as instrumentalities").  Congress clearly knew how to define and exempt instrumentalities and define independent establishments.  Accordingly, the fact that FNMA qualifies as a government instrumentality is not dispositive of Defendants' liability under the Exchange Act.  <u>See</u> <u>id.</u> (holding that while Freddie Mac is, in some sense an "instrumentality," it is not an independent establishment).

Congress clearly knew how to designate an entity as an "independent establishment." Congress has explicitly designated the Postal Service, the Armed Forces Retirement Home, the National Transportation Safety Board, the Office of the Nuclear Waste Negotiator, the National Archives and Records Administration, and the Federal Maritime Commission as "independent establishments."  <u>See</u> 39 U.S.C. § 201; 24 U.S.C. § 411; 49 U.S.C. § 1111; 42 U.S.C. § 10242(a); 44 U.S.C. § 2102; 46 U.S.C. §301(a).  Despite having two opportunities to do so—in 1938, when FNMA was created, and in 1968, when FNMA was reorganized into a government sponsored private corporation—Congress never designated FNMA as an "independent establishment."

"The dominant congressional purposes underlying the Securities Exchange Act of 1934 were to promote free and open public securities markets and to protect the investing public from suffering inequities in trading, including, specifically, inequities that follow from trading that has been stimulated by the publication of false or misleading corporate information releases."  <u>S.E.C. v. Texas Gulf Sulphur Co.</u>, 401 F.2d 833, 858 (2d Cir. 1968).  Any doubt about the correctness of the Court's conclusion is eliminated by the FNMA's own conduct with respect to the

Exchange Act.  FNMA is a shareholder-owned private corporation that voluntarily registered under the Exchange Act in 2003, and "has, since then, been required to file periodic and current reports with the SEC . . . ."  (Compl. ¶ 23.)  In registering under the Exchange Act, FNMA explicitly acknowledged that:

> Voluntary Exchange Act registration will also subject Fannie Mae to the provisions of the Exchange Act, and to the SEC's enforcement jurisdiction thereunder, applicable to issuers with securities registered under Section 12(g), except where the Exchange Act or the rules thereunder explicitly exclude "exempted securities."

(Decl. Natasha S. Guinan, Ex. A.)   Indeed, FNMA has since been sued by the SEC, under the Exchange Act, for accounting fraud.  See SEC v. Fed. Nat'l Mortgage Ass'n, No. 06-00959 (RJL) (D.D.C. 2006).  Exempting FNMA's employees from liability for their false and misleading public statements would contravene the Exchange Act's purpose of protecting the investing public from false public filings.  Accordingly, the Exchange Act's purpose suggests that Section 3(c) does not apply to FNMA or the Defendants.

The Court concludes that FNMA is not an independent establishment under Section 3(c), and Defendants are not exempt from liability.

II.    An Actionable Misrepresentation or Omission: Relating to All Counts

The SEC has adequately alleged that FNMA's quantitative subprime and Alt-A disclosures were false because they failed to include all loans that fell within FNMA's subprime and Alt-A description.

FNMA's February 27, 2007 Form 12b-25 defined subprime as loans to borrowers with weaker credit histories.  (Compl. ¶¶ 72, 84.)  FNMA's EA and MCM loans were made to borrowers with weaker credit profiles, and thus fit FNMA's own definition of "subprime."  FNMA's Form 12b-25 subprime exposure calculations were thus

misleading because they failed to include FNMA's exposure to EA and MCM loans.  (Id. ¶¶ 66-68.)

Defendants argue that FNMA's expanded definition of subprime, beginning on May 2, 2007, clarified that it categorized a loan as "subprime" only if the loan (i) originated by subprime specialty lenders (ii) using processes unique to subprime.  They argue that since EA and MCM loans did not originate from subprime specialty lenders, FNMA's failure to include these loans in its subprime exposure calculations was not inaccurate or misleading.

