UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>  v.<br><br>DANIEL H. MUDD, ENRICO DALLAVECCHIA, and THOMAS A. LUND,<br><br>      Defendants. | Case No. 11-cv-9202 (PAC)<br><br>ECF Case<br><br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT .................................................................1

II.   BACKGROUND FACTS ......................................................................5

      A.    FNMA and its Mission..........................................................5

      B.    The OFHEO Examination, New Leadership, and the New Disclosure Process......6

      C.    Expanded Approval and MyCommunityMortgage Loans.......................8

      D.    The Subprime New Business Initiative.................................12

      E.    Alt-A Loans and Reduced Documentation Loans ..................14

      F.    The Conservatorship ........................................................17

      G.    The Current Proceedings...................................................18

III.  LEGAL STANDARD..........................................................................19

IV.   THE SEC HAS FAILED TO ADDUCE ANY EVIDENCE THAT FNMA'S PUBLIC
      FILINGS WERE FALSE OR MISLEADING ................................................19

      A.    The SEC Has Failed to Adduce Any Evidence that FNMA's Subprime
            Disclosures Were False or Misleading ................................20

            1.    The undisputed facts show that FNMA's quantitative subprime disclosures
                  accurately captured the number of loans that fell within the company's
                  subprime classification...........................................................20

            2.    The SEC's incomplete reading of FNMA's subprime disclosures does not
                  create a dispute of material fact, because these disclosures did *not* define
                  as subprime all loans to borrowers with weaker credit profiles.................24

      B.    The SEC Has Failed to Adduce Any Evidence That FNMA's Alt-A Disclosures
            Were False or Misleading .....................................................29

            1.    FNMA's quantitative Alt-A disclosures accurately captured the number of
                  loans that the company classified as Alt-A loans ......................................29

            2.    The SEC's incomplete reading of FNMA's Alt-A disclosures does not
                  create a disputed issue of material fact because these disclosures did *not*
                  define all reduced-documentation loans as Alt-A loans ...........................32

      C.    The Arguments That the SEC Has Relied Upon are Meritless and Underscore the
            Lack of Any Genuine Dispute of Material Fact.....................................33

i

V.     THE RECORD CONTAINS NO EVIDENCE THAT ANY OF THE DEFENDANTS
       ACTED WITH THE REQUISITE SCIENTER ............................................................36

       A.     There Is No Evidence that Mr. Mudd Acted with Recklessness in Approving
              FNMA's Disclosures or that Defendants had Actual Knowledge that FNMA's
              Subprime and Alt-A Disclosures Were False or Misleading................................39

       B.     Defendants' Reliance Upon FNMA's Extensive Disclosure Process in Approving
              the Disclosures at Issue Demonstrates Good Faith.................................................42

       C.     Defendants Relied in Good Faith Upon the Advice of Counsel in Approving
              FNMA's Subprime and Alt-A Disclosures...............................................................44

       D.     The Undisputed Facts Show That Defendants Had No Incentive to Violate the
              Exchange Act ...........................................................................................................46

VI.    NONE OF THE ALLEGED MISSTATEMENTS WERE MATERIAL ..........................48

       A.     FNMA Disclosed All Material Credit Risk Information ........................................49

       B.     The SEC Cannot Demonstrate That Including EA or MCM Loans in FNMA's
              Quantitative Subprime Disclosures Would Have Changed the "Total Mix" of
              Information Available to Investors .........................................................................51

       C.     The SEC Cannot Demonstrate That Including Process Efficiency Loans in
              FNMA's Quantitative Alt-A Disclosures Would Have Changed the "Total Mix"
              of Information Available to Investors......................................................................53

VII.   DEFENDANTS DID NOT SUBSTANTIALLY ASSIST ANY PRIMARY
       SECURITIES LAW VIOLATION ......................................................................................53

       A.     Mr. Lund's Actions Did Not Constitute Substantial Assistance............................55

       B.     Mr. Dallavecchia's Actions Did Not Constitute Substantial Assistance ...............56

       C.     Mr. Mudd's Actions Did Not Constitute Substantial Assistance ..........................58

VIII.  MR. MUDD AND MR. DALLAVECCHIA ARE ENTITLED TO SUMMARY
       JUDGMENT ON COUNT 2 ...............................................................................................59

       A.     Mr. Mudd's Public Statements Were Not Materially False or Misleading ...........59

       B.     Mr. Dallavecchia's Public Statements Were Not Materially False or Misleading 62

       C.     Mr. Mudd and Mr. Dallavecchia Were Not Negligent ..........................................63

       D.     Neither Defendant Obtained Money or Property by Means of Their Alleged
              Misstatements ..........................................................................................................64

IX.    CONCLUSION.................................................................................................................65

920608

# TABLE OF AUTHORITIES

**Federal Cases**

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)..................................................................................................19

*Chen Jie Shan v. Citibank, N.A.*
   No. 06 Civ. 5095, 2007 WL 2325854 (S.D.N.Y. Aug. 10, 2007) (Crotty, J.).........................42

*Cole v. Schenley Indus., Inc.*
   563 F.2d 35 (2d Cir. 1977) ........................................................................................28

*Cruden v. Bank of New York*
   957 F.2d 961 (2d Cir. 1992) ......................................................................................46

*Cumis Ins. Soc'y, Inc. v. E.F. Hutton & Co.*
   457 F. Supp. 1380 (S.D.N.Y. 1978) ...........................................................................55

*Dalberth v. Xerox Corp.*
   766 F.3d 172 (2d Cir. 2014) .........................................................................49, 51, 52

*Dodds v. Cigna Sec., Inc.*
   12 F.3d 346 (2d Cir. 1993) ........................................................................................60

*Ganino v. Citizens Utilities Co.*
   228 F.3d 154 (2d Cir. 2000) ......................................................................................48

*Greenapple v. Detroit Edison Co.*
   618 F.2d 198 (2d Cir. 1980) .........................................................................26, 28, 33

*Halperin v. eBanker USA.com, Inc.*
   295 F.3d 352 (2d Cir. 2002) ......................................................................................28

*Howell v. Mgmt. Assistance, Inc.*
   519 F. Supp. 83 (S.D.N.Y. 1981) ..............................................................................28

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*
   936 F.2d 759 (2d Cir. 1991) ...............................................................26, 28, 33, 63

*IIT v. Cornfeld*
   619 F.2d 909 (2d Cir. 1980) ......................................................................................54

*In re Alstom SA*
   454 F. Supp. 2d 187 (S.D.N.Y. 2006) ..................................................................46, 47

*In re Amaranth Nat. Gas Commodities Litig.*
   730 F.3d 170 (2d Cir. 2013) .............................................................................. *passim*

iv

*In re Bristol-Myers Squibb Sec. Litig.*
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ....................................................47

*In re FNMA 2008 Sec. Litig.*
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) (Crotty, J.) ..............................26, 64

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*
    32 F.3d 697 (2d Cir. 1994) ...............................................................28

*Janus Capital Grp., Inc. v. First Derivative Traders*
    131 S. Ct. 2296 (2011) ............................................................ *passim*

*Kalnit v. Eichler*
    264 F.3d 131 (2d Cir. 2001) ...............................................................38

*Kuriakose v. Fed. Home Loan Mortg. Corp.*
    897 F. Supp. 2d 168 (S.D.N.Y. 2012) .............................................. *passim*

*La Pietra v. RREEF Am., L.L.C.*
    738 F. Supp. 2d 432 (S.D.N.Y. 2010) ....................................................52

*Litwin v. Blackstone Grp., L.P.*
    634 F.3d 706 (2d Cir. 2011) ...............................................................49

*Markowski v. SEC*
    34 F.3d 99 (2d Cir. 1994) ...............................................................45

*Morrison v. Nat'l Austl. Bank Ltd.*
    130 S. Ct. 2869 (2010) ...............................................................54

*Novak v. Kasaks*
    216 F.3d 300 (2d Cir. 2000) ...............................................................39

*Olkey v. Hyperion 1999 Term Trust, Inc.*
    98 F.3d 2 (2d Cir. 1996) ..........................................................60, 63

*SEC v. Apuzzo*
    689 F.3d 204 (2d Cir. 2012) .....................................................38, 39, 54, 58

*SEC v. Biovail Corp.*
    No. 08-2979, 2010 WL 2465482 (S.D.N.Y. June 16, 2010) ....................................49

*SEC v. DiBella*
    587 F.3d 553 (2d Cir. 2009) ...............................................................19

*SEC v. Ginder*
    752 F.3d 569 (2d Cir. 2014) ..........................................................59, 64

920608

*SEC v. Global Express Capital Real Estate Investment Fund, I, LLC*
   289 Fed. App'x 183 (9th Cir. 2008) .......................................................................54

*SEC v. Kelly*
   817 F. Supp. 2d. 340 (S.D.N.Y. 2011) ..................................................................63

*SEC v. McNulty*
   137 F.3d 732 (2d. Cir. 1998) ................................................................................37

*SEC v. Monarch Funding Corp.*
   192 F.3d 295 (2d Cir. 1999) .................................................................................19

*SEC v. Mozilo*
   No. CV 09-3994, 2010 WL 3656068 (C.D. Cal. Sept. 16, 2010)..........................19

*SEC v. Shanahan*
   646 F.3d 536 (8th Cir. 2011) ................................................................................64

*SEC v. Syron*
   934 F. Supp. 2d 609 (S.D.N.Y. 2013) (Sullivan, J.).......................................64, 65

*SEC v. Treadway*
   430 F. Supp. 2d 293 (S.D.N.Y. 2006) ..................................................................37

*SEC v. Wyly*
   950 F. Supp. 2d 547 (S.D.N.Y. 2013) .............................................................38, 39

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*
   148 F. App'x 66 (2d Cir. 2005) ............................................................................45

*Steinberg v. Carey*
   439 F. Supp. 1233 (S.D.N.Y. 1977) ........................................................25, 39, 42

*Woodward v. Metro Bank of Dallas*
   522 F.2d 84 (5th Cir. 1975) .............................................................................54, 55

*Wright v. Schock*
   571 F. Supp. 642 (N.D. Cal. 1983) .......................................................................42

**Federal Statutes**

12 U.S.C. § 1716.................................................................................................5, 17

12 U.S.C. § 1719.....................................................................................................17

15 U.S.C. § 77q(a)(2)..........................................................................................59, 64

920608

**Federal Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................................19

920608

## I.       PRELIMINARY STATEMENT

The SEC can no longer rest on the unfounded allegations in its Complaint.  The SEC must now come forward with admissible evidence demonstrating genuine issues of material fact that necessitate a trial in this matter.  The SEC cannot meet this burden.  Despite extensive discovery—including 60 investigative depositions; 50 more depositions taken in this case; over 4 terabytes of documents and data produced; a waiver of privilege by the Federal National Mortgage Association ("FNMA") giving the SEC open discovery into the company's disclosure process; and a cooperation agreement with FNMA requiring the company to produce any document or witness at the SEC's request—the SEC has found no evidence to support the essential elements of its claims against Defendants Daniel H. Mudd, Enrico Dallavecchia, and Thomas A. Lund:  the existence of a false or misleading statement, made with scienter, that was material to a reasonable investor.

Defendants are entitled to summary judgment for at least three reasons, any one of which is independently sufficient to grant judgment in Defendants' favor:

***First***, there is no evidence that FNMA's subprime or Alt-A disclosures contained any false or misleading statements.  The SEC contends that FNMA's subprime disclosures were false and misleading because FNMA failed to include certain loans—Expanded Approval ("EA") and MyCommunityMortgage ("MCM") loans—in its quantification of its subprime exposure.  FNMA, however, explicitly disclosed the criteria by which it classified loans as subprime, and the evidence is undisputed that neither EA nor MCM loans met FNMA's subprime classification criteria.  Indeed, the SEC cannot point to any testimony or any document that supports the contention that EA or MCM loans met FNMA's subprime classification criteria.  To the contrary, every FNMA witness and every third-party witness testified that EA and MCM did not meet FNMA's classification criteria.

1

Because these facts are unassailable, the SEC has had to advance a fundamentally flawed theory that cannot be reconciled with the disclosures at issue.  The SEC claims that a reasonable investor would have overlooked FNMA's explicit statement about how it classified loans as subprime and instead would have focused on a general description of subprime loans as "typically made to borrowers with weaker credit profiles."  The problem is that there is no evidence that anyone read FNMA's disclosures in the manner concocted by the SEC.  Every investor who was deposed testified that he or she understood that the percentage of its book of business that FNMA disclosed as subprime loans did *not* encompass all loans that the company held that were made to borrowers with weaker credit profiles.  A simple comparison of FNMA's quantitative subprime disclosure to the information it disclosed about the credit characteristics of its book as a whole makes it clear that FNMA did not include every loan to a borrower with a weaker credit profile in its calculation of its subprime exposure.  Moreover, the SEC's reading of FNMA's subprime disclosures—which ignores the explicit classification criteria that accompanied FNMA's quantitative disclosures—fails as a matter of Second Circuit law.

The SEC's case as to FNMA's quantitative Alt-A disclosures fails for the same reason.  FNMA's disclosures explicitly stated that the company "classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features."  There is no evidence of a single loan being classified as Alt-A by a lender but not disclosed as Alt-A by FNMA, or any other evidence that FNMA did not accurately report its Alt-A exposure consistent with its classification criteria.

Three additional undisputed facts underscore the absence of any genuine issue of fact as to whether the FNMA disclosures at issue were false or misleading.

- Throughout the Relevant Period, which is December 2006 to August 2008 (Comp. ¶ 2), the Office of Federal Housing Enterprise Oversight ("OFHEO"), FNMA's

primary regulator at the time, knew that FNMA did not classify EA or MCM loans as subprime and knew that FNMA did not classify all reduced documentation loans as Alt-A, and never so much as suggested that FNMA's disclosures were misleading or that FNMA ought to change its classifications or its quantitative disclosures.

- After the Federal Housing Finance Agency ("FHFA," the successor to OFHEO) took control of FNMA and the Defendants had left, the subprime and Alt-A classifications and quantitative disclosures the SEC claims were false and misleading remained the same.  The company classified loans as subprime and Alt-A in the same way, continued to exclude EA and MCM loans from its quantitative subprime disclosures, and never included all reduced documentation loans in its quantitative Alt-A disclosure.

- Today, even after signing a non-prosecution agreement with the SEC and cooperating with its investigation and prosecution of this case, FNMA maintains that its subprime and Alt-A disclosures were accurate, complied with all relevant requirements, and were not in any way misleading.  Indeed, FNMA has never restated or amended any of the disclosures at issue in this case.

*Second*, there is no evidence that any of the Defendants acted with the requisite *scienter*. The SEC cannot point to a single piece of evidence that even suggests that any of the Defendants thought for a moment that FNMA's quantitative subprime or Alt-A disclosures were inaccurate or misleading in any way.  The absence of evidence is striking: there is literally no email, memo, or other document sent or received by any of the Defendants suggesting that the disclosures were inaccurate or that they could be misleading.  Likewise, there is not a single witness who has testified that any of the Defendants was ever told, or ever expressed, that the disclosures were inaccurate or could be misleading.

On the other hand, the evidence is overwhelming that the disclosures were consistent with the way FNMA ran its business, that the disclosures were the result of a robust, best-in-class disclosure process spearheaded by FNMA's legal department, and that the Defendants reasonably relied on the company's disclosure process to produce accurate disclosures.  The list of individuals and entities that reviewed and approved the disclosures that the SEC now claims

3

to have been false and misleading is remarkable: hundreds of FNMA employees involved in the business, in-house attorneys, outside disclosure counsel at Latham & Watkins, FNMA's auditors at Deloitte & Touche, OFHEO, the company's Disclosure Committee, its General Counsel, the Audit Committee, and the full Board of Directors.  Indeed, Beth Wilkinson, FNMA's General Counsel at the time, has testified that she evaluated the accuracy and adequacy of the disclosures at issue and, on the basis of complete information, advised the Defendants that the disclosures complied with all applicable legal requirements.

*Third*, the SEC cannot establish that a reasonable investor would have considered the alleged misstatements to be material.  FNMA made extensive disclosures of the credit characteristics of its book of business—including the extent of its holdings made to borrowers with low FICO[1] scores and high loan-to-value ("LTV") ratios.  What's more, the evidence shows that FNMA made extensive disclosures regarding its EA and MCM loan programs in particular; the SEC has failed to adduce any information showing that the inclusion of these loans, about which the public was already aware, in FNMA's subprime disclosures would have been material to investors.  With respect to Alt-A, the SEC has wholly failed to show that the reduced documentation loans it claims should have been included in FNMA's Alt-A disclosures were material to investors in any way.  Indeed, the undisputed evidence shows that these non-Alt loans were extremely high-quality loans that actually decreased the risk on FNMA's book.

*Finally*, Count 2 of the Complaint as to Messrs. Mudd and Dallavecchia fails for the additional reason that the SEC has not come forward with any evidence that they were negligent in making their public statements.

