UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Case No. 11-cv-9202 (PAC) ECF Case |
| Plaintiff, | |
| v. | |
| DANIEL H. MUDD, ENRICO DALLAVECCHIA, and THOMAS A. LUND, | |
| Defendants. | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, Defendants Daniel H. Mudd, Enrico Dallavecchia, and Thomas A. Lund respectfully submit the following Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.[1]

## I.  FNMA'S EXPANDED APPROVAL AND MYCOMMUNITYMORTGAGE PROGRAMS

1.      All Expanded Approval ("EA") loans were originated using FNMA's standard automated underwriting system, Desktop Underwriter ("DU").[2]

2.      Even EA loans originated by subprime divisions of large lenders were originated only using DU.[3]

3.      FNMA's Seller-Servicer Guide ("Selling Guide") was available to the public on FNMA's website.[4]

4.      FNMA's Selling Guide outlined the underwriting, origination, delivery, and servicing guidelines that lenders were required to follow, and the representations and warranties that they were required to provide, to sell loans to FNMA.[5]

5.      FNMA's Selling Guide disclosed the eligibility criteria for the EA and MCM loan programs.[6]

---

[1] The exhibits cited herein are exhibits to the Declaration of Brook Dooley, dated March 20, 2015, and filed concurrently herewith.

[2] Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 17:21-18:1, 27:23-28:3, 78:14-20; Ex. 1458 [Johnson Dep.] at 29:15-17; Ex. 860 [Excerpt of FNMA May 2007 Selling Guide] at 1, 2; see Ex. 1471 [Senhauser Dep.] at 31:20-33:13.

[3] Ex. 816 [Nov. 11, 2007 Letter to SEC] at FM-0024 n.5; see Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 75:22-76:17; Ex. 1475 [Sobczak Dep.] at 174:14-175:20.

[4] See, e.g., Ex. 1491 [FNMA Selling Guide, July 2007 Update].

[5] Ex. 1458 [Johnson Dep.] at 21:20-24:2; see also, e.g., Ex. 866 [Excerpt of FNMA Jan. 2007 Selling Guide].

[6] See, e.g., Ex. 1491 [FNMA Selling Guide, July 2007 Update]; Ex. 1491 [FNMA Selling Guide, July 2007 Update]; Ex. 1456 [Hopper Wells Fargo 30(b)(6) Dep.] at 30:19-31:24, 37:16-38:6; Ex.860 [Excerpt of FNMA May 2007 Selling Guide] at Section VII, 114 ("Expanded Approval and Expanded Approval with Timely Payment Rewards"); Ex. 866 [Excerpt of FNMA Jan. 2007 Selling Guide] at Section VIII, Chapter 2 ("MyCommunityMortgage").

6.      EA loans were "conventional" loans included in FNMA's Selling Guide.[7]

7.      MyCommunityMortgage ("MCM") loans were a "conventional" FNMA affordable housing product included in FNMA's Selling Guide.[8]

8.      Although MCM loans could be manually underwritten in limited circumstances,[9] 97-99% of MCM loans that FNMA purchased between 2006 and 2008 were underwritten through DU and complied with all DU and Selling Guide protections.[10]

9.      MCM loans originated by subprime divisions of large lenders were originated using DU.[11]

10.      The small portion of MCM loans underwritten outside of DU were subject to additional requirements and protections in the Selling Guide.[12]

11.      All loans originated using DU, including EA and MCM loans, were originated pursuant to the same standard processes outlined in FNMA's Selling Guide and Guide to Underwriting with Desktop Underwriter as conventional, conforming loans.[13]

12.      FNMA did not consider EA or MCM loans to be subprime loans.[14]

---

[7] *See* Ex. 1468 [Quinn Dep.] at 87:7-88:10; Ex. 1456 [Hopper Wells Fargo 30(b)(6) Dep.] at 30:19-31:24; Ex. 860 [Excerpt of FNMA May 2007 Selling Guide] at Section VII, 114 ("Expanded Approval and Expanded Approval with Timely Payment Rewards").

[8] *See* Ex. 1456 [Hopper Wells Fargo 30(b)(6) Dep.] at 37:16-38:6; Ex. 866 [Excerpt of FNMA Jan. 2007 Selling Guide] at Section VIII, Chapter 2, Section VIII, 201 ("MyCommunityMortgage").

[9] *See, e.g.*, Ex. 866 [Excerpt of FNMA Jan. 2007 Selling Guide] at Section VIII, 201.

[10] Ex. 1406 [Bostic Report] ¶ 116 & n.92; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 19:18-20:9; Ex. 1456 [Hopper Wells Fargo 30(b)(6) Dep.] at 38:17-21; *see also* Ex. 1475 [Sobczak Dep.] at 26:15-27:4.

[11] *See* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 19:18-20:9, 28:15-18, 83:13-15; Ex. 1473 [Sleeper Dep.] at 47:12-20; Ex. 816 [Nov. 17, 2011 Letter to SEC] at FM-0024 n. 5; Ex. 866 [Excerpt of FNMA 2007 Selling Guide] at 1.

[12] *See, e.g.*, Ex. 866 [FNMA Jan. 2007 Selling Guide] at Section VIII, 201; Ex. 1495 [FNMA 2007 Selling Guide] at Part VII, Chapter 1, Exhibit 2 n.2.

[13] Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 78:14-20; Ex. 1458 [Johnson Dep.] at 24:20-28:8; 29:15-17; *see* Ex. 1471 [Senhauser Dep.] at 31:20-33:13; *see also* Ex. 1475 [Sobczak Dep.] at 26:15-27:4; Ex. 1456 [Hopper Wells Fargo 30(b)(6) Dep.] at 32:3-36:2; Ex.860 [Excerpt of FNMA May 2007 Selling Guide] at Section VII, 114.

[14] Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 12:1-14, 12:24-13:14; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 18:15-20:9, 26:17-28:18.

2

13.     None of the individuals responsible for FNMA's subprime business considered EA or MCM loans to be subprime loans.[15]

14.     Every FNMA employee who gave deposition testimony on the topic testified that EA and MCM loans were not considered subprime loans by FNMA.[16]

15.     FNMA did not purchase EA or MCM loans through the subprime channel, and the personnel who managed the subprime channel were not involved in the purchase of EA or MCM loans; rather, FNMA purchased EA and MCM loans through the same channel as all other conventional, conforming loans, and managed them with the same personnel as all other conventional, conforming loans.[17]

16.     FNMA began purchasing EA and MCM loans around 2000, before the Subprime New Business Initiative ("NBI") commenced. [18]

17.     On September 28, 2006, Mr. Mudd stated that FNMA's MCM loan program offered a "standard product" that was intended to help "the borrower without much cash."[19]

18.     In September 2007, Mr. Mudd told investors (i) that EA was a "prime" mortgage option for "borrowers with blemished credit;" and (ii) that FNMA had done "almost $53 billion" of EA and MCM loans.[20]

---

[15] Ex. 1461 [Lewis Dep.] at 30:14-31:14, 52:22-53:23, 61:12-19, 62:15-20; Ex. 1465 [Mirran Dep.] at 38:13-21, 43:24-44:4, 45:13-20, 52:24-53:3.

[16] *See,* Ex. 1471 [Senhauser Dep] at 31:20-33:7; Ex. 1477 [Tretler Dep.] at 77:16-81:2; Ex. 1458 [Johnson Dep.] at 46:19-47:3, 67:2-3; Ex. 1481 [Wilkinson Dep.] at 140:22-142:4; Ex. 1473 [Sleeper Dep.] at 47:5-20, 65:20-66:21; Ex. 1461 [Lewis Dep.] at 30:14-31:14, 52:22-53:23, 61:12-19, 62:15-20; Ex. 1465 [Mirran Dep.] at 38:13-21, 43:24-44:4, 45:13-20, 52:24-53:3; Ex. 1443 [Chandler Dep.] at 62:1-14; Ex. 1444 [Cheng Dep.] at 49:21-50:9, 64:23-65:2; Ex. 1445 [Christy Dep.] at 311:19-312:3; Ex. 1449 [Fine Dep.] at 64:2-15; Ex. 1459 [Kenney Dep.] at 80:1-3, 85:17-18; Ex. 1460 [Lesmes Dep.] at 118:18-119:7; Ex. 1467 [Pallotta Dep.] at 28:4-29:17, 33:23-34:9; Ex. 1468 [Quinn Dep.] at 85:24-86:12, 101:3-9, 111:25-112:10; Ex. 1470 [Schuppenhauer Dep.] at 135:18-136:16; Ex. 1472 [Shaw Dep.] at 165:14-166:1; Ex. 1476 [Sullivan Dep.] at 78:20-21, 81:11-82:3; Ex. 1475 [Sobczak Dep.] at 175:3-14.

[17] Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 20:11-22:8; 25:10-16; Ex. 1461 [Lewis Dep.] at 25:25-26:5.

[18] *See, e.g.,* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 18:2-21, 19:14-20:9; Ex. 1458 [Johnson Dep.] at 24:20-26:20; Ex. 1415 [Excerpt of FNMA 2000 AHAR] at 8.

[19] Ex. 1402 [July 10, 2014 SEC Resp. to Mudd RFAs] at No. 39.

882462

19.     When the Single-Family business shut down the Subprime NBI because of performance concerns, it continued to purchase EA and MCM loans.[21]

20.     Beginning in April 2007, FNMA's annual reports to HUD ("AHARs") were publicly available on HUD's website.[22]

21.     FNMA's AHARs disclosed that FNMA purchased $14.4 billion and $20.5 billion in EA loans in 2006 and 2007, respectively,[23] and $9.3 billion and $26 billion in MCM loans in 2006 and 2007, respectively.[24]

## II.     SUBPRIME LOANS AND FNMA'S SUBPRIME NEW BUSINESS INITIATIVE

22.     FNMA's corporate objectives for the Single-Family business included achieving significant penetration into the subprime market in 2006.[25]

23.     To achieve that objective, Mr. Lund established the Subprime NBI as a separate business initiative devoted exclusively to the prudent and measured acquisition of subprime loans.[26]

24.     FNMA established a separate channel,[27] managed by dedicated personnel,[28] for the acquisition of subprime loans.

---

[20] Ex. 806 [Sept. 12, 2007 Remarks Prepared for Delivery by Daniel H. Mudd] at 3-4; *see also* Ex. 1402 [July 10, 2014 SEC Resp. to Mudd RFAs] at No. 40.

[21] Ex. 1461 [Lewis Dep.] at 57:1-58:2; Ex. 1484 [Lund Investigative Tr.] at 238:11-239:19; Ex. 1426 [Oct. 28, 2008 SFMB CAC Meeting Minutes] at 2.

