UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | 11 Civ. 9202 (PAC) |
| | : | |
| *Plaintiff*, | : | **OPINION & ORDER** |
| | : | |
| - against - | : | |
| | : | |
| DANIEL H. MUDD, | : | |
| | : | |
| *Defendant*. | : | |

-----------------------------------------------------------x

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendant Daniel H. Mudd served as CEO of the Federal National Mortgage Association (FNMA) from June 2005 to September 2008, during which time FNMA suffered extensive financial losses that eventually led the federal government to place it into conservatorship. On December 16, 2011, the Securities Exchange Commission (SEC) filed suit against Mudd and two other FNMA executives, Enrico Dallavecchia and Thomas Lund, alleging that statements they made in public SEC filings and the media were false and misleading as to FNMA's actual exposure to subprime and reduced-documentation "Alt-A" loans.[1] On August 12, 2012, the Court denied defendants' motion to dismiss, and thereafter the parties engaged in extensive discovery. The defendants moved for summary judgment on March 20, 2015, but then Dallacecchia and Lund entered into settlement agreements with the SEC as of September 17, 2015. The SEC's action remains pending solely against Mudd. There are genuine issues of material fact present, and Mudd's motion for summary judgment must be denied.

---

[1]   The SEC entered into a non-prosecution agreement with FNMA.

## BACKGROUND

*1. FNMA's Subprime Exposure*

From at least the 1990s, FNMA acquired and guaranteed mortgage loans made to borrowers with weaker credit histories primarily through two programs: Expanded Approval (EA) and MyCommunityMortgage (MCM).[2] EA loans "support[ed] . . . [FNMA's] mission to provide access to affordable home financing" to "borrowers with blemished credit." Exh. 1303. MCM loans served low- and moderate-income home buyers across a wide credit spectrum, also in furtherance of FNMA's housing goals. *See* Exh. 1542. FNMA considered EA and MCM loans to be on the same risk continuum as other subprime loans on its books, and it treated EA and MCM loans like subprime loans both internally and in communications with its regulator.[3]

As the housing and mortgage markets began to unravel leading into the global financial crisis of 2008, FNMA's investors became increasingly wary of the risks surrounding subprime loans.[4] There was no generally accepted definition of *subprime* within the industry, but FNMA defined *subprime mortgage loan* in its 2004 Form 10-K, filed December 6, 2006,[5] as "a

---

[2] *See, e.g.*, Exh. 1131 at 3 (describing EA as FNMA's "most significant initiative to serve credit-impaired borrowers").

[3] FNMA described EA loans as "a mortgage option that gives borrowers with blemished credit access to high-quality, low-cost, non-predatory loans." Exh. 1303 at 1. Similarly, FNMA described MCM loans as serving "credit challenged borrowers." Exh. 110 at 5. *See also* Exh. 1131 at 2–3 (including EA loans in FNMA's quantification of its subprime exposure).

[4] For further background information, see the Court's prior opinion of August 10, 2012, *S.E.C. v. Mudd*, 885 F. Supp. 2d 654, 658–60 (S.D.N.Y. 2012).

[5] During Mudd's tenure as CEO, he certified FNMA's Forms 10-K and 10-Q, and reviewed and approved FNMA's Forms 12b-25. The Court's opinion refers primarily to seven SEC filings made during the relevant period:

    (1) 2004 Form 10-K (Exh. 748), filed December 6, 2006;
    (2) Q4 2006 Form 12b-25 (Exh. 716), filed February 27, 2007;
    (3) 2005 Form 10-K (Exh. 717), filed May 2, 2007;
    (4) Q1 2007 Form 12b-25 (Exh. 718), filed May 9, 2007;
    (5) 2006 Form 10-K (Exh. 66), filed August 16, 2007;
    (6) Q1 2007 Form 10-Q (Exh. 1486), filed November 9, 2007; and

