UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 4, 2016
```

-------------------------------------------------------x

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              *Plaintiff,*

      - against -

DANIEL H. MUDD,

                              *Defendant.*

-------------------------------------------------------x

11 Civ. 9202 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    The SEC alleges that defendant Daniel H. Mudd, the former CEO of the Federal National Mortgage Association (FNMA), made false and misleading statements about FNMA's exposure to subprime and reduced-documentation "Alt-A" loans.[1] Before the Court are six expert reports and six corresponding motions to exclude expert testimony and reports. The Court heard oral argument on April 13, 2016, and now grants—in large part—the parties' motions to exclude their adversary's experts.

## LEGAL STANDARD

    Under Rule 702 of the Federal Rules of Evidence, an expert witness with "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue" may testify so long as that testimony is "based on sufficient facts or data" and "is the product of reliable principles and methods" that the witness has "reliably applied . . . to the facts of the case."[2] The party offering the expert testimony has the burden of establishing these requirements,

---

[1] For further background information, refer to the Court's previous orders denying Mudd's motion to dismiss (Dkt. 40) and motion for summary judgment (Dkt. 191).

[2] Rule 702 provides in full:

        A witness qualified as an expert by knowledge, skill, experience, training, or education may testify
        in the form of an opinion or otherwise if:

and the Court acts as a gatekeeper to ensure that proffered expert evidence "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).[3] Both parties agree that experts cannot opine about what others knew or understood; they cannot present mere summary or narrative; they cannot offer testimony that could be presented by a lay witness; and they cannot testify to any ultimate issue in question. *See* Oral Arg. Tr. at 3–4; *cf. In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

At oral argument, Mudd stated that "almost all, if not all, of the expert opinions that have been offered may be resolved by these principles." Oral Arg. Tr. at 5. And he further disclaimed the need to present *any* expert witnesses, so long as the SEC also agreed to forgo expert testimony. *See id.* at 4–5, 16.[4] The SEC was unwilling, however, to make such a concession, instead insisting that it "should be permitted to put on the case the way it sees fit, not the way that . . . the defense would like [us to] put it on." *Id.* at 39. The SEC, of course, has that right, but its proffered experts, like Mudd's, must satisfy Rule 702.

----

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

[3] In assessing reliability under Rule 702, courts may consider "(1) whether [the expert's] theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 593–94).

[4] In response to the Court's question whether Mudd would consent to striking all the expert witnesses, Mudd's counsel stated, "If we think if the SEC experts don't testify, then we will not call our experts to testify. If they are going to call their experts to get up and overcomplicate the issues in this case and we think steer the focus in areas that are irrelevant and prejudicial, then of course we would feel the need to respond. The answer is yes, we do not need expert testimony in this case we believe." Oral Arg. Tr. at 16.

## DISCUSSION

The Court concludes that the reports and testimony of Robert Comment and David J. Reis, proffered by the SEC, and Bradford Cornell and Aulana L. Peters, proffered by Mudd, must be excluded in their entirety. The remaining two experts—Matthew M. Long, proffered by the SEC, and Raphael W. Bostic, proffered by Mudd—will be constrained by the principles agreed to by the parties. They will not be permitted to opine about what others knew or understood, to present mere summary or narrative, to offer testimony that could be presented by a lay witness, or to testify to any ultimate issue in question. Rather, their testimony must be based on sufficient facts or data and the product of reliable—and reliably applied—principles and methods. Accordingly, Long's and Bostic's testimony will be limited to their respective analyses of FNMA's mortgage data and their comparisons of the risk and performance of FMNA's mortgages.[5]

### I.    The SEC's Experts

#### a.    Robert Comment

Robert Comment is a financial economist who holds a Ph.D. from the University of Michigan. Dr. Comment's proffered testimony bears on whether FNMA's allegedly misleading disclosures were material to investors. His report concludes "that corporate exposure to subprime and Alt-A mortgages was important to investors during the relevant period." Comment Rep. ¶ 4. To support his conclusion, Dr. Comment conducted what he refers to as an "indicative exposure anal-

---

[5] On March 30, 2016, the Court endorsed a stipulated order to amend the case-management plan to permit the SEC to pursue engaging a new rebuttal expert to replace the SEC's proffered expert, Prof. Dwight M. Jaffee, who died while this litigation was pending. Prof. Jaffee's report addressed two issues: (1) the role of origination processes and loan channels in creating mortgage default risk; and (2) the value of FNMA's risk characteristics tables and credit risk supplements to analysts and investors when evaluating the risk imbedded in FNMA securities. The Court will apply the same standards to the proposed new expert. Accordingly, the SEC should confine its new expert's report and testimony to admissible expert opinions, and it may even wish to reconsider whether it wants to engage a new expert at all.