FNMA's expanded definition stated that subprime loans "generally" are "loan[s] made to a borrower with weaker credit profile," which "often" or "typically" originate from "lenders specializing in this type of business, using process unique to subprime loans," and that FNMA quantified a loan as "subprime" if it originated from "these specialty lenders" or "subprime divisions of larger lenders."  (Id. ¶¶ 101, 119.)  A reasonable investor could interpret the "loan[s] made to . . . borrower[s] with weaker credit profile[s]" language as describing the "type of business" employed by the "specialty lenders" who "often" originated the loans that FNMA quantified as subprime. Mudd's public statements that FNMA's "definition of what would be a subprime loans, not a predatory loan, [is] typically a loan to an individual that has had a credit blemish in the past," support such an interpretation.  (Compl. ¶ 132 (December 2007 newspaper article).)  Under this interpretation, EA and MCM loans met FNMA's definition of subprime.  Accordingly, it was misleading to exclude these loans from FNMA's subprime exposure calculation.

In addition, FNMA's subprime definition explicitly included loans originated by "subprime divisions of larger lenders" (id. ¶¶ 101, 119), but FNMA's subprime exposure calculations failed to include in full FNMA's acquisition of $28.5 billion worth of loans from Countrywide's subprime division during the Relevant Period (id. ¶¶ 126-28).  FNMA misled investors concerning its total subprime exposure by failing to include in full its acquisition of Countrywide's subprime loans.  Accordingly, the SEC has adequately alleged that FNMA's quantitative subprime disclosures were misleading.

FNMA chose to define Alt-A as "a loan that can be underwritten with *lower* or alternative *documentation*," and stated that it categorized a loan as Alt-A if "the lenders that deliver the mortgage loan[ ] to us have classified the loan[ ] as Alt-A *based on documentation* or other product features."  (Id. ¶ 180.)  A reasonable investor could interpret FNMA's definition to mean that lenders classified all low documentation loans as Alt-A, and thus, FNMA's Alt-A exposure calculations include lender-selected low-documentation loans.

FNMA did not disclose, however, that it instructed lenders not to code certain low-documentation loans—including lender-selected loans—as Alt-A, and therefore excluded such low-documentation loans from its Alt-A exposure calculations.  (Id. ¶¶ 168-71.)  While FNMA's statement that it quantified loans as Alt-A when delivered as Alt-A may have been accurate, "'half-truths'—literally true statements that create a materially misleading impression  . . . will support claims for securities fraud."  S.E.C. v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011).  Accordingly, the SEC has adequately alleged that FNMA's quantitative Alt-A disclosures were misleading.

*1.   The Materiality of FNMA's False Statements*

FNMA's failure to include EA loans understated FNMA's subprime exposure by more than $60 billion; and its failure to include MCM loans understated FNMA's subprime exposure by an additional $41.7 billion.  (Compl. ¶ 144.)  FNMA's failure to include lender-selected low-documentation loans understated its Alt-A exposure by $341 billion.  (Id. ¶ 195.)  Such exposure would have been particularly "important to investors because of the volatility in the housing and secured-transaction markets."  In re MBIA, Inc., Sec. Litig., 700 F.Supp.2d 566, 586 (S.D.N.Y. 2010) (holding that a failure to disclose that 1% of the insurers' portfolio was exposed to assets backed in part by residential-mortgage-backed securities was material).

Defendants argue that FNMA's failure to include EA, MCM, and lender-selected low-documentation loans in its subprime and Alt-A exposure disclosures was immaterial because: (1) FNMA provided extensive credit metrics, which corrected any misimpression created by FNMA's subprime and Alt-A definitions; (2) FNMA increasingly warned investors about attendant risks as the housing market deteriorated; and (3) the market did not react negatively when corrective disclosures were made.

 "[N]ot every mixture with the true will neutralize the deceptive.  If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."  Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097 (1991).  FNMA's credit metrics quantified loans to borrowers with FICO credit scores below 620 (constituting approximately 5% of its Single Family portfolio), and loan-to-value ("LTV") ratios above 90% (constituting approximately 8% of its Single Family portfolio).  FNMA, however, did not define

subprime loans by FICO scores or LTV ratios.  Accordingly, it is not clear that this data would have corrected, clarified, or rendered immaterial FNMA's subprime exposure calculations.  Moreover, the credit metrics did not address loans' level of documentation, and thus would not have corrected FNMA's exposure to Alt-A loans.