---

[1] A "FICO" score is a standard measure of a borrower's credit history.  A low FICO score corresponds to a more blemished credit history.

## II.    BACKGROUND FACTS[2]

### A.    FNMA and its Mission

FNMA is a Government-Sponsored Enterprise ("GSE"), chartered by Congress to facilitate a stable secondary market for residential mortgages and to provide greater access to mortgage financing.  One way FNMA fulfills this mission is to acquire mortgages from originators as part of FNMA's Single-Family Credit Guaranty business.  Because of its government sponsorship and its vital role in the housing market, FNMA's finances have long been subject to oversight and regulation.  FNMA's regulators include Congress, the SEC, the Department of Housing and Urban Development ("HUD"), OFHEO, and FHFA.

Part of FNMA's congressionally mandated mission is to support lending to low- and moderate-income families.[3]  Throughout the Relevant Period, HUD mandated that more than half of all loans purchased by FNMA go towards meeting those housing goals.[4]  To meet these housing goals, FNMA was obliged to relax some of its underwriting criteria.  This practice—and its risks— were disclosed in each of FNMA's Form 10-K filings during the Relevant Period:

> We have also relaxed some of our underwriting criteria to obtain goals-qualifying mortgage loans and increased our investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals, which could increase our credit losses.[5]

FNMA also annually reported detailed descriptions of its housing goal loan products and the volume of such loans it acquired.[6]

---

[2] All factual citations in the Background Facts section are to exhibits to the Dooley Declaration ("Ex."), filed concurrently with this motion.

[3] FNMA Charter Act §§ 301(3)-(4); 12 U.S.C. § 1716(3)-(4).

[4] *See* Ex. 717 [2005 10-K], at 24-25.

[5] *See, e.g.*, Ex. 748 [2004 10-K] at 28; *see also* Ex. 717 [2005 10-K] at 123.

[6] *See, e.g.*, Ex. 1114 [2005 AHAR], at 3.

**B.     The OFHEO Examination, New Leadership, and the New Disclosure Process**

Between July 2003 and May 2006, before the Relevant Period, OFHEO conducted a

special examination of FNMA's accounting practices and internal controls.[7]  OFHEO concluded

that there had been serious problems with FNMA's accounting practices, internal controls,

financial reporting, and corporate governance.[8]  On May 23, 2006, FNMA entered into a

Consent Order with OFHEO in which it agreed, among other things, to make extensive

organizational and operational changes to improve its accounting practices, corporate

governance, internal controls, regulatory reporting, personnel and compensation practices, and

public disclosures.[9]  FNMA invested $1.6 billion to establish "new strategies, roles,

responsibilities, governance, and culture" to meet its obligations under the Consent Order.[10]

An important component of these changes was hiring new management.  In June 2005,

FNMA's Board of Directors appointed Daniel Mudd to be the new CEO.[11]  Witnesses testified

that, from the start of his tenure as CEO, Mr. Mudd worked to set the right tone at the top of the

company, making the accuracy and completeness of FNMA's disclosures a top priority,[12] and

emphasizing the importance of being as transparent as possible with respect to all of FNMA's

regulators, including OFHEO, HUD, and the SEC.[13]  In 2006, the company hired Enrico

Dallavecchia to fill the newly created role of Chief Risk Officer.  In addition, FNMA promoted

---

[7] *See, e.g.*, Ex. 748 [2004 10-K], at 1-2.

[8] Ex. 796 [Report of Special Examination of FNMA, May 2006].

[9] Ex. 890 [Stipulation and Consent to the Issuance of a Consent Order]; *see also* Ex. 748 [2004 10-K], at 1-3.

[10] Ex. 1413 [2006 FNMA Annual Report], at 2.

[11] *See* Ex. 748 [2004 10-K], at 3.  Mr. Mudd served as interim CEO from December 2004 until June 2005.

[12] Ex. 1470 [Schuppenhauer Dep.] at 41:19-44:24; *see also* Ex. 1460 [Lesmes Dep.] at 28:2-29:1.

[13] Ex. 1460 [Lesmes Dep.] at 29:2-10; *see also* Ex. 1481 [Wilkinson Dep.], at 191:9-21; Ex. 1441 [Beresford Dep.], at 80:17-82:1; Ex. 1470 [Schuppenhauer Dep.], at 41:19-46:3; 195:5-196:16.

6

Thomas Lund to Executive Vice-President ("EVP") of FNMA's Single-Family Credit Guarantee business. FNMA also added numerous new directors to its Board.[14]

Mr. Mudd and FNMA's new leadership worked to build a robust, extensive, and transparent disclosure process. It included a re-chartered Disclosure Committee responsible for "assist[ing] the CEO and CFO in fulfilling their responsibility for oversight of the accuracy and timeliness of the [SEC] disclosures made by the Company."[15] The Disclosure Committee was led by new General Counsel Beth Wilkinson, a highly-regarded member of the bar and former partner at Latham & Watkins (and a current partner at Paul Weiss). The Committee's membership included senior executives, legal personnel, and major business leaders of the company.[16] As the CEO, Mr. Mudd was purposely excluded from the Disclosure Committee to allow members to freely debate and discuss issues before providing him with a recommendation.[17]

The new disclosure process, which was run by FNMA's Legal Department, included: (i) review and comment by more than a hundred officers and employees of FNMA; (ii) review and comment by Latham & Watkins, FNMA's outside disclosure counsel; (iii) review and comment by Deloitte & Touche, FNMA's outside auditor; (iv) review by a large team of experienced and sophisticated in-house attorneys; (v) an extensive sub-certification process whereby each section of the filing was sub-certified by a senior member of the business with subject matter expertise; (vi) review and approval by FNMA's Board of Directors; (vii) review by FNMA's Disclosure Committee, which formally recommended each of the relevant filings—including the particular

---

[14] *See* Ex. 748 [2004 10-K], at 3.

[15] Ex. 771 [Disclosure Committee Charter], at -957.

[16] Ex. 771 [Disclosure Committee Charter], at -957.

[17] Ex. 1466 [Mudd Dep.] at 192:22-193:16; Ex. 771 [Disclosure Committee Charter] at -957.

disclosures at issue in this case—to Mr. Mudd and the CFO before he certified the filing for release; and (viii) review and comment from FNMA's regulator prior to each filing.

### C.    Expanded Approval and MyCommunityMortgage Loans

FNMA sought to meet its HUD goals, in part, by establishing programs targeting those goals.  Two such programs, introduced years before the Relevant Period, were the Expanded Approval ("EA") and MyCommunityMortgage ("MCM") programs.[18]

The EA program was a pricing mechanism that allowed certain credit-challenged, but otherwise deserving, borrowers to secure mortgage loans at rates that were significantly lower than those offered by specialty subprime lenders.[19]  EA loans were originated through Desktop Underwriter ("DU"), FNMA's propriety automated underwriting system, using the same processes as other prime, conventional loans originated through DU—namely, the standard data collection, verification, and analysis procedures set forth in FNMA's Selling Guide and Guide to Underwriting with Desktop Underwriter.  EA loans also had all of the standard features of prime, conventional loans: they were fixed-rate, 30-year mortgages that did not include features associated with "predatory lending," such as exploding ARMs or prepayment penalties.[20]

The MCM program was a means to help borrowers without savings sufficient to make large down-payments, and, like the EA program, it was offered as an alternative to loans

---

[18] *E.g.*, Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 17:21-18:1, 18:2-21, 19:14-20:9; Ex. 1458 [Johnson Dep.] at 24:20-28:8; Ex. 1415 [2000 AHAR] at 8.

[19] *See, e.g.*, Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.], at 21:8-20; 34:13-36:8; Ex. 1458 [Johnson Dep.] at 24:20-28:8.

[20] *See, e.g.*, Ex. 860 [FNMA 2007 Selling Guide] at 4-5.

8

originated by specialty subprime lenders.[21]  The vast majority of MCM loans were originated

through DU, and MCM loans could not be originated with predatory features.[22]

Because they were aimed at borrowers with imperfect credit and borrowers who could

not make large down-payments, EA and MCM loans—like FNMA's other loans designed to

meet its housing goals—were expected to perform worse than loans made to borrowers with

excellent credit and borrowers who could afford large down-payments.  In addition to alerting

investors that it purchased loans with increased risk in order to satisfy its HUD goals, FNMA

disclosed the specific risks associated with its EA and MCM loans in the same way that it

disclosed the risks of all other conventional loans on its book—by providing investors detailed

information on credit risk characteristics.  Starting as early as 2003, and throughout the Relevant

Period, FNMA published tables in every 10-K detailing key credit characteristics for every loan

on its Single-Family book of business ("Single-Family book").[23]  For example, these tables

disclosed the percentage of the Single-Family book comprising loans to borrowers with FICO

scores below 620, between 620 and 659, between 660 and 699, between 700 and 739, and above

740.  Similarly, the tables disclosed the percentage of FNMA's Single-Family book comprising

loans within six different bands of original LTV ("OLTV") ratios.  These tables also disclosed

detailed information on seven other credit risk characteristics: current LTV ratio, product type

(*e.g.*, fixed rate, adjustable rate), property type, occupancy type, loan purpose, geographic

concentration, and origination year.  FNMA also disclosed, immediately following these tables,

---

[21] *See, e.g.*, Ex. 866 [FNMA 2007 Selling Guide], Part VIII, Chapter 2; *id.*, Part XIII (Glossary).

[22] *See, e.g.*, Ex. 866 [FNMA 2007 Selling Guide], Part VIII, Chapter 2.

[23] Ex. 748 [2004 10-K], at 140-41; Ex. 717 [2005 10-K], at 117-18; Ex. 66 [2006 10-K], at 125-26; Ex. 709 [2007 10-K], at 126-28.

the "key elements" of these credit characteristics, giving investors a comprehensive view of how the credit characteristics disclosed in the tables reflected risk.[24]

Beginning in August 2007, FNMA also publicly filed quarterly "credit supplements" containing more detailed information about the credit characteristics of its business; these additional disclosures were filed with the SEC as Form 8-Ks when FNMA filed its quarterly and annual financial statements.[25]  Over time, as the credit crisis worsened, FNMA's credit supplements became more detailed, providing, among other things, a breakdown of sixteen separate credit characteristics.  For example, FNMA's August 8, 2008 credit supplement included the following table[26]:

## Fannie Mae Credit Profile by Key Product Features
### Credit Characteristics of Single-Family Conventional Mortgage Credit Book of Business

| As of June 30, 2008 | Overall Book | NegAm | Interest Only | FICO < 620 | OLTV > 90% | FICO < 620 and OLTV > 90% | Alt-A | Subprime | Jumbo Conforming |
|---|---|---|---|---|---|---|---|---|---|
| Unpaid principal balance "UPB" (billions) * | $2,666.5 | $19.1 | $216.4 | $127.4 | $277.2 | $29.2 | $307.0 | $8.0 | $0.9 |
| Share of SF Conventional Credit Book[(1)] | 100.0% | 0.7% | 8.1% | 4.8% | 10.4% | 1.1% | 10.8% | 0.3% | 0.0% |
| Average UPB | $146,503 | $146,020 | $240,395 | $127,346 | $140,213 | $120,462 | $171,289 | $153,423 | $585,028 |
| SDQ Rate All Loans | 1.36% | 3.12% | 4.26% | 5.48% | 3.75% | 10.25% | 3.79% | 9.08% | 0.0% |
| Alt-A | 11.51% | 45.10% | 42.51% | 1.64% | 6.03% | 1.19% | 100.00% | 0.00% | 0.2% |
| Origination Years 2005-2007 | 49.8% | 62.2% | 83.8% | 57.5% | 62.0% | 70.2% | 73.0% | 79.3% | 30.8% |
| Weighted Average Original LTV | 71.8% | 71.1% | 75.5% | 77.0% | 97.4% | 98.1% | 72.7% | 78.3% | 66.2% |
| Original LTV > 90 | 10.4% | 0.3% | 9.1% | 22.9% | 100.0% | 100.0% | 5.4% | 7.8% | 0.0% |
| Weighted Average Mark-to-Market LTV | 64.5% | 72.9% | 82.7% | 71.0% | 91.4% | 92.4% | 72.6% | 79.7% | 67.2% |
| Mark-to-Market LTV > 100 | 5.7% | 26.2% | 18.7% | 8.6% | 26.6% | 26.9% | 11.3% | 12.0% | 0.0% |
| Weighted Average FICO | 722 | 696 | 725 | 588 | 692 | 592 | 719 | 622 | 762 |
| FICO < 620 | 4.8% | 11.6% | 1.3% | 100.0% | 10.5% | 100.0% | 0.7% | 48.4% | 0.0% |
| Fixed-rate | 89.5% | 0.1% | 39.6% | 93.4% | 94.0% | 96.7% | 71.9% | 69.9% | 79.5% |
| Principal Residence | 89.8% | 70.9% | 84.9% | 96.8% | 97.1% | 99.4% | 77.9% | 96.4% | 98.9% |
| Condo/Coop | 9.1% | 13.2% | 16.0% | 4.9% | 9.8% | 5.9% | 10.8% | 4.9% | 5.8% |
| Credit Enhanced [(2)(3)] | 21.2% | 76.9% | 35.7% | 36.5% | 92.8% | 94.7% | 39.0% | 68.2% | 5.7% |
| % of 2007 Credit Losses [(4)] | 100.0% | 0.9% | 15.3% | 18.9% | 16.9% | 6.2% | 31.4% | 1.0% | 0.0% |
| % of 2008 Q1 Credit Losses [(4)] | 100.0% | 1.1% | 29.5% | 14.6% | 17.4% | 6.0% | 42.7% | 1.4% | 0.0% |
| % of 2008 Q2 Credit Losses [(4)] | 100.0% | 3.3% | 35.6% | 11.7% | 19.5% | 5.3% | 49.6% | 2.2% | 0.0% |

[(1)] Subprime and Alt-A are calculated as a percentage of the single-family mortgage credit book of business.
[(2)] UPB of all loans with credit enhancement/UPB of single-family conventional mortgage credit book of business.
[(3)] Includes primary mortgage insurance, pool insurance, lender recourse and other credit enhancement.
[(4)] Expressed as a percentage of total credit losses for the single-family mortgage credit book of business.

Note: Categories are not mutually exclusive; numbers are not additive across columns.

---

[24] *E.g.*, Ex. 748 [2004 10-K], at 144-45.

[25] *E.g.*, Ex.391 [August 2007 Credit Supplement]; Ex.894 [February 2008 Investor Summary].

[26] Ex. 773 [August 2008 Investor Summary] at 30.

10

FNMA disclosed the risk of its EA and MCM loans—and of all the other conventional loans in its Single-Family book—using credit risk characteristics because this information is objective and comparable.[27]  It also allowed investors to weigh for themselves the factors that they considered most important when assessing risk.  While all EA and MCM loans were reflected in the credit risk tables and the credit profile charts, they were predominantly captured in the segments identified by FNMA as containing increased risk.  For example, by December 2007, over 80% of all EA and MCM loans were loans made to borrowers with FICO scores below 620 or loans with OLTV ratios greater than 90%.[28]

FNMA did not separately report on each of the myriad loan programs or brand names represented on the Single-Family book.  FNMA did not consider loan programs and brand names to be risk factors because they are neither objective nor comparable and cannot be used in risk modeling.[29]  At one point FNMA's Disclosure Committee explicitly considered whether a separate disclosure of EA and MCM loans by program name would be helpful to investors, but concluded that such a disclosure would be less informative than a disclosure focused on objective credit risk characteristics.[30]  Further, FNMA's Disclosure Committee and management understood that the risk of EA and MCM loans was based on the credit risk characteristics that it disclosed in detail for all of its loans, rather than on any unique origination process or feature.[31]

---

[27] *E.g.*, Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 72:3-73:5.

[28] *E.g.*, Ex. 1129.

[29] *E.g.*, Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 14:8-15:7.

[30] *E.g.*, Ex. 1481 [Wilkinson Dep.] at 142:11-144:3.

[31] *E.g.*, *id.*

D.    The Subprime New Business Initiative

Unlike its longstanding commitment to affordable housing, FNMA did not have any significant involvement in the subprime market before the end of 2005.  In 2006, FNMA launched its Subprime New Business Initiative ("Subprime NBI"), with the stated goal of entering the subprime market in a limited manner.  The objective of the Subprime NBI was to acquire a small amount of subprime loans originated by specialty subprime lenders, which FNMA could then analyze and assess to better understand the risks associated with the unique origination practices used by subprime lenders.[32]  FNMA believed what many in the mortgage industry understood at the time (and what many more have come to learn):  the processes used by subprime lenders to originate subprime loans presented risk above and beyond the risk presented by the credit characteristics.[33]  That "origination" risk emanated from the unique, and looser, origination practices that had developed in the subprime market.[34]  FNMA capped the percentage of subprime loans it could acquire relative to its overall business at 0.3%, and set up a separate channel for the acquisition of subprime loans, managed by dedicated personnel.[35]

When FNMA launched its Subprime NBI, and throughout the Relevant Period, there was no standard industry definition for subprime.[36]  The loans that FNMA considered to be subprime were those loans that it had acquired through the Subprime NBI, along with the very limited amount of historical subprime loans from subprime lenders already on the Single-Family book.