[22] *See* Ex. 821 [Apr. 24, 2007 HUD Press Release].  These documents remain publicly available today.  *See* Ex. 1417 [FHFA "Fannie Mae & Freddie Mac Affordable Housing Goals"]

[23] *See* Ex. 815 [FNMA 2006 AHAR] at 17; Ex. 822 [FNMA 2007 AHAR] at 19; Ex. 1402 [July 10, 2014 SEC's Resp. to Mudd RFAs] at Nos. 37, 38.

[24] Ex. 815 [FNMA 2006 AHAR] at 10; Ex. 822 [FNMA 2007 AHAR] at 2.

[25]  *See* Ex. 356, [FNMA Subprime Phase 1 Business Plan] at 2, 5.

[26] Ex. 1484 [Lund Investigative Tr.] at 154:14-155:2; Ex. 1461 [Lewis Dep.] at 16:22-21:16; Ex. 1470 [Schuppenhauer Dep.] at 118:15-119:25; *see also* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 17:6-12; Ex. 356 [FNMA Subprime Phase 1 Business Plan] at 2, 5.

[27] *See* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 20:10-22:8; 22:16-25:16; Ex. 816 [Nov. 17, 2011 Letter to SEC] at 24; Ex. 1461 [Lewis Dep.] at 18:14-20; 19:16-21:20.

25.     FNMA established a separate risk process, including distinct risk limits, for the Subprime NBI, which the Chief Risk Office ("CRO") oversaw.[29]

26.     FNMA understood that subprime loans had additional risk, above and beyond the credit profile of the borrower, based on channel and origination processes.[30]

27.     Subprime loans could never be underwritten using DU, or according to the Selling Guide.[31]

28.     Not all loans from subprime divisions of large lenders were originated using processes unique to subprime loans.[32]

29.     FNMA's internal reports, such as its CRAM reports, uniformly treated subprime loans as a category separate from EA and MCM loans.[33]

## III.   ALT-A AND REDUCED DOCUMENTATION LOANS

30.     Lenders did not designate all reduced-documentation loans delivered to FNMA as Alt-A.[34]

31.     The lenders that delivered Alt-A loans to FNMA designated as Alt-A loans originated under their internal Alt-A or non-conventional underwriting guidelines, including both reduced-documentation loans where the borrower chose to provide something less than full

---

[28] Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 20:10-22:8, 66:19-67:4; Ex. 1461 [Lewis Dep.] at 25:1-20; 26:20-27:6.

[29] Ex. 1472 [Shaw Dep.] at 116:25-121:1; *see* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 18:6-12.

[30] *See, e.g.,* Ex. 1481 [Wilkinson Dep.] at 128:15-129:4; Ex. 753 [Feb. 23, 2007 E-mail chain]; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 18:2-20:9; 28:20-29:12.

[31] *See, e.g.,* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 78:21-79:12; Ex. 1467 [Pallotta Dep.] at 166:21-167:2; Ex. 1481 [Wilkinson Dep.] at 120:23-121:21, 166:18-19; Ex. 1468 [Quinn Dep.] at 82:13-15; Ex. 1476 [Sullivan Dep.] at 71:7-8; Ex. 1443 [Chandler Dep.] at 63:21-23; Ex. 1470 [Schuppenhauer Dep.] at 133:12-14; Ex. 1456 [Hopper Wells Fargo 30(b)(6) Dep.] at 65:6-18.

[32] Ex. 816 [Nov. 11, 2007 Letter to SEC] at FM-0024 n. 5.

[33] *See, e.g.,* Ex. 1435 [June 2008 CRAM Report] at FMSL_00008277-366, FMSL_00008475-483, FMSL__00008502-555, FMSL_00008835-852, FMSL_00009051-077, FMSL_00009177-194, FMSL_00009312-329.

[34] *See, e.g.* Ex. 1482 [Woodward Wells Fargo 30(b)(6) Dep.] at 45:25-48:4, 50:7-18, 53:17-24; Ex. 1464 [McMurray Dep.] at 48:12-49:13; Ex. 1457 [Ingerslev Bank of America 30(b)(6) Dep.] at 89:18-91:18; Ex. 1439 [Alson Bank of America 30(b)(6) Dep.] at 63:20-64:18.

documentation and other loans that did not meet FNMA's conventional lending standards for reasons independent of documentation.[35]

32.     The lenders that delivered Alt-A loans to FNMA did not designate as Alt-A loans in which the lender, as opposed to the borrower, chose to require something less than full documentation (*i.e.*, Process Efficiency loans), because they did not consider such loans to be Alt-A.[36]

33.     FNMA, like lenders, distinguished between borrower-selected reduced-documentation loans and lender-selected reduced-documentation (Process Efficiency) loans, and understood that borrower-selected reduced documentation loans carried fundamentally higher risk than Process Efficiency loans.[37]

34.     Internal CRAM Reports used to manage FNMA's business separately analyzed Process Efficiency loans and Alt-A loans.[38]

35.     The Single-Family business, with credit risk oversight from the CRO, purchased credit enhancement for Alt-A loans in addition to primary mortgage insurance policies it purchased based on the loans' LTV ratios.[39]

---

[35] *See, e.g.*, Ex. 1439 [Alson Bank of America 30(b)(6) Dep.] at 63:20-64:1; Ex. 1457 [Ingerslev Bank of America 30(b)(6) Dep.] at 89:18-91:5; Ex. 1482 [Woodward Wells Fargo 30(b)(6) Dep.] at 45:25-48:4; 50:7-18; 53:17-24; Ex. 1464 [McMurray Dep.] at 48:12-49:13; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 64:10-69:7; Ex. 1130 [Jan. 20, 2011 Letter to SEC] at 22.

[36] *See, e.g.* Ex. 1482 [Woodward Wells Fargo 30(b)(6) Dep.] at 45:25-48:4, 50:7-18, 53:17-24; Ex. 1464 [McMurray Dep.] at 48:12-49:13.

[37] Ex. 1466 [Mudd Dep.] at 260:16-262:9; Ex. 1483 [Dallavecchia Investigative Tr.] at 112:11-114:12, 270:17-273:5, 275:10-278:9, 283:13-21; Ex. 1462 [Lund Dep.] at 53:8-54:6; Ex. 1484 [Lund Investigative Tr.] at 75:25-76:13; 396:16-397:18; Ex. 1477 [Tretler Dep.] at 88:11-90:2; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 64:10-69:7; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 39:22-41:13, 49:20-50:16; *see* Ex. 1130 [Jan. 20, 2011 Letter to SEC] at 22; Ex. 246 [Tretler handwritten comments].

[38] *See, e.g.*, Ex.1435 [June 2008 CRAM Report] at FMSL_00008277-366, FMSL_00008475-483, FMSL_00008502-555, FMSL_00008835-852, FMSL_00009051-077, FMSL_00009177-194, FMSL_00009312-329.

[39] *See, e.g.,* Ex. 1113 [Jan. 30, 2007 Email with attached excerpts of Nov. 2006 CRAM Report] at 118, 120; Ex. 1484 [Lund Investigative Tr.] at 396:16-397:18.

882462

36.     The Single-Family business did not purchase additional credit enhancement for Process Efficiency loans.[40]

37.     The additional credit enhancement that FNMA purchased on Alt-A loans was intended to compensate for the greater risk associated with Alt-A loans.[41]

38.     Countrywide Fast & Easy loans were not borrower-selected reduced-documentation loans.[42]

39.     Neither Countrywide nor FNMA considered Fast & Easy loans to be Alt-A loans.[43]

40.     Throughout the Relevant Period, the performance of Fast & Easy loans was significantly better than that of Alt-A loans.[44]

41.     Process Efficiency loans performed between four and seven times better than Alt-A loans between 2004 and 2008.[45]

42.     Process Efficiency loans performed better than FNMA's overall book of business during the Relevant Period.[46]

43.     Including all reduced documentation loans in FNMA's Alt-A quantification would have increased the performance of the Alt-A category as a whole.[47]

---

[40] *See, e.g.,* Ex. 1113 [Jan. 30, 2007 Email with attached excerpts of Nov. 2006 CRAM Report] at 118, 120; Ex. 1484 [Lund Investigative Tr.] at 396:16-397:18.

[41] *See, e.g.,* Ex. 1113 [Jan. 30, 2007 Email with attached excerpts of Nov. 2006 CRAM Report] at 118, 120; Ex. 1484 [Lund Investigative Tr.] at 396:16-397:18.

[42] *See, e.g.,* Ex. 1457 [Ingerslev Countrywide 30(b)(6) Dep.] at 198:9-21, 202:1-7.

[43] *See, e.g.,* Ex. 1130 [Jan. 20, 2011 Letter to SEC] at 22; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 39:19-21; *Cf.* Ex. 1071 [Feb. 8, 2008 Conventional Technical Manual] at 2.

[44] *See* Ex. 1123 [Chart re "Data Responsive to Request Nos. 1-4"] (showing Fast & Easy loans had lower SDQ rates than Alt-A for the years ended 2004-2008); Ex. 1130 [Jan. 20, 2011 Letter to SEC] at 22; *see* Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 71:10-72:1.

[45] *See* Ex. 1406 [Bostic Report] at Table 4; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 17:3-28:16; 70:2-72:1; Ex. 1123 [Data Responsive to Request Nos. 1-4 in 30(b)(6) Deposition Subpoena to FNMA]; Ex. 1130 [Jan. 20, 2011 Letter to SEC] at 22.

[46] *See, e.g.*, Ex. 1123 [Data Responsive to Request Nos. 1-4 in 30(b)(6) Deposition Subpoena to FNMA].

882462

## IV.  FNMA'S DISCLOSURE COMMITTEE AND DISCLOSURE PROCESS

44.  Each of the disclosures that FNMA issued during the Relevant Period, including the subprime and Alt-A disclosures that the SEC alleges were false and misleading, underwent a comprehensive drafting and review process led by FNMA's legal department before filing.[48]

45.  FNMA officers, executives, and employees were involved in the disclosure process, including FNMA's investor relations group, which canvassed the investor community to determine what investors wanted to know about FNMA, and hundreds of employees with specialized subject matter expertise and familiarity with FNMA's day-to-day operations, who received FNMA's draft disclosures, initially drafted by FNMA's lawyers, for review and comment to ensure that the disclosures accurately reflected how FNMA managed and ran its business.[49]

46.  Specifically, FNMA employees who worked with FNMA's subprime, EA, MCM, Alt-A, and Process Efficiency products had the opportunity to comment upon—and ultimately approved—the disclosures at issue. [50]

47.  FNMA's Audit Committee reviewed and approved each of the disclosures that FNMA issued during the Relevant Period.[51]

---

[47]*See, e.g.,* Ex. 1458 [Johnson Dep.] at 108:19-109:25; Ex. 1467 [Pallotta Dep.] at 56:19-58:23; Ex. 1476 [Sullivan Dep.] at 51:12-52:16; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 23:8-24:13; 70:2-72:1; Ex. 1130 [Jan. 20, 2011 Letter to SEC] at 22.