mortgage loan underwritten using lower credit standards than those used in the prime lending market." Exh. 748.[6] And on February 23, 2007, Reuters published an article quoting Mudd, who described subprime mortgages as loans "offered to borrowers with damaged credit." Hempstead Test. at 671. Four days later, FNMA defined *subprime mortgages* in its Q4 2006 Form 12b-25 as loans made to "borrowers with weaker credit histories." Exh. 716. That form stated that 0.2% of FNMA's single-family book of business consisted of subprime loans or mortgage-backed securities (MBS) backed by subprime loans, and an additional 2% of the book consisted of other subprime securities. *Id.* It did not include EA or MCM loans in those quantifications. In the following months, Mudd testified twice before Congress, where he described *subprime* broadly as a loan given to a borrower "who doesn't have perfect credit," Exh. 572, or who has "a credit blemish," Exh. 573. He further estimated FNMA's subprime exposure to be "less than 2.5 percent" of FNMA's book of business. *Id.*

On May 2, 2007, FNMA filed its 2005 Form 10-K which defined *subprime mortgage* as follows:

> *"Subprime mortgage"* generally refers to a mortgage loan made to a borrower with weaker credit profile, than that of a prime borrower. As a result of the weaker credit profile, subprime borrowers have a higher likelihood of default than prime borrowers. Subprime mortgage loans are often originated by lenders specializing in this type of business, using processes unique to subprime loans. *In reporting our subprime exposure, we have classified mortgages loans as subprime if the mortgage loans are originated by one of these specialty lenders or, for the original or resecuritized private-label, mortgage-related securities that we hold in our portfolio, if the securities were labeled as subprime when sold.*

Exh. 717 (emphasis added). Yet despite this narrower definition, the 2005 Form K-10 continued to represent FNMA's subprime exposure as approximately 2.2% of its single-family book of

---

(7) 2007 Form 10-K (Exh. 709), filed February 27, 2008.

[6] Despite defining *subprime mortgage loan*, the disclosure did not separately quantify FNMA's subprime exposure; rather, it lumped together data for all loans.

business, of which "approximately 0.2% consisted of subprime mortgage loans or structured

FNMA MBS backed by subprime mortgage loans and, to a lesser extent, resecuritizations of

private-label mortgage-related securities backed by subprime mortgage loans," just as it had in

the Q4 2006 Form 12b-25. *Id.*[7] That is, the definition of *subprime* changed, but the amount of

subprime loans FNMA quantified stayed essentially the same.

On November 9, 2007, FNMA filed its Q1 2007 Form 10-Q which expanded the

definition of *subprime* to include loans from the "subprime divisions of larger lenders." Exh.

1486. As for its subprime exposure, FNMA stated:

> Approximately 0.2% of our total single-family mortgage credit book of business
> as of March 31, 2007 consisted of subprime mortgage loans or [FNMA] MBS
> backed by subprime mortgage loans. This percentage increased to approximately
> 0.3% as of September 30, 2007. Less than 1% of our single-family business
> volume for the nine months ended September 30, 2007 consisted of subprime
> mortgage loans or [FNMA] MBS backed by subprime mortgage loans.

*Id.*[8] So while the definition of *subprime* expanded, FNMA did not quantify substantially more

loans as subprime. In fact, despite defining *subprime* to include loans from the "subprime

divisions of larger lenders," FNMA did not keep separate statistical reports or otherwise track

loans made by those divisions. And it was not until the SEC's investigation that FNMA realized

it had failed to quantify billions of dollars of loans from Countrywide's subprime division.[9]

On December 2, 2007, Mudd stated in an interview with the *San Francisco Gate*: "We

have about 2 percent of our broker's business in total that meets our definition of what would be

---

[7]   The same definition of subprime mortgage, along with a similar quantification of subprime exposure,
      was used in FNMA's Q1 2007 Form 12b-25, filed May 9, 2007, and 2006 Form K-10, filed August 16,
      2007. Exhs. 718, 66.