Case 1:11-cv-09202-PAC   Document 204   Filed 05/04/16   Page 4 of 17

ysis," which he admits is a novel method. Comment Dep. at 65–68, 258–63. Dr. Comment identi-

fied 229 companies as "candidates for inclusion" in his analysis. Comment Rep. ¶ 7. He classified

those companies as having high, low, or unclassified exposure to subprime and Alt-A mortgages

and then compared the average investment performance during the relevant period of 41 institu-

tions with high exposures to 166 institutions with low exposures. *Id.* at ¶¶ 6–8, 10, 14–15. From

that analysis, he concludes: (1) companies with high exposure to subprime and Alt-A loans "fell

substantially and almost universally during the relevant period"; (2) "[o]n average, lower-exposure

financial institutions strongly outperformed higher-exposure companies"; and (3) FNMA "outper-

formed" the average performance of companies with high exposure until the end of the relevant

period. *Id.* at ¶¶ 13–14, 20. To support his indicative-exposure analysis, Dr. Comment conducted

18 event studies.[6] *Id.* at ¶ 29. The events identified by Dr. Comment were disclosures that were

mentioned in the complaint as well as several news stories that he "identified independently by

reviewing Bloomberg's archive of newswire stories." *Id.* at ¶ 26. He then used a "market-model

regression supplemented with a dummy variable that isolates the event day" to determine whether

the events significantly impacted FNMA's stock prices. *Id.* at ¶ 28. In only one event did Dr.

Comment identify a significant effect, the date of a *Barron's* article discussing the possibility of a

government bailout for FNMA. *Id.* at ¶ 29. But Dr. Comment admits that the article did not contain

any new information. Comment Dep. at 218–19.

There is no treatise, article, or paper that has applied Dr. Comment's method of calculating

indicative exposure, nor has any economist tested this methodology. *Id.* at 65–68, 258–63. Further,

Dr. Comment's classification of a given company as having high or low exposure was "partly

---

[6] Event studies examine the extent to which stock prices react to the release of new material information and are not uncommon in cases where materiality is an issue. *See, e.g., In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012).

judgmental," and his 30% cutoff was based only on his desire to at least 40 companies classified as having high exposure. Comment Rep. ¶ 8; Comment Dep. at 150–54. As for the 18 event studies, 17 studies produced no significant result (i.e., a statistically significant correlation between the release of new information and an expected drop in stock price). These studies are neither consistent nor inconsistent with his conclusions. Comment Rep. ¶ 29. Only one event produced a significant result—the *Barron's* article—but it contained no new information. Comment Dep. at 218–19. Nonetheless, the event was nonetheless notable in that *Barron's* had reported the information. *Id.* at 215, 220–22.

Dr. Comment's indicative-exposure analysis is novel, untested, and not peer reviewed; there is no known error rate; and it has not been generally accepted by the relevant scientific community. Accordingly, Dr. Comment's findings and conclusions based on his analysis are not based on "reliable principles and methods" and are thus inadmissible. The Court further finds that the event studies would not "help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Whether FNMA's stock prices changed in response to *Barron's* reporting of previously disclosed information bears little on the question of materiality. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014) ("[W]hile the disclosures made on the event dates did not merely parrot previously released information, they did no more than to provide gloss on public information, and thus permitted the district court to find that they would not have moved AOL's share price in an efficient market.").