It is plausible that the reason that the market did not react negatively to FNMA's disclosed credit metrics is that such disclosures were not corrective.  In any event, the SEC does not have to show a stock drop to plead or prove materiality.  S.E.C. v. Penthouse Intern., Inc., 390 F.Supp.2d 344, 353 (S.D.N.Y. 2005) ("[T]here is no requirement to allege or demonstrate any particular movement in a company's stock price in order to sustain the element of materiality on a Rule 12(b)(6) motion").

Defendants' disclaimers and warnings also do not preclude liability.  "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004).  The SEC alleges that Defendants failed to accurately quantify FNMA's current exposure to subprime and Alt-A loans.  Therefore, FNMA's disclaimers and warnings regarding future deterioration in the housing market and subsequent losses do not foreclose liability.  Moreover, a reasonable investor might not have been concerned about future risk in the subprime market, given Mudd's representation that FNMA's subprime exposure was "about zero percent."  (See Compl. ¶ 146.)

Finally, even if FNMA's credit metrics, warnings, or other disclosures could be considered corrective, to preclude liability the Defendants would have to show that these disclosures were conveyed to the public "'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the

alleged misstatements." Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir.

2000) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir.1989)).

Making such a showing is "intensely fact-specific." Id. Thus, this truth-on-the-market

defense "is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to

plead materiality." Id. at 167-68.

In sum, the Court cannot say at this juncture that FNMA's failure to include

approximately $100 billion of EA and MCM loans in its subprime exposure calculations,

and approximately $341 billion in lender-selected low-documentation loans in its Alt-A

exposure calculations was immaterial.

III.    Scienter: Counts One and Three

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness

when they have specifically alleged defendants' knowledge of facts or access to information

contradicting their public statements. Under such circumstances, defendants knew or, more

importantly, should have known that they were misrepresenting material facts related to the

corporation." Novak, 216 F.3d at 308.[8]   The SEC has adequately alleged that each Defendant

had knowledge of FNMA's exposure to EA, MCM, and lender-selected low-documentation

loans, and thus knew or should have known that FNMA's subprime and Alt-A exposure

disclosures were inaccurate.

Mudd publicly defined subprime mortgages as loans "offered to borrowers with damaged

credit" (Compl. ¶ 84), and signed the Form 12b-25, which contained a nearly identical definition

of subprime.  (Id. ¶ 72.)  Meanwhile, Mudd knew that EA loans were made to borrowers with

---

[8]  Since the SEC is not pursuing a motive and opportunity theory of scienter, Defendants' arguments
premised on their retention of FNMA stock during the Relevant Period are irrelevant.  See In re
Regeneron Pharms., Inc. Sec. Litig., 03 Civ. 3111(RWS), 2005 U.S. Dist. LEXIS 1350, at *66-71
(S.D.N.Y. Feb. 1, 2005) (finding that a purchase of stock would undermine a scienter claim under a
motive and opportunity theory, but not a recklessness theory).

weaker credit profiles, as intended; personally requested data that showed EA loans had a higher rate of delinquency that FNMA's disclosed subprime loans; and knew that credit losses from EA loans were "disproportionate to the amount of the book they constitute."  (<u>Id.</u> ¶¶ 110-111, 118, 137.)  In addition, Mudd knew that Countrywide originated and sold more than $14.2 billion worth of subprime loans to FNMA from 2004-2006.  (<u>Id.</u> ¶ 126.)  With respect to Alt-A, having signed the SEC disclosures, Mudd should have known that FNMA defined Alt-A based on documentation features, without drawing a distinction between borrower-selected and lender-selected low-documentation loans.  (<u>Id.</u> ¶ 180.)  Mudd tracked the attendant credit risk that both borrower-selected and lender-selected reduced documentation loans presented, and knew that low documentation was a strong predictor of delinquency within the first year of the loan's acquisition.  (<u>Id.</u> ¶¶ 155, 156.)