---

[32] *E.g.*, Ex. 1467 [Pallotta Dep.] at 23:13-25:22.

[33] *See, e.g.*, Ex. 1481 [Wilkinson Dep.] at 128:15-129:4; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 28:20-29:2.

[34] *See, e.g.*, Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 18:22-19:9.

[35] *E.g.*, Ex. 1461 [Lewis Dep.], at 18:3-20, 21:10-16; Ex. 1470 [Schuppenhauer Dep.], at 119:6-25; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.], at 17:6-12; Ex. 1467 [Pallotta Dep.], at 25:4-7.

[36] Ex. 1401 [Plaintiff's Responses to Defendant Lund's First Set of Requests for Admission, dated July 10, 2014], at No. 1.

Although FNMA acquired only a relatively small number of loans through the Subprime NBI, it decided in early 2007 to provide a quantitative disclosure of those loans, because of increased public interest in the subprime market.[37]  FNMA first disclosed its quantitative subprime exposure—approximately 0.2% of its Single Family book—in its February 27, 2007 12b-25.[38]  FNMA disclosed its quantitative subprime exposure, which stayed roughly the same, in each of its subsequent public filings during the Relevant Period.[39]

In the Form 10-K issued by FNMA immediately after its February 2007 Notice of Late Filing, FNMA disclosed the same quantitative subprime exposure it included in the Notice of Late Filing issued 9 weeks earlier.  It also included a detailed explanation of how FNMA reached that number, i.e., its subprime classification criteria.  In accordance with its understanding of what constituted a subprime loan and the risks involved in subprime loans, FNMA disclosed that it classified loans as subprime for purposes of its quantitative disclosure if the loans were originated by specialty subprime lenders using processes unique to subprime loans.  FNMA's 2005 10-K stated:

> "*Subprime mortgage*" generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower.  As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers.  **Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans.  In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders . . . .**[40]

---

[37] *See, e.g.*, Ex. 1441 [Beresford Dep.] at 97:12-98:22; Ex. 850 [Feb. 19-20, 2007 e-mail chain].

[38] Ex. 517 [February 2007 12b-25], at 8.

[39] *E.g.*, Ex. 717 [2005 10-K,] at 122; Ex. 709 [2007 10-K], at 129-30.

[40] Ex. 717 [2005 10-K], at 36 (emphasis added).

13

All of FNMA's subsequent public filings during the Relevant Period disclosed FNMA's classification of subprime loans using effectively the same language.[41]

In its public filings from November 2007 onward, the language changed slightly to include a reference to the subprime divisions of large lenders. This reference was added at a time when many standalone subprime lenders had failed and subprime lending had shifted to divisions within large lenders. It was added to ensure that the disclosure remained accurate.[42]

### E.    Alt-A Loans and Reduced Documentation Loans

FNMA began purchasing Alt-A loans in the early 2000s.[43]  Like subprime, there was no standard industry definition for Alt-A throughout the Relevant Period.[44]  The lenders from which FNMA purchased Alt-A loans did not consider all reduced-documentation loans to be Alt-A; rather, they considered loans where the *borrower* sought out and was willing to pay more for a loan that allowed him or her to provide less than full documentation to be Alt-A loans, in contrast to loans where the borrower was fully prepared to document his or her loan but the *lender* decided to require something less than full documentation based on the high credit-quality of the borrower.[45]  Lenders also considered some full-documentation loans to be Alt-A, where those loans did not meet FNMA's conventional lending standards for certain reasons

---

[41] *E.g.*, Ex. 66 [2006 10-K], at 156; Ex. 709 [2007 10-K], at 129.

[42] Ex. 1473 [Sleeper Dep.], 57:22-61:22.

[43] *See, e.g.*, Ex. 1467 [Pallotta Dep.], at 34:25-36:2; Ex. 1458 [Johnson Dep.], at 71:5-73:12; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.], at 113:16-21.

[44] Ex. 1401 [Plaintiff's Responses to Defendant Lund's First Set of Requests for Admission, dated July 10, 2014], at No. 3.

[45] *See, e.g.*, Ex. 1482 [Woodward Wells Fargo 30(b)(6) Dep.] at 45:25-48:4, 50:7-18, 53:17-24; Ex. 1464 [McMurray Dep.] at 48:12-49:13.

14

independent of documentation.[46]  Lenders originated Alt-A loans pursuant to their own, internal Alt-A or non-conventional underwriting guidelines.[47]

Approximately 90% of the Alt-A loans on the Single-Family book during the Relevant Period were purchased in bulk packages, *i.e.*, through what FNMA called the "investor channel."[48]  In the investor channel, lenders packaged collections of Alt-A loans that the lenders themselves expressly designated as Alt-A, and then FNMA and other companies in the secondary market bid to purchase the packages.[49]  During the Relevant Period, FNMA also began purchasing a relatively small number of Alt-A loans through its "lender channel."[50]  For lender channel purchases, FNMA and the lender negotiated a contract, known as a "variance." The variance allowed the lender to deliver to FNMA loans that were originated under the lenders' own Alt-A underwriting guidelines.[51]  The variance also instructed the lender to label those loans with a "special feature code" that FNMA used to track its Alt-A purchases.[52]

FNMA first disclosed its quantitative exposure to Alt-A loans—approximately 11%—in the 12b-25 that it issued on May 8, 2007.[53]  FNMA explained in this same disclosure that it calculated its quantitative Alt-A exposure based on how lenders designated the loans upon delivery:

---

[46] *E.g.*, Ex. 1457 [Ingerslev Bank of America 30(b)(6) Dep.] at 89:18-91:5.

[47] *E.g.*, Ex. 1439 [Alson Bank of America 30(b)(6) Dep.] at 63:20-64:1; Ex. 1482 [Woodward Wells Fargo 30(b)(6) Dep.] at 45:25-48:4; 50:7-18; 53:17-24.

[48] *See, e.g.*, Ex. 1134 [Data Responsive to Request Nos. 11-12 in FNMA 30(b)(6) Subpoena].

[49] *See, e.g.*, Ex. 816 [November 17, 2011 Letter from FNMA to the SEC], at 22; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.], at 44:14-45:4; 50:18-20; *see also* Ex. 1475 [Sobczak Dep.], at 37:3-38:17.

[50] *See* Ex. 1134 [Data Responsive to Request Nos. 11-12 in FNMA 30(b)(6) Subpoena].

[51] *See, e.g.*, Ex. 1474 [Sleeper 30(b)(6) Dep.], at 45:17-47:2; Ex. 1475 [Sobczak Dep.], at 57:1-14.

[52] *See, e.g.*, Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.], at 47:3-48:3; Ex. 1475 [Sobczak Dep.], at 57:9-14.

[53] Ex. 718 [May 2007 12b-25], at 8.

> We acquire mortgage loans originated as Alt-A from our traditional lenders that generally specialize in originating prime mortgage loans.  These lenders typically originate Alt-A loans as a complementary product offering and generally follow an origination path similar to that used for their prime origination process.  **In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features . . . .[54]**

FNMA disclosed its quantitative Alt-A exposure (which stayed roughly the same), along with the same classification, in each of its subsequent public filings during the Relevant Period.[55]

During the Relevant Period, FNMA also purchased increasing numbers of reduced-documentation loans that were not designated by lenders as Alt-A—*i.e.*, Process Efficiency loans, where the lender chose to require something less than full documentation based on the borrower's credit profile.[56]  Examples of such lender-selected Process Efficiency loans included Countrywide's Fast & Easy loans, Bank of America's PaperSaver loans, and Wells Fargo's Straight to Close loans.[57]  These loans were not considered to be Alt-A loans by the lenders who originated them, and were not labeled as Alt-A when they were delivered to FNMA.[58]  Accordingly, FNMA did not include these loans in its quantification of its Alt-A exposure.[59]

Because of the increasing percentage of the Single-Family book that comprised such loans, however, FNMA's Disclosure Committee considered what, if anything, should be said about the company's portfolio of Process Efficiency loans.[60]  The Disclosure Committee ultimately concluded that Process Efficiency loans did not present a material risk because the

---

[54] *Id.* (emphasis added).

[55] *E.g.*, Ex. 66 [2006 10-K], at 128, 152; Ex. 709 [2007 10-K], at 129.

[56] *See, e.g.*, Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 64:10-66:19.

[57] *See, e.g.*, Ex. 1130 [Jan. 20, 2011 Letter to SEC] at 22; Ex. 1439 [Alson Bank of America 30(b)(6) Dep.] at 49:25-50:9; Ex. 1456 [Hopper Wells Fargo 30(b)(6) Dep.] at 50:24-51:4.

[58] *See, e.g.*, Ex. 1482 [Woodward Wells Fargo 30(b)(6) Dep.] at 45:25-48:4, 50:7-18, 53:17-24.

[59] *E.g.*, Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 39:22-41:13, 49:20-50:16.

[60] *See, e.g.*, Ex. 1481 [Wilkinson Dep.] at 170:12-173:20; Ex. 246 [Handwritten comments from Deborah Tretler].

reduced documentation feature was not something the borrower selected.[61]  FNMA's understanding of the relative risks of different types of reduced-documentation loans proved correct: throughout the Relevant Period, Process Efficiency loans performed significantly better than Alt-A loans; indeed, they even performed better than the overall Single-Family book.[62]

  **F.** **The Conservatorship**

  In 2008, the U.S. housing market—and the global economy more generally—suffered a collapse of unprecedented proportions.  FNMA was required by its congressional charter to invest in—and only in—residential mortgages.[63]  Thus, not surprisingly, FNMA suffered significant losses.  As a result, on September 6, 2008, FHFA placed FNMA into conservatorship.[64]  FNMA's Board of Directors was told by the government that the losses that necessitated the conservatorship were not the fault of the company's management, but rather were the result of the broader economic forces; Board members were further informed that if they did not accept the conservatorship voluntarily, then they would face personal legal retribution from the government.[65]

  After it took over as conservator in September 2008, and after Defendants left the company, FHFA never changed the way that FNMA classified subprime or Alt-A loans.  FNMA continued to classify subprime and Alt-A loans in the same way it continued to exclude EA and MCM loans from its quantitative subprime disclosure and it continued to exclude Process

---

[61] *See id.*; *see also* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 39:22-41:13, 49:20-50:16.

[62] *E.g.*, Ex. 1123 [Data Responsive to Request Nos. 1-4 in FNMA 30(b)(6) Subpoena].

[63] 12 U.S.C. § 1716-1719.

[64] *See, e.g.*, Ex. 525 [Q3 2008 10-Q], at 146.

[65] *See* Ex. 1141 [Beresford Dep.], at 119:23-125:8.

Efficiency loans from its quantitative Alt-A disclosure.[66]  The only difference is the addition of a note that FNMA has "other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime *because they do not meet our classification criteria.*"[67]  To this day, under control by the federal government, FNMA continues to recognize that EA, MCM, and Process Efficiency loans do not meet its subprime and Alt-A classifications. FNMA never restated or amended its disclosures from the Relevant Period, and it remains FNMA's position today that its disclosures during the Relevant Period were accurate, complied with all relevant requirements, and were in no way misleading.[68]

      **G.**    **The Current Proceedings**

The SEC filed this case on December 16, 2011.  The SEC claims that FNMA's quantification of its subprime exposure was false and misleading for not including EA and MCM loans.  The SEC also claims that FNMA's quantification of its Alt-A exposure was false and misleading because it did not include all reduced-documentation loans.  The SEC's Complaint comprises five causes of action: (1) a Section 10(b) claim against Mr. Mudd; (2) a Section 17(a) claim against Mr. Mudd and Mr. Dallavecchia; (3) a Section 20(e) claim for aiding and abetting alleged violations of Section 10(b) against Mr. Mudd, Mr. Dallavecchia, and Mr. Lund; (4) a Rule 13a-14(a) claim against Mr. Mudd; and (5) a Section 20(e) claim for aiding and abetting alleged violations of Rule 13a-14(a) against Mr. Mudd, Mr. Dallavecchia, and Mr. Lund.

The Court denied Defendants' motion to dismiss on August 10, 2012.[69]  The parties engaged in nearly two years of fact discovery, involving approximately fifty depositions and the

---

[66] *E.g.*, Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 10:20-17:8; 24:15-26:2.

[67] Ex. 525 [Q3 2008 10-Q], at 115 (emphasis added).

[68] *E.g.*, Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 58:3-59:12.

[69] Dkt. 40 (Aug. 10, 2012).

production of millions of pages of documents.  Fact discovery closed on July 11, 2014, and

expert discovery closed on January 30, 2015.

## III.    LEGAL STANDARD

The Court should grant summary judgment when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Where a non-moving party "has failed to make a sufficient showing on an essential element of

[its] case with respect to which [it] has the burden of proof" at trial, then summary judgment is

appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## IV.    THE SEC HAS FAILED TO ADDUCE ANY EVIDENCE THAT FNMA'S PUBLIC FILINGS WERE FALSE OR MISLEADING[70]

The existence of a false or misleading statement is a necessary element of each of the

SEC's claims.[71]  The undisputed and uncontroverted evidence in this case proves that FNMA's

public filings did not contain any false or misleading statements.  FNMA's public filings clearly

disclosed its classification criteria for subprime and Alt-A loans and accurately reported the

number of loans held by FNMA that met those criteria.  The SEC's allegations to the contrary

rest on incomplete and legally impermissible readings of FNMA's disclosures—readings with

which not a single witness in this case agrees.  After reading FNMA's disclosures properly and

completely as required by binding circuit law, the undisputed evidence confirms that Defendants

are entitled to summary judgment.

---

[70] All factual citations in the remaining sections are to the Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("UF") or to the exhibits to the Declaration of Brook Dooley in Support of Defendants' Motion for Summary Judgment ("Ex."), both of which were filed concurrently with this motion.

[71] *E.g.*, *SEC v. DiBella*, 587 F.3d 553, 563, 566 (2d Cir. 2009) (Section 10(b) and aiding and abetting); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (Section 17(a)); *SEC v. Mozilo*, No. CV 09-3994, 2010 WL 3656068, at *21 (C.D. Cal. Sept. 16, 2010) (Rule 13a-14(a)).

### A.   The SEC Has Failed to Adduce Any Evidence that FNMA's Subprime Disclosures Were False or Misleading

#### 1.   The undisputed facts show that FNMA's quantitative subprime disclosures accurately captured the number of loans that fell within the company's subprime classification

The SEC confirmed during discovery that its theory of liability as to subprime is as follows: FNMA's subprime disclosures were false and misleading because FNMA failed to include EA and MCM loans in its quantification of its subprime exposure, even though they met FNMA's definition of subprime loans in its disclosures.[72]  The SEC made clear that it does not contend that FNMA had an independent obligation to disclose its exposure to EA or MCM loans—or any other loans—separate and apart from its subprime exposure.[73]  The SEC likewise does not contend that FNMA's public disclosures were false or misleading because FNMA failed to include in its quantitative subprime exposure loans that performed similar to the loans classified as subprime.[74]  The SEC also has disclaimed the argument that FNMA should have used any specific, alternative subprime disclosure, and acknowledged that there was no accepted definition of subprime during the Relevant Period.[75]  Thus, to establish that FNMA's subprime disclosures contained any false or misleading statements, the SEC must prove that EA and MCM loans fell within the company's subprime classification.  But after years of discovery, the SEC has uncovered no evidence supporting its theory of liability.

---

[72] Ex. 1492 [9-11-14 Letter from Dooley to Kisslinger], at 1; *see also* Ex. 1493 [9-12-14 Letter from Kisslinger to Dooley], at 1-2; Ex. 1494 [9-16-14 Letter from Dooley to Kisslinger], at 1.

[73] *Id.*

[74] *Id.*

[75] *Id.*

FNMA's public filings clearly and explicitly disclosed that FNMA classified loans as subprime if they were originated by subprime specialty lenders using processes unique to subprime loans:

> "*Subprime mortgage*" generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower.  As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers.  **Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans.  In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders . . . .**[76]

FNMA's public filings accurately captured the number of loans that met the company's subprime classification—*i.e.*, the quantitative disclosures accurately reported the number of loans held by FNMA that were originated by subprime specialty lenders using processes unique to subprime loans.  The undisputed testimony is that the quantitative subprime exposure of 0.2% in FNMA's February 27, 2007 Form 12b-25, for example, accurately captured all loans on FNMA's Single-Family book originated by specialty subprime lenders using processes unique to subprime loans.  UF 87.  There is no evidence that the quantitative subprime exposure in any of FNMA's subsequent public filings during the Relevant Period misstated in any way the percentage of FNMA's Single-Family book comprising loans originated by specialty subprime lenders using processes unique to subprime loans.[77]  There is no evidence that FNMA ever acquired any loans that were originated by specialty subprime lenders using processes unique to subprime loans that it did not include in its quantitative subprime disclosures.  UF 89.