[48]*See, e.g.*, Ex. 1481 [Wilkinson Dep.] at 25:13-27:11, 126:13-127:17, 131:18-132:2, 135:11-137:16, 233:12-20; Ex. 1466 [Mudd Dep.] at 192:22-193:16 ; Ex. 1446 [Dallavecchia Dep.] at 46:18-47:11, 78:24-79:18, 83:9-84:4, 124:18-25 ; Ex. 1462 [Lund Dep.] at 226:24-230:8 ; Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 27:19-30:5; Ex. 1477 [Tretler Dep.] at 27:1-6, 30:7-24, 36:5-40:22,  46:12-47:17; Ex. 933 [Aug. 9, 2007 FNMA Memo]; Ex. 251 [Feb. 20, 2008 FNMA Memo].

[49] *See, e.g.,* Ex. 1445 [Christy Dep.] at 19:25-20:20, 21:15-22:21; Ex. 1462 [Lund Dep.] at 226:24-230:8; Ex. 1446 [Dallavecchia Dep.] at 72:16-73:13, 78:24-79:18, 83:9-84:4, 84:17-85:10, 85:22-86:9, 87:11-25, 88:20-23, 91:10-17, 101:6-12, 107:15-108:7,  117:6-118:3, 124:18-25; Ex. 1449 [Fine Dep.] at 16:9-17:3,  177:4-181:6; Ex. 1477 [Tretler Dep.] at 25:5-30:24, 36:5-40:22, 46:12-47:17, 84:23-86:25, 90:15-96:13; Ex. 1481 [Wilkinson Dep.] at 106:25-107:14, 126:13-127:17, 131:18-132:2, 135:11-137:16 ; Ex. 1472 [Shaw Dep.] at 75:2-76:18; Ex. 933 [Aug. 9, 2007 FNMA Memo]; Ex. 251 [Feb. 20, 2008 FNMA Memo].

[50] *See, e.g.*, Ex. 1477 [Tretler Dep.] at 25:5-30:24, 84:23-86:25, 90:15-96:13; Ex. 933 [Aug. 9, 2007 FNMA Memo]; Ex. 251 [Feb. 20, 2008 FNMA Memo].

8

48.     FNMA's Board of Directors reviewed and approved each of the disclosures that FNMA issued during the Relevant Period.[52]

49.     FNMA solicited the input of dozens of individuals outside the company, distributing draft disclosures to its outside legal counsel (Latham & Watkins),[53] its outside auditor (Deloitte & Touche),[54] and its primary regulator (OFHEO),[55] for review and comment.

50.     FNMA's outside auditors never advised FNMA that any of the disclosures at issue were false or misleading.[56]

51.     FNMA's legal department assembled and consolidated comments into subsequent drafts, which were recirculated, both internally and outside FNMA.[57]

52.     After several rounds of drafting and review, FNMA's legal department obtained sub-certifications from more than a hundred FNMA employees across numerous departments at FNMA, each of whom attested to the accuracy and completeness of the disclosures.[58].

55.     FNMA's Disclosure Committee, chaired by FNMA's General Counsel, Beth Wilkinson, discussed and vetted the disclosures before recommending that the CEO and CFO certify them.[59]

---

[51] *See, e.g.*, Ex. 1481 [Wilkinson Dep.] at 36:12-38:6; 70:7-15.

[52] *See, e.g.*, Ex. 1481 [Wilkinson Dep.] at 36:12-38:6.

[53] *See, e.g.* Ex. 1481 [Wilkinson Dep.] at 61:18-62:24, 65:11-66:23; Ex. 1478 [Trotter Latham & Watkins 30(b)(6) Dep.] at 21:15-29:4, 43:6-44:9, 52:24-53:21, 82:8-83:4; Ex. 1470 [Schuppenhauer Dep.] at 65:20-66:10.

[54] *See, e.g.,* Ex. 1481 [Wilkinson Dep. ]at 36:12-38:6, 70:7-15; Ex. 1452 [Hazard 30(b)(6) Dep.] at 43:5-55:25..

[55] *See, e.g.,* Ex. 1481 [Wilkinson Dep.] at 69:23-70:5, 85:15-88:24.

[56] Ex. 1452 [Hazard Deloitte 30(b)(6)] at 85:15-86:9, 94:13-25.

[57] *See, e.g.,* Ex. 1481 [Wilkinson Dep.] at 76:16-77:6, 78:15-79:17, 81:9-20; Ex. 1449 [Fine Dep.] at 19:10-23; Ex. 1451 [Hairston Dep.] at 38:16-39:18, 42:9-43:18, 69:6-20; Ex. 1477 [Tretler Dep.] at 16:25-17:19, 21:5-22:17.

[58] *See, e.g.,* Ex. 1481 [Wilkinson Dep.] 47:24-49:14; Ex. 772 [May 1, 2007 FNMA Support for 2005 10-K] at Appx. F; Ex. 1420 [Aug. 16, 2007 FNMA Support for 2006 10-K] at Appx. F; Ex. 1422 [Feb. 26, 2008 FNMA Support for 2007 Form 10-K] at Appx. F; Ex. 1460 [Lesmes Dep.]. at 47:14-21; Ex. 1462 [Lund Dep.] at 58:2-17, 120:21-122:2, 219:5-19.

[59] *See* Ex. 1481 [Wilkinson Dep.] at 36:12-38:6, 47:24-52:18, 67:11-71:14; Ex. 1466 [Mudd Dep.] at 325:2-22.

56.     FNMA's Disclosure Committee was comprised of between 16 and 18 members during the Relevant Period, including the Controller, Chief Risk Officer, and senior officers from Investor Relations, Communications, Capital Markets, the Single-Family Business, Accounting Policy, and the Legal Department. [60]

57.     FNMA's Disclosure Committee reviewed and recommended each of the disclosures that FNMA issued during the Relevant Period.[61]

58.     As the final step of the disclosure process, FNMA's General Counsel met with Mr. Mudd and FNMA's CFO to recommend that they certify the disclosures for filing with the SEC.[62]

59.     During these meetings, Ms. Wilkinson explained to Mr. Mudd the disclosure drafting process, highlighted any issues that had come up during that process, detailed the sub-certifications that the legal department had obtained, and ultimately explained ██████████████ ███████████████████████████████████."[63]

60.     Ms. Wilkinson testified that, in connection with her role as General Counsel and Chair of the Disclosure Committee, it was her "primary responsibility" to give legal advice to

---

[60] *See* Ex. 1021 [FNMA Disclosure Committee Membership: 2004-2008]; Ex. 771 [Aug. 4, 2006 FNMA Disclosure Committee Charter].

[61] *See, e.g.*, Ex. 1446 [Dallavecchia Dep.] at 58:1-13; Ex. 1462 [Lund Dep.] at 226:24-230:8; Ex. 771, [Aug. 4, 2006 FNMA Disclosure Committee Charter]; Ex. 1481 [Wilkinson Dep.] at 25:13-27:11, 36:12-40:3, 50:6-52:18, 70:17-71:14, 73:13-74:9; Ex. 1425 [Aug. 7, 2006 Disclosure Committee Meeting Record]; Ex.1424 [Dec. 5, 2006 Disclosure Committee Meeting Record]; Ex. 1427 [Feb. 22, 2007 Disclosure Committee Meeting Record]; Ex. 1428 [May 1, 2007 Disclosure Committee Meeting Record]; Ex.1428 [May 8, 2007 Disclosure Committee Meeting Record]; Ex. 1423 [Aug. 9, 2007 Disclosure Committee Meeting Record]; Ex. 1433 [Aug. 15, 2007 Disclosure Committee Meeting Record]; Ex. 1434 [Nov. 8, 2007 Disclosure Committee Meeting Record]; Ex. 1430 [Feb. 26, 2008 Disclosure Committee Meeting Record]; Ex. 1431 [May 5, 2008 Disclosure Committee Meeting Record]; Ex. 1432 [Aug. 7, 2008 Disclosure Committee Meeting Record].

[62] *See* Ex. 1481 [Wilkinson Dep.] at 37:7-18, 47:24-49:15, 50:6-52:18, 66:24-71:14; Ex. 1466 [Mudd Dep.] at 325:2-22.

[63] *See* Ex. 1481 [Wilkinson Dep.] at 37:7-18.

Mr. Mudd and the non-legal members of the Disclosure Committee (including Mr. Dallavecchia and Mr. Lund) about the company's disclosure obligations.[64]

61.     Ms. Wilkinson further testified that Mr. Mudd and the other non-lawyers who certified or sub-certified FNMA's disclosures (including Mr. Dallavecchia and Mr. Lund) were entitled to rely upon her legal advice in approving the filings.[65]

62.     Ms. Wilkinson testified that she evaluated the accuracy and legal adequacy of FNMA's subprime and Alt-A disclosures, determined that they complied with all applicable disclosure requirements, and provided legal advice to Mr. Mudd and the non-legal members of the Disclosure Committee (including Mr. Dallavecchia and Mr. Lund) that FNMA file those disclosures.[66]

63.     Ms. Wilkinson and her team not only received information from the relevant subject-matter experts, but asked questions and affirmatively took steps to verify information provided in connection with preparation of the disclosures.[67]

64.     Ms. Wilkinson was aware of the categories of loans that the SEC alleges that FNMA should have included in its subprime and Alt-A disclosures, including EA, MCM and Process Efficiency loans.[68]

65.     Ms. Wilkinson believed—and still believes today—that it would have been improper to include EA or MCM loans in FNMA's subprime disclosures, or all reduced

---

[64] Ex. 1481 [Wilkinson Dep.] at 42:13-22, 43:3-44:1, 47:24-52:18.

[65] Ex. 1481 [Wilkinson Dep.] at 42:13-22, 43:3-44:1, 47:24-52:18.

[66] Ex. 1481 [Wilkinson Dep.] at 26:21-27:11, 133:2-18, 277:12-279:7, 291:8-13, 292:22-293:6, 293:23-295:9; *see also* Ex. 1466 [Mudd Dep.] at 205:12-206:20, 209:9-210:1; Ex. 1446 [Dallavecchia Dep.] at 78:24-79:18.

[66] Ex. 1481 [Wilkinson Dep.] at 41:21-42:22, 43:3-5, 44:3-45:13, 48:19-49:4, 50:14-52:18, 73:13-74:3, 291:8-13, 292:9-16, 292:22-293:6, 293:8-17, 239:23-295:9.

[67] Ex. 1481 [Wilkinson Dep.] at 59:25-62:24.