[8]   FNMA's 2007 Form 10-K, filed February 27, 2008, employed a substantially similar definition of
      *subprime*, as well as a similar quantification of FNMA's subprime exposure.

[9]   *See* Exh. 1124, Exh. A ¶¶ 36, 38. Mudd knew that FNMA purchased EA loans from subprime
      divisions of large lenders, including Countrywide, during the relevant period. *See id.* ¶ 45; Mudd Dep.
      at 300–06; Exh. 847.

a subprime loan, not a predatory loan, but typically a loan to an individual that has had a credit blemish in the past." Exh. 1014. And on August 20, 2008, in a national radio interview on "The Diane Rehm Show," Mudd stated that FNMA had "about zero percent" exposure to subprime loans, which he defined as "a loan to a borrower [who] has had a credit problem in the past."

   2. *FNMA's Alt-A Exposure*

   In addition to subprime loans, the mortgage crisis drew increased scrutiny to low-documentation loans, often called "Alt-A" loans, which did not require borrowers to fully disclose their financial condition. Like the term *subprime*, *Alt-A* did not have a standard definition. FNMA first mentioned Alt-A loans in its 2004 Form 10-K, filed December 6, 2006, which defined *Alt-A mortgage* as a "mortgage loan underwritten using more liberal standards such as higher loan-to-value ratios and less documentation of borrower income or assets." Exh. 748. And FNMA's Q4 2006 Form 12b-25, filed February 27, 2007, defined the term *Alt-A mortgage* as "generally referr[ing] to a loan underwritten with lower or alternative documentation requirements." Exh. 716. Similarly, its 2005 Form 10-K, filed May 2, 2007, expanded the definition of *Alt-A mortgage* slightly, but remained general:

> *"Alt-A mortgage"* generally refers to a loan underwritten with lower or alternative documentation than a full documentation mortgage and may include other alternative product features. As a result, Alt-A mortgage loans generally have a higher risk of default than full documentation mortgage loans.

Exh. 717. FNMA did not quantify its Alt-A exposure in any of these filings.

   One week after filing its 2005 Form 10-K, FNMA filed its Q1 2007 Form 12b-25, in which it narrowed the definition of *Alt-A*. After repeating the broad language defining *Alt-A* generally as loans "underwritten with lower or alternative documentation," it stated that "[i]n reporting our Alt-A exposure, we have classified mortgage loans as Alt-A if the lenders that

5

deliver the mortgage loans to us have classified the loans as Alt-A based on documentation or other product features." Exh. 718. For the first time, FNMA quantified its Alt-A exposure, which it estimated to represent "approximately 11% of [FNMA's] total single-family mortgage credit book of business." *Id.*

The Q1 2007 Form 12b-25 did not explain or disclose, however, that a lender's classification of a loan as Alt-A was determined by criteria set by FNMA. These criteria distinguished between "borrower-selected" low-documentation loans, in which borrowers specifically requested low-documentation loans, and "lender-selected" low-documentation loans, in which lenders initiated the low-documentation process. *See* Exh. 1124 at ¶¶ 56–58. Although all low-documentation loans carried the same risks and suffered similar losses, FNMA included only borrower-selected low-documentation loans in its quantification of its Alt-A exposure, thereby omitting more than $300 billion of low-documentation loans from its disclosures. *See* Exh. 180; Long Rep. at 42, fig. 22.

### 3. Post-Conservatorship

In its first post-conservatorship filing—the Q3 2008 Form 10-Q, filed November 10, 2008—FNMA added an additional disclaimer: "we have other loans with some features that are similar to" both subprime and Alt-A loans "that we have not classified as [subprime or Alt-A] . . . because they do not meet our classification criteria." Exh. 525.