The Court GRANTS Mudd's motion to exclude the testimony and report of the SEC's proffered expert, Dr. Robert Comment.

### b.   Matthew M. Long

Matthew M. Long is a partner at Bates White Economic Consulting in Washington, D.C.; he holds a bachelor's of science in commerce from the University of Virginia. Long's report draws the following conclusions. First, starting in 2006 and until it was placed into conservatorship in the fall of 2008, FNMA's portfolio experienced unprecedented deterioration in its credit quality and performance. Second, FNMA excluded from its disclosures regarding the size of its subprime portfolio billions of dollars' worth of loans made to borrowers with weaker credit, even though its disclosures and subsequent statements from senior executives equated subprime with blemished or otherwise weak credit. Third, had FNMA elected an alternative definition of subprime, it would have reported a substantially larger subprime portfolio. And finally, FNMA excluded from its disclosure of the size of its Alt-A portfolio hundreds of billions of dollars' worth of loans, even though these excluded loans were processed using reduced documentation and FNMA defined Alt-A mortgages as mortgages originated with less documentation than full-documentation mortgages. *See* Opp'n Br. at 3–4 (summarizing conclusions of Long report). Long further testified at his deposition that he found FNMA's disclosures "unclear" and "confusing." Long Dep. at 152, 162–63.

Mudd raises several objections to Long's proffered testimony. First, he argues that Long's testimony that FNMA's disclosures are "unclear" and "confusing" is inadmissible because Long is not qualified to opine on the adequacy of the disclosures and because he employed no reliable methodology or analysis to reach his opinions. The Court notes that the questioning at this point during Long's deposition concerned background sections of Long's report in which he simply quoted and closely summarized various FNMA disclosures.[7] Long's statements that he personally found the disclosures unclear and confusing were not based on any expertise; they were based on

---

[7] The SEC has disclaimed any intention to introduce such these summaries at trial. Opp'n Br. at 14.

6

his plain reading of the text. And although Long's years of experience likely bore on his attempt to interpret the documents, he did not purport to offer an opinion about whether FNMA's disclosures were unclear or confusing to anyone other than himself. *See* Long Dep. at 152 ("This is the section in my opening report where I discuss some of the subprime language used by Fannie in its disclosures and instances where I found, you know, it to be unclear or otherwise, you know, confusing in nature."). The statements are thus inadmissible as expert testimony.

Second, Mudd argues that it is irrelevant whether FNMA could have defined subprime differently and that it is irrelevant what FNMA's subprime exposure would have been under those hypothetical definitions. The Court agrees. The SEC has never contended that FNMA had a duty to define subprime differently or that another subprime definition would have better captured the risks associated with subprime loans. Long's testimony regarding hypothetical definitions would not be helpful to the jury and instead has the potential to confuse jury members by directing their attention to potential theories of liability that the SEC has not alleged.

Third, Mudd argues that Long's comparisons of the risk and performance of certain loan subclasses (e.g., EA, MCM, Fast & Easy, HQ SISA) to that of FNMA's core book, excluding loans FNMA quantified as subprime and Alt-A, are irrelevant. He contends that the only potentially relevant comparison is between those loan subclasses and the subprime and Alt-A loans that FNMA did include in its exposure quantification. This argument is based on a too narrow view of relevance. Although Long's comparisons are not those that Mudd would choose to make, they are unmistakably relevant. FNMA quantified EA, MCM, Fast & Easy, and HQ SISA loans together with prime loans in its disclosures. So it is relevant whether those loans actually performed like prime loans. *Cf. i41 Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand,

disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").[8]

Finally, Mudd argues that Long's report is largely factual narrative. For example, he describes FNMA's various disclosures and recounts e-mails between FNMA executives. Such testimony, which merely closely summarizes documentary evidence without applying any analysis, is inadmissible as expert testimony, and the SEC has disclaimed any intention to introduce it at trial. *See* Opp'n Br. at 14. Although Long may testify about the evidence he actually relied upon in performing his analysis, he cannot simply present his version of the facts in the guise of an expert opinion.