Lund was the senior executive in charge of Single Family and the sole Single Family business executive on the disclosure committee.  (<u>Id.</u> ¶ 49.)  Lund routinely attended disclosure committee meetings where draft filings were reviewed and issues discussed.  (<u>Id.</u>)  Lund knew that EA loans had the highest credit risk on FNMA's book, producing losses that far outweighed those from loans reported as subprime; that "mcm and ea are much deeper risks that [FNMA] take[s]"; and that "many (if not all) in the market call EA subprime."  (<u>Id.</u> ¶¶ 67, 106, 110-112, 118.)  With respect to Alt-A, Lund's Single Family officers prepared presentations and reports concerning FNMA's increased acquisition of low-documentation loans and the associated credit risk, including the actual delinquency rates.  In one of Lund's staff meetings, in July 2008, it was reported that lender-selected low-documentation loans from Countrywide's Fast and Easy program performed as poorly as some of the loans that were included in FNMA's Alt-A disclosures.  (<u>Id.</u> ¶ 192.)

Dallavecchia was the senior most executive in charge of credit risk, a member of the disclosure committee, and head of a team "tasked with developing a definition of 'sub-prime,' as well as providing the numbers."  (Id. ¶¶ 53, 54, 83.)  Dallavecchia knew that EA loans had the highest credit risk on FNMA's book, producing losses that far outweighed those from loans reported as subprime; that "mcm and ea are much deeper risks that [FNMA] take[s]"; and that "many (if not all) in the market call EA subprime."   (Id. ¶¶ 67, 106, 110-112, 118.)  By July 2008, Dallavecchia was emailing Mudd directly to highlight that EA and MCM loans were generating approximately 20% of FNMA's credit losses.  (Id. ¶ 141.)  Additionally, Dallavecchia was briefed on and monitored FNMA's increasing stake in low-documentation loans.  (Id. ¶¶ 155, 157.)

Given what Defendants knew about EA, MCM, and lender-selected low-documentation loans, as detailed above, they must have known that FNMA's disclosed subprime and Alt-A exposure calculations were materially misleading.[9]  Defendants' conduct in making, or aiding others that made, these misstatements constitutes an extreme departure from the standard of ordinary care.

Defendants' arguments to the contrary fail.  Defendants argue that FNMA's extensive disclosure process—whereby the purported misstatements were reviewed by, among others, an attorney—negates scienter.  This argument, at best, raises issues of fact that are premature at this juncture.  See S.E.C. v. Escala Group, Inc., No. 09 Civ. 2646(DLC), 2009 WL 2365548, at *14 (S.D.N.Y. July 31, 2009) (rejecting argument that defendant deferred to the judgment of counsel, because while the defendant "may be able to show at trial that he acted in good faith, the SEC's

---

[9]  The SEC's allegations plausibly show that the Defendants had actual knowledge of the misstatements.  Thus, the Court need not decide whether a "recklessness" standard suffices to state a Section 20(e) claim for conduct that occurred before the Dodd-Frank Wall Street Reform and Consumer Protection Act.

allegations of scienter are sufficient to withstand his motion to dismiss.")  Defendants argue that FNMA's credit metrics and other disclosures regarding EA, MCM, and lender-selected low-documentation loans negate an inference of scienter.  This argument also fails at this juncture, because, as stated above, it is not clear that such disclosures were corrective, or made with sufficient force to neutralize FNMA's misleading subprime and Alt-A calculations.[10]

Finally, Defendants argue that the fact that FNMA continued to use the same definition of subprime and Alt-A after the Relevant Period negates any inference of scienter.  FNMA's November 2008 post-conservatorship filing, however, adds the additional, and perhaps crucial, disclaimer that "we have other loans with some features that are similar to" both subprime and Alt-A loans "that we have not classified as [Subprime or Alt-A] . . . because they do not meet our classification criteria."  (Compl. ¶¶ 148, 196.)  The Court need not determine whether FNMA's post-conservatorship definitions adequately and completely describe how FNMA calculates its subprime and Alt-A exposure.  The fact that FNMA's post-conservatorship disclosure attempts to explain that its exposure calculations exclude certain loans similar to subprime and Alt-A is sufficient to reject Defendants' argument here.