It is also undisputed that EA and MCM loans do not satisfy these classification criteria. EA and MCM loans were not originated by specialty subprime lenders using processes unique to

---

[76] UF 80; *accord* UF 81, 82, 83, 84.
[77] UF 88.

subprime loans.  Unlike subprime loans, EA and MCM loans—even those originated by

subprime divisions of large lenders—were originated using FNMA's standard automated

underwriting system, Desktop Underwriter.  UF 1, 2, 8, 9, 10, 27.  As a result, EA and MCM

loans were originated pursuant to the same standard processes outlined in FNMA's Selling

Guide and Guide to Underwriting With Desktop Underwriter as conventional, conforming loans.

UF 11.[78]

     It is also undisputed that neither FNMA nor any of the individuals responsible for the

company's subprime business considered EA or MCM loans to be subprime loans.  UF 12, 13.

The uncontroverted testimony from every FNMA employee who testified on this topic is that EA

and MCM loans did not meet FNMA's subprime definition, UF 113, and were not considered

subprime loans by FNMA.  UF 14.

     Further, it is undisputed that FNMA's classification of subprime loans, and its

quantification of its subprime exposure, accurately reflected both the way the company ran its

business and the way it understood the risks of subprime loans.  FNMA established a separate

channel, managed by dedicated personnel, for the acquisition of subprime loans.  UF 24.  EA and

MCM loans, in contrast, were purchased through the same channel as all other conventional,

conforming loans, and the personnel who managed the subprime channel were not involved in

the purchase of EA or MCM loans. UF 15.[79]  Furthermore, FNMA understood that subprime

loans had additional risk, above and beyond the credit profile of the borrower, based on channel

---

[78] Although MCM loans could be manually underwritten in limited circumstances, the vast majority (97-99% between 2006 and 2008) were underwritten through DU and complied with all DU and Selling Guide protections. UF 8, 10.

[79] FNMA's internal reports, such as its "CRAM" reports and "Early Warning Reports," further demonstrate that the company viewed and managed subprime loans separately from EA or MCM loans.  These reports uniformly treat subprime as a category separate from EA or MCM.  UF 29.

22

and origination processes.  UF 26.  The fact that EA and MCM loans were not classified as subprime reflected the distinctions recognized by FNMA.

The allegation that FNMA's subprime disclosures contained false or misleading statements is further dispelled by the undisputed evidence that FNMA's subprime classification remained the same even after FHFA took control of FNMA and Defendants had left the company.  Both during and after the SEC's three-year investigation, when FNMA was being run by FHFA, the company continued to classify as subprime only loans originated by specialty subprime lenders using processes unique to subprime loans.  UF 102.  It therefore continued to exclude EA and MCM loans from FNMA's quantitative subprime disclosure.  UF 103, 101.  Nor did the regulators that subjected FNMA to intense scrutiny over the last several years, including the SEC, ever require FNMA to restate the disclosures at issue in this case.  In other words: to this day, even after the filing of the SEC's Complaint, FNMA has never included EA or MCM loans in its quantitative subprime disclosures.  UF 106.  Indeed, it remains FNMA's position that its subprime disclosures were accurate, complied with all relevant requirements, and were not in any way misleading.  UF 105.

Moreover, OFHEO was aware throughout the Relevant Period that FNMA classified EA and MCM loans separately from subprime loans.  UF 90.  OFHEO also was aware throughout the Relevant Period that FNMA held more EA loans than loans it classified as subprime.  UF 91.  OFHEO never suggested, however, that FNMA should change its definition of subprime loans, or include EA and MCM loans in its quantitative subprime disclosure.  UF 92.  *See, e.g., Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 182 (S.D.N.Y. 2012) (Keenan, J.) (finding as "instructive" in dismissing complaint fact that "FHFA did not conclude that any of

Freddie Mac's public statements contradicted its internal numbers") *aff'd, Central States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. App'x 72 (2d Cir. 2013).

Thus, the undisputed and overwhelming evidence shows that FNMA's quantitative subprime disclosures in its public filings were not false or misleading.

> ### 2.    The SEC's incomplete reading of FNMA's subprime disclosures does not create a dispute of material fact, because these disclosures did *not* define as subprime all loans to borrowers with weaker credit profiles

Because the SEC can point to no evidence that EA or MCM loans were originated by specialty subprime lenders using processes unique to subprime loans, the SEC has tried to prove instead that this was not actually the way FNMA's disclosures defined subprime loans.  The SEC contends—and its case hinges on the contention—that a reasonable investor would have read FNMA's public filings as disclosing that FNMA classified as subprime all loans to borrowers with weaker credit profiles.  *E.g.*, Compl. ¶¶ 3-8.

The SEC's implausible reading of FNMA's subprime disclosure is based on the generalized statement found shortly before FNMA's actual classification of subprime loans:

> "*Subprime mortgage*" **generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower**.  As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers.  Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans.  In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders . . . .[80]

The SEC contends that a reasonable investor would have understood this generalized statement about what the term subprime "generally refers to," and not the detailed statement about how FNMA "classified mortgage loans" in "reporting [its] subprime exposure," to be the criterion used by FNMA for classifying loans as subprime.

---

[80] UF 80; *accord* UF 81, 82, 83, 84.

In denying Defendants' motion to dismiss, the Court was required to accept this contention as true.[81]  The Court is no longer required to accept this assertion and should now reject the SEC's unfounded interpretation of FNMA's subprime disclosures.[82]

*First*, the Court should reject the SEC's interpretation because it is wrong as a matter of undisputed fact.  There is not a single piece of evidence supporting the contention that an investor understood the generalized statement about borrowers with weaker credit profiles to be the definition of subprime disclosed in FNMA's public filings.  None of the investors or analysts who testified stated that he or she understood that FNMA classified as subprime all loans to borrowers with weaker credit profiles.  UF 124.  To the contrary, they each confirmed their understanding that FNMA did *not* include all loans to borrowers with weaker credit profiles in its quantitative subprime exposure.  UF 125.  For example:

- Jonathan Adams, a managing director at Oppenheimer Capital (a significant investor in FNMA), confirmed that, throughout the Relevant Period, he "understood that FNMA had loans on its book to borrowers with weaker credit beyond those loans that it disclosed . . . as subprime loans."[83]

- Caroline Cai, a portfolio manager for Pzena Investment Management (also a significant investor in FNMA), testified that she understood how FNMA defined subprime, and that in 2007 "more than 0.2 percent of [FNMA]'s book was made up of loans to borrowers with weaker credit profiles."[84]

And David Hochstim, who was an equity analyst at Bear Stearns, testified as follows:

> Q. . . . [G]iven FNMA's disclosure that 5 percent of the book was made up of loans to borrowers with FICO scores below 620, did you believe in February of 2007 that that 0.2 percent number that FNMA disclosed as subprime was the sum total of loans on FNMA's books that were made to borrowers with weaker credit?
> …

---

[81] Dkt. 40, at 14-15.

[82] *See Steinberg v. Carey*, 439 F. Supp. 1233, 1241 (S.D.N.Y. 1977).

[83] Ex. 1438 [Adams Dep.] 112:11-113:3.

[84] Ex. 1442 [Cai Dep.] 40:6-13, 48:3-8.

> A.  I don't see how I could have. If .2 percent is smaller than 5 or 6
> percent, then why would I think that this is the total exposure when
> I wrote about low FICO scores and high LTV loans?[85]

There is also no evidence that anyone at FNMA understood the company's subprime classification to include all loans to borrowers with weaker credit profiles or intended FNMA's subprime disclosure to be understood in this manner.  UF 115.  Instead, it is undisputed that all of the FNMA employees who worked with subprime, EA, or MCM loans and/or who participated in the disclosure process, including numerous in-house attorneys, understood that the company classified loans as subprime if they were originated by subprime lenders using processes unique to subprime lending.  UF 116.

*Second*, the SEC's contention that a reasonable investor would have understood the generalized statement about borrowers with weaker credit profiles to be the definition of subprime loans is wrong as a matter of law.  In determining how a reasonable investor would have read FNMA's public disclosures, the Court must consider the disclosure as a whole and must evaluate the allegedly misleading statement in context.  *E.g.*, *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991); *Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 206 (2d Cir. 1980); *see also In re FNMA 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 396 (S.D.N.Y. 2010) (Crotty, J.) ("A plaintiff cannot state a [securities fraud] claim by citing snippets of corporate disclosures and alleging [they are] misleading; rather, such disclosures must be 'read as a whole.'" (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 358 (2d Cir. 2002))).

Here, a reasonable investor would have seen that the statement about what the term subprime "generally refers to" was followed almost immediately by a more specific statement

---

[85] Ex. 1455 [Hochstim Dep.] at 54:24-55:7.

about how FNMA, in particular, "classified mortgage loans as subprime" in "reporting [its] subprime exposure."[86]  The plain language of these two statements makes it clear that the latter, specific statement governs how FNMA calculated the quantitative subprime exposure disclosed immediately thereafter, and that the former, generalized statement merely provides background about how others in the industry "generally" use the term subprime.

A reasonable investor reading FNMA's filings also would have seen the detailed information in FNMA's credit tables, which disclosed precisely the percentage of FNMA's book comprising loans to borrowers with weaker credit profiles—a number far greater than FNMA's reported subprime exposure.  For example, in FNMA's 2007 10-K, the credit risk table states that **6%** of the loans on FNMA's Single-Family book at the end of 2007 were loans made to borrowers with FICO scores of less than 620,[87] which qualify as "borrower[s] with weaker credit."  Indeed, it is undisputed that reasonable investors understood that borrowers with FICO scores below 620 were borrowers with weaker credit profiles.  UF 123.  Meanwhile, the quantitative subprime disclosure states that **approximately 0.3%** of the loans on FNMA's book were loans that FNMA classified as subprime.[88]

Thus, no reasonable investor would have understood the statement about what the term subprime "generally refers to" to be FNMA's classification criteria for subprime loans in the context of the specific statement, directly following, about how FNMA "class[ifies] mortgage loans as subprime" in "reporting [its] subprime exposure," especially since the disclosures also contained credit tables showing that FNMA had a much higher exposure to loans made to borrowers with weaker credit profiles than to loans that fell within its subprime classification.

---

[86] UF 80; *accord* UF 81, 82, 83, 84.

[87] Ex. 709 [2007 10-K], at 126-28.

[88] Ex. 709 [2007 10-K], at 129-30.

The SEC's contrary interpretation—which focuses on a statement in isolation while ignoring the context surrounding that statement—is precisely the sort of interpretation that the Second Circuit has routinely rejected as a matter of law.  *See, e.g.*, *I. Meyer Pincus Associates*, 936 F.2d at 762-63 (holding that, when read in context, the allegedly misleading general statement could not be understood by any reasonable investor in the manner alleged by the plaintiff because the statement was preceded by a more particular warning, and because more detailed statements were also found elsewhere in the prospectus); *Greenapple*, 618 F.2d at 206 (upholding grant of summary judgment to the defendant and holding that plaintiff's "interpretation is unreasonable when the highlighted sentence is read in context").[89]  The same conclusion is required here.

In order to prop up its illogical reading of FNMA's subprime disclosure, the SEC may point to the February 2007 Form 12b-25 Notice of Filing, which was the first public filing in which FNMA included a disclosure of its quantitative subprime exposure.  UF 78.  The February 2007 Form 12b-25 did not include the detailed statement, found in all subsequent public filings, explaining how FNMA classified subprime loans for purposes of calculating its quantitative subprime exposure, while it did contain the statement about what the term subprime "generally refers to" in the industry.[90]  The SEC's Complaint alleged that this caused investors to believe that the generalized statement was in fact the specific classification criterion that FNMA used to calculate its quantitative subprime exposure.  *See e.g.*, Compl. ¶¶ 72, 84.

---

[89] *See also Halperin*, 295 F.3d at 359-60; *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 702-03 (2d Cir. 1994); *Cole v. Schenley Indus., Inc.*, 563 F.2d 35, 40-41 (2d Cir. 1977); *Howell v. Mgmt. Assistance, Inc.*, 519 F. Supp. 83, 88-90 (S.D.N.Y. 1981).

[90] Ex. 517 [Feb. 2007 12b-25], at 8; *see also* section IV.A.1, *supra*.

But discovery uncovered no evidence that any investors ever read even the February 2007 Form 12b-25 in the manner alleged by the SEC.  UF 126.  None of the investors and analysts who testified stated that they understood the quantitative subprime disclosure of 0.2% in the February 2007 12b-25 to comprise all loans that FNMA held that were made to borrowers with weaker credit profiles.  UF 127.  This makes sense because, just a few months earlier, in December 2006, FNMA had disclosed in its 2004 Form 10-K credit table that 5% of its Single-Family book comprised loans to borrowers with FICO scores below 620.  UF 74.

Furthermore, the undisputed testimony from the FNMA employees who worked on the February 2007 Form 12b-25 is that this filing did not contain any definition of subprime and that FNMA intended for the generalized statement to be read simply as background.  UF 114.  There also is no evidence that the February 2007 Form 12b-25 had any spillover effect on how investors understood the subprime disclosures in FNMA's subsequent public filings.  UF 128.

Thus, the SEC's incomplete and implausible interpretation of FNMA's subprime disclosures fails as a matter of uncontested fact and as a matter of law.

### B.     The SEC Has Failed to Adduce Any Evidence That FNMA's Alt-A Disclosures Were False or Misleading

#### 1.     FNMA's quantitative Alt-A disclosures accurately captured the number of loans that the company classified as Alt-A loans

The SEC's Alt-A case mirrors its subprime case—and it fails for the same reasons.  There is no evidence supporting the notion that FNMA's quantitative Alt-A disclosures were false or misleading based on the company's publicly disclosed classification criteria for Alt-A.

As with subprime, during discovery the SEC confirmed its theory of liability as to Alt-A, stating that FNMA's public Alt-A disclosures were false and misleading because FNMA failed to include all reduced documentation loans, which the SEC contends met FNMA's definition of

Alt-A, in its quantitative Alt-A disclosures.[91]  The SEC does *not* contend that FNMA had an independent obligation to disclose its exposure to all reduced documentation loans—or to any subset of reduced-documentation loans—separate and apart from its Alt-A disclosure.[92]  And it does not argue that FNMA should have made a particular, alternative disclosure.[93]

FNMA's public filings clearly and explicitly disclosed that FNMA classified loans as Alt-A, for purposes of its quantitative Alt-A disclosures, if lenders designated them as such upon delivery to FNMA:

> Although there is no uniform definition of Alt-A . . . loans across the mortgage industry, Alt-A loans generally are loans that are underwritten with lower or alternative documentation than a full documentation mortgage loan and that also may include other alternative product features. . . .  **In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features . . . .**[94]

The undisputed evidence shows that FNMA's quantitative Alt-A disclosures accurately captured the number of loans held by FNMA that lenders designated as Alt-A upon delivery—*i.e.*, that met FNMA's classification criteria for Alt-A.  UF 97.  The SEC has not presented evidence of a single instance in which a lender designated a loan as Alt-A that FNMA failed to report as Alt-A.  UF 98.  In other words, there is no evidence that the quantitative Alt-A disclosure in any of FNMA's public filings in any way misstated the number of loans held by FNMA that were designated as Alt-A by the lender.

It also is undisputed that lenders did not designate all reduced-documentation loans delivered to FNMA as Alt-A.  UF 30.  Instead, lenders designated as Alt-A the loans that they

---

[91] Ex. 1492 [9-11-14 Letter from Dooley to Kisslinger], at 2; *see also* Ex. 1493 [9-12-14 Letter from Kisslinger to Dooley], at 2; Ex. 1494 [9-16-14 Letter from Dooley to Kisslinger], at 1.

[92] *Id.*

[93] *Id.*

[94] UF 93 (emphasis added); *accord* UF 94, 95.

considered to be Alt-A: namely, loans originated under their internal Alt-A or non-conventional underwriting guidelines, including both reduced-documentation loans where the *borrower* chose to provide something less than full documentation and full documentation loans that did not meet FNMA's conventional lending standards for other reasons.  UF 31.  The lenders that delivered Alt-A loans to FNMA did *not* designate as Alt-A loans as to which the *lender*, as opposed to the borrower, chose to require something less than full documentation (*i.e.*, Process Efficiency loans), because they did not consider such loans to be Alt-A.  UF 32.

The undisputed evidence shows that FNMA's understanding of what constituted an Alt-A loan was consistent with that of its lenders.  FNMA, like lenders, distinguished between borrower-selected reduced-documentation loans and lender-selected reduced-documentation (Process Efficiency) loans, and understood that borrower-selected reduced documentation loans carried fundamentally higher risk than Process Efficiency loans.  UF 33.  Thus, FNMA's Alt-A disclosures mirrored both the company's and the lenders' understanding of what constituted Alt-A loans.