[68] Ex. 1481 [Wilkinson Dep.] at 43:7-25, 59:25-60:9, 137:17-140:21, 170:7-11.

documentation loans in FNMA's Alt-A disclosures, because that would have been inconsistent with how FNMA ran its business and viewed the risk associated with these loans.[69]  .

66.    Mr. Mudd sought and relied on the legal advice of Ms. Wilkinson and the other lawyer members of the Disclosure Committee in approving each of FNMA's public filings during the Relevant Period.[70]

67.    Mr. Lund relied on the legal advice of Ms. Wilkinson and the other lawyer members of the Disclosure Committee in approving each of FNMA's public filings during the Relevant Period.[71]

68.    Mr. Dallavecchia relied on the legal advice of Ms. Wilkinson and the other lawyer members of the Disclosure Committee in approving each of FNMA's public filings during the Relevant Period.[72]

69.    Defendants relied upon FNMA's disclosure process in approving or sub-certifying the disclosures at issue in this case.[73]

70.    Defendants did nothing to thwart FNMA's disclosure process.[74]

---

[69] Ex. 1481 [Wilkinson Dep.] at 46:22-47:17, 124:24-126:3, 140:22-142:4, 158:15-170:5, 171:15-173:20.

[70] *See* Ex. 1481 [Wilkinson Dep.] at 51:15-52:18, 291:8-13, 292:9-16, 292:22-293:6; Ex. 1466 [Mudd Dep.] at 205:16-206:20, 325:2-22.

[71] *See* Ex. 1481 [Wilkinson Dep.] at 293:8-17, 294:10-295:9; *see* Ex. 1462 [Lund Dep.] 192:22-193:13, 227:9-228:21.

[72] *See* Ex. 1481 [Wilkinson Dep.] at  293:8-17, 294:10-295:9;  Ex. 1446 [Dallavecchia Dep.] at 78:24-79:18, 83:4-84:4, 84:17-85:10, 88:10-23, 89:11-22, 117:6-118:3.

[73] *See, e.g.*, Ex. 1466 [Mudd Dep.] at 325:2-22; Ex. 1446 [Dallavecchia Dep.] at 78:24-79:18, 83:4-84:4, 84:17-85:10, 88:10-23, 89:11-22, 117:6-118:3; Ex. 1483 [Dallavecchia Investigative Tr.] at 95:4-19; 225:10-23; Ex. 1462 [Lund Dep.] at 120:21-122:2, 126:4-127:17, 210:22-212:8; Ex. 1481 [Wilkinson Dep.] 51:15-52:18, 291:8-13, 292:9-16, 292:22-293:17, 294:10-295:9.

[74] *See, e.g.*, Ex. 1440 [Battany Dep.] at 109:21-24, 110:10-13, 110:20-23; Ex. 1443 [Chandler Dep.] at 67:6-11, 67:21-24, 68:10-13; Ex. 1444 [Cheng Dep.] at 93:9-12, 95:5-7, 95:25-96:2; Ex. 1445 [Christy Dep.] at 90:15-20, 141:25-142:10, 144:6-10; Ex. 1448 [Engelstad Dep.] at 62:7-11, 62:23-63:2, 63:6-9; Ex. 1449 [Fine Dep.] at 57:12-15, 59:6-9, 61:2-5; Ex. 1451 [Hairston Dep.] at 116:4-11, 120:22-121:3, 123:5-12; Ex. 1454 [Hisey Dep.] at 128:7-11; Ex. 1458 [Johnson Dep.] 132:5-8, 135:17-20, 139:9-12; Ex. 1459 [Kenney Dep.] 91:11-15, 92:10-14, 93:4-7; Ex. 1461 [Lewis Dep.] 64:11-15, 66:16-67:2;  Ex. 1467 [Pallotta Dep.] 59:24-60:3, 62:15-18, 65:7-10; Ex. 1473 [Sleeper Dep.] 79:11-14, 80:16-18, 81:19-21; Ex. 1475 [Sobczak Dep.] 135:20-23; Ex. 1476 [Sullivan Dep.] 98:15-

---

12

71.     Mr. Mudd was not a member of the Disclosure Committee and had no involvement in drafting the subprime and Alt-A disclosures at issue.[75]

## V.     FNMA'S DISCLOSURES DURING THE RELEVANT PERIOD

### A.     Credit Risk Disclosures

72.     FNMA published tables in its 2004, 2005, 2006, and 2007 Forms10-K, all filed during the Relevant Period, reflecting the credit risk of each loan in FNMA's Single-Family business,[76] including every single EA, MCM, Process Efficiency, subprime, and Alt-A loan on FNMA's Single-Family book.[77]

73.     The credit risk tables provided detailed information about the FICO scores, original LTVs, current LTVs, product types, property types, occupancy types, loan purposes, origination years, and geographic concentrations of all loans comprising FNMA's Single-Family book.[78]

74.     These tables disclosed, *inter alia*, that loans with FICO scores below 620 comprised between 5 and 6% of FNMA's Single-Family book during the Relevant Period, and that loans with FICO scores between 620 and 660 comprised between 10 and 11% of FNMA's Single-Family book during the Relevant Period.[79]

---

99:6; Ex. 1477 [Tretler Dep.] 50:7-12; Ex. 1480 [Warner-Williams Dep.] 96:23-97:2; Ex. 1481 [Wilkinson Dep.] at 74:5-75:4.

[75] Ex. 1481 [Wilkinson Dep.] at 26:21-27:11, 40:5-41:15; Ex. 1466 [Mudd Dep.] at 192:22-193:21, 209:9-210:1.

[76] *See* Ex. 748 [2004 FNMA 10-K]  at 140-42 (Table 27); Ex. 717 [2005 FNMA 10-K] at 117-18 (Table 21); Ex. 66 [2006 FNMA 10-K] at 125-27 (Table 35); Ex. 709 [2007 FNMA 10-K] at 126-28 (Table 41); Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 11:3-15:7; 29:13-21.

[77] Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 13:7-15:7; 29:13-21; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 152:6-23; 155:19-156:3.

[78] *See* Ex. 748 [2004 FNMS 10-K] at 140-42 (Table 27); Ex. 717 [2005 FNMA 10-K] at 117-18 (Table 21); Ex. 66 [2006 FNMA 10-K] at 125-27 (Table 35); Ex. 709 [FNMA 2007 10-K] at 126-28 (Table 41); Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 11:3-15:7; 29:13-21; Ex. 1402 [SEC Resp. to Mudd RFAs] at Nos. 1-5, 9-13, 21-24; Ex. 1400 [SEC Resp. to Dallavecchia RFAs] at Nos. 1-4.

[79] *See* Ex. 748 (2004 FNMA 10-K) at 140-42 (Table 27); Ex. 717 [2005 FNMA 10-K] at 117-18 (Table 21); Ex. 66 [2006 FNMA 10-K] at 125-28 (Table 35); Ex. 709 [2007 FNMA 10-K] at 126-28 (Table 41).

882462

75.     Beginning in August 2007, FNMA provided investors with credit supplements that disclosed further information regarding the credit risk factors of the loans in its Single-Family book.[80]  For example, FNMA's August 8, 2008 credit supplement included the following table[81]:

# Fannie Mae Credit Profile by Key Product Features
### Credit Characteristics of Single-Family Conventional Mortgage Credit Book of Business

| As of June 30, 2008 | Overall Book | NegAm | Interest Only | FICO < 620 | OLTV > 90% | FICO < 620 and OLTV > 90% | Alt-A | Subprime | Jumbo Conforming |
|---|---|---|---|---|---|---|---|---|---|
| Unpaid principal balance "UPB" (billions) * | $2,666.5 | $19.1 | $216.4 | $127.4 | $277.2 | $29.2 | $307.0 | $8.0 | $0.9 |
| Share of SF Conventional Credit Book[(1)] | 100.0% | 0.7% | 8.1% | 4.8% | 10.4% | 1.1% | 10.8% | 0.3% | 0.0% |
| Average UPB | $146,503 | $146,020 | $240,395 | $127,346 | $140,213 | $120,462 | $171,269 | $153,423 | $585,028 |
| SDQ Rate All Loans | 1.36% | 3.12% | 4.26% | 5.48% | 3.75% | 10.25% | 3.79% | 9.08% | 0.0% |
| Alt-A | 11.51% | 45.10% | 42.51% | 1.64% | 6.03% | 1.19% | 100.00% | 0.00% | 0.2% |
| Origination Years 2005-2007 | 49.8% | 62.2% | 83.8% | 57.5% | 62.0% | 70.2% | 73.0% | 79.3% | 30.8% |
| Weighted Average Original LTV | 71.8% | 71.1% | 75.5% | 77.0% | 97.4% | 98.1% | 72.7% | 78.3% | 66.2% |
| Original LTV > 90 | 10.4% | 0.3% | 9.1% | 22.9% | 100.0% | 100.0% | 5.4% | 7.8% | 0.0% |
| Weighted Average Mark-to-Market LTV | 64.5% | 72.9% | 82.7% | 71.0% | 91.4% | 92.4% | 72.6% | 79.7% | 67.2% |
| Mark-to-Market LTV > 100 | 5.7% | 26.2% | 18.7% | 8.6% | 26.6% | 26.9% | 11.3% | 12.0% | 0.0% |
| Weighted Average FICO | 722 | 696 | 725 | 588 | 692 | 592 | 719 | 622 | 762 |
| FICO < 620 | 4.8% | 11.6% | 1.3% | 100.0% | 10.5% | 100.0% | 0.7% | 48.4% | 0.0% |
| Fixed-rate | 89.5% | 0.1% | 39.6% | 93.4% | 94.0% | 96.7% | 71.9% | 69.9% | 79.5% |
| Principal Residence | 89.8% | 70.9% | 84.9% | 96.8% | 97.1% | 99.4% | 77.9% | 96.4% | 98.9% |
| Condo/Coop | 9.1% | 13.2% | 16.0% | 4.9% | 9.8% | 5.9% | 10.8% | 4.9% | 5.8% |
| Credit Enhanced[(2)(3)] | 21.2% | 76.9% | 35.7% | 36.5% | 92.8% | 94.7% | 39.0% | 68.2% | 5.7% |
| % of 2007 Credit Losses[(4)] | 100.0% | 0.9% | 15.3% | 18.9% | 16.9% | 6.2% | 31.4% | 1.0% | 0.0% |
| % of 2008 Q1 Credit Losses[(4)] | 100.0% | 1.1% | 29.5% | 14.0% | 17.4% | 6.0% | 42.7% | 1.4% | 0.0% |
| % of 2008 Q2 Credit Losses[(4)] | 100.0% | 0.3% | 35.6% | 11.7% | 19.5% | 5.3% | 49.6% | 2.2% | 0.0% |

[(1)] Subprime and Alt-A are calculated as a percentage of the single-family mortgage credit book of business.
[(2)] UPB of all loans with credit enhancement/UPB of single-family conventional mortgage credit book of business.
[(3)] Includes primary mortgage insurance, pool insurance, lender recourse and other credit enhancement.
[(4)] Expressed as a percentage of total credit losses for the single-family mortgage credit book of business.