### 4. Procedural History

On December 16, 2011, the SEC instituted this action, charging Mudd with knowingly or recklessly making material misstatements regarding FNMA's exposure to subprime and Alt-A loans in violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Count One); Mudd and Dallavecchia with knowingly, recklessly, or negligently obtaining money or property by means

of material misstatements in violation of Section 17(a)(2) of the Securities Act (Count Two); all defendants with aiding and abetting a primary securities violation in violation of Section 10(b) and Rule 10b-5 (Count Three); Mudd with signing false certifications to the SEC in violation of Rule 13A-14(A) of the Exchange Act (Count Four); and all defendants with aiding and abetting violations of Section 13(A) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 (Count Five). Defendants moved to dismiss, and the Court denied their motion on August 10, 2012. *S.E.C. v. Mudd*, 885 F. Supp. 2d 654 (S.D.N.Y. 2012). At the close of discovery, defendants moved for summary judgment. While that motion was pending, however, Dallavecchia and Lund entered into settlement agreements with the SEC, leaving only the SEC's action against Mudd and his motion for summary judgment.

## LEGAL STANDARD

The Court may grant summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment lies where a non-moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

Mudd moves for summary judgment on the basis that (1) FNMA's public filings were not false or misleading; (2) the alleged misstatements were not material; (3) Mudd did not possess the requisite scienter; (4) Mudd did not substantially assist any primary securities law violation; (5) Mudd was not negligent; and (6) Mudd did not obtain money or property by means of his alleged misstatements. Each of Mudd's arguments raise an issue of fact which precludes his motion for summary judgment.

## I.      False or Misleading Statements

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahon & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (citation omitted). As such, a securities violation may arise from both statements that are factually false and "literally true statements that create a materially misleading impression." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." *McMahon & Co.*, 900 F.2d at 579 (citation, internal quotation marks, and alterations omitted).

### a.      Subprime

FNMA's Q4 2006 Form 12b-25 defined *subprime* as loans to borrowers with weaker credit histories, but excluded EA and MCM from its subprime quantification. FNMA's EA and MCM loans were made to borrowers with weaker credit profiles, and thus can be seen as falling within FNMA's definition of "subprime." As such, a jury could find the subprime-exposure calculations in FNMA's Q4 2006 Form 12b-25 to be misleading because they failed to include FNMA's exposure to EA and MCM loans.

Mudd argues that FNMA's later definitions of subprime clarified that it categorized a loan as "subprime" only if the loan (1) originated by subprime specialty lenders or subprime divisions of larger lenders (2) using processes unique to subprime loans. He argues that because EA and MCM loans neither originated from subprime specialty lenders or subprime divisions of larger lenders, nor used (unspecified) processes unique to subprime loans, FNMA's failure to include these loans in its subprime exposure calculations was not false or misleading.

But Mudd's public statements do not provide the clarity he suggests. FNMA's latest definition of *subprime* during the relevant period states that subprime loans "generally" are "loan[s] made to a borrower with weaker credit profile," which "often" or "typically" originate from "lenders specializing in this type of business, using processes unique to subprime loans," and that FNMA quantifies a loan as "subprime" if it originated from "these specialty lenders" or "subprime divisions of larger lenders." A reasonable investor could interpret "loan[s] made to . . . borrower[s] with weaker credit profile[s]" as describing the "type of business" employed by the "specialty lenders" who "often" originated the loans that FNMA quantified as subprime. Mudd's imprecise public statements and testimony before Congress support such an interpretation. And under this interpretation, EA and MCM loans meet FNMA's definition of subprime. As such, a jury could find that it was misleading to exclude these loans from FNMA's subprime exposure calculation.

In addition, FNMA's subprime definition explicitly included loans originated by "subprime divisions of larger lenders," but FNMA's subprime exposure calculations failed to include in full FNMA's acquisition of $28.5 billion worth of loans from Countrywide's subprime division during the Relevant Period. On that basis, a jury could find that FNMA misled investors concerning its total subprime exposure by failing to fully include its acquisition of Countrywide's subprime loans.