The Court GRANTS in part Mudd's motion to limit Matthew E. Long's testimony in the following respects: Long shall not testify about what FNMA's quantitative subprime disclosures might have looked like had the company used a different definition of subprime; nor will he be permitted to offer factual narratives and summaries of documentary evidence. Long's testimony must be limited to his comparisons of the risk and performance of FMNA's mortgages.

### c. David J. Reiss

David J. Reiss is a professor at Brooklyn Law School; he received his J.D. from New York University School of Law. He has written extensively about FNMA and the mortgage market, and part of his research entails gauging the public's reactions to and perceptions of that market. *See* Reiss Rep. at 4–9. Prof. Reiss's report contains a great deal of background information about the mortgage industry (including various mortgage types, such as subprime and reduced-documentation mortgages), FNMA, the SEC's regulation of FNMA, and the financial crisis. *See id.* at 10. He

---

[8] In a similar vein, Mudd argues that individual comparisons of certain loan subclasses (e.g., EA to subprime, and MCM to subprime) are irrelevant because the SEC's allegations address EA and MCM loans collectively. That may be, but the Court does not think this distinction will confuse the jury as to the relevant issues. The same goes for certain loan subclasses (e.g., Fast & Easy and HQ SISA) as compared to Alt-A loans.

also concludes, based on his review of media coverage during the relevant period, that FNMA's disclosures "failed to fully inform the public about [FNMA's] actual exposure to subprime and Alt-A mortgages" and that it was not until late 2007 or early 2008 "that the media even began to understand that [FNMA's] definitions of 'subprime' and 'Alt-A' were so different from those commonly used by others in the financial markets." *Id.* at 38.[9]

The general background information necessary to understand the mortgage market, FNMA, and the financial crisis is not in dispute, nor is an expert necessary to explain those topics. At oral argument, the parties acknowledged that they might agree to stipulated background facts. *See* Oral Arg. Tr. at 38–40. The Court pursuit of this route. As for Prof. Reiss's opinions regarding the adequacy of FNMA's disclosures and the media's understanding of them, there are no reliable principles and methods used to reach his conclusions. Prof. Reiss simply searched various electronic databases of news articles using various search terms and then "reviewed the headline of each story that resulted from [each] search and reviewed each story that seemed relevant." *Id.* at 3. But Prof. Reiss offers no objective basis for the search terms or databases he chose to identify potentially relevant news articles. Nor does he provide any objective basis for which headlines he selected as relevant, characterizing his method only as an "iterative process" based on "qualitative determination[s]." Reiss. Dep. at 321. In short, Prof. Reiss's methodology is untestable, not reproducible, and thus unreliable.

The Court GRANTS Mudd's motion to exclude the testimony and report of the SEC's proffered expert, Prof. David J. Reiss.

---

[9] Although Mudd's motion focuses primarily on Prof. Reis's analysis of media coverage, he made clear at oral argument that he opposes the entirety of Prof. Reis's report and testimony. Oral Arg. Tr. at 36–38.

## II.  Mudd's Experts

### a.  Raphael W. Bostic

Raphael W. Bostic is a professor at the University of Southern California's Price School of Public Policy. Prof. Bostic's expert report covers several topics related to FNMA's role in the housing market, including FNMA's mandate to serve historically underserved populations, FNMA's definitions of subprime and Alt-A, the comparative performance of EA and MCM loans, and the comparative performance of borrower-selected and lender-selected reduced-documentation loans. The SEC challenges Prof. Bostic's opinions about reduced-documentation loans only.