IV.    Section 17(a)(2) of the Securities Act

Section 17(a)(2) provides that it shall be unlawful for any person in the offer or sale of security, by means of interstate commerce, directly or indirectly "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact

---

[10] While Mudd told investors not to rely upon "vague, prosaic titles that pass for market data—[such as] 'subprime,' [and] 'Alt-A,'" to be "'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA Litig., 763 F.Supp.2d 423, 495 (S.D.N.Y. 2011) (quoting In re Immune Response Sec. Litig., 375 F.Supp.2d 983, 1033 (S.D.Cal. 2005)).  Given FNMA's definition of subprime and Alt-A, it is not clear at this juncture that Mudd's statements directing investors to FNMA's credit metrics would have clarified FNMA's risk exposure.  Moreover, there is insufficient evidence at this point to find that Mudd's cautionary statements dropped the real risk of deception to nil.

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C.A. § 77q.  It is sufficient to allege either that the defendant directly "obtained money or property for his employer while acting as its agent, or, alternatively, for the SEC to allege that [the defendant] personally obtained money indirectly from the fraud."  S.E.C. v. Stoker, --- F. Supp. 2d ---, No. 11 Civ. 7388(JSR), 2012 WL 2017736, at *5-6 (S.D.N.Y. June 6, 2012).

The SEC alleges that Mudd and Dallavecchia directly or indirectly obtained money or property by means of their false statements, because each received a bonus that was tied to both FNMA's performance and their own personal performance in attaining individual year-end goals.  (Compl. ¶¶ 41, 42, 59, 60.)[11]  The complaint further alleges, in an almost verbatim recitation of the statutory language, that such statements were "in the offer and sale of FNMA Mae securities."  (Compl. at 54.)

Defendants argue that the SEC failed to plausibly state a claim because it failed to specifically allege that there was an offer or a sale of FNMA stock during the Relevant Period. There is some support for Defendants' argument that a Section 17(a) claim should be dismissed where the SEC fails to include the basic allegation that there "was an offer or sale of [the company's] securities" during the relevant period.  See S.E.C. v. Brown, 740 F.Supp.2d 148, 164 (D.D.C. 2010) (dismissing Section 17(a) claim on this ground).  As the court in Brown recognized, however, "[t]he Supreme Court has instructed that the 'offer or sale' requirement should be construed broadly so as to encompass fraud in any part of the selling process."  Id. (citing United States v. Naftalin, 441 U.S. 768, 772–73, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624

---

[11]  Defendants reference to S.E.C. v. Forman, No. 07–11151–RWZ, 2010 WL 2367372 (D.Mass. 2010), is thus inapposite.  In that case, there was "no evidence that the employee bonus was tied to company performance or that Forman was an executive within the meaning of the bonus plan."  Id. at *8.

(1979)).  The complaint here alleges that FNMA's common stock was traded on the New York

Stock Exchange ("NYSE") during the Relevant Period.  (Compl. ¶ 24.)  Accordingly, the Court

can take "judicial notice of the fact that a common stock listed on the NYSE is intended, for the

most part, to be sold and exchanged."  S.E.C. v. Geswein, 2011 WL 4565898, at *15 (N.D.Ohio

Aug. 5, 2011), adopted in relevant part, 2011 WL 4541303, at *2 (N.D.Ohio Sept. 29, 2011).

This is sufficient to find that the SEC has adequately stated a claim against Mudd and

Dallavecchia under Section 17(a)(2).

   V.     Aiding and Abetting Liability Under Section 20(e)

      To state a claim under Section 20(e), the SEC "must prove: '(1) the existence of a

securities law violation by the primary (as opposed to the aiding and abetting) party; (2)

'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance'

by the aider and abettor in the achievement of the primary violation.'"  S.E.C. v. DiBella, 587

F.3d 553, 566 (2d Cir. 2009) (quoting Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754

F.2d 57, 62 (2d Cir.1985)).  For the reasons discussed above, the SEC has adequately alleged

that FNMA and Mudd committed a primary securities law violation by materially misstating

FNMA's subprime and Alt-A exposure, and that the Defendants had actual knowledge of this

violation.