Furthermore, the actions of FNMA's regulators before and after the company's conservatorship contradict any notion that FNMA's Alt-A disclosures were false or misleading.  Indeed, OFHEO was aware throughout the Relevant Period that FNMA considered borrower-selected reduced-documentation loans to be Alt-A, but that FNMA did not include all reduced-documentation loans in its quantitative Alt-A disclosure.  UF 99.  Yet OFHEO never advised FNMA that it should change its classification or disclosures, or that FNMA was otherwise required to characterize all reduced-documentation loans as Alt-A.  UF 100.  Moreover, even after FHFA took over FNMA, FNMA never changed the way it classified Alt-A loans or included all reduced-documentation loans in its quantitative Alt-A disclosures.  UF 107.  Nor did

31

FNMA ever amend the Alt-A disclosures at issue.  UF 106.  To the contrary, it maintains to this day that these disclosures were accurate.  UF 105.  *See, e.g., Kuriakose*, 897 F. Supp. 2d at 182. The undisputed facts thus show that FNMA's Alt-A disclosures were complete and accurate.

> **2.      The SEC's incomplete reading of FNMA's Alt-A disclosures does not create a disputed issue of material fact because these disclosures did *not* define all reduced-documentation loans as Alt-A loans**

As with its subprime case, the SEC will likely attempt to manufacture a dispute of material fact through a strained and implausible reading of FNMA's Alt-A disclosures.  The SEC alleges that a reasonable investor would have read the public filings as disclosing that FNMA classified all reduced-documentation loans as Alt-A for purposes of its quantitative Alt-A disclosures.  The SEC's contention is premised on the following language:

> Although there is no uniform definition of Alt-A . . . loans across the mortgage industry, **Alt-A loans generally are loans that are underwritten with lower or alternative documentation than a full documentation mortgage loan and that also may include other alternative product features**. . . .  In reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features . . . .[95]

The Court accepted as true the SEC's interpretation of FNMA's Alt-A disclosures, based on the Complaint's characterization of the disclosures, in denying Defendants' motion to dismiss,[96] but it need not and should not do so now.  A reasonable investor would have seen the specific statement about how FNMA "classified mortgage loans as Alt-A" in "reporting [its] Alt-A exposure" immediately after the generalized statement about what "Alt-A loans generally are."[97]  A reasonable investor would have understood that the specific statement, by its plain terms, governs how FNMA classified Alt-A loans for purposes of its quantitative disclosures,

---

[95] UF 93, 94, 95; *see also* Compl. ¶¶ 9-13.
[96] Dkt. 40, at 16.
[97] UF 93; *accord* UF 94, 95.

while the generalized statement merely provides background on how others in the industry used the term Alt-A.  The SEC's attempt to create a dispute of material fact by taking this generalized statement out of context must fail.  *See e.g.*, *I. Meyer Pincus*, 936 F.2d at 762-63; *Greenapple*, 618 F.2d at 206; section IV.A.2, *supra*.

### C. The Arguments That the SEC Has Relied Upon are Meritless and Underscore the Lack of Any Genuine Dispute of Material Fact

Because the SEC cannot prove that FNMA's quantitative subprime and Alt-A disclosures in any way misstated the number of loans held by FNMA that met the company's publicly disclosed classification criteria for subprime and Alt-A loans, the SEC will likely try to avoid summary judgment by resorting to several irrelevant and meritless arguments that merely underscore the absence of any *genuine* dispute of material fact as to the actual issues in this case.

*First*, the SEC may argue that EA loans performed worse than the loans that FNMA classified as subprime.  *See, e.g.*, Compl. ¶ 5.  Even if true, this would be irrelevant.  Nowhere in FNMA's disclosures is it even suggested that FNMA classified loans as subprime based on the performance of those loans.[98]  Furthermore, the SEC's theory is that EA and MCM loans met FNMA's disclosed definition of subprime, not that all poor-performing loans—by any absolute or relative metric—should have been included in FNMA's quantitative subprime disclosure.[99]

*Second*, the SEC may argue that the addition of the phrase "or by subprime divisions of large lenders" to the end of FNMA's subprime definition, beginning in November 2007, was false or misleading because FNMA's quantitative subprime disclosure did not include all loans from subprime divisions of large lenders, such as loans originated by Countrywide's Full

---

[98] *E.g.*, UF 80.

[99] Ex. 1492 [9-11-14 Letter from Dooley to Kisslinger], at 1; *see also* Ex. 1493 [9-12-14 Letter from Kisslinger to Dooley], at 1-2; Ex. 1494 [9-16-14 Letter from Kisslinger to Dooley], at 1.

Spectrum Lending.  *See, e.g.*, Compl. ¶¶ 123-128.  This argument is also irrelevant.  FNMA's subprime classification, including the classification as edited in November 2007, never purported to include all loans from subprime divisions in its quantitative subprime exposure.  Rather, FNMA's subprime classification consistently included only loans that were originated by lenders specializing in subprime lending "*using processes unique to subprime loans*."[100]  It is undisputed that *not* all loans from subprime divisions of large lenders were originated using processes unique to subprime lending.  UF 28.  To the contrary, EA and MCM loans that were originated by subprime divisions of large lenders, such as Countrywide's Full Spectrum Lending, were originated using DU—and, thus, pursuant to the standard origination processes outlined in FNMA's Selling Guide and the Guide to Underwriting With Desktop Underwriter.  UF 2, 9, 11.  There is no evidence of any instance in which FNMA acquired loans originated by subprime divisions of large lenders using processes unique to subprime but failed to include those loans in its quantitative subprime disclosure.  UF 89.  It is also undisputed that the addition of the phrase regarding subprime divisions of large lenders reflected only the changing landscape of the market and did not alter the fundamental requirement that a loan had to be originated using processes unique to subprime in order to be classified as subprime.  UF 85.

   ***Third***, the SEC likely will quote a couple of isolated documents in an attempt to conflate EA and subprime loans.  These documents only further underscore the lack of any genuine issue of material fact regarding FNMA's subprime disclosures.  For example, the SEC will likely point to two letters from 2005 and 2006 in which FNMA responded to questions from OFHEO regarding subprime (and other loans) with information regarding its EA (and other) loan

---

[100] UF 83 (emphasis added).

holdings.[101]  The author of those letters, and others, testified—and their testimony is undisputed—that these letters were in no way intended to convey that FNMA considered EA loans to be subprime loans.  UF 117.  Indeed, these letters were written before FNMA had even started its Subprime NBI.  UF 118.  After FNMA commenced the Subprime NBI, in a letter to OFHEO responding to a similar annual request for information, FNMA made it clear that it had recently entered the subprime market in the form of its Subprime NBI, and only loans originated from subprime lenders pursuant to subprime underwriting guidelines fell within its subprime classification.  UF 119.  The undisputed evidence thus shows that FNMA made it perfectly clear to its regulator that it had both EA and subprime loans on its books and it classified them separately.

Similarly, the SEC likely will quote an email, from an FNMA employee, that states that "many (if not all) in the market call EA subprime."[102]  It cannot be disputed, however, that this email has no bearing on whether FNMA's subprime disclosures were false or misleading. Indeed, the undisputed testimony from *the author of this email* is that he himself did not think that EA loans met FNMA's subprime classification, that he was not aware of anyone in the market who mistakenly believed that EA loans met FNMA's subprime classification and that he had no factual basis for the words in his email—instead, he was merely relaying second-hand information from a colleague who told him what some unidentified people in the market purportedly thought.  UF 120.

*Finally*, the SEC may argue that one particular subset of reduced-documentation loans— Countrywide's Fast & Easy loan program—began to take on characteristics and performance

---

[101] Exs. 1131, 530.

[102] Ex. 712.

similar to that of borrower-selected reduced-documentation loans and thus should have been classified as Alt-A loans. *See, e.g.*, Compl. ¶¶ 165-67. The undisputed testimony, however, is that Fast & Easy loans were not borrower-selected reduced-documentation loans. Accordingly, neither Countrywide nor FNMA considered Fast & Easy loans to be Alt-A loans. UF 38, 39. Furthermore, by singling out a specific program, the SEC ignores the fact that its own allegations hinge on a finding that *all* reduced documentation loans—not a particular subset of reduced documentation loans—met FNMA's Alt-A classification criteria.

## V.   THE RECORD CONTAINS NO EVIDENCE THAT ANY OF THE DEFENDANTS ACTED WITH THE REQUISITE SCIENTER

As discussed in Section IV, *supra*, no evidence supports the SEC's claim that FNMA's disclosures were false and misleading. But even if the SEC could muster an issue of fact on that element (it cannot), its claims still must be dismissed because the record contains no evidence that any Defendant acted with the requisite scienter. Not a single document, piece of testimony, or other evidence suggests, let alone proves, that any of the Defendants harbored a belief that FNMA's subprime or Alt-A disclosures were anything less than entirely accurate. The undisputed facts show that FNMA drew sharp distinctions between EA and MCM loans on the one hand and subprime loans on the other, and between Process Efficiency loans and Alt-A loans, in the way it ran its business and assessed its risks.

These distinctions were incorporated into the disclosures at issue as part of a robust disclosure process led by FNMA's legal department with the input of more than a hundred individuals across the company. Each of the disclosures at issue in this case went through a thorough review and vetting process involving not only hundreds of FNMA employees, but also FNMA's outside counsel, outside auditor, and regulator. The evidence shows that this disclosure

36

process was imbued with integrity and good faith, and that Defendants acted reasonably in relying upon FNMA's meticulous and extensive disclosure process.

Critically, this process culminated in legal advice from FNMA's General Counsel, Beth Wilkinson, who approved FNMA's subprime and Alt-A disclosures and recommended to Defendants that these disclosures be filed.  Ms. Wilkinson was unequivocal in testifying that she provided legal advice to Defendants when she communicated that FNMA's subprime and Alt-A disclosures were complete, accurate and complied with all applicable legal requirements. Moreover, she testified that her advice was fully informed, and that Defendants were entitled to rely on her advice in approving these disclosures.  In sum, discovery has obliterated whatever scienter the SEC thought that it could prove when it brought this case, and Defendants are entitled to summary judgment.

To prevail on its claims of primary liability against Mr. Mudd (Counts 1 and 4), the SEC must show that Mr. Mudd acted with an intent to defraud, or with reckless disregard for the fact that FNMA's subprime and Alt-A disclosures were false or misleading.  *SEC v. McNulty*, 137 F.3d 732, 741 (2d. Cir. 1998).[103]  In the Second Circuit, "[c]onscious misbehavior or recklessness is demonstrated by conduct that is 'highly unreasonable' and 'represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *SEC v. Treadway*, 430 F. Supp. 2d 293, 331 (S.D.N.Y. 2006) (citation omitted).  Because the SEC has disavowed any theory that Mr. Mudd had a "motive" to commit fraud, the SEC must "produce a stronger inference of recklessness" to create a disputed issue of material fact on Mr. Mudd's scienter for

---

[103] The SEC's claims against Mr. Mudd and Mr. Dallavecchia under Section 17(a)(2) of the Securities Act (Count 2) are addressed separately in Section VIII, *infra*.

Counts 1 and 4.  *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).  Mr. Mudd is entitled to

summary judgment on Counts 1 and 4 because the SEC cannot show that he ignored any warning

or risk that the exclusion of EA, MCM, and Process Efficiency loans from FNMA's quantitative

subprime and Alt-A disclosures could render those disclosures false or misleading.  To the

contrary, the undisputed evidence establishes that Mr. Mudd set an exemplary "tone at the top"

when it came to ensuring FNMA's compliance with disclosure requirements.  Mr. Mudd sought

to build a culture of transparency at FNMA and repeatedly emphasized the importance of

complete and accurate disclosures, which is incompatible with any notion of recklessness.

The SEC's aiding and abetting allegations (Counts 3 and 5) against Mr. Mudd, Mr.

Dallavecchia, and Mr. Lund require an even more demanding showing.  To prevail on its aiding

and abetting claims, the SEC must come forward with admissible evidence showing that Mr.

Mudd, Mr. Dallavecchia, and Mr. Lund, respectively, had "*actual* knowledge of the fraud"

alleged by the SEC.  *SEC v. Apuzzo*, 689 F.3d 204, 211 (2d Cir. 2012) (emphasis added); *see*

*SEC v. Wyly*, 950 F. Supp. 2d 547, 563 (S.D.N.Y. 2013).[104]  Thus, the SEC must introduce

evidence showing that Mr. Mudd, Mr. Dallavecchia, and Mr. Lund actually knew that FNMA's

quantitative subprime and Alt-A disclosures were false and misleading because they did not

include EA, MCM, and Process Efficiency loans.  A mere showing that Defendants were aware

of the existence of EA and MCM loans or Process Efficiency loans, or that certain loans carried

higher relative risk, is not enough.  Knowledge of these basic facts does not demonstrate scienter,

as it says nothing about whether Defendants actually believed that EA, MCM, and Process

---

[104] In 2010, the Dodd-Frank Act amended Section 20(e) of the Exchange Act by inserting the words "or recklessly" after "knowingly," but as the Second Circuit has made clear since this Court ruled on Defendants' motion to dismiss in 2012, the "recklessness" standard does not apply in this case because the Relevant Period predated the effective date of the Dodd-Frank amendment, which "does not apply retroactively," so "the scienter requirement [under Section 20(e)] is 'actual knowledge'" here.  *Wyly*, 950 F. Supp. 2d at 562 & n.104; *see In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 182 n.15 (2d Cir. 2013).

38

Efficiency loans should have been included in FNMA's quantitative subprime and Alt-A disclosures.  *See Apuzzo*, 689 F.3d at 211; *Wyly*, 950 F. Supp. 2d at 563.[105]

In other words, the SEC cannot demonstrate actual knowledge by assuming that its reading of FNMA's disclosures is correct and then arguing that Defendants had access to information that—under the SEC's reading of those disclosures, but <u>not</u> the Defendants' or anyone else's reading—renders those disclosures false and misleading.  That theory of scienter is wrong as a matter of law.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (allegations premised on "fraud by hindsight" are impermissible).  The evidence—including the unrefuted testimony of FNMA's General Counsel, FNMA's legal and accounting staff, and its outside auditors and regulators—unequivocally demonstrates that Defendants had no actual knowledge that FNMA's subprime and Alt-A disclosures were false or misleading for failing to include all EA, MCM, and reduced documentation loans, as shown *infra*, and all Defendants are entitled to summary judgment on Counts 3 and 5.

> **A.  There Is No Evidence that Mr. Mudd Acted with Recklessness in Approving FNMA's Disclosures or that Defendants had Actual Knowledge that FNMA's Subprime and Alt-A Disclosures Were False or Misleading**

Despite engaging in extensive fact discovery, the SEC has failed to adduce a single piece of evidence showing that Mr. Mudd acted with reckless disregard as to whether FNMA's disclosures were false or misleading, or that any of the Defendants had the slightest inkling, much less actual knowledge, that FNMA's quantitative subprime and Alt-A disclosures were false or misleading. Indeed, the record is replete with undisputed evidence to the contrary.  The following facts, which the SEC cannot dispute, emerged from discovery:

---

[105] *See also Steinberg*, 439 F. Supp. at 1239-40 ("'[k]nowledge of the *fraud*, and not merely the . . . *facts*, is indispensable' to [aiding and abetting] liability") (emphases added) (citation omitted); *Amaranth*, 730 F.3d at 183 (citation omitted) ("a nexus" must exist "between a defendant's knowledge of, intent to further, and assistance given to a primary violation").

- Hundreds of individuals inside and outside FNMA—including numerous attorneys, auditors, and regulators—received, reviewed, and sanctioned FNMA's subprime and Alt-A disclosures.  UF 44-65.

- Not a single current or former FNMA employee, auditor, or regulator testified that he or she believed the FNMA's subprime or Alt-A disclosures were false or misleading. Every one of these witnesses, including FNMA's corporate designee, categorically rejected that allegation.  UF 50, 90-92, 99-100, 113-116.

- Not a single current or former FNMA employee testified that EA and MCM loans fell within FNMA's classification of subprime, UF 113, or that Process Efficiency loans fell within FNMA's classification of Alt-A.  UF 121.

- Not a single witness—inside or outside FNMA—testified that Mr. Mudd, Mr. Dallavecchia, or Mr. Lund believed or suggested in any way that FNMA's subprime or Alt-A disclosures were false or misleading, or that they should have included the loans at issue in this case.  UF 109, 111.

- Defendants each testified that he believed FNMA's subprime and Alt-A disclosures were complete, accurate, and consistent with how FNMA ran its Single-Family business.  UF 108.

- Not a single witness testified that anyone at FNMA ever raised the slightest concern to any Defendant regarding FNMA's subprime or Alt-A disclosures.  UF 112. Instead, as described *infra*, those disclosures were drafted, vetted and blessed by FNMA's Disclosure Committee, and recommended by FNMA's General Counsel.