Note: Categories are not mutually exclusive; numbers are not additive across columns.

76.     FNMA included the following language in its 2004, 2005 and 2006 Forms 10-K:

> We have also relaxed some of our underwriting criteria to obtain goals-qualifying mortgage loans and increased our investments in higher-risk mortgage loan products that are more likely to serve the borrowers targeted by HUD's goals and subgoals, which could increase our credit losses.[82]

77.     FNMA's 2007 Form 10-K contained the following language:

---

[80] Ex. 391 [Aug. 2007 FNMA Investor Summary]; Ex. 846 [Nov. 2007 FNMA Investor Summary]; Ex.894 [Feb. 2008 FNMA Investor Summary]; Ex. 1409 [May 2008 FNMA Investor Summary]; Ex.773 [Aug. 2008 FNMA Investor Summary]; *see* Ex. 1401 [SEC Resp. to Lund RFAs] at No. 4-6, 10-13, 18-22, 28-32, 38-43.
[81] Ex. 773 [Aug. 2008 FNMA Investor Summary] at 30.

[82] Ex. 748 [2004 FNMA 10-K] at 28; *see also* Ex. 717 [2005 FNMA 10-K] at 123; Ex. 66 [2006 FNMA 10-K] at 16, 27.

We also relaxed some of our eligibility criteria to obtain goals-qualifying mortgage loans and increased our investments in higher risk mortgage loan products that were more likely to serve the borrowers targeted by HUD's goals and subgoals.  These efforts to meet our housing goals and subgoals often result in our acquisition of higher risk loans, and we typically incur proportionately more credit losses on these loans than on other types of loans.  Accordingly, these efforts contributed to our higher credit losses in 2007 and may lead to further increases in our credit losses. [83]

### B.    Subprime Disclosures

78.    On the advice of outside counsel and outside auditors, FNMA separately

disclosed its quantitative subprime holdings for the first time in a Form 12b-25 Notice of Late

Filing issued on February 27, 2007.[84]   .

79.    The February 2007 Form 12b-25 included the following language:

We have continued to work with our lender customers to support a broad range of mortgage products, including Alt-A and sub-prime products, which have represented an increased proportion of mortgage originations in recent years.  In addition, there has been an increasing industry trend towards streamlining the mortgage loan underwriting process by reducing the documentation requirements for borrowers and accepting alternative or non-traditional documentation.

Although there is no uniform definition for sub-prime and Alt-A loans across the mortgage industry, Alt-A loans are generally defined as loans with lower or alternative documentation requirements, while sub-prime loans typically are made to borrowers with weaker credit histories.  Because these products are important both to our customers and their borrowers, particularly for many first-time homebuyers, and to the achievement of our housing goals, we have increased our participation in these types of products by developing strategies to better support this business, where we have concluded that it would be economically advantageous and/or that it would contribute to our mission objectives.  Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses.  We continue to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types.  Our assessment of these dynamics will continue to determine the timing and level of our acquisitions of these types of mortgage products.

We estimate that approximately 0.2% of our single-family mortgage credit book of business as of December 31, 2006 consisted of sub-prime mortgage loans or structured [FNMA] MBS backed by sub-prime mortgage loans.  To date, our

---

[83] *See* Ex. 709 [2007 FNMA 10-K] at 30.

[84] *See* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 30:23-31:17; Ex. 850 [Feb. 19-20, 2007 E-mail chain] ▮▮▮▮▮▮▮▮▮▮ Ex.
1441 [Beresford Dep.] at 97:12-98:22; Ex. 517 [Feb. 27, 2007 FNMA Form 12b-25] at 7-8.

882462

purchases of sub-prime mortgage loans generally have been accompanied by the purchase of credit enhancements that materially reduce our exposure to credit losses on these mortgages.[85]

80.     On May 2, 2007, FNMA filed its 2005 Form 10-K, which stated:

"*Subprime mortgage*" generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower.  As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans.  In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as subprime when sold.[86]

81.     On May 9, 2007, FNMA filed a Form 12b-25 Notice of Late Filing, which

included the following language:

Subprime mortgage loans that we acquire are often originated by lenders specializing in this type of business, using processes unique to subprime loans.  In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as subprime when sold.  We estimate that approximately 0.2% of our total single-family mortgage credit book of business as of both March 31, 2007 and December 31, 2006 consisted of subprime mortgage loans or structured [FNMA] MBS backed by subprime mortgage loans.[87]

82.     FNMA filed its 2006 Form 10-K on August 16, 2007, which included the

following disclosure:

 "*Subprime mortgage*" generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower.  As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers.  Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans.  In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or, for the

---

[85] Ex. 517 [Feb. 27, 2007 FNMA Form 12b-25] at 7-8.
[86] *See* Ex. 717 [2005 FNMA 10-K] at 36.
[87] *See* Ex. 718 [May 9, 2007 FNMA Form 12b-25] at 8.

original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as subprime when sold.[88]

83.     FNMA filed three Forms 10-Q (for Q1, Q2, and Q3 21007) in November 2007.

Each of these disclosures included the following language:

> *Subprime Loans*: A subprime mortgage loan generally refers to a mortgage loan made to a borrower with a weaker credit profile than that of a prime borrower.  As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers.  Subprime mortgage loans are typically originated by lenders specializing in this type of business or by subprime divisions of large lenders, using processes unique to subprime loans.  In reporting our subprime exposure, we have classified mortgage loans as subprime if the mortgage loans are originated by one of these specialty lenders or a subprime division of a large lender.[89]

84.     FNMA's subsequent filings during the Relevant Period, including two Forms 10-Q filed in 2008 (for Q1 and Q2 2008), and the 2007 Form 10-K filed in February 2008, included similar language quoted in the preceding statement of undisputed fact.[90]

85.     The addition of the phrase regarding "subprime divisions of large lenders" in FNMA's subprime disclosures beginning in November 2007 did not alter the requirement that a loan had to be originated using processes unique to subprime in order to be classified as subprime.[91]

86.     The quantitative subprime exposure disclosed in FNMA's public filings during the Relevant Period ranged from 0.2% to 0.3% of the Single-Family book.[92]

---

[88] *See* Ex. 66 [2006 FNMA 10-K] at 156.

[89] Ex. 1486 [FNMA Q1 2007 10-Q] at 41; Ex. 1487 [FNMA Q2 2007 10-Q] at 44; Ex. 1488 [FNMA Q3 2007 10-Q] at 51.

[90] Ex. 709 [2007 FNMA 10-K] at 129; Ex. 1489 [FNMA Q1 2008 10-Q] at 105; Ex. 1490 [FNMA Q2 2008 10-Q] at 122.

[91] Ex. 1473 [Sleeper Dep.] at 57:22-61:22.

[92] Ex. 517 [FNMA Feb. 27, 2007 Form 12b-25] at 8; *See* Ex. 717 [2005 FNMA 10-K] at 122; *See* Ex. 718 [FNMA's May 9, 2007 Form 12b-25] at 8; Ex. 66 [2006 FNMA 10-K] at 48; Ex. 1486 [FNMA Q1 2007 10-Q] at 41; Ex. 1487 [FNMA Q2 2007 10-Q] at 44; Ex. 1488 [FNMA Q3 2007 10-Q] at 5;1 Ex. 709 [2007 FNMA 10-K] at 129-30; Ex. 1489 [FNMA Q1 2008 10-Q] at 65; Ex. 1490 [FNMA Q2 2008 10-Q] at 76.

87.     The 0.2% subprime figure disclosed in FNMA's February 27, 2007 Form 12b-25 included all loans delivered by subprime originators using processes unique to subprime lending.[93]

88.     There is no evidence that the quantitative subprime exposure disclosed in any of FNMA's public filings during the Relevant Period subsequent to the February 27, 2007 Form 12b-25 misstated in any way the percentage of FNMA's Single-Family book of business comprising loans originated by specialty subprime lenders using processes unique to subprime loans.[94]

89.     There is no evidence that FNMA ever acquired any loans that were originated by specialty subprime lenders using process unique to subprime loans that it did not include in its quantitative subprime disclosures.[95]

90.     OFHEO was aware throughout the Relevant Period that FNMA classified EA and MCM loans separately from subprime loans.[96]

91.     OFHEO also was aware throughout the Relevant Period that FNMA held more EA loans than loans it considered subprime.[97]

92.     OFHEO never suggested that FNMA change its classification of subprime loans, or include EA and MCM loans in its quantitative subprime disclosure.[98]

---

[93] Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 30:23-32:24.

[94] *See* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 30:23-32:24.

[95] *See* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 30:23-32:24.

[96] Ex. 1447 [Dickerson FHFA 30(b)(6) Dep.] at 176:1-14; 177:7-184:12; Ex. 1463 [McElhennon FNMA 30(b)(6) Dep]. at 27:19-32:19; *see also id.* at 37:3-12.

[97] Ex. 1447 [Dickerson FHFA 30(b)(6) Dep.] at 176:1-14; 177:7-184:12.; Ex. 1463 [McElhennon FNMA 30(b)(6) Dep]. at 27:19-32:19; *see also id.* at 37:3-12..

[98] Ex. 1447 [Dickerson FHFA 30(b)(6) Dep.] at 176:1-14; 177:7-184:12.; Ex. 1463 [McElhennon FNMA 30(b)(6) Dep]. at 27:19-32:19; *see also id.* at 37:3-12..

882462

C.     **Alt-A Disclosures**

93.     In its Form 12b-25 Notice of Late Filing issued on May 9, 2007, FNMA first

disclosed its quantitative exposure to Alt-A loans:

> Although there is no uniform definition of Alt-A and subprime loans across the
> mortgage industry, Alt-A loans generally are loans that are underwritten with
> lower or alternative documentation than a full documentation mortgage loan and
> that also may include other alternative product features, while subprime loans
> typically are made to borrowers with weaker credit profiles than those of prime
> borrowers.  Because these products are important both to our customers and their
> borrowers, and to the achievement of our housing goals, we have increased our
> participation in these types of products by developing strategies to better support
> this business, where we have concluded that it would be economically
> advantageous and/or that it would contribute to our mission objectives . . . In
> reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the
> lenders that deliver the mortgage loans to us have classified the loans as Alt-A
> based on documentation or other product features or, for the original or
> resecuritized private-label, mortgage-related securities that we hold in our
> portfolio, if the securities were labeled as Alt-A when sold.  We estimate that
> approximately 11% of our total single-family mortgage credit book of business as
> of both March 31, 2007 and December 31, 2006 consisted of Alt-A mortgage
> loans or structured [FNMA] MBS backed by Alt-A mortgage loans.[99]

94.     FNMA's 2006 Form 10-K, filed August 16, 2007, included the following

language:

> "*Alt-A mortgage*" generally refers to a loan that can be underwritten with lower or
> alternative documentation than a full documentation mortgage loan but may also
> include other alternative product features.  As a result, Alt-A: mortgage loans
> generally have a higher risk of default than non-Alt-A mortgage loans.  In
> reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the
> lenders that deliver the mortgage loans to us have classified the loans as Alt-A
> based on documentation or other product features, or, for the original or
> resecuritized private-label, mortgage-related securities that we hold in our
> portfolio, if the securities were labeled as Alt-A when sold.[100]

95.     In subsequent filings during the Relevant Period, FNMA continued to disclose its

Alt-A classification in the same manner disclosed in its 2006 Form 10-K.[101]

---

[99] *See* Ex. 718 [FNMA May 9, 2007 Form 12b-25] at 8.