**b.    Alt-A**

FNMA defined Alt-A as "a loan that can be underwritten with lower or alternative documentation," and stated that it categorized a loan as Alt-A if "the lenders that deliver the mortgage loan[] to us have classified the loan[] as Alt-A based on documentation or other product features." A reasonable investor could interpret FNMA's definition to mean that lenders

classified *all* low documentation loans (both lender selected and borrower selected) as Alt-A, and thus be misled by FNMA's Alt-A quantification. While FNMA's statement that it quantified loans as Alt-A when delivered as Alt-A may have been literally accurate, that is only half of the full story. *See Gabelli*, 653 F.3d at 57. FNMA did not disclose that it instructed lenders not to classify certain low-documentation loans—including lender-selected loans—as Alt-A, and therefore excluded such low-documentation loans from its Alt-A exposure calculations. As such, a jury could find that FNMA's quantitative Alt-A disclosures were misleading.

## II.     Materiality

Misleading statements are material if "a reasonable investor would have considered [them] significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted). FNMA's failure to include EA, MCM, and lender-selected low-documentation loans in its quantification of its subprime and Alt-A exposure understated FNMA's exposure to those types of loans by hundreds of millions of dollars. Such exposure would have been particularly "important to investors because of the volatility in the housing and secured-transaction markets." *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 586 (S.D.N.Y. 2010) (holding that a failure to disclose that 1% of the insurers' portfolio was exposed to assets backed in part by residential-mortgage-backed securities was material).

Mudd argues that FNMA's failure to include EA, MCM, and lender-selected low-documentation loans in its subprime and Alt-A exposure disclosures was immaterial because inclusion of those loans in FNMA's disclosures would not have "significantly altered the 'total mix' of information made available" to investors. *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (quoting *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988)). He points to the credit metrics for FNMA's entire single-family book of business that were included in each of FNMA's

SEC filings, which he argues were complete and accurate. Mudd further argues that FNMA's disclosures adequately warned investors about the risks attendant to FNMA's pursuit of its housing goals.

FNMA's credit metrics quantified loans to borrowers with FICO credit scores below 620 and loan-to-value (LTV) ratios above 90%. But FNMA did not define subprime loans by FICO scores or LTV ratios. So this data, while also material to investors' decisions, is unrelated to FNMA's subprime quantification. As such, it could not have corrected, clarified, or rendered immaterial FNMA's misleading subprime exposure calculations. Moreover, the credit metrics did not address loans' level of documentation, and thus would not have corrected FNMA's exposure to Alt-A loans. Finally, FNMA's disclaimers and warnings also do not preclude liability—a warning does no good if it misstates the nature or extent of the risk. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

In sum, a jury could find that FNMA's failure to include EA, MCM, and lender-selected low-documentation loans in its exposure calculations was material.

## III.   Scienter

The parties dispute what level of scienter the SEC must prove.[10] But whether the standard requires actual knowledge or merely recklessness, the SEC has adduced sufficient evidence to put this question to the jury. *See In re DDAVP Direct Purchase Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (directing courts to be "'lenient in allowing scienter issues to withstand

---

[10]   There is a split within the Circuit as to the level of scienter required to prove a defendant aided or abetted a securities violation before the enactment of Dodd–Frank. *Compare S.E.C. v. Landberg*, 836 F. Supp. 2d 148, 157 (S.D.N.Y. 2011) ("The scienter standard in this Circuit [for aiding and abetting liability] included recklessness prior to Dodd–Frank."); *with S.E.C. v. Aronson*, 11 Civ. 7033, 2013 WL 4082900, *10 (S.D.N.Y. Aug. 6, 2013) (acknowledging disagreement on the issue but concluding that the SEC must show actual knowledge for aiding and abetting claims premised on pre-Dodd–Frank conduct).

summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact'").