Regarding reduced-documentation loans, Prof. Bostic opined that, although the term *Alt-A* lacks a standard definition, the industry generally recognizes a distinction between borrower-selected reduced-documentation loans—which involve borrowers affirmatively seeking and paying a premium for loans which require less documentation upfront—and lender-selected reduced-documentation loans—in which the reduced-documentation features are initiated by the lenders.[10] *See* Bostic Rep. at ¶¶ 147–52. Prof. Bostic found that FNMA's lender-selected reduced-documentation loans (which FNMA did *not* quantify as Alt-A in its disclosures) performed between 4 and 7.9 times better than FNMA's borrower-selected reduced-documentation loans (which FNMA *did* quantify as Alt-A). *See id.* at ¶ 156 & Table 4. Prof. Bostic further found that FNMA's lender-selected reduced-documentation loans even outperformed FNMA's single-family book of business

---

[10] Prof. Bostic uses the terms *Alt-A* and *Process Efficiency* loans to refer to borrower-selected and lender-selected reduced-documentation loans, respectively, which reflects the fact that FNMA classified only borrower-selected reduced-documentation loans as Alt-A in its disclosures. For clarity—and because the parties dispute FNMA's use of the term *Alt-A*—the Court will use the more specific terms.

as a whole. *See id.* at Table 4.[11] The SEC objects to these portions of Prof. Bostic's report on several grounds.

First, the SEC argues that Prof. Bostic's findings and opinions are unsupported by any authoritative sources, reliable data, or proven methodologies. In particular, the SEC argues that Prof. Bostic merely "applied simple arithmetic" to a table of data created by FNMA. But that is not an accurate description of Prof. Bostic's report and conclusions. Prof. Bostic performed expert calculations on FNMA's loan-level data to derive the serious-delinquency rates for FNMA's borrower-selected and lender-selected reduced-documentation loans, both separately and combined. *See id.* at Table 4 & n.119. That analysis went beyond any data or tables created by FNMA. The SEC further objects that Prof. Bostic's analysis is not reliable because he did not perform a multivariate-regression analysis to control for other credit risk factors. But as Prof. Bostic explained during his deposition, he did not initially perform such an analysis because he did not believe it was necessary. *See* Bostic Dep. at 62. Moreover, he has since done such an analysis and concluded that it does not change his conclusions. *See id.* at 62–63.[12]

Second, the SEC argues that portions of Prof. Bostic's report are inadmissible insofar as they describe simple factual concepts that could be presented by lay witnesses. The Court agrees. Prof. Bostic's descriptions of the general differences between borrower-selected and lender-selected reduced-documentation loans are lay opinions, not based on any special expertise beyond the ken of the average juror. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004). To the extent general background information about the mortgage market is necessary for jurors to understand the case, the parties are urged to consider stipulating to those facts.

---

[11] Similarly, Prof. Bostic found that Fast & Easy and HQ SISA loans (both subtypes of reduced-documentation loans) outperformed FNMA's borrower-selected reduced documentation loans. *See* Bostic Rebuttal Rep. at ¶ 41–45 & Table 5.

[12] The Court addresses the SEC's objections to that analysis below.

Third, the SEC argues that Prof. Bostic improperly opines regarding what FNMA subjectively knew, understood, recognized, or intended. Mudd concedes such testimony is impermissible.

Fourth, the SEC argues that Prof. Bostic's comparison of all borrower-selected reduced-documentation loans to all loans FNMA classified as lender-selected is irrelevant and misleading because it distracts from the SEC's contention that certain loans FNMA deemed lender-selected—namely, Fast & Easy and HQ SISA loans—were in fact not. But the SEC has repeatedly asserted—including in its *Daubert* motions—that FNMA's quantitative Alt-A disclosures were materially false and misleading because they failed to include *all* reduced-documentation loans in the definition of *Alt-A. See, e.g.*, Complaint at ¶ 164. The SEC's has never limited its claims to certain subsets of lender-selected reduced-documentation loans. Accordingly, Prof. Bostic's conclusion that lender-selected reduced-documentation loans performed substantially better than borrower-selected reduced-documentation loans is relevant and admissible.