      "[T]o satisfy the 'substantial assistance' component of aiding and abetting, the SEC must

show that the defendant 'in some sort associate[d] himself with the venture, that he participate[d]

in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make

it succeed.'"  S.E.C. v. Apuzzo, No. 11-696-cv, 2012 WL 3194303, at *1 (2d Cir. Aug. 8, 2012)

(quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir.1938)).  In other words, the defendant

must "consciously assist[ ] the commission of the specific crime in some active way."  Id. at *6

n.8 (quoting <u>United States v. Ogando</u>, 547 F.3d 102, 107 (2d Cir.2008)).  "Inaction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act."  <u>Armstrong v. McAlpin</u>, 699 F.2d 79, 91 (2d Cir.1983).

The SEC has plausibly alleged that Mudd, Dallavecchia, and Lund consciously assisted the venture to misstate FNMA's subprime and Alt-A exposure in an active way.  Lund and Dallavecchia were the sole Single Family and Chief Risk Office representatives, respectively, on the Disclosure Committee (Compl. ¶¶ 49, 54).  Lund, Dallavecchia, and Mudd received and reviewed FNMA's periodic filings.  (<u>Id.</u> ¶¶ 45, 50, 55.)  Dallavecchia drafted FNMA's first definition of subprime, contained in its Form12b-25.  (<u>Id.</u> ¶ 56.)  Mudd commented on multiple drafts of each periodic filing.  (<u>Id.</u> ¶ 45.)  Mudd met with Lund and Dallavecchia individually to discuss the SEC filings.  (<u>Id.</u>)  Mudd signed, and Dallavecchia and Lund sub-certified, all of FNMA's 10-Ks and 10-Qs during the Relevant Period, and approved FNMA's Form 12b-25. (Compl. ¶¶ 20, 21, 45.)  Mudd and Dallavecchia spoke to investors on conference calls and repeated FNMA's misleading disclosures while emphasizing that FNMA's subprime exposure was "immaterial," and constituted approximately "zero percent" of FNMA's book of business. (<u>Id.</u> ¶¶ 93, 146.)[12]  These allegations are sufficient at this juncture to show that Defendants associated themselves with the venture, participated in it as in something that he wished to bring about, and sought by his actions to make it succeed.  <u>See</u> <u>S.E.C. v. Global Express Capital Real Estate Inv. Fund, I, LLC</u>, 289 Fed. App'x 183, 188 (9th Cir. 2008) (holding that defendant "substantially assisted Global Securities' violations by reviewing, approving, and certifying the Global Securities' misleading public filings."); <u>S.E.C. v. Fehn</u>, 97 F.3d 1276, 1293-1294 (9th Cir.

---

[12] Any warnings that Dallavecchia may have given on the same investor conference call are insufficient at this juncture to foreclose liability.  <u>See</u> <u>supra</u> n. 12.

1996) (holding that defendant "hand in the editing the Form 10–Q's," "fail[ure] to properly advise" others of the "material omissions" in the Form 10-Q's, and submission of those forms to the SEC was sufficient to demonstrate "substantial assistance").[13]

## CONCLUSION

For the reasons above, the Defendants' motion to dismiss is DENIED.  The Clerk of Court is directed to terminate this motion.

Dated: New York, New York                                    SO ORDERED
      August 10, 2012

                                             PAUL A. CROTTY
                                             United States District Judge

---

[13] Alternatively, given Defendants high degree of actual knowledge of the primary violation, the SEC's allegations are sufficient to plausibly show that Defendants' inaction was designed intentionally to aid the primary violation.  While the SEC also argues that Defendants' positions "as corporate officers and fiduciaries" creates a duty to correct or report the fraudulent statements (Opp. at 39), it has not plausibly shown that Defendants had any such duty.  See S.E.C. v. Apuzzo, No. 11-696-cv, 2012 WL 3194303, at *10 ("If the allegations were merely that [defendant] failed to report the fraud . . . and if [defendant] lacked a duty to report, he would not be liable.").  Notably, the SEC does not cite any case in support of its argument.