- Not a single witness—inside or outside FNMA—testified that any Defendant ever indicated that he thought EA or MCM loans should have been included in FNMA's quantitative subprime disclosures, and no witness testified that he had reason to believe that any of the Defendants thought as much.  UF 110.[106]

- FNMA and Defendants drew unequivocal distinctions between EA and MCM loans and subprime loans, and FNMA's business operations reflected those distinctions:

  o When the corporate objectives for FNMA's Single-Family business in 2006 included, for the first time, achieving significant penetration into the subprime market,[107] Mr. Lund established the Subprime NBI as a separate business initiative devoted exclusively to the prudent and measured acquisition of subprime loans.  UF 22, 23.

  o FNMA's Single-Family business hired individuals with specialized expertise

---

[106] Notably, the SEC has adduced no evidence that the Single-Family business could achieve its subprime objectives by expanding its purchases of EA and MCM loans.

[107] FNMA had been purchasing EA and MCM loans since around 2000.  UF 16.

in the subprime market to run the Subprime NBI, UF 24, and established a separate risk process, including distinct risk limits, which the Chief Risk Office oversaw, for the initiative.  UF 25.

    o  FNMA's Single-Family business did not purchase EA and MCM loans as part of the Subprime NBI, but instead purchased them in the same manner and managed them with the same personnel as all other conventional, conforming loans originated through DU.  UF 15.

    o  FNMA began purchasing EA and MCM loans long before the Subprime NBI commenced, UF 16, and even after the Single-Family business shut down the Subprime NBI because of performance concerns, it continued to purchase EA and MCM loans.  UF 19.

    o  Internal "CRAM Reports" used to manage FNMA's business did not include EA and MCM loans in analyses of subprime performance.  UF 29.

- FNMA and Defendants drew unequivocal distinctions between Process Efficiency loans and Alt-A loans, and their business operations reflected that:

    o  FNMA and Defendants recognized that "borrower-selected" reduced documentation loans carried unique risks, whereas Process Efficiency loans did not.  UF 33.

    o  The Single-Family business, with credit risk oversight from the Chief Risk Office, purchased additional credit enhancement for Alt-A loans, but not Process Efficiency loans, to compensate for the greater risk associated with Alt-A loans.  UF 35.[108]

    o  Internal "CRAM Reports" used to manage FNMA's business separately analyzed Process Efficiency loans and Alt-A loans.  UF 34.

Moreover, even after FNMA was placed into conservatorship and endured a three-year SEC investigation culminating in a non-prosecution agreement, the company still has ***never*** classified EA and MCM loans as subprime or Process Efficiency loans as Alt-A, nor has FNMA restated its prior disclosures.  UF 101-107.  Thus, even under the company's new management, FNMA has continued to classify subprime and Alt-A loans in the same way as before, and it has

---

[108] The expected risk differences between Alt-A and Process Efficiency loans materialized.  Indeed, Alt-A loans performed between four and seven times worse than Process Efficiency loans between 2004 and 2008.  UF 41.  This supports Defendants' good faith belief that Process Efficiency loans were distinct from Alt-A, and the SEC can identify no countervailing evidence.

continued to exclude the same loans that the SEC alleges should have been included in its subprime and Alt-A disclosures.

The SEC's wholesale failure to point to any evidence indicating that Mr. Mudd acted with recklessness in approving these disclosures, or that any Defendant had actual knowledge that FNMA's subprime and Alt-A disclosures were false or misleading, mandates summary judgment in Defendants' favor. *Chen Jie Shan v. Citibank, N.A.*, No. 06 Civ. 5095, 2007 WL 2325854, at *3 (S.D.N.Y. Aug. 10, 2007) (Crotty, J.) ("'an absence of evidence to support the nonmoving party's case'" is sufficient for summary judgment in the moving party's favor) (quoting *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam)). Where, as here, the SEC can "do no better in controverting defendants' showing that in fact they had no such knowledge than to plead, over and over, 'they must have known'" about the alleged fraud, Defendants are entitled to summary judgment.[109] *Wright v. Schock*, 571 F. Supp. 642, 663 (N.D. Cal. 1983); *see also Carey*, 439 F. Supp. at 1241 (granting summary judgment upon finding "no suggestion that . . . evidence exists to support . . . an inference of scienter").

**B.    Defendants' Reliance Upon FNMA's Extensive Disclosure Process in Approving the Disclosures at Issue Demonstrates Good Faith**

Before the SEC's investigation began, FNMA waived all relevant privileges concerning the subprime and Alt-A disclosures at issue in this case. Because FNMA's legal department ran the disclosure process at FNMA, this waiver granted the SEC unrestricted access to the e-mails, memoranda, draft disclosures, and other records showing exactly when and how the disclosures at issue came into existence and who contributed to their evolution. This record shows—and the

---

[109] In denying Defendants' motion to dismiss, the Court accepted the allegations in the Complaint as true and concluded that Defendants "must have known that FNMA's disclosed subprime and Alt-A exposure calculations were materially misleading." *See* Dkt 40, at 21. At this juncture, however, those restrictions no longer bind the Court. *Steinberg*, 439 F. Supp. at 1241.

SEC cannot dispute—that FNMA implemented and followed a rigorous process for the drafting, review, and approval of its disclosures.  Defendants' good-faith participation in, and reliance upon, this lawyer-driven process eviscerates the SEC's theory of scienter.

Each of the disclosures that FNMA issued during the Relevant Period underwent a comprehensive drafting and review process, led by FNMA's legal department, before filing.  UF 44.  All relevant FNMA officers, executives, and employees were involved in the disclosure process, including both subject matter experts familiar with FNMA's day-to-day operations and FNMA's investor relations group, which canvassed the investor community to determine what investors wanted to know about FNMA.  UF 45.  Indeed, after initial drafting by FNMA's lawyers, hundreds of FNMA employees with specialized subject matter expertise reviewed and commented upon FNMA's draft disclosures to ensure that they accurately reflected how FNMA managed and ran its business.  UF 45.  FNMA's Disclosure Committee, chaired by FNMA's General Counsel, also reviewed and approved the disclosures, UF 57, as did FNMA's Audit Committee, UF 47, and Board of Directors, UF 48.

In addition to numerous levels of internal review, FNMA solicited the input of dozens of individuals outside the company, distributing draft disclosures to its outside legal counsel (Latham & Watkins), its outside auditor (Deloitte & Touche), and its primary regulator (OFHEO, now FHFA), for review and comment.  UF 49, 90-92, 99, 100.  FNMA's legal department then assembled and consolidated comments into subsequent drafts, which were recirculated, both internally and outside FNMA.  UF 51.  After several such rounds of drafting and review, FNMA's legal department obtained sub-certifications from more than a hundred FNMA employees across numerous departments at FNMA, each of whom attested to the accuracy and completeness of the disclosures.  UF 52.  FNMA's Disclosure Committee, comprising 16 to 18

members during the Relevant Period, UF 56, then discussed and vetted the disclosures before recommending them to the CEO and CFO.  UF 55.

Finally, FNMA's General Counsel met with Mr. Mudd and FNMA's CFO to recommend that they certify the disclosures for filing with the SEC.  UF 58.  During these meetings, Ms. Wilkinson explained to Mr. Mudd the disclosure drafting process, highlighted any issues that had come up during that process, detailed the sub-certifications that the legal department had obtained, and ultimately explained "why everyone believed these were accurate disclosures." UF 59.  Only after each of these meetings did Mr. Mudd and the CFO affix their signatures to the relevant filing for submission to the SEC.  UF 66.

The subprime and Alt-A disclosures at issue here underwent this rigorous review process, UF 44, and FNMA employees who worked with FNMA's subprime, EA, MCM, Alt-A, and Process Efficiency products had the opportunity to comment upon—and ultimately approved— the disclosures at issue.  UF 46.  Each such employee who testified during discovery supported the accuracy of the disclosures at issue in this case.  UF 116, 122.  Defendants did nothing to thwart FNMA's disclosure process and in fact appropriately relied upon it.  UF 69, 70.  FNMA's extensive disclosure process, which the SEC does not and cannot dispute, precludes the SEC from showing that any of the Defendants approved the disclosures at issue with actual knowledge that they were false or misleading or, in Mr. Mudd's case, with reckless disregard to the accuracy of the disclosures.  Accordingly, Defendants are entitled to summary judgment.

### C.   Defendants Relied in Good Faith Upon the Advice of Counsel in Approving FNMA's Subprime and Alt-A Disclosures

The General Counsel for FNMA and Chair of the Disclosure Committee during the Relevant Period was Beth Wilkinson.  At her deposition, Ms. Wilkinson testified that her "primary responsibility" was to give legal advice to Mr. Mudd and the non-legal members of the

44

Disclosure Committee about the company's disclosure obligations.  UF 60.  She further testified that Mr. Mudd and the other non-lawyers who certified or sub-certified FNMA's disclosures were entitled to rely upon her legal advice in approving the filings.  UF 61.

Of particular import to this case, Ms. Wilkinson testified that she evaluated the accuracy and legal adequacy of FNMA's subprime and Alt-A disclosures, determined that they complied with all applicable disclosure requirements, and provided legal advice to Mr. Mudd and the non-legal members of the Disclosure Committee (including Mr. Dallavecchia and Mr. Lund) that FNMA should file those disclosures.  UF 62.  It is uncontroverted that Ms. Wilkinson's issuance of legal advice was based on full information.  Ms. Wilkinson and her team not only received information from the relevant "subject-matter experts," but asked questions and affirmatively took steps to verify information provided in connection with the preparation of those disclosures. UF 63.  Indeed, not only was Ms. Wilkinson well-versed in FNMA's business, she was well aware of precisely the categories of loans that the SEC alleges that FNMA should have included in its subprime and Alt-A disclosures.  UF 64.  Ms. Wilkinson believed—and still believes today—that it would have been *improper* to include these loans in FNMA's subprime and Alt-A disclosures because that would have been inconsistent with how FNMA ran its business and viewed the risk associated with these loans.  UF 65.  Thus, the SEC cannot show that her legal advice was uninformed, unspecific, or unreliable.

In approving the disclosures at issue, Defendants "made complete disclosure to counsel, sought advice as to the legality of [their] conduct, received advice that [their] conduct was legal, and relied on that advice in good faith," UF 66-68, and therefore may invoke an advice of counsel defense.  *Markowski v. SEC*, 34 F.3d 99, 104-05 (2d Cir. 1994) (citation omitted); *see also Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66, 69 (2d Cir. 2005) (affirming

grant of summary judgment based on lack of scienter where the defendant had "relied on the expertise of counsel"). This advice of counsel defense precludes a finding that Defendants' approvals of FNMA's subprime and Alt-A disclosures violated the securities laws. *See Cruden v. Bank of New York*, 957 F.2d 961, 972 (2d Cir. 1992) (affirming grant of summary judgment based on defendants' good faith reliance on advice of counsel).

> **D.**    **The Undisputed Facts Show That Defendants Had No Incentive to Violate the Exchange Act**

Not only did Defendants rely upon FNMA's robust disclosure process and the advice of counsel in approving the disclosures in question, they had no incentive to violate the Exchange Act in the first place. In evaluating scienter, the Court should consider the "totality of circumstances." *In re Alstom SA*, 454 F. Supp. 2d 187, 206-09 (S.D.N.Y. 2006). The completeness and accuracy of FNMA's disclosures when read as a whole, and whether Defendants profited from the sale of FNMA stock during the Relevant Period, are two such "circumstances" to be considered.

*First*, as discussed in Section VI.B, *infra*, FNMA made a "bevy of truthful disclosures" throughout the Relevant Period, which included tables showing the credit characteristics of every single loan on FNMA's Single-Family book—including EA, MCM, and Process Efficiency loans.[110] *Kuriakose,* 897 F. Supp. 2d at 182-83, 185 (in dismissing precisely the claims made by the SEC in this case, the court explained that "broad disclosure [of] all of its loan characteristics [is] an accurate way to relay information to investors"). The truth, accuracy, and comprehensiveness of these tables—which the SEC does not dispute—"negates an inference of scienter." *Id.* at 185 ("[w]hether executives referred to these loans as 'risky,' 'non-prime,'

---

[110] *E.g.*, UF 72, 73.

'subprime-like,' or 'subprime' is irrelevant since [the company] fully disclosed the composition of [its] portfolio").  Indeed, "[i]t defies logic to conclude that executives who are seeking to perpetuate fraudulent information upon the market would make such detailed disclosures." *Id.*[111]  Rather, if Defendants "sought to shield investors from 'learning the truth of' [FNMA's] business, they needed to be measurably more opaque."  *Id.* (citation omitted).[112]

**Second**, Defendants held FNMA stock throughout the Relevant Period.  With the exception of sales to satisfy tax obligations,[113] no Defendant sold any of his FNMA shares during this period.  UF 144.  Indeed, Mr. Mudd and Mr. Dallavecchia purchased *more* FNMA stock during the period of their alleged fraud.  UF 145.  All three Defendants "suffered significant losses" as a result.  *Plumbers & Steamfitters Local 773*, 694 F. Supp. 2d at 299.  Defendants' stock transactions during the Relevant Period therefore strongly negate any inference of scienter.  *See In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 561.

Likewise, each Defendant's bonus was tied to compliance with FNMA's "mission goals," which included completing FNMA's financial restatement and correcting the company's financial records, rebuilding relationships with regulators (including OFHEO), and improving corporate culture at FNMA.  UF 140.  Thus, Defendants had strong incentive to do precisely the

---

[111] Similarly, Mr. Dallavecchia's pessimistic statements made during an investor call on February 27, 2007 about the risks in the mortgage market demonstrate that he could not have acted with an intent to shield investors from the truth.  See Ex. 557 [Transcript of Feb. 27, 2007 Investor Call] at 5-6 (cautioning that the housing market was deteriorating with no "obvious catalyst for improvement" on the horizon and that the issues in the subprime market would spill over into the prime market).  Indeed, his statements were far more pessimistic than contemporaneous statements made by senior government officials.  *See, e.g.*, Greg Ip, *Bernanke Notes Risks But Holds to Outlook*, Wall St. J., Mar. 29, 2007, at A2 ("As many Fed officials have said in recent months, [Chairman] Bernanke said that the impact of subprime problems in the broader economy 'seems likely to be contained.'")

[112] In *Kuriakose*, plaintiffs alleged both motive and opportunity and recklessness theories of scienter.  The court rejected both theories.  Even if the SEC does not allege a motive and opportunity theory of scienter here, FNMA's tables of credit characteristics nonetheless comprise part of the "totality of circumstances" to be considered in assessing scienter.  *See In re Alstom*, 454 F. Supp. 2d at 206-09.

[113] Stock sales made to satisfy tax obligations do not support an inference of scienter.  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

opposite of what the SEC alleges and to ensure that FNMA's disclosures were complete and accurate, and to keep OFHEO fully apprised of FNMA's disclosures and financial information. *See Kuriakose*, 897 F. Supp. 2d at 184 (failure to allege "adequate motive" requires heightened showing of conscious misbehavior) (citation omitted).

Similarly, Mr. Lund's conduct, considered in light of FNMA's compensation and bonus structure, is inconsistent with the SEC's allegations of scienter.  His performance objectives in 2006 included "[i]ncreas[ing] [FNMA's] penetration into *subprime*."  UF 143.  If the SEC's contention that Mr. Lund aided and abetted a fraud were valid, one would expect Mr. Lund to advocate for FNMA to classify as *many* loans as possible as subprime to meet this performance objective and increase his personal bonus.  UF 143.  He did not do so.  Mr. Lund's continued belief that EA and MCM loans were not subprime was directly and tangibly contrary to his own personal financial interests and, like the absence of any stock sales by Defendants and Mr. Dallavecchia's pessimistic statements regarding the mortgage market, is inconsistent with the requisite scienter to aid and abet fraud.

## VI.   NONE OF THE ALLEGED MISSTATEMENTS WERE MATERIAL

In order to prevail on its misstatement claims, the SEC must show not only that FNMA's quantitative subprime and Alt-A disclosures were false or misleading for failing to include EA and MCM loans and all reduced documentation loans, but also that a reasonable investor would have considered FNMA's exclusion of these loans "significant" in light of the "total mix of information."  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000).  The SEC has failed to adduce any evidence whatsoever supporting that contention.  First, the evidence shows that FNMA's extensive disclosures provided investors with all material information required to assess the quality of the Single-Family book.  Second, the SEC cannot show that the addition of EA or MCM loans to FNMA's quantitative subprime disclosures or the addition of

48

Process Efficiency loans to its quantitative Alt-A disclosures would have altered the "total mix of information" available to investors.  Because materiality is an essential element of all of the SEC's claims, Defendants are entitled to summary judgment on all counts.