[100] Ex. 66 [2006 10-K] at 152.

[101] Ex. 1486 [FNMA Q1 2007 10-Q] at 40-41; Ex. 1487 [FNMA Q2 2007 10-Q] at 43-44; Ex. 1488 [Q3 2007 10-Q] at 50-51; Ex. 709 [FNMA 2007 10-K] at 129; Ex. 1489 [FNMA Q1 2008 10-Q] at 105; Ex. 1490 [FNMA Q2 2008 10-Q] at 122.

96.     The quantitative Alt-A exposure disclosed in FNMA's public filings during the Relevant Period ranged from 11% to 12% of the Single-Family Book.[102]

97.     FNMA's quantitative Alt-A disclosure in its public filings during the Relevant Period accurately captured the number of loans held by FNMA that lenders designated as Alt-A upon delivery.[103]

98.     There is no evidence of any instance in which a lender designated a loan as Alt-A that FNMA failed include in its quantitative Alt-A disclosure.[104]

99.     OFHEO was aware throughout the Relevant Period that FNMA considered borrower-selected reduced documentation loans to be Alt-A, and that FNMA did not include all reduced-documentation loans in its quantitative Alt-A disclosure.[105]

100.     OFHEO never advised FNMA that it should change its Alt-A classification or disclosure.[106]

## VI.     FNMA'S DISCLOSURES DURING THE CONSERVATORSHIP

101.     On November 10, 2008, FNMA filed a Form 10-Q—the company's first filing post-conservatorship.[107]   That disclosure included the following language:

> *Alt-A and Subprime Loans*.  We provide information below on our exposure to Alt-A and subprime mortgage loans.  We have classified mortgage loans as Alt-A if the lender that delivers the mortgage loan to us has classified the loan as Alt-A based on documentation or other features.  We have classified mortgage loans as subprime if the mortgage loan is originated by a lender specializing in subprime business or by subprime divisions of large lenders.  We apply these classification

---

[102] Ex. 718 [FNMA May 9, 2007 12b-25] at 8; Ex. 66 [2006 FNMA 10-K] at 128; Ex. 1486 [FNMA Q1 2007 10-Q] at 40; Ex. 1487 [FNMA Q2 2007 10-Q] at 44; Ex. 1488 [FNMA Q3 2007 10-Q] at 50; Ex. 709 [2007 FNMA 10-K] at 129; Ex. 1489 [FNMA Q1 2008 10-Q] at 65; Ex. 1490 [Q2 2008 10-Q] at 76.
[103] *See* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 40:13-41:13.

[104] *See* Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 41:9-13.

[105] *See* Ex. 1447 [Dickerson FHFA 30(b)(6) Dep.] at 185:16-194:15; Ex. 1463 [McElhennon FNMA 30(b)(6) Dep]. at 27:19-32:19; *see also id.* at 37:3-12; Ex. 530, [Apr. 28, 2006 FNMA Letter to OFHEO] at 2; Ex. 893, [Mar. 2, 2007 Letter to OFHEO] at 2-3.

[106] Ex. 1447 [Dickerson FHFA 30(b)(6) Dep.] at 185:16-194:15; Ex. 1463 [McElhennon FNMA 30(b)(6) Dep]. at 27:19-32:19; *see also id.* at 37:3-12.

[107] *See* Ex. 525 [FNMA Q3 2008 10-Q].

criteria in order to determine our Alt-A and subprime loan exposures; however, we have other loans with some features that are similar to Alt-A and subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria.[108]

102.    When FNMA was under new management and being run by FHFA, the company continued to classify as subprime only loans originated by specialty subprime lenders using process unique to subprime loans.[109]

103.    When FNMA was under new management and being run by FHFA, the company continued to exclude EA and MCM loans from FNMA's quantitative subprime disclosure.[110]

104.    The SEC knew that FNMA continued to exclude EA and MCM and Process Efficiency loans from its subprime and Alt-A classifications, respectively, years after the Relevant Period but never told FNMA to include those loans in its subprime or Alt-A disclosures, or to otherwise change its subprime or Alt-A definitions or classifications.[111]

105.    It remains FNMA's position that its subprime and Alt-A disclosures were accurate, complied with all relevant requirements, and were not in any way misleading.[112]

106.    FNMA has never restated or amended its disclosures from the Relevant Period.[113]

---

[108] *See* Ex. 525 [FNMA Q3 2008 10-Q] at 115.

[109] Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 10:20-13:14, 13:17-14:3; 14:22-17:8; 24:15-26:4; 37:18-38:20; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 58:6-11, 58:14-19, 58:25-59:5, 59:7-12 ; Ex.1128 [Sept. 22, 2011 Letter to SEC] at FMCIV-NY-020_1747421-422.

[110] Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 10:20-13:14, 13:17-14:3; 14:22-17:8; 24:15-26:4; 37:18-38:20; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 58:6-11, 58:14-19, 58:25-59:5, 59:7-12; Ex. 1128 [Sept. 22, 2011 Letter to SEC] at FMCIV-NY-020_1747421-422.

[111] Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 18:20-24:14; 26:6-27:6; 33:4-19; 36:4-8; Ex. 816 [Nov. 17, 2011 Letter from FNMA to the SEC] at 23, 25 n.6; *see also* Ex. 1463 [McElhennon FNMA 30(b096) Dep.] at 36:4-8.

[112] Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 10:20-13:14, 13:17-14:3; 14:22-17:8; 24:15-26:4; 37:18-38:20; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 58:6-11, 58:14-19, 58:25-59:5, 59:7-12 ; Ex. 1128 [Sept. 22, 2011 Letter to SEC] at FMCIV-NY-020_1747421-422;.

[113] *See* Ex. 517 [FNMA Feb. 27, 2007 Form 12b-25] at 8; *See* Ex. 717 [2005 FNMA 10-K] at 122; *See* Ex. 718 [FNMA's May 9, 2007 Form 12b-25] at 8; Ex. 66 [2006 FNMA 10-K] at 48; Ex. 1486 [FNMA Q1 2007 10-Q] at 41; Ex. 1487 [FNMA Q2 2007 10-Q] at 44; Ex. 1488 [FNMA Q3 2007 10-Q] at 5;1 Ex. 709 [2007 FNMA 10-K] at 129-30; Ex. 1489 [FNMA Q1 2008 10-Q] at 65; Ex. 1490 [FNMA Q2 2008 10-Q] at 76; Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 58:6-11, 58:14-19, 58:25-59:5, 59:7-12.

107.    Even after FHFA took over FNMA, FNMA never changed the way it classified

Alt-A loans and never included all reduced-documentation loans in its quantitative Alt-A

disclosures.[114]

## VII.    FNMA'S AND DEFENDANTS' UNDERSTANDING OF FNMA'S SUBPRIME AND ALT-A DISCLOSURES

### A.    Defendants

108.    Mr. Mudd, Mr. Dallavecchia, and Mr. Lund each testified that he believed

FNMA's subprime and Alt-A disclosures were complete, accurate, and consistent with how

FNMA ran its Single-Family business.[115]

109.    Not a single witness—inside or outside FNMA—testified that Mr. Mudd, Mr.

Dallavecchia, or Mr. Lund believed that FNMA's subprime or Alt-A disclosures were false or

misleading.[116]

110.    Not a single witness—inside or outside FNMA—testified that Mr. Mudd, Mr.

Dallavecchia, or Mr. Lund ever indicated that he thought EA or MCM loans should have been

---

[114] Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 10:20-13:14, 13:17-14:3; 14:22-17:8; 24:15-26:4; 37:18-38:20 Ex. 1450 [Griffith FNMA 30(b)(6) Dep.] at 58:6-11, 58:14-19, 58:25-59:5, 59:7-12 ; Ex. 1128 [Sept. 22, 2011 Letter to SEC] at FMCIV-NY-020_1747421-422.

[115] *See, e.g.*, Ex. 1466 [Mudd Dep.] at 179:11-180:8, 209:9-210:1, 211:10-24, 321:17-322:1; Ex. 1446 [Dallavecchia Dep.] at 96:4-97:6, 123:20-124:4, 142:7-15, 143:3-25; Ex. 1483 [Dallavecchia Investigative Tr.] at 269:13-270:15, 349:16-23, 353:21-354:2, 355:18-356:11, 383:24-384:24; Ex. 1462 [Lund Dep.] at 59:12-21, 219:4-19; Ex. 1484 [Lund Investigative Tr.] at 75:25-76:13, 376:16-25, 378:9-21, 379:10-383:3, 387:13-388:2, 398:16-400:7, 401:24-402: 4, 402:23-403:10, 407:22-408:20, 442:7-17, 444:12-446:8; *see also* Ex. 1446 [Dallavecchia Dep.] at 62:4-24.

[116] *See, e.g.*, Ex1444 [Cheng Dep.] at 95:18-23; Ex 1445 [Christy Dep.] at 142:11-143:10, 144:24-146:2, 147:1-25; Ex. 1449 [Fine Dep.] at 57:21-58:9, 59:10-60:4, 60:18-61:15; Ex. 1451 [Hairston Dep.] at 116:13-117:18, 121:5-17, 123:14-124:1, 125:9-15; Ex. 1452 [Hazard Deloitte 30(b)(6) Dep.] at 175:23-176:6, 177:18-25, 179:3-10; Ex. 1458 [Johnson Dep.] at 132:9-133:5, 135:21-136:18, 139:13-140:10; Ex. 1459 [Kenney Dep.] at 91:17-92:1, 92:16-25, 93:11-20; Ex. 1461 [Lewis Dep.] at 64:16-20, 65:9-12, 67:3-19; Ex. 1467 [Pallotta Dep.] at 60:4-22, 62:19-63:14, 65:16-66:9; Ex. 1468 [Quinn Dep.] at 147:4-18, 148:12-22, 149:22-150:5, 151:10-21, 154:3-13, 155:21-156:7; Ex. 1470 [Schuppenhauer Dep.] at 191:22-192:13; Ex. 1472 [Shaw Dep.] at 205:15-208:4, 213:21-215:3, 218:5-17; Ex. 1476 [Sullivan Dep.] at 99:8-102:1.