The SEC has adduced evidence that Mudd knew or should have known that his public statements and FNMA's disclosures, which he personally reviewed, edited, and certified, were materially false or misleading. Mudd publicly defined subprime mortgages as loans offered to "borrower[s] who do[] [not] have perfect credit," and signed the Q4 2006 Form 12b-25, which contained essentially the same definition of subprime. Meanwhile, Mudd knew that EA loans were made to borrowers with weaker credit profiles, as intended; reviewed data that showed EA loans had a higher rate of delinquency than FNMA's disclosed subprime loans; and knew that credit losses from EA loans were disproportionate to the amount of the book they constituted.[11] And he has since admitted that defining *subprime* as "loans made to borrowers with blemished credit" would include EA and MCM loans. Mudd Test. at 182. Moreover, Mudd knew that Countrywide's subprime division originated and sold EA loans to FNMA from 2004 to 2006.[12] With respect to Alt-A, having signed the SEC disclosures, Mudd knew that FNMA defined Alt-A based on documentation features, without drawing a distinction between borrower-selected and lender-selected low-documentation loans. From these facts, a rational jury could infer that Mudd acted with intent or recklessness.[13]

## IV.   Aiding and Abetting Liability

For Mudd to be held liable for aiding and abetting a primary securities-law violation, the SEC "must prove: '(1) the existence of a securities law violation by the primary (as opposed to

---

[11]  *See* Exh. 1303; Exh. 390; Exh. 1015.

[12]  *See* Exh. 847.

[13]  Mudd's contention that his reliance on the advice of counsel and on FNMA's disclosure process negates any scienter may be a factor for the jury to consider, but it cannot support his motion for summary judgment. *See Markowski v. S.E.C.*, 34 F.3d 99, 104–105 (2d Cir. 1994).

the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation.'" *S.E.C. v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985)). For the reasons discussed above, the SEC has adduced sufficient evidence that FNMA and Mudd committed a primary securities law violation by materially misstating FNMA's subprime and Alt-A exposure, and that Mudd had actual knowledge of this violation.

"[T]o satisfy the 'substantial assistance' component of aiding and abetting, the SEC must show that the defendant 'in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'" *S.E.C. v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)). In other words, the defendant must "consciously assist[] the commission of the specific crime in some active way." *Id.* at 212 n.8 (quoting *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008)). Mudd argues that his actions "simply cannot constitute 'consciously assist[ing]' FNMA in committing a primary securities law violation 'in some active way,'" because "the SEC can produce no evidence that Mr. Mudd believed that the disclosures at issue were false or misleading," and Mudd relied upon "copious advice . . . from the General Counsel and the legal department assuring him that the disclosures were appropriate and complete." Def. Br. at 58. That is an argument for the jury. Mudd signed all of FNMA's misleading disclosures and made numerous public statements downplaying FNMA's exposure to subprime and Alt-A loans. From this, a jury could infer that Mudd was aware of the violations and consciously assisted in an active way.

1 of 14

## V. Negligence

The same evidence that would support a finding that Mudd acted recklessly would necessarily support a finding that he acted negligently. "Recklessness is, after all, only negligence raised to a higher power." *Goldwater v. Ginzburg*, 414 F.2d 324, 343 (2d Cir. 1969).

## VI. Obtaining Money or Property

Section 17(a)(2) provides that it shall be unlawful for any person in the offer or sale of a security, by means of interstate commerce, directly or indirectly "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C.A. § 77q; *see also S.E.C. v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012). Mudd testified that his compensation was explicitly or implicitly tied to FNMA's performance. Mudd Test. at 43–45. From that evidence, a jury could find that Mudd received "money or property" by means of his material misrepresentations. The fact that Mudd eventually lost millions of dollars when FNMA was placed into conservatorship is evidence the jury may consider, but it does not preclude liability as a matter of law.

## CONCLUSION

Mudd's motion for summary judgment is DENIED. The Clerk of Court is directed to terminate the motion at Docket No. 152.

Dated: New York, New York
      February 29, 2016

SO ORDERED

PAUL A. CROTTY
United States District Judge