Finally, the SEC objects to a table Prof. Bostic produced at his deposition on January 29, 2015. Prof. Bostic testified that he created the table using a multivariate-regression analysis in response to the SEC's objection that Prof. Bostic did not use such an analysis in preparing his report. Bostic Dep. at 62–63. The SEC objects that the table is untimely and lacks sufficient explanation of the means and methodologies Prof. Bostic used in preparing it. As for timeliness, the table was produced during a deposition near the close of expert discovery. If the table had presented voluminous new information, notice might have been an issue. But Prof. Bostic created the table in response to the SEC's objections. It is not appropriate for the SEC to object to Prof. Bostic's report for failing to use multivariate-regression analysis and then object to that analysis on the basis that it had insufficient notice of it. The problem with the table, however, is that it does

not adequately explain the methods Prof. Bostic used to prepare it. *See Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). Nonetheless, since the Court has granted the SEC's request to extend expert discovery in light of the death of one of their expert witness, there is ample time for Prof. Bostic to prepare and disclose to the SEC a new version of the table that adequately explains his methods.[13]

The Court GRANTS in part the SEC's motion to exclude the testimony and report of Mudd's proffered expert, Prof. Raphael W. Bostic. Prof. Bostic shall not testify about the general differences between borrower-selected and lender-selected reduced-documentation loans, except in so far as his testimony explains his expert calculations. Nor shall he testify about what he believes FNMA knew, understood, recognized, or intended. And although the SEC objected only to certain sections of Prof. Bostic's report regarding FNMA's reduced-documentation loans, Prof. Bostic will not be permitted to offer general background information about the mortgage market or FNMA's mortgages and disclosures. He must limit his testimony to his analysis of FNMA's mortgage data and his comparisons of the risk and performance of FNMA's mortgages.

### b. Bradford Cornell

Bradford Cornell holds a Ph.D. in financial economics from Stanford University and served for 26 years as a professor of finance and director of the Bank of America Research Center at the University of California's Anderson Graduate School of Management. Prof. Cornell's 230-page report focuses on five subjects: (1) his view of what constitutes "useful" disclosures for investors and his conclusion that FNMA's quantitative disclosures were more useful than qualitative or proprietary terms (such as *subprime* or *EA*); (2) his survey about whether "consistent definitions of

---

[13] Should Mudd intend to produce such a table at trial, it must be made available to the SEC by May 27, 2016, the date by which the SEC must produce to Mudd its rebuttal expert report for its replacement rebuttal expert witness.

subprime and Alt-A" existed; (3) his interpretation of what selected "market participants" generally understood of FNMA's business; (4) his critique of two of the SEC's proffered experts, Dr. Comment and Prof. Reis; and (5) the results from an event study. The SEC objects to all of Prof. Cornell's report, except his rebuttals to Dr. Comment's and Prof. Reis's reports.[14]

The sections of the report that discusses which disclosures investors find "useful" is inadmissible for two reasons. First, the usefulness of FNMA's disclosures is not at issue and thus irrelevant. Nothing in the SEC's allegations implicates any hierarchy of qualitative, subjective assessment of usefulness of disclosures for investors, or what characteristics of FNMA's disclosures were most useful. Rather, the SEC alleges that FNMA's disclosures were materially false or misleading. Second, Prof. Cornell's opinion about the usefulness of FNMA's disclosures is likely to confuse and mislead the jury on the issue of materiality, a distinct legal concept with a distinct legal definition. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1976).

As for Prof. Cornell's survey regarding whether there existed a consensus about the definitions of *subprime* or *Alt-A*, these sections of the report are inadmissible because this fact is not in dispute. The parties agree that during the relevant period no standardized definition of *subprime* or *Alt-A* existed.