A mere showing that an investor "might" have found an alleged misrepresentation important is not sufficient to establish materiality.  *SEC v. Biovail Corp.*, No. 08-2979, 2010 WL 2465482, at *1 (S.D.N.Y. June 16, 2010).  To meet its burden, the SEC must show a "substantial likelihood" that the information allegedly misrepresented or omitted would have "***significantly altered*** the total mix of information made available" to investors.  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)) (emphasis added).  This requires sufficient evidence of "a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716-17 (2d Cir. 2011) (citing *Basic*, 485 U.S. at 231).

## A.      FNMA Disclosed All Material Credit Risk Information

The evidence uncovered during discovery is uncontroverted that FNMA's disclosures provided investors with all material information regarding the credit risk of the Single-Family book, including the credit risk posed by EA, MCM and Process Efficiency loans.  Accordingly, the SEC cannot show that the exclusion of EA and MCM loans from FNMA's quantitative subprime disclosures—or the exclusion of Process Efficiency loans from FNMA's quantitative Alt-A disclosures—was significant to a reasonable investor's decision to invest in FNMA.

FNMA's Form 10-Ks and its credit supplements issued during the Relevant Period contained extensive, detailed information about the credit characteristics of every loan on FNMA's Single-Family book, including EA, MCM, and Process Efficiency loans.  UF 72.  As discussed above, the credit risk tables that accompanied FNMA's Form 10-Ks disclosed, *inter alia*, the percentage of FNMA's Single-Family book that was made up of loans to borrowers

49

with FICO scores below 620, loans with OLTV ratios greater than 90%, loans that were fixed rate, and loans that were credit enhanced.  UF 73.  Likewise, beginning in August 2007, FNMA provided investors with credit supplements containing even greater detail on the risk factors of its Single-Family book.  UF 75.  FNMA's "broad disclosure [of] all of its loan characteristics was an accurate way to relay information to investors[]." *Kuriakose*, 897 F. Supp. 2d at 182 (finding that the decision not to label certain loans as "subprime" was not material in light of broad disclosures regarding all loans held by Freddie Mac).[114]

The information disclosed by FNMA—that is, objective and comparable data regarding the credit risk characteristics of every loan on FNMA's Single-Family book—was precisely the information that was material to investors when making investment decisions.  UF 129. According to an analyst, "what matters are the loan characteristics and borrower characteristics" and not the labels that were applied to loan products.[115]  Similarly, another analyst at a major investor testified that he "would want to know more about the credit characteristics" rather than the labels applied to the loans.[116]  Likewise, another analyst created her own model to assess the risks on FNMA's Single-Family book that included loan characteristics such as average OLTV, vintage and the existence of credit enhancements.[117]

---

[114] The fact that FNMA has never restated its disclosures from the Relevant Period, even after being placed into conservatorship, and even after the SEC's filing of the complaint in this case, UF 106, further negates any inference that the disclosures contained material misstatements.  *See, e.g.*, *Kuriakose*, 897 F. Supp. 2d at 181.

[115] Ex. 1455, Hochstim Dep. at 61:17-62:15.

[116] Ex. 1438 [Adams Dep.] at 393:23-394:3.

[117] Ex. 1442 [Cai Dep.] at 72:20-73:16, 77:2-80:8; *see also* Ex. FNM 873.

**B.    The SEC Cannot Demonstrate That Including EA or MCM Loans in FNMA's Quantitative Subprime Disclosures Would Have Changed the "Total Mix" of Information Available to Investors**

The SEC cannot demonstrate that the inclusion of EA or MCM loans in FNMA's quantitative subprime disclosures would have "significantly altered the 'total mix' of information made available."  *Dalberth*, 766 F.3d at 183; *see also Kuriakose*, 897 F. Supp. 2d at 182-83.

*First*, to the extent the SEC alleges (incorrectly) that FNMA's subprime classification included all loans to borrowers with weaker credit, the inclusion of EA or MCM loans in the company's quantitative subprime disclosures would not have provided any additional information to investors regarding FNMA's exposure to loans made to such borrowers.  The SEC alleges that if EA and MCM loans were included in FNMA's subprime disclosures, those disclosures would have increased to between 2.3% and 3.5% of FNMA's Single-Family book.[118] But as a result of FNMA's extensive credit risk disclosures, the investment community already knew that approximately 5% of FNMA's Single-Family book constituted loans to borrowers with FICO scores below 620, UF 74, which investors understood to be borrowers with "weaker credit." UF 123.  Thus, including EA and MCM loans in FNMA's quantitative subprime disclosures would not have provided investors with any more information regarding FNMA's exposure to loans made to borrowers with weaker credit profiles than they already had.

*Second*, FNMA already publicly disclosed extensive information regarding its EA and MCM loans, including the volume of EA and MCM loans it acquired, the eligibility for the EA and MCM programs, and the fact that FNMA viewed EA and MCM loans as "standard," "prime" loans that were alternatives to subprime loans:

---

[118] Compl. ¶77.

- **AHARS**:  Beginning in April 2007, FNMA's annual reports to HUD were publicly available on HUD's website.  UF 20.[119]  These disclosed the amount of EA and MCM loans FNMA purchased each year.  UF 21.

- **FNMA's Selling Guide**:  FNMA's Selling Guide, publicly available on FNMA's website, fully disclosed the criteria necessary to qualify for the EA and MCM loan programs.  UF 3.

- **Public Statements by CEO Dan Mudd**:  Mr. Mudd informed the market multiple times during the Relevant Period that FNMA's EA and MCM programs were aimed at enabling borrowers with weaker credit profiles to be eligible for prime loans.  For example, as early as September 28, 2006, Mr. Mudd told the market that FNMA's MCM loan program offered a "standard product" intended to help "the borrower without much cash."  UF 17.  And in September 2007, Mr. Mudd told investors (i) that EA was a "prime" mortgage option for "borrowers with blemished credit;" and (ii) that FNMA had done "almost $53 billion" of EA and MCM loans.  UF 18.

In light of all of this publicly available information[120] regarding EA and MCM loans, the inclusion of EA and MCM loans in FNMA's quantification of its exposure to subprime loans would not have altered in any material way "the total mix of information" available.  *Dalberth*, 766 F.3d at 183; *see also Kuriakose*, 897 F. Supp. 2d at 182-83.

*Third*, FNMA disclosed the risks associated with its HUD-mandated housing goal loan programs, which included the EA and MCM program, in its Form 10-Ks:

> We have also relaxed some of our underwriting criteria to obtain goals-qualifying mortgage loans and increased our investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals, which could increase our credit losses.

UF 76.  FNMA's 2006 and 2007 Form 10-Ks contained similar language.  UF 77.  This cautionary language warned that housing goal loans (*i.e.*, EA and MCM loans) were "higher-risk" and "could increase our credit losses."

---

[119] These documents remain publicly available today.  *See Fannie Mae & Freddie Mac Affordable Housing Goals*, Federal Housing Finance Agency, http://www.fhfa.gov/PolicyProgramsResearch/Programs/AffordableHousing/Pages/Affordable-Housing-FMandFM.aspx (last visited March 19, 2015).

[120] *See La Pietra v. RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 441 (S.D.N.Y. 2010) (holding that documents on a government website are "part of the total mix of information reasonably available" to investors).

      **C.**    **The SEC Cannot Demonstrate That Including Process Efficiency Loans in FNMA's Quantitative Alt-A Disclosures Would Have Changed the "Total Mix" of Information Available to Investors**

The SEC asserts that the inclusion of Process Efficiency loans in FNMA's quantification of its exposure to Alt-A loans would have been material to investors because those loans were part of the same "risk continuum" as Alt-A loans.[121]  But changing FNMA's quantitative disclosures as the SEC suggests would not have altered the "total mix" of information in a way that would have impacted investors' decisions to invest in FNMA.  In fact, it would have had the perverse and misleading effect of making the Alt-A portfolio appear less risky.

The undisputed evidence shows that Process Efficiency loans were less risky than the loans that FNMA disclosed as Alt-A, UF 33, and they performed significantly better than the loans that FNMA disclosed as Alt-A during the Relevant Period.  UF 41.  Indeed, there is no dispute that the Process Efficiency loans that the SEC alleges were improperly excluded from FNMA's Alt-A quantification performed significantly better than FNMA's book of business as a whole during the Relevant Period.  UF 42.

As a result, including all reduced documentation loans in the Alt-A quantification would have masked the true risks of loans that FNMA considered to be Alt-A by raising the performance of the Alt-A category as a whole, and thus improperly signaling to investors that Alt-A loans were less risky than FNMA actually considered them to be.  UF 43.

**VII.**    **DEFENDANTS DID NOT SUBSTANTIALLY ASSIST ANY PRIMARY SECURITIES LAW VIOLATION**

The SEC's aiding and abetting claims against all three Defendants (Counts 3 and 5) fail for the independent reason that the SEC cannot show that any Defendant substantially assisted

---

[121] Ex. 1402 [SEC's Responses to Mudd Interrogatories], at 7, 11-12.

FNMA in violating the Exchange Act.  To meet its burden, the SEC must demonstrate that each

Defendant "associated himself with a violation of the [Exchange] Act, participated in it as

something that he wished to bring about . . . sought by his actions to make the violation

succeed," and "'consciously assisted the commission of the [primary violation] in some active

way.'"  *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 182 (2d Cir. 2013)

(citation omitted); *Apuzzo*, 689 F.3d at 212 n.8 (citation omitted).

       Substantial assistance "cannot be considered in isolation."  *IIT v. Cornfeld*, 619 F.2d 909,

922 (2d Cir. 1980), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct.

2869, 2879-83 (2010).  Rather, the courts evaluate substantial assistance in connection with—not

apart from—scienter.[122]  *Apuzzo*, 689 F.3d at 215.  Where evidence of scienter is weak, a

plaintiff's burden to show substantial assistance escalates.  *See Cornfeld*, 619 F.2d at 925;

*Amaranth*, 730 F.3d at 185-86.  In this case, the SEC's substantial assistance claims fail because

a defendant cannot substantially assist a fraud of which he is unaware.[123]

       Even if the SEC were able to produce any evidence suggesting actual knowledge of the

alleged fraud, it could not satisfy its heavy burden of proving substantial assistance.  The only

evidence to which the SEC can point in support of its substantial assistance theory is that each

---

[122] This principle is consistent with *SEC v. Global Express Capital Real Estate Investment Fund, I, LLC*, 289 Fed. App'x 183 (9th Cir. 2008), which the Court cited in denying Defendants' motion to dismiss, *see* Docket No. 40 at 25 (Aug. 10, 2012). In *Global Express*, the court held that the defendant "substantially assisted . . . [primary securities law] violations by reviewing, approving, and certifying the . . . misleading public filings." *Global Express*, 289 Fed. App'x at 188. However, in that case, the SEC showed that the defendant acted with a high degree of scienter—in particular, the defendant was actively involved in the underlying deception and had "actual knowledge of the primary violation and of her role in furthering it." *Id.* at 187-88.  The  showing of a "high degree of actual knowledge" in *Global Express* accordingly "lessen[ed] the burden [to show] substantial assistance." *See Apuzzo*, 689 F.3d at 214.  Here, in contrast, there is no evidence that any of the Defendants had actual knowledge of the alleged fraud.  *See supra.*

[123] *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975) ("before someone can be caught within the net of aiding and abetting liability under Rule 10b-5 . . . he must ***knowingly*** render substantial assistance") (emphasis added); *see also Amaranth*, 730 F.3d at 183 ("nexus" between knowledge of fraud, scienter, and assistance given required to establish aiding and abetting liability); *Apuzzo*, 689 F.3d at 215.

Defendant fulfilled his job responsibilities.  That is not enough.  *See Woodward*, 522 F.2d at 97

("the degree of knowledge required should depend on how ordinary the assisting activity is in the

business involved").  Evidence that Defendants did their jobs and participated in the disclosure

process in the same manner as dozens of others at FNMA is not evidence of "substantial

assistance"—particularly in the absence of scienter.  *Amaranth*, 730 F.3d at 185-86 (performance

of "routine . . . services" with "only weak evidence" of association with manipulative scheme

"cannot constitute the aiding and abetting of fraud"); *Cumis Ins. Soc'y, Inc. v. E.F. Hutton &*

*Co.*, 457 F. Supp. 1380, 1387 & n.9 (S.D.N.Y. 1978).  Thus, Defendants are entitled to summary

judgment on Counts 3 and 5.

### A.     Mr. Lund's Actions Did Not Constitute Substantial Assistance

The SEC has alleged nothing more than Mr. Lund participated in the disclosure process

along with—and in the same manner as—dozens of others at FNMA.  Notably, the SEC has

presented no evidence that Mr. Lund sought to steer or direct the disclosure process in any way,

much less in an improper manner.  In particular, the SEC has not alleged that Mr. Lund sought to

influence improperly the subprime or Alt-A disclosure drafting processes, or that he lobbied the

Disclosure Committee to classify subprime or Alt-A in a particular manner.[124]  The SEC also has

not presented any evidence that Mr. Lund met with Mr. Mudd to discuss the disclosures at

issue.[125]

---

[124] Indeed, the SEC alleges nothing more than that Mr. Lund fulfilled his job responsibilities.  In particular, the SEC alleges that Mr. Lund (1) was provided information about loans in FNMA's portfolio; (2) reviewed FNMA's public filings; (3) served on the Disclosure Committee; and (4) sub-certified FNMA's Forms 10-K and 10-Q, and "approved" FNMA's Forms 12b-25, during the Relevant Period.  Compl. ¶¶ 9, 14, 21, 46-47, 49-50, 67, 75, 159.

[125] As cited in the Court's order denying Defendants' motion to dismiss, the Complaint alleges that "[p]rior to certification, Mudd met—seriatim—with officers of the Company who had provided sub-certifications to discuss issues presented by upcoming public filings."  Compl. ¶ 45; *see* Docket No. 40 at 25 (Aug. 10, 2012).  The SEC has presented no evidence of such meetings between Mr. Mudd and Mr. Lund or Mr. Dallavecchia.

Moreover, the SEC has identified no evidence suggesting that Mr. Lund believed that FNMA's subprime or Alt-A disclosures were false or misleading.  *See supra.*  Rather, the evidence uniformly confirms that Mr. Lund reviewed and signed off on the disclosures with the belief that they were correct and accurately reflected the risks of FNMA's Single-Family business.  UF 108.  Like other members of the Disclosure Committee, Mr. Lund relied on the sub-certifications of others in the company, assurances from the General Counsel and legal team regarding the accuracy of the subprime and Alt-A disclosures that they drafted, and the Disclosure Committee's consensus that those disclosures were appropriate.  UF 67, 69.

Mr. Lund's ordinary and unremarkable involvement in the disclosure process does not amount to substantial assistance.  The SEC cannot show the required "nexus" between Mr. Lund's alleged knowledge of the fraud and the acts (such as Mr. Lund's routine participation in the disclosure process) that it alleges constitute substantial assistance.  *See Amaranth*, 730 F.3d at 183, 185-86.  As such, the SEC's aiding and abetting claims against Mr. Lund fail.

### B.    Mr. Dallavecchia's Actions Did Not Constitute Substantial Assistance

In support of its accusations, the SEC alleges that Mr. Dallavecchia (1) was provided information about the performance of loans in FNMA's portfolio;[126] (2) reviewed FNMA's public filings;[127] (3) served on the Disclosure Committee;[128] and (4) subcertified FNMA's 10-Ks and 10-Qs, and "approved" FNMA's Form 12b-25s, during the Relevant Period.[129]  As with Mr.

---

[126] Compl. ¶¶ 9, 14, 53, 67, 75, 157.

[127] Compl. ¶ 55.

[128] Compl. ¶¶ 54, 158.

[129] Compl. ¶ 20.

Lund, these allegations amount to nothing more than Mr. Dallavecchia's fulfillment of ordinary job responsibilities. They do not suffice to show substantial assistance.[130]

The Complaint also focuses on Mr. Dallavecchia's recitation of the quantification of FNMA's subprime exposure on an investor call.[131] The Complaint fails to mention, however, that seconds before Mr. Dallavecchia quantified FNMA's 0.2% subprime exposure on this call, he noted that "less than 5% of the book has a [FICO] score below 620."[132] This statement made clear to any reasonable investor that FNMA did not include all loans made to "borrowers with weaker credit histories" in its subprime quantification of 0.2%. On this same call, Mr. Dallavecchia also repeatedly cautioned investors that the housing market was deteriorating, opined that "there doesn't appear to be any obvious catalyst for improvement on the horizon," and warned investors that problems in the subprime market would spill over onto the prime market.[133] His statement therefore does not constitute substantial assistance of a fraud.

Furthermore, the SEC can point to no evidence that Mr. Dallavecchia sought to improperly influence the Alt-A disclosure drafting process, that he lobbied the Disclosure Committee to classify Alt-A in a particular manner, or that he met with Mr. Mudd to discuss the disclosures at issue.[134] Thus, the SEC's substantial assistance claims against Mr. Dallavecchia premised upon FNMA's Alt-A disclosures fail.