22

included in FNMA's quantitative subprime disclosures, and no witness testified that he had reason to believe that any Defendant thought as much.[117]

111.    Not a single witness—inside or outside FNMA—testified that Mr. Mudd, Mr. Dallavecchia, or Mr. Lund ever indicated that he thought Process Efficiency loans should have been included in FNMA's quantitative Alt-A disclosures, and no witness testified that he had reason to believe that any Defendant thought as much.[118]

112.    Not a single witness testified that anyone at FNMA ever raised any concerns to any of the Defendants regarding FNMA's subprime or Alt-A disclosures.[119]

**B.     FNMA**

113.    FNMA employees who testified on the topic stated that EA and MCM loans did not meet FNMA's subprime definition.[120]

114.    FNMA employees who worked on the February 2007 Form 12b-25 Notice of Late Filing testified that this filing did not contain any definition of subprime and that FNMA

---

[117] *See, e.g.*, Ex1437 [Abbasi Dep.] at 159:19-25, 164:4-10, 170:2-8; Ex 1445 [Christy Dep.] at 143:12-144:3, 146:4-18, 148:2-19; Ex. 1451 [Hairston Dep.] at 117:20-118:7, 121:19-122:4, 125:17-126:2;  Ex. 1458 [Johnson Dep.] at 133:15-134:5, 134:13-25, 137:3-18, 138:2-16, 140:21-141:11, 141:19-142:6; Ex. 1461 [Lewis Dep.] at 65:18-23, 67:20-68:20; Ex. 1467 [Pallotta Dep.] at 61:7-14, 61:20-24, 63:24-64:6, 64:12-16, 66:18-25, 67:6-10; Ex. 1468 [Quinn Dep.] at 147:20-4, 150:7-151:1, 154:15-155:10; Ex. 1471 [Senhauser Dep.] at 34:25-35:15; Ex. 1472 [Shaw Dep.] at 205:15-209:18, 213:13-214:14, 217:18-218:17; Ex. 1476 [Sullivan Dep.] at 103:2-25, 105:20-25, 106:11-106:23.

[118] *See, e.g.*, Ex.1437 [Abbasi Dep.] at 159:11-18, 162:23-163:3, 169:20-170:1; Ex. 1449 [Fine Dep.] at 57:16-58:9, 59:10-60:4, 60:18-61:1, 61:11-15; Ex. 1451 [Hairston Dep.] at 118:9-14, 122:6-10, 126:6-11; Ex. 1458 [Johnson Dep.] at 133:7-14, 134:6-11, 136:20-137:2, 137:19-25, 140:12-20, 141:12-17; Ex. 1467 [Pallotta Dep.] at 60:24-61:6, 61:15-19, 63:16-23, 64:7-11, 66:10-17, 67:1-5; Ex. 1472 [Shaw Dep.] at 208:23-209:18, 214:15-215:3, 218:23-219:10; Ex. 1476 [Sullivan Dep.] at 102:3-103:1, 104:1-12, 105:6, 105:12-16.

[119] *See, e.g.*, Ex 1479 [Van Alstyne Dep.] at 99:22-100:22; Ex. 1472 [Shaw Dep.] at 87:3-18.

[120] *See, e.g.*, Ex. 1466 [Mudd Dep.] at 210:10-211:9, 321:17-322:; Ex. 1446 [Dallavecchia Dep.] at 96:4-97:6, 123:20-124:4; Ex. 1483 [Dallavecchia Investigative Tr.] at 349:16-23, 353:21-354:2, 355:18-356:11, 383:24-384:24; Ex. 1462 [Lund Dep.] at 45:4-47:6; Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 26:8-28:18; Ex. 1458 [Johnson Dep.] at 46:19-47:3, 67:2-3; Ex. 1471 [Senhauser Dep.] at 33:4-13; Ex. 1477 [Tretler Dep.] at 77:16-81:2; Ex. 1463 [McElhennon FNMA 30(b)(6) Dep.] at 10:20-13:14.

intended for the statement in the February 2007 12b-25 that "sub-prime loans typically are made to borrowers with weaker credit histories" to be read as simply background.[121]

115.    There is no evidence that anyone at FNMA understood the company's subprime classification to include all loans to borrowers with weaker credit profiles or intended FNMA's subprime disclosure to be understood in this manner.[122]

116.    All of the FNMA employees who worked with subprime, EA, or MCM loans and/or who participated in the disclosure process, including numerous in-house attorneys, understood that the company classified loans as subprime if they were originated by subprime lenders using processes unique to subprime lending.[123]

117.    FNMA's 2005 and 2006 letters to OFHEO[124] were in no way intended to convey that FNMA considered EA loans to be subprime loans.[125]

118.    FNMA's 2005 and 2006 letters to OFHEO were written before FNMA had started to buy loans under its Subprime NBI.[126]

119.    After FNMA commenced the Subprime NBI, in a letter to OFHEO responding to a similar annual request for information, FNMA stated that, while it previously did not have a significant presence in the subprime market, it recently had entered that market, and only loans

---

[121] Ex. 1474 [Sleeper FNMA 30(b)(6) Dep.] at 30:23-34:11, 55:24-57:9; Ex. 1445 [Christy Dep.] at 66:7-67:23, 76:8-79:19 ██████████████████████████████████████████████████████████████████████████; Ex. 1449 [Fine Dep.] at 42:13-43:7; Ex. 1460 [Lesmes Dep.] at 112:7-116:13; Ex. 1481 [Wilkinson Dep.] at 132:3-25 ██████████████████████████████████████████████████████████; Ex.742 [Feb. 23, 2007 e-mail chain] ███████████████████████████████████████████████████. *see also* Ex. 517 [Feb. 27, 2007 12b-25] at 8; Ex. 1458 [Johnson Dep.] at 245:24-246:23.

[122] *See, e.g.*, Ex.1445 [Christy Dep.] at 77:12-21; 79:3-19; Ex.1481 [Wilkinson Dep.] at 132:3-25; Ex. 1458 [Johnson Dep.] at 62:6-21; 121:7-16; Ex.1449 [Fine Dep.] at 44:2-21.

[123] Ex. 1467 [Pallotta Dep.] at 27:14-30:8; Ex. 1468 [Quinn Dep.] at 80:5-81:21; Ex. 1472 [Shaw Dep.] at 109:13-110:19; Ex. 1476 [Sullivan Dep.] at 69:19-71:5.

[124] Ex. 1131 [Apr. 4, 2005 Letter to OFHEO]; Ex. 530 [Apr. 28, 2006 Letter to OFHEO].

[125] Ex. 1471 [Senhauser Dep.] at 125:23-127:25.

[126] *See* Ex. 893 [Mar. 2, 2007 Letter to OFHEO] at 2.

originated from subprime lenders pursuant to subprime underwriting guidelines fell within its subprime classification.[127]

120.    FNMA employee Sal Mirran authored the April 5, 2007 email stating that "many (if not all) in the market call EA subprime."[128]  Mr. Mirran testified that he: (i) did not think that EA loans met FNMA's subprime classification; (ii) was not aware of anyone in the market who mistakenly believed that EA loans met FNMA's subprime classification; and (iii) had no factual basis for the words in his email.  Mr. Mirran testified that he was merely relaying second-hand information from a colleague who told him what some unidentified people in the market purportedly thought.[129]

121.    All current and former FNMA employees who gave testimony on the subject testified that they do not believe that Process Efficiency loans fell within FNMA's classification of Alt-A loans.[130]

122.    FNMA employees who worked with Alt-A and Process Efficiency loans and/or who participated in the disclosure process supported the accuracy of the Alt-A disclosures at issue in this case.[131]

---

[127] Ex. 893 [Mar. 2, 2007 Letter to OFHEO] at 2; Ex. 1125 [June 29, 2011 FNMA Letter to SEC] at FMCIV-NY-02_01750598.

[128] Ex. 712 [Apr. 5, 2007 E-mail chain]; Ex. 1465 [Mirran Dep.] at 50:9-53:3, 73:22-75:10.

[129] Ex. 1465 [Mirran Dep.] at 50:9-53:3, 73:22-75:10.

[130] Ex. 1467 [Pallotta Dep.] at 40:13-16; Ex. 1476 [Sullivan Dep.] at 40:12-42:19; *see also, e.g.*, Ex. 1466 [Mudd Dep.] at 211:10-24; Ex. 1483 [Dallavecchia Investigative Tr.] at 269:13-272:3, 349:16-23; Ex. 1462 [Lund Dep.] at 53:8-22; Ex. 1484 [Lund Investigative Tr.] at 75:25-76:13, 376:16-25, 378:9-21, 379:10-383:3, 387:13-388:2, 398:16-400:7, 401:24-402:4, 402:23-403:10, 407:22-408:20, 442:7-17, 444:12-446:8.

[131] Ex. 1459 [Kenney Dep.] at 102:7-103:25; Ex. 1467 [Pallotta Dep.] at 58:12-59:15; Ex. 1472[Shaw Dep.] at 107:13-109:11.

882462

## VIII.   INVESTORS' UNDERSTANDING OF FNMA'S DISCLOSURES

123.   Reasonable investors understood that borrowers with FICO scores below 620 were borrowers with weaker credit profiles.[132]

124.   None of the investors or analysts who testified stated that he or she understood that FNMA classified as subprime all loans to borrowers with weaker credit profiles.[133]

125.   To the contrary, every one of the investors and analysts who testified confirmed that he or she understood from FNMA's public filings that FNMA did not include all loans to borrowers with weaker credit profiles in its quantitative subprime exposure.[134]

126.   There is no evidence that any investors ever read even the February 2007 12b-25 as disclosing that FNMA classified as subprime all loans to borrowers with weaker credit profiles.

127.   None of the investors and analysts who testified in this case stated that they understood the quantitative subprime disclosure of 0.2% in the February 2007 12b-25 to comprise all loans that FNMA held that were made to borrowers with weaker credit profiles.[135]

128.   There is also no evidence that the February 2007 12b-25 had any spillover effect on how investors understood the subprime disclosures in any of FNMA's subsequent public filings.

129.   Investors relied on the credit risk characteristics disclosed by FNMA in making their investment decisions.[136]

---

[132] *See, e.g.*, Ex. 1438 [Adams Dep.] at 109:5-11.