Prof. Cornell's opinion about market participants' understanding of FNMA's business is not expert testimony; it is mere narration and second-hand knowledge under the guise of claimed expertise. *See S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus fails to fulfill *Daubert*'s

---

[14] Because Dr. Comment's and Prof. Reis's reports and testimony have been excluded in their entirety, Prof. Cornell's rebuttal is no longer necessary or relevant.

most basic requirements. In addition, narration of facts of the case may easily invade the province of the jury.").

As for the event study, Prof. Cornell admits that he used a nonstandard methodology by increasing—by a factor of three—the confidence level he used to identify statistically significant trading days, and he cites no authority to support that radical departure. At his deposition, Prof. Cornell admitted that he has never used this methodology before and that he was not aware of any published peer-reviewed research that takes this approach. *See* Cornell Dep. at 330–39. Moreover, Prof. Cornell's conclusion that certain disclosures were "not material" finds no basis in evidence. As Prof. Cornell admitted at his deposition, "there was no evidence of materiality, but lack of evidence of materiality doesn't necessarily mean immaterial." *Id.* at 405. On these bases, the Court concludes that Prof. Cornell's event study is not based on proven methodologies, is unreliable, and would not assist the jury.

The Court GRANTS the SEC's motion to exclude the testimony and report of Mudd's proffered expert, Prof. Bradford Cornell.

### c. Aulana L. Peters

Aulana L. Peters holds a J.D. from the University of Southern California Law Center. She is a former SEC Commissioner with a distinguished career in securities regulation and litigation. In her report, Peters draws three primary conclusions: (1) "FNMA's disclosure process was robust and met the applicable standards of good corporate governance"; (2) Mudd "could reasonably rely on the effectiveness of the company's disclosure process in certifying and signing the disclosures identified in the Complaint"; and (3) FNMA's disclosures contained information about credit risks "sufficient to allow a reasonable investor to understand the nature and scope of the credit risk in

15

the company's Single-Family loan portfolio and specifically how FNMA's management considered and evaluated risk." Peters Rep. at ¶¶ 6–9.[15]

The Court holds that Peters's testimony is inadmissible. Her testimony that FNMA's disclosure process met industry standards is not relevant and is likely to confuse the jury. The SEC has not alleged that FNMA's disclosure process was not adequate. Moreover, Peters's opinions are not based on any reliable methodology. Although Rule 702 does not require all experts to use scientific methods when reaching conclusions on the basis of their experience, *see* Fed. R. Evid. 702 advisory committee's note to 2000 amendment, Peters was unable to articulate any standard by which she judged FNMA's compliance process to be adequate, *see, e.g.*, Peters Dep. at 106. The proposed expert testimony is also cumulative of fact-witness testimony. As Mudd conceded at oral argument, FNMA's former general counsel, Beth Wilkinson, is prepared to testify regarding FNMA's disclosure process. Oral Arg. Tr. at 17. This first-hand testimony will be more helpful to the jury.

The Court GRANTS the SEC's motion to exclude the testimony and report of Mudd's proffered expert, Aulana L. Peters.

## CONCLUSION

The Court GRANTS the motions to exclude the reports and testimony of Robert Comment, David J. Reiss, Bradford Cornell, and Aulana L. Peters. The Court GRANTS in part the motions to exclude the reports and testimony of Matthew M. Long and Raphael W. Bostic. Long's and

---

[15] Peters further opined that Mudd "relied on" and "had faith in" FNMA's disclosure process. *See id.* at ¶¶ 47–48, 134. Such testimony regarding Mudd's state of mind is not admissible, and Mudd has disclaimed any intent of eliciting such testimony at trial. *See* Oral Arg. Tr. at 12–13 ("Ms. Peters is not going to be speaking or testifying about Mr. Mudd's state of mind, whether or not Mr. Mudd did in fact rely upon Fannie Mae's disclosure process.").

16

Bostic's testimony will be limited to their respective analyses of FNMA's mortgage data and their comparisons of the risk and performance of FMNA's mortgages.

Dated: New York, New York
      May 3, 2016

SO ORDERED

PAUL A. CROTTY
United States District Judge