---

[130] The Complaint erroneously alleges that Mr. Dallavecchia and his team assisted in drafting FNMA's first definition of subprime, which purportedly was disclosed in a Form 12b-25 filed on February 27, 2007. Compl. ¶ 56. The SEC cannot support this contention. Deposition and documentary evidence show that, although FNMA quantified its subprime exposure for the first time in the February 2007 12b-25, the filing provided only a general description of the term "subprime"—not FNMA's definition of subprime, UF 114—and made clear that "there [was] no uniform definition of sub-prime" in the marketplace.

[131] Compl. ¶¶ 93, 95.

[132] UF 134.

[133] UF 135, 136.

[134] In fact, the Complaint contains only general allegations that Mr. Dallavecchia reviewed documents that had

Likewise, there is no evidence that Mr. Dallavecchia believed that the routine performance of his disclosure obligations—participating in Disclosure Committee meetings, reviewing and sub-certifying FNMA's disclosures, and repeating on an investor call figures that he believed to be accurate and correct—furthered a fraud.  Again, the SEC cannot show the requisite "nexus" between Mr. Dallavecchia's actions and his state of mind, and Mr. Dallavecchia is entitled to summary judgment on the SEC's aiding and abetting claims.  *See Amaranth*, 730 F.3d at 183.

### C.    Mr. Mudd's Actions Did Not Constitute Substantial Assistance

Mr. Mudd was not a member of the Disclosure Committee, had no involvement in drafting the subprime and Alt-A disclosures at issue, and reasonably relied upon the advice he received from FNMA's General Counsel and legal department in approving the disclosures.  UF 66, 69, 71.  Mr. Mudd was tasked with signing FNMA's Forms 10-K and 10-Q and discussing their contents on investor calls and with various media outlets, by virtue of his position as CEO of FNMA.  Given that the SEC can produce no evidence that Mr. Mudd believed that the disclosures at issue were false or misleading, and considering the copious advice he received from the General Counsel and the legal department assuring him that the disclosures were appropriate and complete, *see supra*, Mr. Mudd's actions simply cannot constitute "'consciously assist[ing]" FNMA in committing a primary securities law violation "in some active way.'"  *Apuzzo*, 689 F.3d at 212 n.8 (citation omitted).

---

references to Alt-A loans or the performance of reduced documentation loans.  The SEC, however, failed to ask Mr. Dallavecchia a single question about Alt-A loans in his deposition, let alone questions regarding what role, if any, he played in drafting, editing, or commenting on FNMA's Alt-A disclosures.

## VIII.   MR. MUDD AND MR. DALLAVECCHIA ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT 2

Count 2 alleges that Mr. Mudd and Mr. Dallavecchia themselves made false and misleading public statements regarding FNMA's exposure to subprime loans—separate and apart from FNMA's SEC filings—in violation of Section 17(a)(2) of the Securities Act.  The undisputed evidence shows that the Section 17(a)(2) claims are baseless.

To establish a violation of Section 17(a)(2), the SEC must prove that: (1) the public statement at issue was false; (2) the misrepresentation was material; (3) the defendant acted negligently; (4) the misrepresentation was made in connection with the purchase or sale of a security; and (5) the defendant obtained money or property by means of the misrepresentation. 15 U.S.C. § 77q(a)(2); *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

### A.   Mr. Mudd's Public Statements Were Not Materially False or Misleading

The SEC alleges that certain public statements made by Mr. Mudd about FNMA's subprime exposure were false or misleading.  For example, the SEC alleges that Mr. Mudd made the following statement at a congressional hearing on March 15, 2007, in response to a question about whether FNMA was engaged in the subprime market:  "The answer for FNMA on behalf of subprime is that it's important to remember there is subprime and there is predatory. Subprime simply means . . . that you have a credit blemish, and we think those are part of the market.  It's less than 2 percent of our book . . . ." Compl. ¶ 96.

The SEC's theory with respect to Mr. Mudd's public statements is that these statements were false or misleading because they would have caused a reasonable investor to understand that FNMA's definition of subprime for purposes of calculating its quantitative subprime disclosure was all loans to borrowers with a credit blemish, rather than the classification explicitly disclosed in FNMA's SEC filings.  *See* Compl. ¶¶ 96-99, 132-33, 146.  This theory

fails as a matter of law and undisputed fact for many of the same reasons that the SEC's theory

regarding FNMA's SEC filings fails.  *See* section IV.A, *supra*.

*First*, as a matter of law, any reasonable investor would have understood that Mr. Mudd's

public comments were not intended to be complete, detailed disclosures of FNMA's exposure to

subprime loans, or to supplant FNMA's public disclosures.  The comments were made to a

general audience and were intended to be at a high level.  Reasonable investors knew to review

FNMA's actual disclosures for further details, and no reasonable investor would have thought

that Mr. Mudd's general public comments could (or were intended to) convey the complexity

and detail found in FNMA's public disclosures.  *See Olkey v. Hyperion 1999 Term Trust, Inc.*,

98 F.3d 2, 9 (2d Cir. 1996) (holding that representations made in oral statements were not

actionable in light of contemporaneously prepared written documents containing more fulsome

descriptions of risk).  Nor would any reasonable investor have interpreted Mr. Mudd's public

statements in the manner alleged by the SEC, in light of the detailed information provided in

FNMA's public disclosures showing that at least 5% of the borrowers on FNMA's Single-

Family book had FICO scores less than 620 (*i.e.*, had a credit blemish).  *Dodds v. Cigna Sec.,*

*Inc.*, 12 F.3d 346, 351 (2d Cir. 1993) ("Nor can a plaintiff rely on misleading oral statements . . .

when the offering materials contradict the oral assurances.").

*Second*, the SEC has adduced no evidence to support its allegation that Mr. Mudd's

public statements were false or misleading.  There is no evidence in the record indicating that

any investor understood Mr. Mudd's public statements in the manner alleged by the SEC, or was

misled by those statements in any way.  UF 130.  Indeed, there is no evidence of any investor

being aware of Mr. Mudd's public statements, much less relying on those statements.  UF 131,

132.  To the contrary, the investors and analysts deposed in this case uniformly testified that they

relied on FNMA's detailed public disclosures to understand FNMA's exposure to loans made to borrowers with weaker credit profiles.  UF 129.  Based on these detailed public disclosures, investors understood in 2007 and 2008, when Mr. Mudd's public statements were made, that FNMA had significantly more loans to borrowers with weaker credit profiles than loans that it classified as subprime.  UF 125.  Investors testified that they understood that FNMA did ***not*** classify as subprime all loans made to borrowers with weaker credit, consistent with the plain text of FNMA's disclosures.  UF 124, 125.  Consequently, the SEC has wholly failed to prove that any investor was misled by Mr. Mudd's public statements.

In any event, none of Mr. Mudd's public statements regarding subprime was material because, for all the reasons discussed in detail above, FNMA publicly disclosed all material information regarding EA and MCM loans.  *See* section VI, *supra*.  Indeed, Mr. Mudd himself made several public statements during the same time period which refute the SEC's theory that investors could have been misled by the isolated comments referred to in the complaint. For example, in January of 2008 Mr. Mudd stated publicly that:

> Loans to borrowers with FICO scores below 620 make up about $118 billion, or 5 percent of our book.  Many of these mortgages where we take on a bit more credit risk in order to help us meet our affordable housing goals.  The serious delinquency rate was about 4 percent, and these loans contributed about 20 percent of our credit losses.  About 37 percent of those loans have credit enhancement.

> [W]hat we define as "subprime," mostly because of the companies that originate them and tag the loans.  Total here:  $7.3 billion, which amounts to only about a third of a percent of our total Single-Family mortgage credit book.  The serious delinquency rate here as of last September was about 4.8 percent, but the losses have been pretty small, partly attributable to the fact that nearly 80 percent of those loans had some form of credit enhancement.

UF 133.  Given the total mix of information, no reasonable investor could have believed—or did believe—that Mr. Mudd's statements meant that FNMA defined subprime as loans made to borrowers with weaker credit.

61

**B.    Mr. Dallavecchia's Public Statements Were Not Materially False or Misleading**

The SEC alleges that Mr. Dallavecchia's statements during a February 27, 2007 investor call "emphasizing that FNMA's subprime was 'modest,' 'prudent' and 'immaterial'" "misled investors regarding FNMA's subprime exposure."  Compl. ¶¶ 93-95.

*First*, Mr. Dallavecchia's statements were almost identical to those made by FNMA in its 12b-25 filed on the same day.[135]  His statement that "[a]pproximately 0.2% of our Single-Family credit book of business consisted of subprime loans or FNMA MBS backed by subprime loans"[136] came almost verbatim from the 12b-25, and it supports his statement that FNMA's exposure to subprime was "immaterial" and "modest."  Likewise, his statements that FNMA made "prudent" purchases of subprime loans follows directly from the company's disclosure that its "purchases of sub-prime mortgage loans generally have been accompanied by the purchase of credit enhancements that materially reduce our exposure to credit losses on these mortgages."[137]  Thus, the SEC's Section 17(a)(2) claim against Mr. Dallavecchia fails for the same reasons that the Rule 10b-5 claim fails: the statements were not materially false or misleading.  *See* Sections IV, VI, *supra*.

*Second*, Mr. Dallavecchia's public statements are not actionable as a matter of law.  Any reasonable investor would have understood that his public comments were not intended to be complete, detailed disclosures or to supplant FNMA's public disclosures; and, thus, any reasonable investor would have known to review FNMA's actual disclosures for further

---

[135] Ex. 551.

[136] Compl. ¶ 93.

[137] Ex. 517 at 8.

920608

detail.[138]  *See Olkey*, 98 F.3d at 9.  Furthermore, his statement that FNMA's subprime holdings were "modest," "prudent," and "immaterial" is not actionable because it is not a statement of objective material fact, but a subjective statement that cannot be evaluated using any objective standard.  *I. Meyer Pincus*, 936 F.2d at 762-63; *accord Fiat*, 655 F.3d at 110-11.

  **Third**, there is no evidence of any investor being misled by Mr. Dallavecchia's public comments.  UF 138.

  **Fourth**, Mr. Dallavecchia did not "make" the statements for purposes of liability under Section 17(a)(2) because he was merely repeating, with explicit attributions to the 12b-25 filed earlier that same day, what FNMA had just disclosed.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) ("maker" of a statement is the one who controls its content and liability extends only to that "maker"); *see also SEC v. Kelly*, 817 F. Supp. 2d. 340, 345 (S.D.N.Y. 2011) (extending *Janus* to claims made by the SEC pursuant to Section 17(a)(2)).

### C.  Mr. Mudd and Mr. Dallavecchia Were Not Negligent

  The SEC cannot prove that Mr. Mudd or Mr. Dallavecchia acted negligently with regard to the public statements at issue.  Mr. Dallavecchia's statements were read from a script that was drafted pursuant to an internal process (that involved lawyers) implemented to ensure that no misstatements were made during investor calls.  UF 137.  His reliance on these processes was reasonable, UF 139, and the SEC has presented no evidence to the contrary.  Similarly, the SEC has presented no evidence that Mr. Mudd acted negligently in making his public statements, and has failed to establish that an officer of a company must, when speaking publicly, recite the

---

[138]  In fact, Mr. Dallavecchia referred to FNMA's contemporaneous filing several times during the investor call. He stated: "We describe in our 12b-25 how we calculate the data . . . "; "In our filing today, we also indicate that we have increased our participation in subprime product in 2006"; and "[t]he first point, as per our filing, is that our exposure is modest."  Ex. FNM 551 at 6.

company's disclosures verbatim in order to avoid violating the securities laws.  This absence of proof on negligence is fatal to the SEC's claim.[139]  *See Ginder*, 752 F.3d at 575 (absence of evidence demonstrating how a defendant should have acted precluded finding of negligence); *SEC v. Shanahan*, 646 F.3d 536, 545-46 (8th Cir. 2011) (SEC's failure to put forth evidence regarding the applicable standard of care was fatal to Section 17(a)(2) claim).

### D.   Neither Defendant Obtained Money or Property by Means of Their Alleged Misstatements

Count 2 also fails because the SEC cannot demonstrate, merely by showing that Messrs. Mudd and Dallavecchia "earned salaries, bonuses and stock," that they personally "obtain[ed] money or property by means of any untrue statement of a material fact or any omission to state a material fact."  15 U.S.C. § 77q(a)(2).[140]

Both Mr. Mudd and Mr. Dallavecchia testified that neither their base compensation nor bonus was tied to FNMA's financial success or stock price.  UF 140-142.  Although their compensation included stock options, Mr. Mudd and Mr. Dallavecchia retained their options, and even purchased more stock, ultimately ***losing*** millions of dollars when FNMA was placed into conservatorship.[141]  UF 144, 145.  Finally, based on the plain language of Section 17(a)(2) and the recent decision in *SEC v. Syron*, 934 F. Supp. 2d 609 (S.D.N.Y. 2013) (Sullivan, J.) (the parallel case brought by the SEC against former executives of Freddie Mac), Mr. Mudd and Mr.

---

[139] The SEC has offered no testimony, expert or otherwise, regarding the standard of care that a reasonable executive would have used.  Further, the SEC has not even attempted to rebut opinions of former SEC Commissioner Aulana Peters that Defendants acted with reasonable care in fulfilling their duties at FNMA.

[140] Ex. 1400 [SEC's Responses to Dallavecchia Interrogatories], No. 16; Ex.1402 [SEC's Responses to Mudd Interrogatories], No. 19.

[141] *See In re FNMA Sec. Litig.*, 742 F. Supp. 2d at 403 (acknowledging that Messrs. Mudd and Dallavecchia purchased stock during the Relevant Period, and did not sell their stock prior to FNMA's conservatorship). Specifically, in November 2007, Mr. Mudd purchased 5,000 FNMA shares and Mr. Dallavecchia purchased almost $90,000 worth of FNMA stock.  UF 145.

Dallavecchia renew and preserve their objection that the SEC's theory on the money or property

element fails as a matter of law.[142]

## IX.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court grant

summary judgment in their favor on all the claims in the Complaint.

Dated: March 20, 2015                              Respectfully submitted,


                                          By:    _/s/ John W. Keker_
                                                 JOHN W. KEKER (*pro hac vice*)
                                                 BROOK DOOLEY (*pro hac vice*)
                                                 ERIC H. MACMICHAEL (*pro hac vice*)
                                                 633 Battery Street
                                                 San Francisco, CA  94111-1809
                                                  (415) 391-5400
                                                  (415) 397-7188 - fax
                                                 jkeker@kvn.com
                                                 bdooley@kvn.com
                                                 emacmichael@kvn.com

                                                 Attorneys for Defendant DANIEL H. MUDD


                                                 James D. Wareham
                                                 James E. Anklam
                                                 DLA PIPER LLP (US)
                                                 500 Eighth Street, N.W.
                                                 Washington, DC 20004
                                                 (202) 799-4000
                                                 james.wareham@dlapiper.com
                                                 james.anklam@dlapiper.com

                                                 Attorneys for Defendant DANIEL H. MUDD

---

[142] The SEC's theories of personal gain here are almost identical to those that Judge Sullivan found insufficient for liability in *Syron*. Judge Sullivan found that the "final step, whereby the defendant **personally** gains money or property from the fraud, is essential, for otherwise the defendant may have fraudulently induced the victim to part with money or property, but he has not obtained money or property for himself." *Id.* at 640 (emphasis added). Thus, the SEC must establish a "close[] causal relationship" between the alleged misstatements and the defendant's monetary or property gains. *Id.* at 637.  Its failure to do so here, as in the Freddie Mac case, is fatal to the claim.

Dated: March 20, 2015                By:    */s/ Michael N. Levy*
                                                        Michael N. Levy
                                                        Amy K. Carpenter-Holmes
                                                        PAUL HASTINGS LLP
                                                        875 15th Street, N.W.
                                                        Washington, DC 20005
                                                        (202) 551-1700
                                                        (202) 551-1705 – fax
                                                        michaellevy@paulhastings.com
                                                        amycarpenter-holmes@paulhastings.com

                                                        Attorneys for Defendant THOMAS LUND

Dated: March 20, 2015                By:    */s/ Andrew J. Levander*
                                                        Andrew J. Levander
                                                        Hector Gonzalez
                                                        DECHERT LLP
                                                        1095 Avenue of the Americas
                                                        New York, NY 10036-6797
                                                        (212) 698-3500
                                                        (212) 698-3599 – fax
                                                        andrew.levander@dechert.com
                                                        hector.gonzalez@dechert.com

                                                        Attorneys for Defendant
                                                        ENRICO DALLAVECCHIA

66

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 20, 2015, a true and correct copy of the foregoing was

served electronically via the Court's Electronic Case Filing system on counsel for all parties.


<u>/s/ *John W. Keker*　　　　　　</u>
John W. Keker

67

920608