[133] Ex. 1438 [Adams Dep.] at 109:20-113:3; Ex. 1442 [Cai Dep.] at 47:9-49:3; Ex. 1453 [Hinshaw Dep.] at 80:10-82:1; Ex. 1455 [Hochstim Dep.] at 54:2-55:14; Ex. 1469 [Romo Dep.] at 80:4-81:6, 86:21-87:2.

[134] Ex. 1438 [Adams Dep.] at 112:11-113:3, 399:17-400:20; Ex. 1442 [Cai Dep.] at 40:6-13, 48:3-8, 49:7-54:13, 55:16-56:9; Ex. 1455 [Hochstim Dep.] at 54:24-55:14, 58:23-62:3; Ex. 1453 [Hinshaw Dep.] at 80:14-25; Ex. 1469 [Romo Dep.] at 113:23-114:15.

[135] Ex. 1438 [Adams Dep.] at 110:23-111:21, 112:11-17, 382:2-383:3; Ex. 1453 [Hinshaw Dep.] at 80:14-22, 82:16-21; Ex. 1455 [Hochstim Dep.] at 53:8-55:14; Ex. 1442 [Cai Dep.] at 46:9-48:17, 49:7-54:13, 55:16-57:9; Ex. 1469 [Romo Dep.] at 78:15-81:6, 113:23-114:15.

882462

## IX.   MR. MUDD'S AND MR. DALLAVECCHIA'S PUBLIC STATEMENTS

130.   There is no evidence that any investor was misled by the public statements by Mr.

Mudd that are at issue.

131.   There is no evidence of any investor relying on the public statements by Mr.

Mudd that are at issue.

132.   There is no evidence of any investor even being aware of the public statements by

Mr. Mudd that are at issue.

133.   In January of 2008 Mr. Mudd stated publicly that:

Loans to borrowers with FICO scores below 620 make up about $118 billion, or 5 percent of our book. Many of these mortgages where we take on a bit more credit risk in order to help us meet our affordable housing goals. The serious delinquency rate was about 4 percent, and these loans contributed about 20 percent of our credit losses. About 37 percent of those loans have credit enhancement.

[W]hat we define as "subprime," mostly because of the companies that originate them and tag the loans. Total here: $7.3 billion, which amounts to only about a third of a percent of our total Single-Family mortgage credit book. The serious delinquency rate here as of last September was about 4.8 percent, but the losses have been pretty small, partly attributable to the fact that nearly 80 percent of those loans had some form of credit enhancement.[137]

134.   Mr. Dallavecchia participated as a speaker in an investor conference call on

February 27, 2007, the same day that FNMA filed its Form 12b-25. During that call, Mr.

Dallavecchia directed listeners to the complete filing made that day.[138] Mr. Dallavecchia stated

that "less than 5% of the book had a [FICO] score below 620."[139] He continued:

In our filing today, we also indicate that we have increased our participation in subprime product in 2006. Our purchases have been prudent and have been made when we concluded that they would contribute to our mission objectives or they would generate a profitable return. Given our view of the subprime market generally, let me offers [sic]

---

[136] Ex. 1455 [Hochstim Dep.] at 61:17-62:20; Ex. 1438 [Adams Dep.] at 393:23-394:3; Ex. 1442 [Cai Dep.] at 72:20-73:16, 77:3-80:8; *see also* Ex. 873 [Mar. 8, 2008 E-mail chain].
[137] Ex. 916 [Jan. 29, 2008 Mudd Remarks] at 4.

[138] Ex. 557 [Feb. 27, 2007 FNMA Investor/Analyst Conference Call] at 5.

[139] Ex. 557 [Feb. 27, 2007 FNMA Investor/Analyst Conference Call] at 5.

some insight into our approach to this segment and the exposure to the risk.  The first point, as per our filing, is that our exposure is modest.  Approximately 0.2% of our single-family credit book of business consisted of subprime loans or [FNMA] MBSs backed by subprime loans."[140]

135.    Mr. Dallavecchia also stated that "the housing market is moving through a challenging period . . . .  We also expect to see increased credit losses in the market, especially from loans originated on the outer bands of the underwriting spectrum."[141]

136.    Mr. Dallavecchia further stated that "there doesn't appear to be any obvious catalyst for improvement on the horizon.  In fact, with subprime loans comprising a major portion of loans slated for reset to higher rates in the coming year, credit performance in the market could deteriorate further."[142]

137.    Mr. Dallavecchia's public statements at issue were read from a script that was drafted pursuant to an internal process implemented to ensure that no misstatements were made during investor calls.[143]

138.    There is no evidence of any investor being misled by the public comments by Mr. Dallavecchia that are at issue.

139.    It was reasonable for Mr. Dallavecchia to rely on FNMA's internal processes to ensure that his public statements were accurate and consistent with FNMA's public disclosures.[144]

---

[140] Ex. 557 [Feb. 27, 2007 FNMA Investor/Analyst Conference Call] at 5.

[141] Ex. 557 [Feb. 27, 2007 FNMA Investor/Analyst Conference Call] at 4.

[142] Ex. 557 [Feb. 27, 2007 FNMA Investor/Analyst Conference Call] at 5.

[143] *See* Ex. 1445 [Christy Dep.] at 57:24-64:12, 83:17-84:13; Ex. 1446 [Dallavecchia Dep.] at 88:10-23, 145:21-147:3; *see also* Ex. 80 [Feb. 25, 2007 E-mail]; Ex. 1418 [FMCIV-NY-02_00054227-32, Feb. 24, 2007 e-mail with attachments]; Ex.1421 [FMCIV-NY-02_00055149-71, Feb. 26, 2007 e-mail with attachment]; Ex. 1419 [FMSI-EC2 07092990-12, Feb. 27, 2007 e-mail with attachment].

[144] Ex. 1460 [Lesmes Dep.] at 71:3-22, 96:23-97:23; Ex. 1470 [Schuppenhauer Dep.] at 40:23-43:8, 69:22-71:8.

## X.     DEFENDANTS' COMPENSATION AND BONUS STRUCTURE

140.     Mr. Mudd's, Mr. Dallavecchia's, and Mr. Lund's bonuses were tied to compliance with FNMA's "mission goals," which included completing FNMA's financial restatement and correcting the company's financial records, rebuilding relationships with regulators (including OFHEO), and improving corporate culture at FNMA.[145]

141.     Mr. Dallavecchia's performance objectives were not in any way linked to earnings per share or share price.[146]

142.     Mr. Mudd testified that his compensation was not tied to FNMA's share earnings or price.[147]

143.     Mr. Lund's performance objectives in 2006 included "[i]ncreas[ing] [FNMA's] penetration into subprime."[148]

144.     With the exception of sales to satisfy tax obligations, none of the Defendants sold any of their FNMA shares during the Relevant Period.[149]

//

//

---

[145] Ex. 1466 [Mudd Dep.] at 43:7-48:24; Ex. 1446 [Dallavecchia Dep.] at 52:7-53:20; Ex. 1462 [Lund Dep.] at 67:10-68:12.

[146] Ex. 1446 [Dallavecchia Dep.] at 54:1-13; Ex. 365 [Jan. 5, 2007 e-mail] (discussing key accomplishments of CRO function against AIP goals, including increased staffing, implementation of risk controls and governance, compliance with Restatement, and establishing a control oriented culture; no mention of FNMA's share or earning price); Ex. 367 [Jan. 24, 2008 Letter to Dallavecchia] (providing performance review of Mr. Dallavecchia for year 2007 with no mention of FNMA's share or earning price).

[147] Ex. 1466 [Mudd Dep.] at 43:24-45:25.

[148] Ex. 488 [Performance Plan 2006 for Lund] at FMSI-X 0118111; Ex. 1462 [Lund Dep.] at 67:25-68:12; *see also* Ex. 1466 [Mudd Dep.] at 43:2-51:3; Ex. 1446 [Dallavecchia Dep.] at 52:7-24.

[149] Ex. 1466 [Mudd Dep.] at 55:25-56:20, 62:24-63:3, 67:12-17; *In re Fannie Mae Sec. Litig.*, 742 F. Supp. 2d 382, 403 (S.D.N.Y. 2010) (acknowledging that Mr. Mudd and Mr. Dallavecchia did not sell their FNMA stock prior to FNMA's conservatorship).

882462

145.     Mr. Mudd and Mr. Dallavecchia purchased more FNMA stock during the

Relevant Period.  Specifically, in November 2007, Mr. Mudd purchased 5,000 FNMA shares and

Mr. Dallavecchia purchased almost 3,000 shares of FNMA stock.[150]

Dated: March 20, 2015                          Respectfully submitted,


By:    /s/ John W. Keker
                                               JOHN W. KEKER (*pro hac vice*)
                                               BROOK DOOLEY (*pro hac vice*)
                                               ERIC H. MACMICHAEL (*pro hac vice*)
                                               633 Battery Street
                                               San Francisco, CA  94111-1809
                                                (415) 391-5400
                                                (415) 397-7188 - fax
                                               jkeker@kvn.com
                                               bdooley@kvn.com
                                               emacmichael@kvn.com

                                               Attorneys for Defendant DANIEL H. MUDD


                                               James D. Wareham
                                               James E. Anklam
                                               DLA PIPER LLP (US)
                                               500 Eighth Street, N.W.
                                               Washington, DC 20004
                                               (202) 799-4000
                                               james.wareham@dlapiper.com
                                               james.anklam@dlapiper.com

                                               Attorneys for Defendant DANIEL H. MUDD

---

[150] *See In re Fannie Mae*, 742 F. Supp. 2d at 403 (acknowledging that Mr. Mudd and Mr. Dallavecchia purchased FNMA stock during the Relevant Period); Ex. 1411 [SEC Form 4 for Mudd] (showing that Mr. Mudd purchased FNMA common stock on Nov. 21, 2007); Ex. 1410 [SEC Form 4 for Dallavecchia] (showing that Mr. Dallavecchia purchased FNMA common stock on Nov. 27, 2007).

882462

Dated: March 20, 2015                  By:    */s/ Michael N. Levy*
                                              Michael N. Levy
                                              Amy K. Carpenter-Holmes
                                              PAUL HASTINGS LLP
                                              875 15th Street, N.W.
                                              Washington, DC 20005
                                              (202) 551-1700
                                              (202) 551-1705 – fax
                                              michaellevy@paulhastings.com
                                              amycarpenter-holmes@paulhastings.com

                                              Attorneys for Defendant THOMAS LUND


Dated: March 20, 2015                  By:    */s/ Andrew J. Levander*
                                              Andrew J. Levander
                                              Hector Gonzalez
                                              DECHERT LLP
                                              1095 Avenue of the Americas
                                              New York, NY 10036-6797
                                              (212) 698-3500
                                              (212) 698-3599 – fax
                                              andrew.levander@dechert.com
                                              hector.gonzalez@dechert.com

                                              Attorneys for Defendant
                                              ENRICO DALLAVECCHIA

882462